HAUJSEA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

          v.                          16 Cr. 467 ALC

NORMAN SEABROOK AND MURRAY HUBERFELD,

         Defendants.

------------------------------x

                                  October 30, 2017
                                  8:54 a.m.

Before:

                 HON. ANDREW L. CARTER, JR.,

                             District Judge
                              and a jury

                       APPEARANCES

JOON H. KIM,
     United States Attorney for the
     Southern District of New York
KAN MIN NAWADAY,
MARTIN S. BELL,
RUSSELL CAPONE,
     Assistant United States Attorneys

HAUJSEA1

APPEARANCES (Continued)


BRACEWELL, LLP,
        Attorneys for defendant Seabrook
BY:  PAUL LEWIS SHECHTMAN, Esq.
        MARGARET EMMA LYNAUGH, Esq.
                Of counsel


MAZUREK LIPTON, LLP
        Attorneys for defendant Huberfeld
BY:  HENRY EDWARD MAZUREK, Esq.
        EVAN LOREN LIPTON, Esq.
                Of counsel


Also Present:
        BARD HUBBARD, Special Agent FBI
        YOLANDA BUSTILLO, Paralegal USAO
        AUGUSTA GRANQUIST, Paralegal




            (In open court; jury not present)

            THE COURT:  Are counsel all here?

            MR. BELL:  Mr. Shechtman is here.

            THE COURT:  Counsel, the first thing -- everyone can

have a seat -- the first thing is U.S. Attorney's Office

contacted my Chambers this morning to see if my law clerk could

let the witness who is on the stand up through a different

door.  I wanted to check with counsel to make sure there is no

objection?

HAUJSEA1

1            MR. SHECHTMAN:  None.

2            MR. MAZUREK:  None.

3            THE COURT:  We'll do that.

4            The next thing is to deal with the issues from Friday

5       regarding the newspapers that were left in the jury room.  I

6       received, we all received a letter from Mr. Huberfeld's

7       counsel.  Counsel from the government or the defense, do you

8       have anything else you wish to add?

9            I have thoughts.  Counsel for the government and

10      defense, any other thoughts on this?

11           MR. CAPONE:  We do not object to asking the jurors

12      those questions.  You could ask them all the first question and

13      then ask individually if there are any hands raised or you

14      could just bring them out here separately, but we don't object

15      to the questions.

16           THE COURT:  Counsel for Mr. Seabrook?

17           MS. LYNAUGH:  We are fine either way, your Honor,

18      asking the first question generally or asking all questions

19      individually.

20           THE COURT:  Let me find out from Mr. Huberfeld's

21      attorney so I am clear here, you have three questions posed

22      here.  You have the first question:

23           Newspapers were found in the jury room after court

24      adjourned on Friday.  Did you read an article about this case

25      in any of those newspapers?

HAUJSEA1

```
1              Then you have the second question, if yes, in parens.

2              Then you have the third question:

3              Have you read any articles or news reports about this

4    case since this trial began?

5              Have you heard anyone else discussing the articles or

6    news reports about this case since this trial began?

7              The third question, do you wish me to ask that third

8    question regardless of the first and second question, or is

9    that only if there is a yes to the first question?

10             MR. MAZUREK:  I think it is only if there is a yes to

11   the first question.

12             THE COURT:  Okay.  Let me just let counsel know what

13   my thoughts are on this and I will counsel a chance to respond.

14             I am fine as a purely theoretical matter in terms of

15   asking that question.  Here is what I am concerned about.  I

16   think we have got another couple of weeks of trial left maybe.

17   There were I believe four newspapers left in the jury room,

18   which means to me that there is either one juror who left, as

19   few as one juror who left all four newspapers in there or as

20   many as four jurors who left newspapers in there, but it seems

21   that all 16 of the jurors, the 12 jurors and the alternate

22   jurors left these four newspapers in there together.

23             What I am concerned about is the collateral damage of

24   if we bring everyone out here individually and I still tell

25   them as I normally would, don't discuss this with anyone else
```

HAUJSEA1

1   what we have discussed out here, they're all going to know that

2   they're all brought out here to be asked about whether or not

3   anyone read the newspapers, newspaper articles that were left

4   in the jury room, and I am worried about jurors starting to

5   feel animosity toward any particular jurors and starting to

6   look at them sideways and feel a certain kind of way about

7   jurors.

8           It may make sense, but I will do whatever counsel wish

9   me to do essentially since there was quite a bit of newspaper

10  coverage about this case over the weekend.  It may make sense

11  to ask that third question which I think covers the first

12  question.  If we ask them if they read anything about this case

13  or heard anyone discuss this case, that also covers anything

14  they might have read or heard about in the jury room without

15  putting special attention on any of the jurors who might have

16  left newspaper articles in the jury room.

17          And to avoid having this issue in the future, it may

18  make sense to tell all of them not to leave any items in the

19  jury room other than their notebooks because that may kind of

20  alleviate us having to deal with this over and over again.  My

21  concern is that:  One, one of my concerns is that newspapers in

22  the context of where we are with technology may be in some way

23  the safest way for jurors to get news about what else is going

24  on in the world because if they see a headline regarding this

25  case, then hopefully they will stick by their oath and they

HAUJSEA1

1  will ignore and it go to something else as opposed to the

2  television, which it is harder to control when something gets

3  mentioned about this case or even the internet if a juror was

4  interested in just the mayoral election prior to this case

5  starting, and a juror goes on the internet trying to buy some

6  socks, it is quite possible there might be some "pop up"

7  regarding this case or somebody's views about this witness and

8  the like.

9         So those are my concerns.  It may make sense to ask,

10  if we are going to bring everyone out here individually, it may

11  make sense to ask them that general question, Question 3 first

12  and then later say something to them as a whole about not

13  leaving items in the jury room.  I don't think it is necessary,

14  but I will hear from counsel, to try to instruct the jurors not

15  to bring newspapers with them or not to read newspapers.  I

16  wouldn't be inclined to do that anyway.

17         Those are my thoughts.  I will give counsel a chance

18  to think about that and tell me what your thoughts are and I

19  will do what counsel want me to do in.

20         MR. MAZUREK:  My only concern about the particular

21  news article that was located within the newspaper that we now

22  know was inside the jury room, it had a particularly

23  inflammatory and prejudicial aspect as to my client in the end

24  of the article, talking about the current condition of Platinum

25  Partners and that there is the ancillary proceeding in the

HAUJSEA1

Eastern District of New York against other members of that
fund.

          Obviously, if this was something that had been read or
talked about within the jury room, I think it would be
extremely prejudicial and unfair to my client that a member of
the sitting jury would have read that or possibly discussed it.

          That is why I am a little more concerned.  I am more
interested in having a more probing review of the jurors on
this particular article because it was in the jury room, it did
have this paragraph in the article which could have a really
negative effect and shouldn't be obviously considered by the
jury.

          I generally understand and appreciate I think the
court's general approach.  I think individual voir dire of the
jurors are important in this situation just because of the
potential coercive effect of having, being in a whole group and
being asked if you have done something or heard something that
someone else did that may be against the court's instructions.

          So I do urge the court to do individual voir dire.  I
think on balance, I would like to ask the specific questions
about this article because of the potential prejudice it has to
my client.

          THE COURT:  Just to be clear, I wasn't suggesting that
I wasn't going to conduct an individual voir dire.  I was
suggesting we have an individual voir dire and perhaps we start

HAUJSEA1

1    with Question 3 because that covers that.  I understand your

2    concerns.  If you want me to ask them Question 1 and then only

3    if there is a yes answer to Question 1, go to Question 2 and 3,

4    that is fine, we can do that.  I want counsel to be aware of

5    those potential collateral consequences.

6            Counsel for Mr. Seabrook, any thoughts on this?

7            MS. LYNAUGH:  We are fine with that either way.  You

8    can ask questions either way, either ask Question 3 first or

9    starting with Question 1 if there is a yes answer, proceed to 2

10   and 3.

11           THE COURT:  Counsel for the government?

12           MR. CAPONE:  The same, your Honor, either approach is

13   fine with the government.

14           THE COURT:  So since counsel for the government and

15   counsel for Mr. Seabrook are sort of agnostic on this, and

16   counsel for Mr. Huberfeld want me to start with Question 1 and

17   only proceed from there, we will do that.

18           Let me ask counsel, do you think it is appropriate for

19   me, after we do the individual voir dire, what I would like to

20   do is this individual voir dire with each of the jurors and get

21   back to this trial and get back to the testimony.

22           Do counsel think it would be helpful for me to say

23   something to the jury perhaps at the end of the day about not

24   leaving items in the jury room or do you think -- I would like

25   to avoid having to deal with this again because someone leaves

HAUJSEA1

1    some newspaper in the jury room, but I will listen to counsel

2    on this.

3            MR. MAZUREK:  I am fine with that instruction not

4    leaving things, taking your personal belongings with you.

5            MR. BELL:  So are we.

6            MS. LYNAUGH:  That is fine, your Honor.

7            THE COURT:  All right.  Let's wait for the jurors to

8    get here.  What I would like to do is perhaps because this will

9    take a while, to do this individual voir dire, this may take 30

10   minutes to an hour to do this, is see if we can just start

11   bringing jurors out here not necessarily starting with Juror

12   No. 1 so we can start this and get this morning.

13           Are counsel okay with that?

14           MR. MAZUREK:  Yes, your Honor.

15           THE COURT:  I will be right back.

16           (Recess)

17           THE COURT:  Counsel, one more thing.  Are counsel all

18   here?  Okay.

19           Do counsel still want me to give a usual instruction

20   to each of these jurors when we do the individual voir dire not

21   to discuss what we discussed out here with anyone else?

22           MR. BELL:  That sounds fine.

23           MR. CAPONE:  Yes.

24           MS. LYNAUGH:  That is fine with us, your Honor.

25           MR. LIPTON:  Yes.

HAUJSEA1

```
 1              THE COURT:  So we are going to go ahead and start
 2    bringing jurors back.
 3              (Juror No. 1 entered the courtroom)
 4              THE COURT:
 5    Q.  Juror No. 1, please state your name for the record.
 6    A.  Joseph Roldan.
 7    Q.  Good morning.
 8    A.  Good morning.
 9    Q.  Newspapers were found in the jury room after court
10    adjourned on Friday.  Did you read an article about this case
11    in any of those newspapers?
12    A.  No.
13              THE COURT:  Thank you.  Please hand the microphone
14    back to my deputy.  Don't discuss what we discussed out here
15    with any other jurors.
16              JUROR:  I won't.
17              THE COURT:  Thank you.
18              (Jury No. 1 left the courtroom)
19              (Pause)
20    BY THE COURT:
21    Q.  Good morning.
22    A.  Good morning.
23    Q.  Juror No. 2, please state your name for the record.
24    A.  Omar Delos-Santos.
25    Q.  Newspapers were found in the jury room after court
```

HAUJSEA1

1   adjourned on Friday.  Did you read an article about this case?

2           Did you read an article about this case in any of

3   those newspapers?

4   A.  No, sir.

5           THE COURT:  Thank you.  Please do not discuss what we

6   discussed out here with any other juror, okay?  Thank you.

7           (Juror No. 2 left the courtroom).

8           (Pause)

9           THE COURT:  Tara, hold on a second.

10          So, counsel, I believe each counsel has at least two

11  lawyers on this case.  Here are the actual hard copies of

12  newspapers in case counsel wish to inspect them so that we

13  don't delay matters.  What may make sense is for each counsel

14  to designate one person from their team.  You can use the

15  robing room and look through these to make sure there is

16  nothing else you want to address.  Sound good?

17          MR. MAZUREK:  Sounds good.

18          THE COURT:  Here they are.

19          (Ms. Lynaugh, Mr. Lipton and Mr. Nawaday left the

20  courtroom)

21          THE COURT:  Bring in Juror No. 3, Tara.

22  BY THE COURT:

23  Q.  Please have a seat.  Juror No. 3, good morning.

24  A.  No. 4.

25  Q.  Good morning.  Please state your name for the record.

HAUJSEA1

1    A.   Aerica Miller.

2    Q.   Newspapers were found in the jury room after court

3    adjourned on Friday.  Did you read an article about this case

4    in any of those newspapers?

5    A.   No, I didn't.

6              THE COURT:  Don't discuss what we have discussed out

7    here with any other juror, okay?

8              JUROR:  Okay.

9              (Juror No. 4 left the courtroom)

10             (Pause)

11   BY THE COURT:

12   Q.   Juror No. 5, good morning.

13   A.   Good morning.

14   Q.   Please state your name for the record.

15   A.   Corinna Chau Ye.

16   Q.   Newspapers were found in the jury room after court

17   adjourned on Friday.  Did you read an article about this case

18   in any of those newspapers?

19   A.   I didn't see anything.

20             THE COURT:  Don't discuss anything that we have

21   discussed out here with any other juror, okay?

22             JUROR:  Yes.

23             THE COURT:  Thank you.

24             (Juror No. 5 left the courtroom)

25             (Pause)

HAUJSEA1

1    BY THE COURT:

2    Q.  Juror No. 6.

3    A.  Hi.

4    Q.  Please state your name for the record.

5    A.  Kenneth Rubin.

6    Q.  Good morning.

7    A.  Good morning.

8    Q.  Please just speak into the microphone.

9            Newspapers were found in the jury room after court

10   adjourned on Friday.  Did you read an article about this case

11   in any of those newspapers?

12   A.  I did not.

13           THE COURT:  Please don't discuss what we have

14   discussed out here with any other juror, okay?

15           JUROR:  Okay.

16           (Juror No. 6 left the courtroom)

17           (Pause)

18   BY THE COURT:

19   Q.  Juror No. 7, good morning.

20   A.  Good morning.

21   Q.  Please state your name for the record.

22   A.  Scott Saunders.

23   Q.  Newspapers were found in the jury room after court

24   adjourned on Friday.  Did you read an article about this case

25   in any of those newspapers?

HAUJSEA1

1    A.   Not at all.

2              THE COURT:  Don't discuss what we discussed out here

3    with any other juror, okay?

4              JUROR:  Not at all.

5              THE COURT:  Okay.

6              (Juror No. 7 left the courtroom)

7              (Pause)

8              THE COURT:  Just one moment, Tara.

9              (Off-the-record discussion)

10             THE COURT:  There are no other jurors out here,

11   correct?  Correct, counsel?

12             MR. BELL:  Correct.

13             THE COURT:  I have just been informed from the Jury

14   Department that Juror No. 3 is -- hold on a second.  (Pause) --

15   I have been informed from the Jury Department -- hold on.  Let

16   me just check something.

17             (Pause)

18             THE COURT:  Let's bring out the next juror, Tara.

19   BY THE COURT:

20   Q.  Juror No. 8, good morning.

21   A.  Good morning.

22   Q.  Please state your name for the record.

23   A.  Shanta Winns.

24   Q.  Newspapers were found in the jury room after court

25   adjourned on Friday.  Did you read an article about this case

HAUJSEA1

1  in any of those newspapers?

2  A.  No.

3        THE COURT:  Don't discuss what we discussed out here

4  with any other juror, okay?

5        JUROR:  Okay.

6        (Juror No. 8 left the courtroom)

7        (Pause)

8        THE COURT:  Tara, just hold off for a second.  I

9  wanted to give counsel to make sure I had the proper

10  information.

11        The Jury Department called this morning, called my

12  Chambers and informed us that juror Heywood Starks, who I

13  believe is Juror No. 3, is in the emergency room.  They didn't

14  give us any other information.  They wanted to call back to

15  know how to proceed.  I wanted to give counsel that

16  information.  That is the information.  Counsel can think about

17  that and we'll continue with this process while counsel think

18  about how they wish to proceed in that regard.

19        Bring in the next juror, Tara.

20  BY THE COURT:

21  Q.  Good morning.  Juror No. 9?

22  A.  Yes.

23  Q.  Please have a seat and state your name for the record.

24  A.  Aaron Samuels.

25  Q.  Newspapers were found in the jury room after court

HAUJSEA1

1   adjourned on Friday.  Did you read an article about this case

2   in any of those newspapers?

3   A.  No, I did not.

4           THE COURT:  Don't discuss what we discussed out here

5   with any other juror, okay?

6           JUROR:  All right.

7           THE COURT:  Thank you.

8           (Juror No. 9 left the courtroom)

9           (Pause)

10  BY THE COURT:

11  Q.  Juror No. 10, good morning.  Have a seat.

12  A.  Good morning.

13  Q.  Please state your name for the record.

14  A.  Nida Soriano-Bartolome.

15  Q.  Newspapers were found in the jury room after court

16  adjourned on Friday.  Did you read an article about this case

17  in any of those newspapers?

18  A.  No.

19          THE COURT:  Don't discuss what we discussed out here

20  with any other juror, okay?

21          JUROR:  Okay.  Thank you.

22          (Juror No. 10 left the courtroom)

23          (Pause)

24  BY THE COURT:

25  Q.  Juror No. 11?

HAUJSEA1

1    A.  Yes.

2    Q.  Good morning.

3    A.  Good morning.

4    Q.  Please state your name for the record.

5    A.  Helene Worob.

6    Q.  Newspapers were found in the jury room after court

7    adjourned on Friday.  Did you read an article about this case

8    in any of those newspapers?

9    A.  No.

10             THE COURT:  Don't discuss what we have discussed out

11   here with any other juror, okay?

12             (Juror No. 11 left the courtroom)

13             (Pause)

14   BY THE COURT:

15   Q.  Juror No. 12?

16   A.  Yes.

17   Q.  Good morning.

18   A.  Good morning.

19   Q.  Please be seated.  Please state your name for the record.

20   A.  Rafael Guilamo.

21   Q.  Newspapers were found in the jury room after court

22   adjourned on Friday.  Did you read an article about this case

23   in any of those newspapers?

24   A.  No, I haven't.

25             THE COURT:  Don't discuss what we discussed out here

HAUJSEA1

1   with any other juror, okay?

2            JUROR:  Okay.

3            (Juror No. 12 left the courtroom)

4            (Pause)

5   BY THE COURT:

6   Q.  Alternate Juror No, 1 good morning?

7   A.  Good morning.

8   Q.  Please state your name for the record.

9   A.  Janis Hemby.

10  Q.  Newspapers were found in the jury room after court

11  adjourned on Friday.  Did you read an article about this case

12  in any of those newspapers?

13  A.  No.

14           THE COURT:  Don't discuss what we have discussed out

15  here with any other juror, okay?

16           JUROR:  Okay.

17           (Alternate Juror No. 1 left the courtroom)

18           (Pause)

19  BY THE COURT:

20  Q.  Alternate Juror No. 2.

21  A.  Good morning.

22  Q.  Good morning.  Please be seated.  State your name for the

23  record.

24  A.  Antonio Ocasio.

25  Q.  Newspapers were found in the jury room after court

HAUJSEA1

1   adjourned on Friday.  Did you read an article about this case

2   in any of those newspapers?

3   A.  I don't read newspapers.

4           THE COURT:  Don't discuss what we discussed out here

5   with any other juror, okay?

6           JUROR:  I won't.

7           (Alternate Juror No. 2 left the courtroom)

8           (Pause)

9   BY THE COURT:

10  Q.  Alternate Juror No. 3, good morning.

11  A.  Good morning.

12  Q.  Please state your name for the record.

13  A.  Stephanie Daigle.

14  Q.  Newspapers were found in the jury room after court

15  adjourned on Friday.  Did you read an article about this case

16  in any of those newspapers?

17  A.  No.

18          THE COURT:  Don't discuss what we discussed out here

19  with any other juror, okay?

20          JUROR:  Yes.  Thank you.

21          (Alternate Juror No. 3 left the courtroom)

22          (Pause)

23  BY THE COURT:

24  Q.  Alternate Juror No. 4?

25  A.  Yes.

HAUJSEA1

1    Q.   Please be seated.  Good morning.

2    A.   Good morning.

3    Q.   Please state your name for the record.

4    A.   Philip Longville.

5    Q.   Newspapers were found in the jury room after court

6    adjourned on Friday.  Did you read an article about this case

7    in any of those newspapers?

8    A.   No.

9              THE COURT:  Don't discuss what we discussed out here

10   with any other juror, okay?

11             JUROR:  Okay.

12             THE COURT:  Thank you.

13             (Alternate Juror No. 4 left the courtroom)

14             (Pause)

15             THE COURT:  Hold on just a second.  (Pause)

16             (Off-the-record discussion)

17             THE COURT:  So update again, I guess it is not much of

18   an update, but just to give you clearer information about what

19   happened or what is happening with Juror No. 3.  The Juror No.

20   3, Mr. Starks' daughter called the Jury Department, and they

21   called my Chambers to indicate he is in the ER.  So let me know

22   how counsel wish to proceed.

23             Do you want me to call the Jury Department to see if

24   we get any other information, or how does counsel wish to

25   proceed at this point with Juror No. 3?

HAUJSEA1

```
1          MR. BELL:  I think, your Honor, a call to the Jury

2    Department might make sense, but even assuming no new

3    information from the Jury Department, our thought would be it

4    makes sense to seat Alternate Juror No. 3 and dismiss No. 3,

5    obviously, with our best wishes.

6          THE COURT:  Obviously?

7          MR. BELL:  With our best wishes.

8          THE COURT:  Counsel for Mr. Seabrook?

9          MS. LYNAUGH:  Your Honor, we would agree with a call

10   to the Jury Department is appropriate to see if we can get more

11   information.  Depending on what comes back, we would perhaps

12   propose we wait a little bit to see if there isn't additional

13   information at this point, if we can get some.

14         THE COURT:  Counsel for Mr. Huberfeld?

15         MR. MAZUREK:  I agree with previous counsels' comments

16   about proceeding with getting additional information to see how

17   appropriate we wish to proceed.

18         THE COURT:  I will make that call.  I will try to do

19   it on speakerphone on the record.  The other thing is counsel

20   have had an opportunity to review the hard copies of the

21   newspapers.  Do counsel want any follow up or any comments on

22   anything with that?

23         MR. LIPTON:  No, there are no additional articles

24   about this case in any of those newspapers.

25         THE COURT:  Counsel for the government?
```

HAUJSEA1

1          MR. NAWADAY:  We are good, your Honor.

2          THE COURT:  Mr. Seabrook?

3          MS. LYNAUGH:  The same.

4          MR. SHECHTMAN:  Judge, I am okay with your doing that

5     phone call in private in Chambers.  You have a courtroom that

6     has a lot of reporters in it.  I don't know what private

7     information will come out, but it doesn't need to be on

8     speakerphone for us.

9          MR. BELL:  That is fine with us, too, your Honor.

10          MR. MAZUREK:  Agreed, your Honor.

11          THE COURT:  That makes sense.  There may be delicate

12     information, and I will see if we can find out.  I will make

13     this phone call now.  Do counsel have anything else we need to

14     deal with this morning?

15          MR. SHECHTMAN:  No.

16          THE COURT:  I will make this call right now and come

17     right back out when I get more information.

18          Actually, counsel, just for the record, I assume all

19     of the jurors indicated that they have not read anything about

20     this.  I assume there is no other follow-up or anything else

21     counsel wish me to do?

22          MR. BELL:  No, your Honor.

23          MS. LYNAUGH:  No, your Honor.

24          MR. MAZUREK:  No, your Honor.

25          THE COURT:  Okay.

HAUJSEA1

```
 1            (Recess)
 2            THE COURT:  So, counsel, is counsel here?
 3            MS. LYNAUGH:  We are missing Mr. Shechtman and Mr.
 4   Seabrook.
 5            MR. BELL:  Mr. Huberfeld might be missing as well --
 6   here he is.
 7            THE COURT:  I wanted to give counsel an update, which
 8   is not much of an update.  I want to give counsel an update.
 9   Is everyone here?  Mr. Schechtman's counsel is here.  Let's go
10   ahead.
11            I called the Jury Department.  They didn't have any
12   other information, just that the daughter called this morning
13   and indicated that her father was in the emergency room and
14   wouldn't be able to come today.  They are attempting to find
15   the daughter's phone number.  They'll call me back.  Do counsel
16   want me to follow up with the daughter to get more information
17   or how do counsel want to proceed?
18            MR. SHECHTMAN:  Judge, look, life has to go on, but
19   our instinct would be if you could, an hour, hour and a half to
20   see what we learn.  If we are beyond that, we'll proceed with
21   the trial.
22            THE COURT:  Counsel for Mr. Huberfeld?
23            MR. MAZUREK:  I concur with counsel.
24            THE COURT:  The government?
25            MR. BELL:  I guess that is fine with us, your Honor.
```

HAUJSEA1

1           THE COURT:  Hopefully it won't take that long, but
2      we'll see.
3           MR. BELL:  Your Honor, would it be possible as long as
4      we have a witness back there who probably isn't quite sure what
5      the delay is, for me to inform them what is going on?
6           MR. SHECHTMAN:  No objection.
7           MR. MAZUREK:  No objection.
8           THE COURT:  Fine.  All right.  See you later.
9           (Recess)
10          THE COURT:  Are counsel all here?
11          MS. LYNAUGH:  We are missing Mr. Seabrook and Mr.
12     Shechtman.
13          THE COURT:  Can someone check the hallways and see if
14     we can get them in here.
15          (Pause)
16          THE COURT:  So I do have some other information about
17     the juror's status.  It will involve discussing somewhat
18     sensitive medical information, so I think it is best to do it
19     in the robing room, all right?  Let's have counsel come into
20     the robing room.
21          (At the sidebar)
22          THE COURT:  So here is the information.  My Deputy
23     called the daughter.  This is what she was able to find out
24     from the daughter, that Mr. Starks is in the emergency room.
25     He is being treated for dementia.

HAUJSEA1

 1           So, in addition, this doesn't have anything to do with

 2    whether or not to excuse him or not, she indicated that when

 3    the Jury Department, when she called the Jury Department and

 4    told them that her father was somewhat older but not elderly,

 5    was having these issues with dementia, they inquired of her as

 6    to whether or not she had a brother by the same name because it

 7    could be that the wrong Heyward Starks showed up because he has

 8    a son with the same name.

 9           Not that that matters for our purposes here, but just

10    to give you full transparency and all the information I have.

11    Mr. Starks is being treated for dementia.  It seems to me that

12    it makes sense to excuse him from jury duty, but I'll hear from

13    counsel on that and we'll replace him with Alternate No. 1.  I

14    will hear from counsel if counsel wish to confer with their

15    clients about this before making a decision about this, that is

16    fine, too.  I wanted to give you this information, and because

17    it contains somewhat sensitive medical information, I wanted to

18    do this here.  Counsel have any thoughts on this now?

19           MR. SHECHTMAN:  There is no way of substituting in the

20    son?  Can we talk just a moment?

21           THE COURT:  Let's just go out here.

22           MR. SHECHTMAN:  If you wait, we will be back in in a

23    second.

24           THE COURT:  That is fine.

25           (Recess)

HAUJSEA1

```
 1              THE COURT:  What is your pleasure?
 2              MR. SHECHTMAN:  Excuse.
 3              MR. CAPONE:  Agree.
 4              MR. MAZUREK:  Agree.
 5              THE COURT:  We'll excuse Juror No. 3 and substitute
 6    Alternate No. 1 for Juror No. 3.  I will ask my Deputy to
 7    contact Mr. Starks' daughter and let her know he has been
 8    excused from the jury duty with the thanks of the court and
 9    best wishes from the court, and I will let the other jurors
10    know that Juror No. 3 has been excused and we are substituting
11    Alternate Juror No. 1 for Juror No. 3, and they should not
12    speculate why Juror No. 3 has been excused.
13              MR. SHECHTMAN:  Do you want to say it is a medical
14    issue, if you are worried about the floodgates, which I know
15    was a concern to you before?
16              THE COURT:  I can if counsel want me to do that?
17              MR. BELL:  I think we are fine either way.
18              MR. SHECHTMAN:  Your call!
19              THE COURT:  Counsel for Mr. Huberfeld?
20              MR. MAZUREK:  I am agnostic on this issue.  Your
21    Honor, maybe less is more.
22              MR. SHECHTMAN:  That is fine.
23              THE COURT:  Normally, I would just simply tell them
24    not to speculate why this juror has been excused and maybe that
25    makes sense here.  I am, as I think about this a little bit
```

HAUJSEA1

1   more, I am a little concerned about this especially given the

2   colloquy we had this morning.  I don't want these jurors to

3   think that Juror No. 3 somehow was reading articles or the like

4   or something like that.  Maybe that doesn't matter, so in this

5   rare situation it may make sense to tell the jury it was a

6   medical situation.

7               MR. MAZUREK:  No objection.

8               MR. BELL:  That is fine with us.

9               MR. SHECHTMAN:  That is fine with us.

10              THE COURT:  I will let the jury know that Juror No. 3

11   has been excused due to a medical situation, and we'll

12   substitute Alternate No. 1 for Juror No. 3, and have Alternate

13   No. 1 sit in Juror No. 3's seat?  Any objection?

14              MR. MAZUREK:  No.

15              MR. BELL:  No.

16              MR. SHECHTMAN:  No.

17              THE COURT:  Ready to start?

18              MR. MAZUREK:  Yes.

19              (In open court)

20              THE COURT:  Let's go ahead and bring the jury in.

21   Hold on a second.

22              (Continued on next page)

23

24

25

HAUJSEA1                     Rechnitz – direct

1                (In open court, jury present)

2                THE COURT:  Welcome back.  Juror number three is being

3       excused from jury duty due to a medical situation, so I'm going

4       to ask alternate juror number one to come and sit in juror

5       number three's seat.

6                We will continue with the case on trial.  Go head,

7       counsel.

8                MR. BELL:  Thank you, your Honor.

9        JONA RECHNITZ,  (Continued)

10          having been previously affirmed, testified as follows:

11      DIRECT EXAMINATION

12      BY MR. BELL:

13      Q.  Good morning, Mr. Rechnitz.

14      A.  Good morning.

15      Q.  When we left off on Friday I asked you a series of

16      questions about your activities on December 11, 2014.  I

17      believe that we left off where you bought a bag from the

18      Ferragamo store and returned to your office on Fifth Avenue.

19      We showed some video of you entering the office building and

20      then were having some AV issues.  Before we get there, I would

21      like to ask you about a number of things that you have already

22      testified about.

23                First, we asked about a number of things that you and

24      Jeremy Reichberg did for Norman Seabrook from the period

25      beginning late 2013 through 2014.  Were there favors that

1  Norman Seabrook did for you and Mr. Reichberg during that same

2  period of time?

3  A.  I had made some requests to Norman.  At one point there was

4  a friend from Los Angeles, a mutual friend who was in prison,

5  and I asked to help with accommodations, but that's not a

6  prison that Norman controlled.  Norman once helped write a

7  letter for a friend of mine on their stationery which was used

8  for his business.  And other than that, I can't think of

9  anything.

10  Q.  Next item here, you've testified about certain things that

11  Mr. Ross Offinger did for you and Mr. Reichberg, and certain

12  things that you did when Mr. Offinger requested them on behalf

13  of Mr. de Blasio's campaign and administration.  Do you

14  remember those questions?

15  A.  Yes.

16  Q.  I believe I neglected to ask you whether you did anything

17  for Mr. Offinger personally during that period of time, which

18  is to say from the 2013 campaign onward.

19          Setting aside donations you made at Mr. Offinger's

20  request, did you do anything for Mr. Offinger personally?

21  A.  Yes.

22  Q.  What did you do?

23  A.  When he was away on vacation in the Dominican Republic, I

24  paid for his hotel stay.  And in addition, he had some business

25  projects friends of his were running that were looking for

1    investors, and I took meetings on his behalf to meet with them

2    to discuss a potential investment.

3    Q.  You also testified about the frequency of communication

4    that you had with Mr. de Blasio in the late stages of the 2013

5    mayoral campaign.  Do you remember answering those questions?

6    A.  I do.

7    Q.  So around that time, what kinds of communication did you

8    have with Mr. de Blasio?

9    A.  I had communications with him through email, text, his cell

10   phone, office phone, emails with Ross, phone conversations with

11   Ross.

12   Q.  And between the different types of communications that you

13   just mentioned, about how frequent was your communication with

14   Mr. de Blasio at around that time?

15   A.  At around the time of the campaign, it was -- as I said, I

16   believe it was on a weekly basis via those methods.

17   Q.  Switching gears slightly, after the election, did you

18   continue to have direct contact with Mr. de Blasio?

19   A.  I did.

20   Q.  In what way?

21   A.  Many emails, many phone calls, texts, spoke to him on

22   Ross's phone, spoke to him through Ross, through email, and I

23   met him many times.

24   Q.  Are you familiar with an individual named Andrew Penson?

25   A.  Yes.

1   Q.   Who is Andrew Penson?

2   A.   Andrew is a friend.

3   Q.   And what understanding do you have of Mr. Penson's

4   business?

5   A.   His company was dealing with the air rights for the midtown

6   east rezoning, and I tried to help him.  I made a meeting

7   between him and the mayor, and I really spoke to the mayor and

8   put a lot of pressure on him to forward a lot of emails from

9   Andrew to the mayor on trying to come to terms for SL Green,

10  which is the company that owns One Vanderbilt, to buy the air

11  rights which Andrew purchased, that they would go through

12  Andrew and the city wouldn't be offering them for cheaper.

13  Q.   You mentioned an entity called One Vanderbilt.  What was

14  One Vanderbilt?

15  A.   One Vanderbilt was a new project on Vanderbilt, 42nd

16  Street.

17  Q.   And what property, if any, did Mr. Penson own that

18  implicated air rights for that area?

19  A.   So he owned the land of the Grand Central Terminal, and he

20  purchased the air rights that belong to terminal.

21  Q.   And for the uninitiated, I guess, and the jury, could you

22  give us a sense of what air rights are?

23  A.   Air rights are literally air.  You sell air in New York.

24  Sometimes buildings are taller and some are shorter, it's

25  because the taller building has bought the air on top of the

1    shorter building and transferred them over.

2    Q.  What sorts of communications with Mr. de Blasio did you

3    have on Mr. Penson's behalf?

4    A.  First of all, I introduced them in Jeremy Reichberg's home.

5    We had a private meeting about it.  And in addition, Andrew was

6    very distressed that he felt that Carl Weisbrod, who was

7    running this initiative for the city, was not acting fairly or

8    appropriately, and that Carl had a prior relationship with one

9    of the owners at SL Green, and Andrew thought it wasn't fair.

10   And I was corresponding in between the two of them, and I was

11   forwarding a lot of emails from Andrew to the mayor.  And I

12   was, I believe, responsible for arranging a meeting between

13   Carl and Andrew and had the mayor speak to Carl about being

14   more attentive to the issue.

15   Q.  Did there come a point during those email exchanges where

16   you exaggerated communications that you had with Mr. de Blasio

17   to Mr. Penson?

18   A.  Yes.

19   Q.  Tell us about it.

20   A.  At one point I forwarded Andrew's email to the mayor, and I

21   wrote to the mayor FYI, please see below regarding Andrew.  And

22   the mayor responded to me that he would be calling me shortly

23   on my phone.  What I did is when I forwarded the email back to

24   Andrew, I embellished a few sentences to Andrew showing that I

25   went to bat for him more than I did.

1    Q.  What was the nature of the going to bat for Mr. Penson that

2    you included in the email as forwarded?

3    A.  I wrote to the mayor -- well, I didn't write it, but I

4    showed Andrew that I wrote the mayor that he's embarrassing me

5    by allowing this to happen.

6    Q.  What was the purpose of that embellishment?

7    A.  To calm Andrew down.  He was very distressed over it, and I

8    wanted to look more important on this issue for Andrew than I

9    was.

10   Q.  To the best of your knowledge, did that succeed?

11   A.  It did not.

12   Q.  And what do you mean by that?

13   A.  Unfortunately, Andrew was not successful in his case, and I

14   think that the city did a disservice to him.

15   Q.  Were you successful in making Mr. -- making your

16   relationship with Mr. de Blasio look better than it in fact

17   was?

18            MR. SCHECHTMAN:  Your Honor, could I move to strike:

19   I thought they did a disservice?  It's a gratuitous opinion

20   that I don't think anyone needs.

21            THE COURT:  Overruled.  Go ahead.

22   Q.  Were you successful in making yourself more important than

23   you were for the moment?

24   A.  Yes.

25   Q.  And what leads you to believe that you were successful?

HAUJSEA1                         Rechnitz - direct

1    A.  Andrew's wife emailed me very excited that she couldn't

2    believe that's what I wrote to the mayor.

3    Q.  And in the short term, what came of the email that you

4    actually did send to Mr. de Blasio?

5    A.  A follow-up phone call with the mayor, actually several

6    phone calls with the mayor regarding the issue, and then the

7    mayor told me he would speak to Carl Weisbrod, and Andrew

8    Carl had correspondence.

9    Q.  Switching to another the subject, you also testified last

10   week about a series of conversations with Mr. Huberfeld in

11   December of 2013 after you returned from the Dominican

12   Republic, and that during one of these Mr. Huberfeld came up

13   with a formula with which to pay Mr. Seabrook.  Do you recall

14   that?

15   A.  Yes.

16   Q.  As part of that conversation, I believe you testified that

17   Mr. Huberfeld said that Mr. Seabrook would make $100,000 if the

18   union invested 20 million.  Do you recall that testimony?

19   A.  Yes.

20   Q.  Who was it who raised the $20 million figure in those

21   conversations?

22   A.  Murray did.

23   Q.  At that time, how much did you believe that the union was

24   potentially investing, at least to start?

25   A.  Originally five to seven million.

1   Q.  What was your understanding of why Mr. Huberfeld was

2   talking about $20 million at that point?

3   A.  Greater aspirations.  To give a figure of a hundred

4   thousand based on 20 million, I understood that to be the case,

5   that Norman -- that was one of the goals he should achieve.

6   Q.  You also testified that about a year later after informing

7   you that the fund had underperformed, Mr. Huberfeld changed the

8   formula, right?

9   A.  Yes.

10  Q.  At that time did Mr. Huberfeld give you an example of what

11  Seabrook could stand to make under the new revised formula?

12  A.  Yes.

13  Q.  And what did he say?

14  A.  He said that, for example, if it was $20 million, he would

15  get half a percent, and it would be an annuity, so that would

16  be $100,000 a year.

17  Q.  Who was it who raised the $20 million figure on that

18  occasion, him or you?

19  A.  Murray.

20  Q.  What was your understanding at that time of how much the

21  union had actually invested?

22  A.  It was either 10 or 15 million, I don't recall.

23  Q.  And what was your understanding of why Mr. Huberfeld was

24  talking to you about $20 million at that time?

25  A.  The same reason, he wanted the union to put more money in.

1   Q.  Mr. Rechnitz, I want to direct your attention to back

2   records already in evidence as Government Exhibit 106.  These

3   are records from the JSR Capital account at JP Morgan Chase,

4   and as we see, it's quite a lengthy exhibit, and I will ask you

5   to jump ahead to page 607.

6           What I will ask you to do is to focus in on say the

7   top half or so of the payments and transfers listed.

8           MR. BELL:  Can you highlight the January 9, 2013

9   transfer to Apollo Jets, or 38,000, just down one.

10  Q.  I want to direct your attention to the highlighted text,

11  references made there on the statement from January 1st,

12  2013 -- January 31, 2013, to a January 9 transfer from the JSR

13  Capital account to Apollo Jets, LLC for $38,109.64.  Do you see

14  that?

15  A.  I do.

16  Q.  Are you familiar with the payment reference there?

17  A.  Yes.

18  Q.  And what was that payment for?

19  A.  This was the payment for the jet charter company for the

20  trip to Miami we spoke about for the BCS championship football

21  game.

22  Q.  Is that the same BCS championship game that featured Notre

23  Dame that you testified about last week?

24  A.  Yes.

25  Q.  If we could jump is head to page 1237, and if we could

HAUJSEA1                    Rechnitz - direct

focus in on the second transfer, one for $45,000, made on

December 17, 2013 to M-2 Jets Manager LLC in Brooklyn, New

York, for $45,000.  Are you familiar with that transaction?

A.  Yes, I am.

Q.  And what transaction does that refer to?

A.  This was payment for the trip for the jet charter to the

Dominican Republic with Phil, Norman, me, Jeremy and Hamlet.

Q.  Can we go ahead now to page 1382, and can we direct your

attention to a March 19 transfer to Five Star Travel for

$27,000, Five Star Travel in Brooklyn, New York.  Are you

familiar with that March 19, 2014 transfer to Five Star Travel?

A.  Yes.

Q.  And what is that transfer referencing?

A.  That's the payment to the travel agent for the trip that I

paid for taking Jeremy, Phil and Norman to Israel.

Q.  Now let's look at page 1172 of the same document, the same

set of bank statements.

          This is, on its face, a check from JSR Capital to an

entity called Daniella Diamonds for $5,790.  The memo line

reads Rolex.

          Mr. Rechnitz, is that your signature on the check?

A.  Yes.

Q.  Do you recall what this check was for?

A.  Yes.

Q.  What was that check for?

1    A.   This was the payment for Rob Astorino's watch.

2    Q.   And were you aware of any other payments that were made

3    toward that same watch?

4    A.   Yes.

5    Q.   What other payment were you aware of?

6    A.   The minimal payment that Rob made on his credit card that

7    we discussed the other day.

8    Q.   To the best of your knowledge, was Mr. Astorino aware of

9    your contribution to that watch?

10   A.   Yes.

11   Q.   How do you know?

12   A.   Because I told him I was doing it so that I would get the

13   grace in his eyes.

14            MR. BELL:  Let's take that down.

15            Now I would like to show you a couple of quick emails.

16   First, the government offers Government Exhibit 1011 without

17   objection.

18            THE COURT:  Okay, it's in.

19            (Government's Exhibit 1011 received in evidence).

20            MR. BELL:  Could we publish that, Ms. Bustillo.

21   Q.   So I want to direct your attention just to the first two

22   conversations in that page.  I want to direct your attention,

23   Mr. Rechnitz, to the bottom, a November 8, 2013 email from you

24   to Mr. Seabrook in which you say, 8:50 a.m. Monday morning,

25   then shortly after Mr. Seabrook responds:  Are you tuned into

HAUJSEA1                          Rechnitz - direct

1    my show?

2                Do you know what that references, Mr. Rechnitz?

3    A.  Yes, Norman used to have his own talk show on the radio.

4    Q.  And were you in fact listening to the radio show at that

5    point?

6    A.  No.

7    Q.  Did there come a time where you learned what was happening

8    on the radio show at that time?

9    A.  Yes.

10   Q.  How did you learn?

11   A.  Jeremy told me.

12   Q.  And what did you learn from Mr. Reichberg?

13   A.  That Norman gave me a nice shout out.

14   Q.  So you then respond at 12:11, and you say heard it all,

15   THX.  So nice to show appreciation and friendship.

16               What was the THX?

17   A.  Thanks.

18   Q.  And what were you doing here, Mr. Rechnitz?

19   A.  I was thanking Norman for the shout out.

20   Q.  Was there a particular reason why you didn't tell

21   Mr. Seabrook that you hadn't in fact heard the radio bit?

22   A.  I think that would be rude.  I didn't want to insult him.

23               MR. BELL:  Let's take that down.

24               Your Honor, the government offers 1032, I believe also

25   without objection?

1          THE COURT:  Okay, it's in.

2          (Government's Exhibit 1032 received in evidence)

3          MR. BELL:  If we put that up, this is not

4    Mr. Rechnitz's email, but you're on it, so I will read it

5    beginning with the lower conversation.

6          On Sunday, March 30, 2014, at 7:16, Norman,

7    normanseabrookcoba@gmail writes:  Shalom, Brother, hope all is

8    well.  It's Norman Seabrook from New York.  I was speaking with

9    you about some work I needed done.  I would like a backgammon

10   table made from wood from Israel for a special friend,

11   something that stands alone from all the rest, something that's

12   one of a kind.  Thank you.  If you send some photos, that would

13   help put this together.  Thank you, Brother.

14         Norman Seabrook, President of New York City Correction

15   Officers Benevolent Association.  God is great.

16         Can you take the blow up window down and go to the

17   first part.

18   BY MR. BELL:

19   Q.  At the time of this email exchange, Mr. Rechnitz, March 31,

20   2014, this is before or after the Israel trip?

21   A.  After.

22   Q.  And in this email Didi Kelman writes backs to Norman,

23   subject line, wood table, table is misspelled:  Hi, Norman.  It

24   was a great honor to take you around and a great honor to get

25   this email from you.  I made a table like this a few years ago.

HAUJSEA1                    Rechnitz - direct

1   This one is made from walnut, pear and emboiya wood from

2   Mexico.  I want to use Israel wood for you, like olive, kerb

3   and more.  The size I recommend is three feet by two feet, more

4   or less, with the game in the center.  If you like the idea, I

5   will start planning and send a price.  I had a great day with

6   you and hope to come and pay you a visit soon.  Didi.

7            Did there come a time when you received a backgammon

8   table from Mr. Seabrook?

9   A.  Yes, Norman and Phil Banks gave me a backgammon table after

10  the trip.

11  Q.  Can you describe that backgammon table?

12  A.  The specifications in this email describe it well.

13            MR. BELL:  Let's take that down.

14  Q.  Finally, I would like to return to your testimony

15  concerning Roy Richter, who you discussed the other day.  He's

16  the head of a police union.

17            MR. BELL:  Ms. Bustillo, could you republish

18  Government Exhibit 105, please.

19  Q.  I want to direct your attention to the last email on the

20  page, which is to say the first email, you say:  Dear Roy, it

21  was nice meeting you last week in Chief Bank's office.  I would

22  like to get together when time permits to introduce you to a

23  fund as an investment for some of your pension money.  The fund

24  has other NYC union investors as well.  The name of the fund is

25  called Platinum Partners Value Arbitrage Fund.  Please let me

1    know when you are available.

2              MR. BELL:  And Ms. Bustillo, can you highlight the

3    date, please, November 4, 2014.

4    Q.  With that, at that time, Mr. Rechnitz, why were you

5    contacting Mr. Richter about the Platinum Partners Value

6    Arbitrage Fund specifically?

7    A.  I met Roy, I spoke to Murray, and we made up that I would

8    trying to arrange a meeting with Roy.  And I called Murray and

9    asked him what to write, and we spoke about it on the phone,

10   and then I wrote after what we discussed exactly what we

11   discussed.

12   Q.  Now are you aware of any sort of official pitch ultimately

13   happening?

14   A.  No.

15   Q.  How had you made contact with Mr. Richter?

16   A.  I met him in Phil Bank's office.

17   Q.  To your knowledge, did you have other connections with

18   Mr. Richter among your contacts at the NYPD?

19   A.  No.

20             MR. BELL:  Let's take that down.

21             Finally, let's put up Government Exhibit 1023, I

22   believe without objection.

23             THE COURT:  It's in.

24             (Government's Exhibit 1023 received in evidence).

25   Q.  And let's just look at the whole thing.  This is an email

HAUJSEA1                      Rechnitz - direct

1    from Murray Huberfeld to jreichberg@gmail.com.

2              Do you recognize that as one of Mr. Reichberg's email

3    addresses?

4    A.  Yes.

5    Q.  And BCC'ing mhuberfeld@platinumlp.com.

6              MR. BELL:  Could you highlight the date as well.

7    Q.  Mr. Huberfeld writes Mr. Reichberg and says:  Let's get

8    some more meetings set up for presentations.

9              Did you ever receive this email, to your knowledge?

10   A.  No.

11             MR. BELL:  Let's take that down.

12   Q.  Now on Friday, Mr. Rechnitz, I asked you about what other

13   things you did, or rather what things you did on December 11,

14   2014 in order to arrange for Norman to get paid, and you gave

15   testimony about going to the Ferragamo store and buying a bag

16   for Mr. Seabrook.  Do you remember that?

17   A.  Yes.

18   Q.  Before we get right back into that, I want to ask you about

19   what led to this.  What was it that happened that moved you to

20   lay out the money for Mr. Seabrook at that point?

21   A.  Murray and I had spoken, and I had the comfort that I was

22   going to be reimbursed from him via a fake Knicks invoice, and

23   that gave me the comfort to go forward and make the payment to

24   Norman because I knew how I was being reimbursed.

25   Q.  What was your best sense of when that conversation or those

1   conversations took place relative to when you actually laid out

2   the cash?

3   A.  It could have been the same day, maybe the day before.

4   Q.  I want to redirect your attention to December 11 itself.

5   What time of day was it when you went to Ferragamo store to buy

6   the bag?

7   A.  Later afternoon, early evening.

8   Q.  Where did you go after you left the Ferragamo store?

9   A.  Back to my office.

10  Q.  What was the address of the building where your office was

11  located?

12  A.  580 Fifth Avenue.

13  Q.  About how far was the Ferragamo store from your office?

14  A.  Two and a half blocks.

15  Q.  What were you going to do with the bag at your office?

16  A.  Fill it with the cash that I was going to be giving to

17  Norman.

18          MR. BELL:  Ms. Bustillo, I will ask you to put up both

19  Government Exhibit 1404, which came in via stipulation.

20          Let's post the first clip from that exhibit.  We fixed

21  it here, so that hopefully the video will work this time.  And

22  let's just pause to note the time in the lower right corner,

23  which is to say 6:15 and about three and a half seconds.

24  Q.  What area are we looking at, Mr. Rechnitz?

25  A.  That's Fifth Avenue right in front of the entrance to 580

HAUJSEA1                      Rechnitz - direct

1   Fifth Avenue.

2              MR. BELL:  Why don't we play the video for about the

3   next 19 or 20 seconds.

4              (Video recording played)

5              MR. BELL:  Can we stop there.

6   Q.  Now who is that holding onto the door, Mr. Rechnitz?

7   A.  That's me.

8   Q.  By the way, what do you have in your left hand?

9   A.  Paper.

10  Q.  And at this point, do you have the bag with you?

11  A.  I do.

12             MR. BELL:  Let's play it some more.

13             (Video recording played)

14  Q.  Now from this angle, Mr. Rechnitz, are you going into or

15  out of the building?

16  A.  Into the building.

17             MR. BELL:  So let's take that down and go to the next

18  clip, 1404, and let's pause for a moment and note the time in

19  the corner, again that's 6:15 about 19 seconds.  Why don't we

20  go ahead and play the next few seconds of this clip.

21             (Video recording played)

22             MR. BELL:  Let's stop.

23  Q.  Again, Mr. Rechnitz, who is this?

24  A.  That's me.

25  Q.  And what are you holding?

1    A.   There's a bag on my right arm and it's either paper or my

2    phone in my left hand.

3    Q.   What kind of phone did you have at the time?

4    A.   An iPhone.

5    Q.   Let's go ahead and keep playing.

6              (Video recording played)

7              MR. BELL:   All right.   Let's take that down and go to

8    the next clip from 1404.   Let's play a fraction of a second.

9    Q.   What area are we looking at here, Mr. Rechnitz?

10   A.   That's the mantrap in between the street entrance and the

11   lobby entrance to 580 Fifth Avenue.

12             MR. BELL:   Let's note the time in the corner, which

13   6:15 and about 15 seconds on December 11, and let's hit play.

14             (Video recording played)

15   Q.   Who is that, Mr. Rechnitz?

16   A.   Pardon?

17   Q.   Who is that, sir?

18   A.   That's me.

19   Q.   And which direction are you going?

20   A.   I'm going into the office lobby.

21             MR. BELL:   Let's hit play.

22             (Video recording played)

23             MR. BELL:   Let's go ahead, Ms. Bustillo, and take that

24   down.

25             If we can, let's put up Government Exhibits 1404A and

HAUJSEA1                    Rechnitz - direct

1    B side by side.  These are stills from the image that you just

2    saw.

3              Let's take those down.

4              Ms. Bustillo, could we briefly, before we get to the

5    rest of the video, put up Government Exhibit 1062 again.

6    BY MR. BELL:

7    Q.  This is the email exchange with the invoice that I think we

8    went through just last Friday.  Directing your attention to the

9    bottom email, the one being responded to from Levin Prado, your

10   assistant, to you.

11             What time does Mr. Prado email you the invoice?

12   A.  6:27 p.m.

13   Q.  And what time do you forward it on to Mr. Huberfeld?

14   A.  6:30 p.m.

15             MR. BELL:  Now with that email, Ms. Bustillo, I want

16   to -- can you highlight the text underneath the signature block

17   that says "sent from my iPhone?"

18   Q.  Are you familiar with that part of your signature block,

19   Mr. Rechnitz, the "sent from my iPhone" part?

20   A.  Yes.

21   Q.  What does that part of your signature indicate?

22   A.  When I send an email from my iPhone, as opposed to my

23   computer, it says "sent from my iPhone."

24   Q.  Where were you, Mr. Rechnitz, and Mr. Prada, when you asked

25   Mr. Prada to create the invoice for you?

 1   A.  In my office.

 2            MR. BELL:  We can take that down.  Thank you.

 3            Now let's jump to the end of, I think it's the fourth

 4   clip that we have got of 1404, if we could go to right around

 5   6:29 and a few seconds.  So Ms. Bustillo, if you blow up the

 6   corner that indicates 6:29 and 13.8 seconds.  If we go ahead

 7   and play that.

 8            (Video recording played)

 9            MR. BELL:  Stop there.

10   Q.  Who is that, Mr. Rechnitz?

11   A.  That is me.

12   Q.  What are you holding?

13   A.  My iPhone and the bag.

14   Q.  And to your understanding and recollection, Mr. Rechnitz,

15   was that bag empty or full?

16   A.  Full.

17   Q.  And what was it full of?

18   A.  $60,000 in cash.

19            MR. BELL:  Can you play some more of that,

20   Ms. Bustillo.

21            (Video recording played)

22   Q.  Which way are you heading now relative to the exit?

23   A.  I'm exiting the building.

24            MR. BELL:  Let's pull up what I believe we organized

25   as the third clip of 1404, if we could go to 6:29 once again.

1           The time showed I believe it's 6:29 and one second,

2     let's play the next 40 or so seconds.

3               (Video recording played)

4     Q.  Mr. Rechnitz, who is that?

5     A.  That's me.

6     Q.  And in which direction are you going?

7     A.  I'm leaving the building.

8               MR. BELL:  Let's play it, please.  We'll note it's

9     6:29 and 36 seconds.

10              Let's pull up 1305, which is also in evidence, can we

11    get right around to 6:29 there as well.  Let's pause and note

12    we're at 6:29 and 10 seconds.

13    Q.  What area are we looking at?

14    A.  That's the inner vestibule by the security checkpoint of

15    the office building.

16              MR. BELL:  Can we go ahead and play that.

17              (Video recording played)

18              MR. BELL:  I'll ask you to pause it right around 6:29

19    and 31 seconds.

20    Q.  Mr. Rechnitz, who is that?

21    A.  That's me.

22    Q.  And what are you holding?

23    A.  I'm holding the Ferragamo bag in my left hand, and my phone

24    in my right hand.

25              MR. BELL:  I note it's 6:29 and 31 seconds.  Let's

HAUJSEA1                          Rechnitz - direct

1   play Mr. Rechnitz out of frame.

2          Now I ask you to put up 1404C and D next to each

3   other.  These are stills taken from the footage.

4          And we can take those down.

5   BY MR. BELL:

6   Q.  Mr. Rechnitz, you had your office space within that

7   building, is that right?

8   A.  Yes.

9   Q.  Were you a tenant of the building or did you own it?

10  A.  Yes.

11  Q.  Sorry?

12  A.  A renter.

13  Q.  A renter.  As a renter, did you yourself have regular

14  access to the building's surveillance footage.

15  A.  No.

16  Q.  When was the first time that you saw this surveillance

17  footage, Mr. Rechnitz?

18  A.  Within the last week.

19  Q.  Now after you left the building at Fifth Avenue with the

20  bag, where did you go?

21  A.  I went to meet Norman.

22  Q.  And where, once again, were you expecting to meet Norman?

23  A.  On Lexington Avenue between 38th and 37th Street.

24  Q.  And just to refresh the jury here, why were you supposed to

25  be meeting Norman originally that evening?

HAUJSEA1                        Rechnitz - direct

1   A.  We had dinner plans with Jeremy and Phil at a restaurant on

2   that block.

3   Q.  And what was supposed to happen after those dinner plans?

4   A.  After the dinner plans we were going to my friend's party

5   for the new Torah he was dedicating on 42nd Street.

6   Q.  What kind of establishment was La Brochette?

7   A.  It was a kosher steakhouse.

8   Q.  And as you left the building, what were you planning on

9   doing when you he got to La Brochette?

10  A.  Meeting Norman outside before going in to give him the bag.

11  Q.  Had you spoken to Norman about that plan?

12  A.  Yes.

13  Q.  When had you spoken to Norman about that plan?

14  A.  I don't remember exactly when, but we met -- we made a plan

15  to meet up before.

16  Q.  How had you contacted Mr. Seabrook?

17  A.  On his cell phone.

18  Q.  Did there come a time when you in fact reached La

19  Brochette?

20  A.  Yes.

21          MR. BELL:  The government offers, I believe without

22  objection, Government Exhibits 660 through 663.

23          THE COURT:  Okay, they're in.

24          (Government's Exhibit 660 through 663 received in

25  evidence)

1          MR. BELL:  Could we publish on the screen 660, 661 and

2     662.  And while we're at it, sorry to get greedy here, could we

3     put 663 up as well.

4     BY MR. BELL:

5     Q.  Now are you familiar with the area depicted in those

6     photographs?

7     A.  Yes, I am.

8     Q.  I want to start with 663.

9          The building depicted in the lower right corner,

10    what's that, sir?

11    A.  That's the restaurant we had dinner in, La Brochette.

12    Q.  And what area do you see depicted in the remaining pictures

13    660, 661 and 662?

14    A.  The top left corner and the top right corner are across the

15    street from the restaurant.

16    Q.  Can you see in any of these pictures approximately where it

17    is that you and Mr. Seabrook met?

18    A.  Yeah, the top left corner, if you could zoom it in, we met

19    about a third way up the block, so I guess right in front of

20    the DP car in the left lane -- or the right lane from where I'm

21    looking.

22    Q.  When you met up with Mr. Seabrook, first of all, where were

23    you when you first saw him or some sign of him?

24    A.  I was on the street waiting for him.

25    Q.  What did you see?

HAUJSEA1                     Rechnitz - direct

1    A.  I saw him pull in his black Suburban and stop the car.

2    Q.  What happened then?

3    A.  I went in through the front passenger's door and I entered

4    the vehicle.

5    Q.  Was Mr. Seabrook there?

6    A.  Yes.

7    Q.  Was he alone?

8    A.  Yes.

9    Q.  What happened once you entered the car?

10   A.  I closed the door, I gave him the bag, and told him that

11   there was $60,000 inside, and I saw his face was a look of

12   disappointment.  So I explained to him that there would be a

13   new formula moving forward and he doesn't have to worry about

14   how much it's going to be in the future, how the fund performs.

15   I said don't worry, I know it's not what you expected, Murray

16   actually added more money to it, it came out to less.  And

17   moving forward there's a new formula, you will get a half

18   percent of everything you invested in.  So if you have $20

19   million invested, you get a half percent, which is a hundred

20   grand, and you don't have wait the whole year, you will start

21   getting paid out at the beginning of the year.

22   Q.  How did Mr. Seabrook react to what you told him?

23   A.  He was not thrilled, and he said:  I don't have a choice.

24   This is what you're telling me I got to do.  And he took the

25   bag and put it down by his feet by the driver's side.

1   Q.   What happened after Mr. Seabrook put the bag by his feet?

2   A.   We left the car to go eat dinner.

3   Q.   About how long would you say the two of you were in the car

4   together?

5   A.   Maybe a minute or two.

6   Q.   And as you left the car, just to be clear, what happened

7   with the bag?

8   A.   He left the bag in the car.

9   Q.   Now how many times had you and Mr. Seabrook gotten together

10  with Chief Banks and Mr. Reichberg before?

11  A.   Dozens.

12  Q.   And over those dozens of times, to your recollection, had

13  Mr. Seabrook ever carried a man purse in your presence before?

14  A.   No.

15  Q.   What do you remember of the dinner?

16  A.   I remember having dinner, and I remember feeling very

17  rushed because we were running late for the Torah dedication

18  ceremony, and I was trying to rush things along.

19  Q.   Did there come a time when you spoke to Mr. Huberfeld?

20  A.   Yes.

21  Q.   When and where did you speak to Mr. Huberfeld?

22  A.   I remember stepping outside of the restaurant to tell

23  Murray that I paid Norman.

24  Q.   Do you remember anything of that conversation?

25  A.   No.

Q.  Did there come a time when you and the folks assembled left
La Brochette?

A.  Yes.

Q.  And when you left, where did you go?

A.  I drove with Norman and Jeremy rode with Phil.

Q.  Was there a reason why you drove with Norman?

A.  Yes, I didn't want Norman to feel neglected.  I felt the
right thing to do would be to go with him.

Q.  Why were you concerned about Mr. Seabrook feeling neglected
on that occasion?

A.  Often when we were with Phil, he didn't feel as important,
to my -- that was my feeling, and I had just delivered him less
money than he was expecting, so I wanted to make sure he was
okay.

Q.  Where did you and Mr. Seabrook go once you got to the car?

A.  We went to 42nd and Fifth to the Torah dedication ceremony
and we parked the car and met Jeremy and Phil downstairs and
walked up together.

Q.  I'm not sure we touched on this, but what was the name of
the place where the Torah dedication ceremony and party took
place?

A.  Chabad of Midtown.

Q.  You may have touched on this to a degree last week, but
what was the significance of this Torah dedication ceremony, or
what was it, first of all?

1  A.  A friend of mine purchased a Torah, which is quite

2  expensive, and donated it to the synagogue.

3  Q.  What was the name of synagogue?

4  A.  Chabad of Midtown.

5  Q.  And what, if any, connection -- well, first of all, what

6  was your friend's name?

7  A.  Mendy.

8  Q.  And what, if any, connection did Mendy have with the other

9  people in your party?

10  A.  So he had met also a lot of police officers through Jeremy,

11  and I don't remember if he had met Phil in the past, but Jeremy

12  and I wanted to bring him -- we knew he would appreciate if we

13  brought Phil and Norman, it would look nice for him, so that's

14  something that we did.

15  Q.  Did you in fact get to the ceremony at Chabad of Midtown?

16  A.  We did.

17  Q.  What did you do there?

18  A.  We danced with Mendy, we danced with the Torah, and then we

19  left.

20  Q.  Were there, to your knowledge, photographs taken of that

21  event?

22  A.  Yes.

23        MR. BELL:  So I want to offer, I believe without

24  objection, Government Exhibit 716.

25        THE COURT:  Okay, it's in.

1              (Government's Exhibit 716 received in evidence)

2              MR. BELL:  Could we publish 716, Ms. Bustillo.

3              Thank you.

4    Q.  What are we looking at right now, Mr. Rechnitz?

5    A.  This is a photo inside of the synagogue.

6    Q.  And is that -- what event was happening at that synagogue

7    at the time?

8    A.  The Torah dedication ceremony we were just speaking about.

9    Q.  Can you take me through who everyone is here from left to

10   right?

11   A.  I'm the first person on the left, then Fernando Mateo, then

12   Michael Harrington, then Mendy, and then Norman Seabrook,

13   Philip Banks, and Jeremy Reichberg.

14             MR. BELL:  We can take that down.

15   Q.  Now do you have a recollection, Mr. Rechnitz, of about how

16   much time you spent at the Torah dedication ceremony?

17   A.  I believe it was less than an hour.

18   Q.  And what do you recall of the circumstances under which you

19   left?

20   A.  I remember Phil and Norman wanting to leave after a while

21   to go get a cigar at the Grand Havana Club.

22   Q.  Did you leave with them?

23   A.  I did.

24   Q.  And what was the Grand Havana Club?

25   A.  At the time a members only cigar lounge at 666 Fifth

HAUJSEA1                          Rechnitz – direct

1    Avenue.

2    Q.  And had you been there with any one of your travel party

3    before?

4    A.  Yes.

5    Q.  Who had you been there with before?

6    A.  Phil, Norman, Jeremy, Mike Harrington.

7             MR. BELL:  I want to offer and publish, I believe

8    without objection, Government Exhibit 666.

9             THE COURT:  Okay, it's in.

10            (Government's Exhibit 666 received in evidence)

11   Q.  Mr. Rechnitz, this is a map of a portion of Manhattan.  Are

12   you familiar with this area?

13   A.  I am.

14   Q.  So I want to spotlight a couple of locations for you.

15   First, there's a dot by East 52nd Street that says Salvatore

16   Ferragamo.  Does that comport with your recollection of where

17   the Salvatore Ferragamo store is?

18   A.  Yes.

19   Q.  There's then a dot labeled 580 Fifth Avenue.  Does that

20   comport with your understanding of where your office was

21   located?

22   A.  Yes.

23   Q.  Now I want to direct your attention to the La Brochette dot

24   near the bottom of the page by East 39th Street.  Do you see

25   that?

1    A.  I do.

2    Q.  Does that comport with your understanding of where La

3    Brochette was located?

4    A.  Yes.

5    Q.  Finally, there is a Torah dedication ceremony dot up at

6    Fifth Avenue around 43rd Street.  Does that comport with your

7    understanding of where Chabad of Midtown is located?

8    A.  Yes.

9         MR. BELL:  Let's take that down.

10   Q.  Did there come a time after -- before we get there, do you

11   recall how long you, Mr. Seabrook, and others were at the Grand

12   Havana Club?

13   A.  No.

14   Q.  Do you recall the circumstances under which you left that

15   evening?

16   A.  No.

17   Q.  Now did there come a time after that day when you received

18   a reimbursement for the $60,000 you laid out for Mr. Seabrook?

19   A.  Yes.

20        MR. BELL:  So I want to direct your attention to

21   Government Exhibits 1065 and 1066, which the government now

22   offers, I believe without objection.

23        THE COURT:  Okay, they're in.

24        (Government's Exhibits 1065 and 1066 received in

25   evidence)

1                MR. BELL:  Let's publish 1065, Ms. Bustillo.

2                Let's focus in on the text.

3    Q.  This is an email from you to Mr. Huberfeld.  It's dated

4    December 14, 2:53 p.m.  The subject line is tomorrow.  The body

5    of the email reads:  Levin, please coordinate with

6    Mr. Huberfeld tomorrow.  He has a reimbursement check for JSR

7    for $50,000 that will be delivered to you tomorrow.  Please

8    deposit it.  Thank you.

9                Now Mr. Rechnitz, the actual email appears to be

10   addressed to Mr. Huberfeld, but you write Levin at the

11   beginning of the email.  Do you have a recollection of what

12   happened here?

13   A.  Yeah, I made a mistake.  I meant to send to it Levin as

14   well.  I meant to copy Levin.

15   Q.  You also said in the email that Mr. Huberfeld had a

16   reimbursement check for $50,000 that would be delivered

17   tomorrow.  Why $50,000?

18   A.  It may have been a typo, just like I forgot to add Levin.

19   Q.  Then you also used the phrase "reimbursement check."

20               Now what meaning did you give to reimbursement here,

21   Mr. Rechnitz?

22   A.  To reimburse me for the cash I paid Norman with on behalf

23   of Murray.

24   Q.  Would "reimbursement" be a word that you've used to

25   describe the cover story with the Knicks tickets?

HAUJSEA1                          Rechnitz - direct

```
1              MR. SCHECHTMAN:  Objection, leading.

2              THE COURT:  Sustained.  Rephrase that.

3   Q.  Mr. Rechnitz, you testified about the invoice plan that you

4   and Mr. Huberfeld discussed last week.  Do you recall that?

5   A.  Yes.

6   Q.  Had you in fact been picking up a check for Knicks tickets

7   as discussed, would you have used the word "reimbursement?"

8              MR. SCHECHTMAN:  Same objection.

9              THE COURT:  Overruled.  You may answer.

10  A.  Could you repeat the question, please?

11  Q.  Had you in fact been picking up a check for Knicks tickets,

12  would you have used the word "reimbursement?"

13             MR. SCHECHTMAN:  Objection.

14  A.  Yes.

15             MR. BELL:  I think there was an objection, there,

16  Judge.

17             THE COURT:  It's overruled.

18             MR. BELL:  Let's take that down.

19             Now let's direct your attention to Government

20  Exhibit 1066, and let's go to the second page.  This is the

21  beginning of an email thread between I believe yourself and

22  Mr. Prado.  On December 15, 2014 at 4:10 you write:  Did Murray

23  reach you?

24             Let's take that down.

25             Mr. Prado says:  Yes, I spoke to someone in his office
```

1    just before you called.  A messenger is on his way already to

2    pick up the envelope.  As soon as I have it, I will email you.

3              Let's to to the first page.

4              And let's look at just that bottom email first.  You

5    then write on December 15 at 4:13:  Okay, deposit the check to

6    JSR and add to account and my list and send new balance and

7    hold their check for me.

8              And let's look at the next one up.

9              Mr. Prado writes just received the checks.  I am not

10   able to deposit the JSR check until tomorrow morning.  Citibank

11   has changed their hours and now close at 5:00 p.m. on Mondays.

12             Then you say to Mr. Prado at 5:07:  Okay, first thing,

13   please.

14             Let's take that down.

15   BY MR. BELL:

16   Q.  And Mr. Rechnitz, did see the actual check before Mr. Prado

17   deposited it?

18   A.  No.

19   Q.  Did there come a time when you saw a record of the check?

20   A.  Yes.

21   Q.  And how did you see the record of the check?

22   A.  I have copies of all my bank statements, copies of checks.

23             MR. BELL:  So I will ask Ms. Bustillo that we put up

24   Government Exhibit 105, which is already in evidence.  This is

25   a JSR Capital Citibank account.  We go to page 1933, please.

HAUJSEA1                      Rechnitz - direct

1    Q.  Are you familiar with this instrument, sir?

2    A.  Yes.

3    Q.  And what is it?

4    A.  This is the reimbursement check for the fake Knicks invoice

5    with the cash I laid out on Murray's behalf.

6           MR. BELL:  Could you highlight the date, December 15,

7    2014, the amount, $60,000, the paid to order of, then the

8    signature.

9    Q.  Now at around this time, December of 2014, had you and

10   Mr. Huberfeld earlier discussed the possibility of his paying

11   you for your role in this deal with Mr. Seabrook?

12   A.  Yes.

13   Q.  What do you recall of that discussion and how it ended?

14   A.  I had told Murray that I didn't need payment on this, and

15   he said he doesn't want anyone to say Murray Huberfeld doesn't

16   pay, so he said he wants to give to some charity in my honor,

17   places I wanted to give.

18   Q.  What did you say to that?

19   A.  I said okay.

20   Q.  Did you discuss any particular charities at that point in

21   December of 2014?

22   A.  I did.

23   Q.  What charities, if any, did you discuss?

24   A.  My kids' school, Yeshiva Ketana, they had an upcoming

25   dinner, so Murray had given them a check for $18,000 towards my

HAUJSEA1                         Rechnitz – direct

1    request.

2    Q.  And where did the $18,000 figure come from?

3    A.  It was a number we had chosen.  There was a certain amount

4    of charity Murray wanted to give from me.

5            MR. BELL:  So could we publish what's in I believe as

6    Government Exhibit 103A from the Platinum Partners bank account

7    at Sterling National Bank, and can we publish page 483.

8            There are a number of checks labeled here.  Could it

9    be possible, Mr. Bustillo, to zoom in on the check labeled

10   2965.  That is a check dated December 15, 2014 for $18,000,

11   made payable to Yeshiva Ketana Manhattan.

12            (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

HAUJSEA3                        Rechnitz - direct

 1   Q.  Mr. Rechnitz, is that the name of your kid's school?

 2   A.  Yes.

 3           MR. BELL:  Let's highlight the signature as well.

 4   Let's take that down. .

 5   Q.  Mr. Rechnitz, did there come a time when you learned of

 6   Mr. Seabrook's attending at a Huberfeld family function?

 7   A.  Yes.

 8   Q.  What was it that you learned?

 9   A.  That I was in Los Angeles, but I was invited to an event in

10   the Lincoln Square Synagogue for a new grandchild to Murray.

11   Q.  What was the nature of the event?

12   A.  It is 30 days after the first grandson is born, it is

13   called a Pidyon Haben, which is redemption of the first born.

14   Q.  Can you spell the Hebrew term for the reporter, please.

15   A.  I'll try.  P I D Y O N, H A B E N.

16   Q.  Now, how did you come to learn that Mr. Seabrook had

17   attended that event?

18   A.  Murray had told me, sent me an email.

19   Q.  What did Mr. Huberfeld tell you about Mr. Seabrook's

20   attendance at that event?

21   A.  That he came to the event and told me that he gave a very

22   generous gift.

23   Q.  Do you recall what that gift was?

24   A.  Yes, a thousand dollars in cash.

25   Q.  Was that, to your knowledge and in your experience, typical

1     of gifts given at this sort of event?

2     A.   No.

3     Q.   Did you ever discuss Mr. Seabrook's presence at that event

4     with Mr. Seabrook?

5     A.   Afterwards I told him I heard he went, that was so nice of

6     him and that they were really touched with his gift.

7     Q.   What, if anything, did Mr. Seabrook say?

8     A.   I don't remember exactly what he said.

9          MR. BELL:  Now, at this point, your Honor, the

10    government would like to read a stipulation.  It is marked as

11    Government Exhibit 1506.

12         It is hereby stipulated and agreed between the parties

13    that from January 12th, 2015 through May 12th, 2015, law

14    enforcement officers from the Federal Bureau of Investigation

15    conducted judicially authorized wiretap intercepts of

16    communications over a cellular telephone with call No.

17    917-468-24 OO, used by Jeremy Reichberg.  We'll call the

18    Reichberg phone.

19         The following government exhibits contain true and

20    accurate recordings of calls intercepted over the Reichberg

21    phone on the following dates and times.  There is then a list

22    of exhibits, Exhibits 901 through 910, with the number of the

23    phone that that phone was in contact with and the dates and

24    time of the call.

25         From January 12th, 2015 through May 12th, 2015, law

HAUJSEA3                    Rechnitz – direct

enforcement officers of the FBI conducted judicially authorized

wiretap intercepts, communications over a Telephone

646-283-3283 used by Jona Rechnitz, the Rechnitz phone.

          The following government exhibits contain true and

accurate recordings of calls intercepted over the Rechnitz

phone over the following dates and times, and there, too, there

is a list of a couple of exhibits, the phone number on the

other end, the dates and the Times of those calls.

          Government Exhibits 901-T through 912-T are true and

accurate transcripts of the recorded telephone conversations

contained in Government Exhibits 901 through 912 respectively.

The dates, times, participants in the calls and phone numbers

used for each of the Government Exhibits 901-T through 912-T

are accurately depicted in the corresponding transcripts.

          It is at this point I tell you to look understand your

seats, don't get excited, look in your binder.  The binder

contains transcripts of those calls which you can use to follow

along.  That is what I just referenced, the T exhibits.

          It is further stipulated and agreed between the

parties that the stipulation which is Government Exhibit 1506,

Government Exhibits 901 through 912 may be received in evidence

as government exhibits at trial, and it is further stipulated

and agreed that Government Exhibits 901-T through 912-T; that

is to say, the portions in your binders may be used as aids to

the jury at trial.  It is dated October 23 and signed by the

HAUJSEA3                          Rechnitz - direct

1    parties.

2            At this time, your Honor, the government offers

3    Government Exhibits 901, 902, 905 through 908, 911, 912 into

4    evidence pursuant to the stipulation.

5            THE COURT:  Okay.

6            (Government Exhibits 901, 902, 905 through 908, 911

7    and 912 received in evidence)

8            MR. BELL:  We would ask the jurors, we are first going

9    to play --

10           THE COURT:  Before you play that, do counsel want my

11   instruction regarding transcripts at this time or not?

12           MR. BELL:  If your Honor has a standard one that you

13   use.

14           MR. MAZUREK:  That is fine, your Honor.

15           THE COURT:  Okay.  So, members of the jury, let me

16   give you a quick instruction here.

17           A recording has been admitted into evidence and a

18   transcription of the recording has been provided to you.  The

19   recording itself, not the transcription, is the evidence.  The

20   transcription is not an official court reporter's transcript.

21   The transcription was prepared only for the purpose of

22   assisting the jury in following the recordings.

23           Transportation may not be completely accurate.  It may

24   contain errors, omissions or notations of inaudible portions of

25   the recording.  Therefore, you should use the transcription

1    only as a guide to help you in following along with the

2    recording.  If there is a discrepancy between your

3    understanding of the recording and the transcription, your

4    understanding of the recording must prevail.

5              Go ahead, counsel.

6              MR. BELL:  Thank you, your Honor.

7              Ladies and gentlemen, we would like to begin with

8    Government Exhibit 911.  So I would ask you to turn to

9    Government Exhibit 911-T, which is an aid for that exhibit.  It

10   is a January 15th, 2015 call at 10:30 pm.  Ms. Bustillo, are

11   you ready?  May I ask you to play the first 20 seconds of that

12   call.

13             (Tape played)

14   BY MR. BELL:

15   Q.  Now, Mr. Rechnitz, do you recognize the voices in this

16   recorded conversation?

17   A.  Yes.

18   Q.  Whose voices are they?

19   A.  Mine and Murray Huberfeld.

20   Q.  Of those, who was the person saying, "my long lost friend"?

21   A.  That is Murray saying that to me.

22             MR. BELL:  I'll note on the record we have handed

23   Mr. Rechnitz a binder with the T exhibits as well.  Ms.

24   Bustillo, can we continue to play that call until the minute

25   and 5 second mark.  Before we do, we will offer the wiretap

HAUJSEA3                    Rechnitz - direct

1    stipulation as well.  I don't believe I formally did, and that

2    is 1506?

3            THE COURT:  It is in.

4            (Government Exhibit 1506 received in evidence)

5    BY MR. BELL:

6    Q.  Now, Mr. Rechnitz, this call is of January 15th 2015.

7    About how long after you paid Mr. Seabrook did this call take

8    place?

9    A.  About a month.

10           MR. BELL:  Can we ago head, Ms. Bustillo, and play

11   until the minute and 5 second mark.

12           (Tape played)

13   BY MR. BELL:

14   Q.  Now, Mr. Rechnitz, why did you tell Mr. Huberfeld that you

15   had texted Norman Seabrook?

16   A.  Because Murray wanted him to put more money into Platinum

17   and was asking me to get more money from him.

18   Q.  Had you spoken with Mr. Huberfeld since the date of the

19   payoff up until this, the date of this call about Mr. Seabrook?

20   A.  Yes.

21   Q.  What sort of conversations had you had?

22   A.  That Norman was working on getting more money, but he

23   wasn't happy with the arrangement and that he only got $60,000.

24   Q.  What was happening at around this time regarding

25   Mr. Murray's search for investments from the union?

HAUJSEA3                    Rechnitz - direct

1   A.  Pardon?

2   Q.  What was happening at around this time with respect to

3   Murray's search for investors investing more money?

4   A.  I am not sure I follow your question.

5   Q.  Let's keep going.

6          What, if any, involvement did Mr. Reichberg have with

7   trying to get Mr. Huberfeld and Platinum more COBA money that

8   you were aware of at this time?

9   A.  None.  If you recall, I testified that Norman did not want

10   Jeremy in the loop.

11          MR. BELL:  Now, I will now direct everyone's attention

12   to Government Exhibit 901, and I ask the jury to turn to 901-T,

13   the aid for that.  This is a January 21st call at 10:23 in the

14   morning, featuring Mr. Reichberg and Mr. Huberfeld.  Can we

15   first play the first 44 seconds, please.

16          (Tape played)

17   BY MR. BELL:

18   Q.  Now, do you recognize Mr. Reichberg's voice here,

19   Mr. Rechnitz?

20   A.  I do.

21   Q.  The date and the time of the call here, January 21st, 2015,

22   at 10:23 am, where were you at this time, Mr. Rechnitz?

23   A.  Los Angeles.

24   Q.  What were you doing in Los Angeles?

25   A.  Was there with my family for winter vacation.

HAUJSEA3                    Rechnitz - direct

1    Q.   About how long were you there for winter vacation?

2    A.   I think about 10 days.

3    Q.   A reference is made to a situation by Mr. Reichberg.  Are

4    you familiar with the situation that Mr. Reichberg is talking

5    about?

6    A.   Yes.

7    Q.   What was the situation?

8    A.   That Norman wasn't thrilled with the amount of money he was

9    paid.

10            MR. BELL:  Well, why don't we go ahead and play the

11   rest of the call, Ms. Bustillo.

12            (Tape played)

13   BY MR. BELL:

14   Q.   Now, there's a point there where Mr. Reichberg says he told

15   me he's putting in 5 and another month putting in another 5.

16            Did you hear that part, Mr. Rechnitz?

17   A.   I did.

18   Q.   Had you had discussions with Mr. Seabrook at around this

19   time about getting Mr. Huberfeld and Platinum Partners more

20   COBA money?

21   A.   No.

22            MR. BELL:  Now I want to direct your attention to

23   Government Exhibit 902.  I direct the jurors to 902-T, which is

24   the aid in your binder.  This is a January 26th, 2015 call, at

25   3:21 pm.  Can we play the first 15 seconds or so, Ms. Bustillo,

1    and then stop.

2              (Tape played)

3    BY MR. BELL:

4    Q.  Do you recognize those voices, Mr. Rechnitz?

5    A.  Yes.

6    Q.  Whose voices are they?

7    A.  Norman Seabrook and Jeremy Reichberg.

8              MR. BELL:  Let's play the rest of this January 26th

9    call.

10             (Tape played)

11   BY MR. BELL:

12   Q.  Now, did Mr. Huberfeld, to your knowledge, have an event at

13   around this time in January 2015?

14   A.  Yes.

15   Q.  What was the event?

16   A.  The one we spoke about before, Lincoln Square Synagogue,

17   the Pidyon Haben.  Event.

18   Q.  Did you go?

19   A.  No.

20   Q.  Why not?

21   A.  I was in Los Angeles.

22   Q.  Do you know if Mr. Seabrook went?

23   A.  Yes.

24   Q.  Did he?

25   A.  Yes.

1   Q.   How do you know that?

2   A.   Jeremy told me, Murray told me and Norman told me.

3            MR. BELL:  So now I will direct your attention to

4   Government Exhibit 905, and I direct the jury to 905-T, the aid

5   in the binder.  This is a January 27th, 2015 call, 6:52 pm.

6   Can you go ahead and play the first 30 seconds.

7            (Tape played)

8   BY MR. BELL:

9   Q.   Now, do you recognize the voices, Mr. Rechnitz?

10  A.   I do.

11  Q.   Whose voices are they?

12  A.   Jeremy Reichberg and Murray Huberfeld.

13           MR. BELL:  Why don't we go ahead and play the rest of

14  this January 27th, 2015 call.

15           (Tape played)

16           MR. BELL:  So I want to start at the beginning and

17  play back some portions of the call.  Ms. Bustillo, can you

18  play the first 50 seconds, please, 5-0, 50, thank you.

19           (Tape played)

20  BY MR. BELL:

21  Q.   Now, the portion where Mr. Huberfeld says, "I'm under some

22  pressure," did you hear that, Mr. Rechnitz?

23  A.   I did.

24  Q.   At around this time, which is to say, late January of 2015,

25  did you have any conversations with Mr. Huberfeld about him

1    needing more money for any of the Platinum funds?

2    A.  No.

3    Q.  Was Mr. Huberfeld at this point trying to get you to get

4    Mr. Seabrook and COBA to bring more money in at around this

5    time?

6    A.  Yes.

7    Q.  What conversations did you have about that?

8    A.  That he wanted to get more money from them and that they

9    were doing well and I should pursue Norman further.

10              MR. BELL:  Let's play the rest of the call, Ms.

11   Bustillo.

12              (Tape played)

13   BY MR. BELL:

14   Q.  Mr. Rechnitz, there is a portion at which Mr. Reichberg

15   says, "Jona feels like he has an issue."  At that point did you

16   have an issue with Mr. Seabrook?

17   A.  Yes.

18   Q.  What was the issue?

19   A.  That he only got $60,000.  He was expecting more and that I

20   told him he'll start getting his annuity payment of half

21   percent calculation from the beginning of the year.

22              MR. SHECHTMAN:  My apologize.  I missed the last part

23   of the answer.

24              THE COURT:  Hold on.  Have that read back.

25              (Record read)

HAUJSEA3                          Rechnitz - direct

1    BY MR. BELL:

2    Q.  To your understanding, had there been an annuity payment at

3    that point?

4    A.  No.

5    Q.  Now I want to direct your attention to Government Exhibit

6    906.  Ladies and gentlemen of the jury, I direct your attention

7    to 906-T the aid.  This is a January 27th, 2015 call, at 6:54

8    pm.  Ms. Bustillo, I would like you to start by playing the

9    first 12 seconds.

10            (Tape played)

11   BY MR. BELL:

12   Q.  Are you familiar with those voices, Mr. Rechnitz?

13   A.  Yes.

14   Q.  Whose are they?

15   A.  Jeremy Reichberg and Murray Huberfeld.

16            MR. BELL:  Can we go ahead and play the remainder of

17   this call, which like the previous one, is January 27th, at

18   around 6:54.

19            (Tape played)

20   BY MR. BELL:

21   Q.  Did you know at this time whether Mr. Reichberg was helping

22   to get Mr. Huberfeld other unions to invest in Platinum

23   Partners?

24   A.  No.

25            MR. BELL:  Why don't we now direct your attention to

1   Government Exhibit 907, and I will ask the jury to turn to

2   907-T, the applicable aid.  This is a January 29th, 2015 call

3   at 7:00 pm.  I will ask you to play the first 25 seconds, Ms.

4   Bustillo.

5         MR. SHECHTMAN:  If this is to identify voices, the

6   voices which are indicated are those.

7         THE COURT:  So I think there is a stipulation to the

8   voices there.  Is that correct?

9         MR. SHECHTMAN:  That's correct.

10         MR. BELL:  Why don't we play the whole shebang, Ms.

11   Bustillo.  Thank you.

12         (Tape played)

13         MR. BELL:  What I will ask you to do now, not for the

14   purposes of identification Ms. Bustillo, play the first minute

15   or so of that call again.

16         (Tape played)

17   BY MR. BELL:

18   Q.  A couple of things here, Mr. Rechnitz.

19         First, in the beginning the reference is made to Shea

20   Schwebel.

21   A.  Yeah.

22   Q.  Are you familiar with who or what she is?

23   A.  Yes.

24   Q.  Who is Shea Schwebel?

25   A.  My old neighbor.

1   Q.  Also there is reference to schachris this morning?

2   A.  A prayer service.

3   Q.  There was also a portion where Mr. Reichberg says you

4   couldn't say anything, right.  Do you recall that?

5   A.  Yes.

6   Q.  And Mr. Huberfeld's response was no.  Did Mr. Huberfeld

7   ever ask Mr. Seabrook directly, as far as you're aware, for

8   money from COBA?

9   A.  No.

10  Q.  How did Mr. Huberfeld at this point make this request for

11  additional money?

12  A.  Through me.  I was the middleman.

13          MR. BELL:  Why don't we just play the rest of that

14  call from that point on.  Thank you, Ms. Bustillo.

15          (Tape played)

16  BY MR. BELL:

17  Q.  Mr. Rechnitz, did you know at this point that Mr. Reichberg

18  was working on Mr. Seabrook?

19  A.  No.

20          MR. BELL:  I want to direct your attention now to

21  Government Exhibit 912, and I direct the ladies and gentlemen

22  of the jury to 912-T.  That is a January 29th, 2015 call at

23  9:51 pm between Mr. Rechnitz -- that is you -- and Mr.

24  Huberfeld.  Why don't we go ahead and play the whole call.

25          (Tape played)

1            MR. BELL:  Now, as for this call, Ms. Bustillo, would

2    you go back and play the first 42 seconds of that

3    conversation -- actually, just up until the first minute.

4            (Tape played)

5    BY MR. BELL:

6    Q.  Now, there is a portion where Mr. Huberfeld says so I

7    didn't want to say anything, Norman give me $10 million for

8    February 1st because I want you to do that, but he is ready to

9    go.  What did you understand Mr. Huberfeld to be saying here?

10   A.  That he wants me to push Norman to invest another 10

11   million into Platinum.

12   Q.  There was a point where he says he didn't want to say

13   anything, but he wanted you to do that.  What was your

14   understanding of why?

15   A.  They had never spoken directly about investments prior.  It

16   always went through me.

17           THE COURT:  Counsel, it is 11:30.  Is this a good time

18   for a break?

19           MR. BELL:  It is, your Honor -- although I may be able

20   to complete -- this is the last of the calls.  Perhaps another

21   minute or so I will be completely out of the calls.  That might

22   be a bit more logical time.

23           THE COURT:  Is there the jury okay if we go another

24   minute or two?  (Pause)  Go ahead, counsel.

25           MR. BELL:  Can we go ahead and keep playing until the

1    end of the call, like I have one or two more questions.

2               (Tape played).

3               MR. BELL:  Can you stop there, Ms. Bustillo.

4    BY MR. BELL:

5    Q.  Now, Mr. Rechnitz, it says okay, what's with this other

6    thing.  What did you decide you want me to do?

7               Do you have an understanding of what the other thing

8    was that Mr. Huberfeld was referring to at the time?

9    A.  Yes.

10   Q.  What was the other thing?

11   A.  It was an unrelated business matter about him providing me

12   a mortgage on one of the properties I was purchasing.

13              MR. BELL:  This might be a good time.

14              THE COURT:  Again, don't do any research regarding any

15   of the people or the issues in this case.  Don't discuss this

16   case with anyone or allow anyone to discuss this case with you.

17   Let's get you back here at 12:07.  Thank you.

18              (Jury excused)

19              THE COURT:  Please be seated.  Let's have everyone

20   wait three minutes.  I suppose the witness can go ahead and be

21   excused now.

22              (The witness left the courtroom)

23              THE COURT:  While we've got counsel here, let's talk

24   about the end of the day today.  I will give the jurors the

25   usual instructions I have been giving them about not reading

HAUJSEA3                        Rechnitz – direct

1    anything or listening to anything in this case and the other

2    usual instructions.  I will also tell them to make sure they

3    remove any personal items from the jury room at the end of the

4    day.  Is there anything else I need to tell the jury at the end

5    of the day today?

6              MR. BELL:  No, your Honor.

7              MR. MAZUREK:  No, your Honor.

8              THE COURT:  Let me get a sense from the government,

9    how much longer with this witness on direct?

10             MR. BELL:  Not much.  We will be done inside of a half

11   our, maybe quite a bit sooner.

12             THE COURT:  All right.  Which defense counsel is going

13   first with this witness?

14             MR. MAZUREK:  I am.

15             THE COURT:  So again in a few minutes I will let

16   counsel and everyone else go.  Let's get counsel back here at

17   like 12:02 to avoid any unnecessary bumping into jurors.  Let's

18   wait another 45 minutes.

19             (Luncheon recess)

20             (Continued on next page)

21

22

23

24

25

1                            AFTERNOON SESSION

2                              (12:10 p.m.)

3              (Jury not present)

4              THE COURT:  While we're waiting for the jurors, is

5    there anything else that we need to discuss?

6              MR. BELL:  I don't believe so, your Honor.

7              THE COURT:  Okay, let's get the witness back on the

8    witness stand.

9              Let's bring in the jury.

10             (Jury present)

11             THE COURT:  Let's continue.  Go ahead, counsel.

12             MR. BELL:  Thank you, your Honor.

13   BY MR. BELL:

14   Q.  Good afternoon, Mr. Rechnitz.

15   A.  Good afternoon.

16   Q.  We have spoken before about your Knicks season tickets and

17   the big invoice for eight of those games to Platinum Partners.

18   Do you recall those discussions?

19   A.  Yes.

20             MR. BELL:  At this time, your Honor, I would like to

21   read a stipulation into the record.  The stipulation is

22   Government Exhibit 1509.

23             It is hereby stipulated and agreed between the parties

24   that Government Exhibits 1201 and 1202 are hard drives

25   containing true and accurate video footage provided by the

HAUTSEA4                    Rechnitz - direct

National Basketball Association, NBA, from various camera

angles for the various games listed in the below chart, all of

which occurred at Madison Square Garden in New York, New York.

       Each folder within Government Exhibits 1201 and 1202

is labeled according to the game whose footage is depicted in

the contents of the folder.  Specifically, the folders depict

the following games.  There's then a chart listing folder name,

the dates of games and the game that took place, for example,

the New York Knicks versus Chicago Bulls, the New York Knicks

versus the Charlotte Hornets and so on, approximately 22 of

these.

       Government Exhibits 1203 through 1226 consists of

still images taken from the video footage contained on

Government Exhibits 1201 and 1202.  The specific camera angles,

games and times for each exhibit, is depicted in the following

table.  Once again, there is a chart listing Exhibits 1220 --

sorry, 1203 through 1226, the specific camera angle, the dates

and the times within the recording.

       Further, if called to testify, Benjamin Brafman would

testify that he received two tickets from Jona Rechnitz to each

of the New York Knicks games at Madison Square Garden on

November 10, 2014, and January 19, 2015, that he attended the

November 2010 game with a relative, and that he provided the

tickets he received from Jona Rechnitz for the January 19, 2015

game to two relatives who attended the game.

1           If called to testify, Sarah Mandelbaum would testify

2     that she attended the February 1st, 2015 New York Knicks game

3     at Madison Square Garden with Jared Rechnitz, Jona Rechnitz's

4     brother, at the invitation of Jona Rechnitz; she is the

5     individual identified as "A" on Government Exhibits 1219 and

6     1220, and Jared Rechnitz is the individual identified as "B" on

7     Government Exhibits 1219 and 1220.

8           If called to testify, Zev Schick would testify that he

9     purchased four courtside tickets from Jona Rechnitz for the

10    December 7, 2014 New York Knicks game at Madison Square Garden.

11    Mr. Schick provided those tickets to four other persons who

12    attended the game, the individuals identified as A, B, C, and D

13    on Government Exhibits 1213 and 1214 are the individuals to

14    whom Mr. Schick gave the tickets he purchased from Jona

15    Rechnitz.

16          It is further stipulated and agreed that this

17    stipulation, which is Government Exhibit 1509, as well as

18    Government Exhibits 1201 through 1204, 1207 through 1216, and

19    1219 through 1226, may be received in evidence as government

20    exhibits at trial.  It's signed by the parties.

21          Your Honor, at this time the government offers through

22    the stipulation 15, 19, 1201 through 1204, 1207 through 1216,

23    and 1219 through 1226.

24          THE COURT:  Okay, those are in.

25          (Government's Exhibits 15, 19, 1201 through 1204, 1207

HAUTSEA4                         Rechnitz - direct

1   through 1216, and 1219 through 1226 received in evidence)

2   BY MR. BELL:

3   Q.  Mr. Rechnitz, when did you start getting season tickets for

4   the Knicks?

5   A.  I think in 2011.

6   Q.  And how did you start getting them?

7   A.  I purchased them on StubHub.

8   Q.  When you started getting actual season tickets, how did you

9   go about getting those?

10  A.  So somebody in the Garden told me who I had purchased the

11  tickets from and gave me his contact info, and I called him and

12  I made him a deal to take over his seats each season.

13  Q.  And did you in fact do that?

14  A.  I did.

15  Q.  Once you took over the seats, did you split them with

16  anyone?

17  A.  I did.

18  Q.  Who did you split them with?

19  A.  Jason Nissen.

20  Q.  How many tickets for each game did you get?

21  A.  We split the season, but we had two tickets per game.

22  Q.  And where were those seats located?

23  A.  On the court, courtside seats.

24  Q.  And you testified earlier that those tickets were Section

25  12, Seats 9 and 10AA?

1    A.   Yes.

2    Q.   Where on the court were those seats located?

3    A.   Across from the visitor's bench between the three point

4    line and the half court line.

5    Q.   So I first want to show you what is already in evidence as

6    Government Exhibit 204.

7         Now I believe that you testified earlier that this was

8    an invoice for your tickets for the 2014/2015 season from the

9    National Event Company.

10   A.   Yes.

11   Q.   Why did you do this via invoice for Neco?

12   A.   We had a running balance, and Neco had owed me money, so

13   this was deducted from that balance.

14   Q.   How many preseason games did you have for that season?

15   A.   Two.

16   Q.   And I believe we had you count earlier, you testified that

17   there were 22 regular season games.  Do you recall that

18   testimony?

19   A.   Yes.

20   Q.   Now how did you pay Neco for this?  And I think you started

21   to tell us that, too.

22   A.   Again, Neco paid for them, for this particular season, and

23   invoiced me to take off the amount of money that he owed me.

24   Q.   How much did each set of two tickets cost?

25   A.   $6,800 for the pair per game.

1    Q.  At that price, approximately, what was the value of the

2    games at $6,800 per game?

3    A.  Pardon?

4    Q.  What was the value -- approximately what was the value of

5    eight games at 6,800 per game?

6    A.  I think it comes out to around 53 or $54,000.

7    Q.  Now generally, Mr. Rechnitz, what did you do with your

8    season tickets?

9    A.  I went to games, I took friends, investors, or I sold a

10   couple of games.

11         MR. BELL:  Now we just read a stipulation,

12   Mr. Rechnitz, regarding footage from a number of games for that

13   season.  What I would like to do is ask you about some of the

14   regular season games you had tickets to, show you some of the

15   footage from those games and other materials.

16         I want to go through a number of tickets, and what I

17   ask you to do is put 204 up on the left and cycle in some of

18   the other exhibits are.

19         Now before we start with the other exhibits on the

20   right, I note here the first regular season game is a game

21   against the Chicago Bulls on October 29, 2014.

22   Q.  Do you see that, Mr. Rechnitz?

23   A.  I do.

24   Q.  At around this time do you recall an event taking place

25   within your family?

1    A.  Yes, my grandmother passed away that week.

2    Q.  Now do you recall what happened to the tickets for that

3    game?

4    A.  I think I sold them.

5    Q.  And this game occurred before or after the fake invoice to

6    Platinum Partners?

7    A.  This came before.

8            MR. BELL:  So what I want to do is show a number of

9    exhibits from the stipulation.  As I do so, I will just point

10   out some of the information from the stipulation.  Obviously

11   the jury will be able to review that later on, if it so

12   chooses.

13           Could we put up Government Exhibit 1203.  And is it

14   possible for us to also put up Government Exhibit 1204, which

15   is to say, could we split the right panel?

16           So per the stipulation, these images pertain to a

17   November 2nd, 2014 game against the Charlotte Hornets, and are

18   about one hour, four minutes and 24 seconds into that footage.

19   BY MR. BELL:

20   Q.  Mr. Rechnitz, are you able to see your seats in these

21   images?

22   A.  Yes.

23   Q.  And can you see who is in your seats?

24   A.  Yes.

25   Q.  Who is in your seats?

HAUTSEA4                          Rechnitz - direct

1    A.  I'm in the seat with my wife.

2              MR. BELL:  And can we, Ms. Bustillo, just circle the

3    witness within 1203.

4              Ms. Bustillo, could we take down 1203 and 1204, and

5    put up on the right 1207 and 1208.  Per the stipulation, this

6    is from a November 22nd, 2014 game against the Philadelphia

7    76ers at the one hour, 15 minute and 46 second part of the

8    footage?

9              MR. SCHECHTMAN:  Judge, if it helps to move things on,

10   we'll stipulate that's the witness and his wife in their seats.

11             MR. BELL:  Yes, so stipulated.

12             THE COURT:  So stipulated.

13             MR. BELL:  Easy enough.  Put up 1209, 1210, please.

14   Per the stipulation, this is from a November 30, 2014 game

15   against the Miami Heat.

16   Q.  And are you able, Mr. Rechnitz, to see from these images

17   who is in your seats here?

18   A.  Yes.

19   Q.  Who is in your seats?

20   A.  Fernando Mateo with a friend of his.

21             MR. BELL:  Can we, Ms. Bustillo, just replace 204 on

22   the left for a moment with Government Exhibit 702 already in

23   evidence.

24   Q.  And that's Mr. Mateo on the left?

25   A.  Yes, it is.

1              MR. BELL:  Can we now replace 702 with 240 once again.

2     And I will ask you, Ms. Bustillo, to take out 1209 and 1210 and

3     replace them with 1211 and 1212.  Per the stipulation these are

4     from a December 4th, 2014 game against the Cleveland Cavaliers

5     about an hour in.

6     Q.  Mr. Rechnitz, do you see who is in your seats here?

7     A.  Yes.

8     Q.  Who is here?

9     A.  I am, and my friend Ari.

10             MR. BELL:  Let's take down 1211, 1212, put up 1213 and

11    1214.

12    Q.  I believe that the stipulation made reference to some of

13    the folks here, but in any event, Mr. Rechnitz, can you see who

14    that is behind Imam Shumpert?

15    A.  Yes.

16    Q.  Who is in your seats?

17    A.  My friend Steven.

18             THE COURT:  Could we take that down.

19             Could we replace 1213 and 1214 with 1215 and 1216,

20    please.

21    Q.  Mr. Rechnitz, are you able to see who is in your seats?

22    A.  Yes.

23    Q.  Is who is the seats for this game per the stipulation at

24    the January 8, 2015 game against the Houston Rockets?

25    A.  I am, with my friend Allen.

1              MR. BELL:  Let's take that down.

2              The stipulation mentioned Benjamin Brafman's relatives

3      having attended a January 19th game, 2015, against another

4      team.

5              Can we replace the pictures on the right with 1219 and

6      1220, please.

7      Q.  I believe that the stipulation made reference to these two

8      individuals.  Do you recognize who is in your seats here?

9      A.  I do not know them -- I would say yes, that's my brother

10     and Sarah.

11             MR. BELL:  Can we take those down and replace them

12     with 1221 and 1222.

13             I should note the last images, 1219 and 1220, per the

14     stipulation, are from a February 1st, 2015 game against the

15     Lakers.

16             1221 and 1222, per the stipulation, are from a

17     March 19, 2015 game against the Minnesota Timberwolves.

18     Q.  And Mr. Rechnitz, are you able to make out who is in your

19     seats here?

20     A.  Yes.

21     Q.  Who is in your seats here?

22     A.  My friend Michael.

23     Q.  What's Michael's last name?

24     A.  Weinberger.

25     Q.  Is this the same Mr. Weinberger who has come up elsewhere

1   in your testimony?

2   A.  Yes.

3           MR. BELL:  Let's take that down.

4           Can you replace 1221 and 1222 with 1223 and 1224.

5           Per the stipulation, these are images from a March 25,

6   2017 game against the Los Angeles Clippers.

7   Q.  And Mr. Rechnitz, are you able to see who is in your seats

8   here?

9   A.  Yes, I am.

10  Q.  Who is in your seats?

11  A.  I am with my friend Ari.

12          MR. BELL:  Let's take those down and replace them with

13  1225 and 1226.  Per the stipulation, this is from a game

14  against the Brooklyn Nets April 1st, 2015.

15  Q.  Are you familiar with who is in your seats at this game?

16  A.  Yes, I am.

17  Q.  Who is there?

18  A.  I am there with Ari.

19          MR. BELL:  Let's take those down.

20          Now Mr. Bustillo, could we also publish Government

21  Exhibit 210.

22  Q.  Mr. Rechnitz, what are we looking at in 210?

23  A.  This is an invoice for tickets that I sold to a ticket

24  brokerage called Great Seats.

25  Q.  And do they pertain to the same season?

1   A.  They do.

2           MR. BELL:  Can we look at the next part of the

3   invoice, Ms. Bustillo, going down.

4   Q.  Now the invoice make reference to the Knicks versus the

5   Golden State Warriors, February 7, 2015, the Knicks versus the

6   Cleveland Cavaliers, February 22nd, 2015 and the Knicks versus

7   the San Antonio Spurs on March 17, 2015.

8           And what is it that you did with these seats,

9   Mr. Rechnitz?

10  A.  I sold the games.

11  Q.  How much did you sell the Warriors tickets for?

12  A.  For $1,500 a ticket.

13  Q.  How much did you sell the Cavaliers tickets for?

14  A.  $2,300 per ticket.

15  Q.  How much did you sell the San Antonio Spurs tickets for?

16  A.  For $1,700 per ticket.

17  Q.  Was this more than or less than the original face value of

18  these tickets?

19  A.  Less.

20  Q.  Were these, as you understood it, relatively appealing

21  games on the secondary market?

22  A.  Yes.

23  Q.  Could you give us a moment on each of them as to why that

24  was the case?

25          MR. SCHECHTMAN:  Your Honor, we stipulate that Lebron

1   James plays for the Cavaliers and the Spurs have always been

2   good.

3          THE COURT:  What about Golden State?

4          MR. SCHECHTMAN:  I missed Golden State.  That's a very

5   good team.

6          THE COURT:  Okay.  So stipulated.

7          MR. BELL:  So stipulated.  Thank you.

8   BY MR. BELL:

9   Q.  Now are each of these three games, games that were sold to

10  you from that invoice from Neco that we looked at before?

11  A.  Yes.

12  Q.  Now between the games that you saw footage of, games that

13  we just mentioned, and games that were brought up in the

14  stipulation, we have spoken about what you did with tickets of

15  16 of the 22 games that season.  Math would suggest that there

16  are six left over, that there are six games left over.

17         Mr. Rechnitz, how many of your tickets did the fake

18  invoice to Platinum purport to sell?

19  A.  Eight games.

20  Q.  Have you, by the way, reviewed footage from the remaining

21  six games?

22  A.  Yes.

23  Q.  And in reviewing those games, did you take a look at who

24  was your seats?

25  A.  Yes.

HAUTSEA4                         Rechnitz - direct

1   Q.  Generally, what did you see?

2   A.  They were empty or people that I didn't recognize.

3   Q.  Now I asked about the secondary market as well.  Was there

4   a period during that season where you were more likely to

5   resell your tickets?

6   A.  Yes.

7   Q.  When was that?

8   A.  Friday night games or Jewish holidays or whenever I was out

9   of town.

10  Q.  Was there a period during the 2014/2015 Knicks season where

11  you were out of town for an extended period of time?

12  A.  Yes, two weeks in January.

13  Q.  Let's switch gears slightly here.

14          As 2015 continued when you returned from Los Angeles,

15  did you continue to try to raise money from Platinum Partners

16  or raise investments for Platinum Partners?

17  A.  Which point in time?

18  Q.  So we're going from -- well, let's say early 2015 onward

19  through 2015, but specifically once you got back from Los

20  Angeles.

21  A.  I don't think so.

22  Q.  Did you have conversations from Mr. Seabrook -- withdrawn.

23          Did you have conversations with Mr. Seabrook, an

24  existing investor, about potential future investments?

25  A.  I don't think so.

1    Q.   Were you ever able to secure another investment from the

2    correction officers union?

3    A.   No.

4    Q.   How about from other law enforcement unions?

5    A.   No.

6    Q.   Did there come a time in 2016 when you were contacted by

7    law enforcement?

8    A.   Yes.

9    Q.   Approximately when was that?

10   A.   I think it was February.

11   Q.   And when you were contacted by law enforcement, who did you

12   understand law enforcement officers to be?

13   A.   The Internal Affairs Bureau for the NYPD.

14   Q.   And what did you understand the Internal Affairs Bureau of

15   the NYPD to be?

16   A.   Basically cops who investigate other cops.

17   Q.   When the officers who you understood to be from the

18   Internal Affairs Bureau asked you questions -- well, first of

19   all, when they visited you in 2015, did they ask questions?

20   A.   Yes.

21   Q.   What sorts of things did the folks from IAB ask you about?

22   A.   They were asking me about Hamlet Peralta and the whole

23   liquor business and if I knew any cops who had invested with

24   him, how I met him, and if I knew any cops were on his payroll.

25   Q.   Were you completely truthful in all your answers to those

1    questions?

2    A.   No.

3    Q.   Were there things responsive to your questions that you did

4    not tell them?

5    A.   Yes.

6    Q.   In what ways were you less than honest and candid with the

7    law enforcement officers who approached you at that point in

8    2015?

9    A.   I had not told them about the investment Phil Banks made

10   with me and I had not told them about the amounts of cash that

11   Hamlet dealt with me.

12   Q.   Now did there come another time in 2015 when you were

13   contacted or when you had contact with law enforcement?

14   A.   Yes.

15   Q.   And approximately how much later was that and what was the

16   nature of the contact?

17   A.   A couple of months later the IAB came back, and also paid a

18   visit to several investors of mine.

19   Q.   And how did you come to know that the IAB also paid visits

20   to investors of yours?

21   A.   They told me.

22   Q.   And when you spoke to the IAB at this point, were you

23   completely honest and candid with them in response to their

24   questions?

25   A.   No.

1    Q.  In what respect were you less than completely truthful and

2    candid?

3    A.  Again, about the cash that I dealt with with Hamlet

4    Peralta.

5    Q.  And at this point, did the officers who approached you ask

6    questions concerning Mr. Seabrook and Mr. Huberfeld?

7    A.  No.

8    Q.  At this point did you volunteer information about

9    Mr. Seabrook and Mr. Huberfeld?

10   A.  No.

11   Q.  At the time that you were approached by the IAB in 2015,

12   what, if anything, did you do with respect to evidence that

13   linked you to the cops and the various other people you knew?

14   A.  I destroyed it.

15   Q.  In what ways did you destroy evidence?

16   A.  I got new computers, I got rid of my old computers, and I

17   changed my phone.

18   Q.  Now at this time, what, if anything, happened to your

19   relationship with Mr. Huberfeld?

20   A.  Nothing changed at that point.

21   Q.  How frequently were you in touch with him?

22   A.  Often.

23   Q.  Were you in touch with him about the law enforcement

24   inquiry that was taking place?

25   A.  Yes.

HAUTSEA4                          Rechnitz - direct

1  Q.  At this point, what happened to your relationship with

2  Mr. Seabrook?

3  A.  I basically shut him out.  We didn't have further contact.

4  Q.  And for what reason did you stop talking to Mr. Seabrook?

5  A.  I was shook up about having any relationship at that point

6  with any law enforcement officials or politicians or any of

7  that sort of thing.

8  Q.  How about your relationship with Mr. Reichberg?

9  A.  Also distanced.

10 Q.  And why did you distance yourself from Mr. Reichberg?

11 A.  I wasn't sure who he was still in contact with, and he was

12 the one who introduced me to the police and I didn't want

13 anything to have any part of that.

14 Q.  Did there come a point where you had contact with

15 additional law enforcement during this period of time?

16 A.  Yes.

17 Q.  About when did that happen and what was the nature of the

18 contact?

19 A.  It was later that year, I met with the FBI in an attorney's

20 office named Bob Fink.

21 Q.  And did you answer questions at that time?

22 A.  Yes.

23 Q.  Were you completely honest or candid in answering those

24 questions?

25 A.  No.

HAUTSEA4                        Rechnitz - direct

Q.  In what ways were you less than completely honest or
candid?

A.  They asked me about who I had relationships with from law
enforcement.  I neglected to mention Norman.  Again, I didn't
tell them about Banks, the way I repaid Phil Banks.  Part of it
was paid back in cash, which I did not tell them, a small
portion, and I also underestimated the amount of cash I
received from Hamlet.

Q.  When you said you underestimated the amount of cash you
received from Hamlet, what did you mean by that?

A.  I grossly misstated the amount of money that I received
from Hamlet Peralta's commissions, which I split with Jeremy.
We had received, I estimate, 3 to 400,000 over time, and I told
them 20 or 30,000.

Q.  Why weren't you truthful with them about these things at
that time?

A.  I didn't think they knew about them, and I wasn't at a
point where I was ready to move forward and take
responsibility.  I still thought I would get away with things.

Q.  Did there come a time when you did start to move forward
and take responsibility?

A.  Yes.

Q.  And approximately when was this?

A.  This was around Passover time of 2016.

Q.  And what was it that you did or started doing around

HAUTSEA4                        Rechnitz - direct

1   Passover of 2016?

2   A.   That's when I began to meet the government and cooperate

3   with the government.

4   Q.   And in what way or ways did you cooperate with the

5   government during this period of time?

6   A.   I had a series of meetings, and I answered questions that I

7   was asked.

8            MR. SCHECHTMAN:   Judge, not all the jurors may know

9   when Passover is.

10  Q.   Approximately when was -- I gather that Passover is a

11  little bit of a moving event.   In any event, approximately when

12  was Passover?

13  A.   It's around Easter time, so April or May time.

14  Q.   Thank you.   Now did there come a time after that where you

15  pled guilty to crimes?

16  A.   Yes.

17  Q.   Is that the same conduct that you described when we began

18  talking about all of this on Thursday?

19  A.   Yes.

20           MR. BELL:   So I want to ask you, Ms. Bustillo, to

21  publish Government Exhibit 1601.

22           Mr. Rechnitz, we asked you a number of questions about

23  this.   This was the cooperation agreement that you and the

24  government signed.

25           Can we go to page 2, please.   So what I'm going to do

1    is read all of this, and I will ask you just to highlight

2    certain portions as we go.

3    Q.   It is understood that Rechnitz, A, shall truthfully and

4    completely disclose all information with respect to the

5    activities of himself and others concerning all matters about

6    which this office inquires of him, which investigation can be

7    used for any purpose.

8         What did you understand "this office" to refer to?

9    A.   The U.S. Attorney's Office in the Southern District of New

10   York.

11   Q.   Then it says, B, shall cooperate fully with this office,

12   Federal Bureau of Investigation, the New York City Police

13   Department, and any other law enforcement agency designated by

14   this office; C, shall attend all meetings at which this office

15   requests his presence; D, shall provide to this office upon

16   request any document, record, or other tangible evidence

17   relating to matters about which this office or any designated

18   law enforcement agency inquires of him.

19        MR. BELL:  I will ask you to highlight E,

20   Ms. Bustillo.

21   Q.   Shall truthfully testify before the grand jury and at any

22   trial or other court proceeding with respect to any matters

23   about which this office may request his testimony.

24        Is it your understanding right now, Mr. Rechnitz, that

25   you may have to testify at proceedings other than these?

1    A.   Yes.

2    Q.   Concerning which individuals?

3            MR. SCHECHTMAN:  Judge, I think we went through this.

4            THE COURT:  Sustained.

5            MR. BELL:  One moment, please.

6            (Pause)

7            MR. BELL:  Thank you, your Honor.

8            May I continue?

9            THE COURT:  Yes.

10   BY MR. BELL:

11   Q.   Mr. Rechnitz, is it your understanding at this time that

12   you may have to testify at other proceedings other than this

13   one?

14   A.   Yes.

15   Q.   Let's go back to the exhibit and let's highlight F, shall

16   bring to this office's attention all crimes which he has

17   committed, and all administrative civil or criminal

18   proceedings, investigations or prosecutions in which he has

19   been or is a subject, target, party or witness; and G, shall

20   commit no further crimes whatsoever.  Moreover, any assistance

21   Rechnitz may provide to federal criminal investigators shall be

22   pursuant to the specific instructions and control of this

23   office and designated investigators.

24           Now as you sit here now, Mr. Rechnitz, do you believe

25   that you have disclosed all of the crimes you committed to the

1    United States Attorney's Office?

2    A.  I do.

3    Q.  Have you answered the questions?

4    A.  Yes.

5    Q.  And generally speaking, Mr. Rechnitz, when you met with the

6    government, what conduct did you tell the government about?

7    A.  All my conduct that I was asked about.

8    Q.  Can you hum a few bars as to specifics?

9         MR. SCHECHTMAN:  Your Honor, I object to going over

10   testimony that we have had ad nauseam.

11        MR. BELL:  This is not a question that we asked.

12        THE COURT:  Overruled.

13   Q.  What conduct did you disclose to the U.S. Attorney's

14   Office?

15   A.  I disclosed to them the conduct of bestowing gifts upon

16   police officers in exchange for favors, the donations that I

17   made to the mayor and his office in the exchange for access,

18   influence and favors, paying the bribe on behalf of Murray

19   Huberfeld to Norman Seabrook, and other conduct that I'm not

20   proud of, such as the insurance, health insurance issue we

21   discussed, and other such conduct.

22        MR. BELL:  Now if we could take down the blow up and

23   go to the second full paragraph.

24        What I would ask you to do is highlight the sentence

25   that begins, "In addition."  Hold on, go to page 3, second full

1   paragraph, there, about halfway down the paragraph, there's a

2   sentence that begins "In addition."

3            Thank you.

4            The sentence I will ask you to highlight, is:  In

5   addition, if this office determines that Rechnitz has provided

6   substantial assistance in an investigation or prosecution, and

7   if he has fully complied with the understandings specified in

8   this agreement, this office will file a motion pursuant to

9   Section 5K1.1 of the sentencing guidelines requesting the Court

10  to sentence Rechnitz in light of the factors set forth in

11  Section 5K1.1A15.

12  BY MR. BELL:

13  Q.  What do you understand that to mean, Mr. Rechnitz?

14  A.  That means if I tell the truth and honor the terms of this

15  agreement and I don't commit any further crimes, that the

16  government will issue what is called a 5K letter at my

17  sentencing to my sentencing judge, which will serve as a hope

18  for leniency for me at my sentencing.

19  Q.  What happens with respect to that 5K letter -- withdrawn.

20           What happens with whether you get a 5K letter if you

21  do not tell the truth today and in the rest of your testimony?

22           MR. SCHECHTMAN:  Objection.

23           THE COURT:  Basis?

24           MR. SCHECHTMAN:  Asked and answered.

25           THE COURT:  Overruled.

1  A.  I did not get -- can you repeat the question, please?

2  Q.  Sure.  My question is what is your understanding of what

3  happens with respect to the letter referenced here if you do

4  not tell the truth?

5          MR. BELL:  Your Honor, I object.

6          THE COURT:  It's overruled.

7          What do you believe happens if you do not tell the

8  truth here?

9          THE WITNESS:  I do not get the 5K letter, my entire

10 cooperation agreement is ripped up, and I am facing a 20-year

11 sentence in front of a judge with no benefits of a cooperating

12 agreement letter.

13         MR. BELL:  Why don't we take that down.

14         Let's pull up the third full paragraph.  Third

15 paragraph reads:  It's understood that should this office

16 determine either that Rechnitz has not provided substantial

17 assistance in an investigation or prosecution, or that Rechnitz

18 has violated any provision of this agreement, such a

19 determination will release this office from any obligation to

20 file a motion pursuant to Section 5K1.1 of the sentencing

21 guidelines, but will not entitle Rechnitz to withdraw his

22 guilty plea once it has been entered.

23         Finally, could we look at the last paragraph, the

24 first full sentence.  Can you highlight the first full

25 sentence.

HAUTSEA4                        Rechnitz - direct

1         It is understood that should Rechnitz commit any

2    further crimes, or should it be determined that he has given

3    false, incomplete or misleading testimony or information, or

4    should he otherwise violate any provision of this agreement,

5    Rechnitz shall thereafter be subject to prosecution for any

6    federal criminal violation of which this office has knowledge,

7    including perjury and obstruction of justice.

8         Let's take that down, and we can take the whole

9    exhibit down.

10   Q.  Mr. Rechnitz, as you sit here today, what feelings, if any,

11   do you have with respect Jeremy Reichberg?

12            MR. MAZUREK:  Objection, relevance.

13            THE COURT:  Let's have a quick sidebar on this.

14            (Continued on next page)

HAUTSEA4                    Rechnitz - direct

1           (At sidebar)

2           THE COURT:  Okay, what is the relevance of this?

3           MR. BELL:  Well, Mr. Reichberg I think was a

4    co-conspirator here, and it goes to bias as much as any similar

5    question about the defenses would.

6           THE COURT:  What do you mean by bias?  What is it you

7    are expecting him to say about Reichberg?  You're asking his

8    feelings about him.  So whether he thinks he's a jerk or

9    whether he thinks he's a great guy --

10          MR. BELL:  Or whether he harbors any particular

11   grudge.  I could ask that more specifically, your Honor, but --

12          THE COURT:  And what is the relevance of that?  I want

13   to try to figure out where we're going with this.  If he says

14   yes, I have a grudge against him, what?  I guess I'm trying to

15   figure out where you're going with this.  Reichberg is not a

16   defendant in this case.

17          MR. SCHECHTMAN:  Or a witness, Judge.

18          MR. BELL:  I will limit myself to folks who are.

19          THE COURT:  Wait, what is it you wish to ask about

20   these other folks?

21          I guess what I'm concerned about is it seems it may

22   not be relevant and certainly prejudicial for him to

23   editorialize and say that he hates somebody's guts.

24          MR. BELL:  I don't think that he would say that, and I

25   would understand that concern, your Honor, but my expectation

HAUTSEA4                        Rechnitz - direct

1    is that he is not going to say that he hates anybody's guts.

2              THE COURT:  Your expectation is that he says what?

3              MR. MAZUREK:  I really like these guys.

4              Judge, 401, 403.  It's not probative of any issue that

5    is disputed at trial, and has the opportunity to substantially

6    prejudice the jury based on irrelevant evidence.  So I ask you

7    to sustain the objection.

8              THE COURT:  Okay.  It seems to me at this point I

9    should sustain that objection.  If the defense is going to

10   start getting into on their cross-examination potential bias

11   and the like, which very well may happen, then certainly on

12   redirect that may be appropriate.

13             MR. BELL:  Something tells me, your Honor, given the

14   projected length of the cross that I will get the opportunity

15   later on, so that's fine.  We're about done.

16             THE COURT:  How much more do you have with him?

17             MR. BELL:  I think like three questions.

18             THE COURT:  Will they be something objectionable?

19             MR. BELL:  I hope not.

20             (Continued on next page)

21

22

23

24

25

1              (In open court)

2              THE COURT:  That objection is sustained.  Go ahead,

3     counsel.

4     BY MR. BELL:

5     Q.  Mr. Rechnitz, why was it that you decided to cooperate with

6     the government?

7     A.  First of all, after meeting with the government I

8     understood that there was a lot of evidence, and unfortunately

9     a lot of my misconduct was vast.  I decided it's time to come

10    clean on everything, hopefully get a second chance, and do the

11    right thing and be able to move forward.  So I decided to come

12    forward and take responsibility for my actions.  I also have a

13    family, a wife and kids, that I thought about as well.

14    Q.  What is it that you hope to accomplish today, Mr. Rechnitz?

15              MR. MAZUREK:  Objection.

16              THE COURT:  Overruled.

17    A.  Only what I'm here to do, that's to tell the truth and

18    honor the agreement I signed with the U.S. Attorney's Office.

19              MR. BELL:  Your Honor, we have to further questions

20    for Mr. Rechnitz.

21              THE COURT:  Any cross-examination?

22              MR. MAZUREK:  I have a few questions for you.

23    CROSS-EXAMINATION

24    BY MR. MAZUREK:

25    Q.  Mr. Rechnitz, you are a liar, correct?

1    A.  No.

2    Q.  Well, you have spent the past several days of direct

3    examination telling us about your lies, right?

4    A.  I have told you about some lies and some of my misconduct.

5    Q.  You have done business by lying, is that right?

6    A.  At times I have lied in order to do business.

7    Q.  You have told people that you own things when you did not,

8    correct?

9    A.  Correct.

10   Q.  You told people you invested in a deal when you had not,

11   correct?

12   A.  Correct.

13   Q.  And you didn't tell your investors on the liquor deal with

14   Mr. Peralta that you were getting hundreds of thousands of

15   dollars in cash returns, correct?

16   A.  Not exactly.  I told some of them, not all.

17   Q.  You lied to investigators about receiving hundreds of

18   thousands of dollars of cash, correct?

19   A.  I had lied to investigators until I came forward and told

20   them the truth.

21   Q.  You didn't tell them the truth when they first approached

22   you, right?

23   A.  That's correct.

24   Q.  Not the first time, correct, in February of 2015, correct?

25   A.  Correct.

HAUTSEA4                          Rechnitz – cross

Q.  Not in March of 2015, when they came a second time,
correct?

A.  Correct.

Q.  Not a third time when you were in the offices of your
attorney, Robert Fink, and the FBI were asking you questions in
May of 2015, correct?

A.  That's correct.

Q.  And you lied to loved ones, Mr. Rechnitz, correct?

A.  I have.

Q.  You have lied to your father-in-law and brother-in-law in
bringing them into bad deals, correct?

A.  My brother-in-law?

            (Continued on next page)

1   Q.  Yes, Alan Cooperman, have you ever heard of him?

2   A.  Yes.  What about him?

3   Q.  Did you bring him into the Nissen deals?

4   A.  Yes.  I don't think they were bad deals.

5   Q.  You didn't think they were bad deals when you were taking

6   10 percent commission off the top of those deals which

7   inevitably led to a Ponzi scheme at the Nissen company?

8              MR. BELL:  Objection.

9              THE COURT:  Overruled.

10  A.  I did not think those were bad deals at the time.

11  Q.  The Nissen company Nikko, eventually you learned or read

12  about somewhere it was a Ponzi scheme, correct?

13  A.  That's correct.

14  Q.  That is what you put your brother-in-law into, correct?

15  A.  Again, I did not know --

16  Q.  My question, sir --

17             MR. BELL:  Objection.

18             THE COURT:  Please just rephrase the question,

19  counsel.

20  BY MR. MAZUREK:

21  Q.  Did you bring Mr. Cooperman into a ticket deal Nikko which

22  ended up being a ponzi scheme, yes or no?

23  A.  I do not believe I did.

24  Q.  You didn't bring him into deals at Nikko?

25  A.  I think you asked me if I brought him in a deal that ended

1   up being a Ponzi, and I don't know if the deals he went in were

2   real or fake.  I only read about it afterwards.

3   Q.  You only read about it afterwards, is that your testimony?

4   A.  That is my testimony.

5   Q.  Do you know that Nikko company owes about $70 million to

6   investors, correct?

7   A.  I don't know the amount.

8   Q.  Approximately?

9   A.  I don't know the amount.

10  Q.  Tens of millions of dollars?

11  A.  I still don't know the amount.

12  Q.  But it was a ponzi scheme, correct?

13  A.  Allegedly.  They were charged for running a Ponzi.

14  Q.  They were charged by the same U.S. Attorney's Office,

15  correct?

16  A.  That is correct.

17  Q.  You learned about that through reading the criminal

18  complaint against your former colleague, Mr. Nissen?

19  A.  I learned about it from reading the post.

20  Q.  The New York Post?

21          That is your favorite newspaper, right?

22  A.  No.

23  Q.  You brought your father-in-law into deals with the Hamlet

24  Peralta liquor business, correct?

25  A.  He is not in any more deals, no.

1  Q.  He was.  You put him into it?

2  A.  I think you asked me if he was.  He is.

3  Q.  The Hamlet Peralta business no longer exists, correct?

4  A.  That's correct.

5  Q.  It was a Ponzi scheme, correct?

6  A.  It was.

7  Q.  And you brought your father-in-law David Kohn into that

8  Ponzi scheme, correct?

9  A.  I did.

10  Q.  You lied to your wife Rachel correct?

11  A.  Yes.

12  Q.  You didn't tell her that when you were going to Las Vegas,

13  to the Super Bowl in Las Vegas and you were taking police

14  officers and a young lady who you hired for sex, correct?

15  A.  That is not what happened.

16  Q.  My question was not that.

17        Did you tell your wife Rachel that when you were going

18  to view the Super Bowl in Las Vegas, that you were taking with

19  you NYPD officers and a prostitute?

20  A.  I did not tell her that, no.

21  Q.  You told her something else, correct?

22  A.  No, I didn't tell her that.

23  Q.  You didn't tell her the truth, right?

24  A.  I neglected to mention the details of who went on the trip.

25  Q.  It is second nature for you to lie.  Is that true?

HAUJSEA5                              Rechnitz - cross

1    A.  No.

2    Q.  Are you able to tell the difference between a truth and a

3    lie?

4              MR. BELL:  Objection.

5              THE COURT:  Overruled.  You may answer.

6    A.  Sorry.  Can you repeat that?

7    Q.  Are you able to tell the difference between a truth and a

8    lie?

9    A.  I don't understand the question.

10             MR. MAZUREK:  I will continue, your Honor.

11             I want to go over some of the lies you made to people

12   you say you care about and who you do business with.

13   BY MR. MAZUREK:

14   Q.  Mr. Rechnitz, you lied to Norman Seabrook, correct?

15   A.  I did.

16   Q.  You told this man, Mr. Seabrook, that you were a part owner

17   of Platinum Partners, correct?

18   A.  Yes, I did.

19   Q.  You were not a partner of Platinum Partners at that time,

20   correct?

21   A.  No, I was not.

22   Q.  You have never been a partner at Platinum Partners,

23   correct?

24   A.  Correct.

25   Q.  Did you think he was a stupid man by telling him that?

1   A.  No.

2   Q.  Is that what you thought?

3   A.  No.

4   Q.  You thought you would get away with saying a bald-face lie

5   that could not be corroborated to impress Mr. Seabrook.  Is

6   that your testimony?

7   A.  Yes.

8   Q.  You knew you were going to promote Platinum Partners to his

9   labor union, correct?

10  A.  No.

11  Q.  Well, isn't that the reason you told him that you were a

12  partner of Platinum Partners?

13  A.  It was to induce Norman to make the investment.

14  Q.  To make an investment into Platinum Partners, correct?

15  A.  That's correct.

16  Q.  So you told him a lie in order to obtain money or property

17  from his organization, correct?

18  A.  I told him a lie in order to get Norman to invest in

19  Platinum Partners, yes.

20  Q.  You would agree with me that is called a fraud, sir, right?

21          MR. BELL:  Objection.

22          THE COURT:  Sustained.

23  BY MR. MAZUREK:

24  Q.  Did you have to plead guilty to making false statements in

25  order to induce money or property being invested by a COBA as

HAUJSEA5                          Rechnitz - cross

1    part of your cooperation agreement?

2    A.  I had to disclose that to the government.

3    Q.  But you didn't have to plead to a criminal mail or wire

4    fraud related to an investment by COBA, correct?

5            MR. BELL:  Objection.

6            THE COURT:  Overruled.  You may answer.

7    A.  I don't understand your question please repeat it.

8    Q.  You didn't have to plead guilty to mail or wire fraud with

9    respect to the false statements that you made in order to in

10   dues an investment by COBA?

11   A.  I don't understand what those frauds are so, no, I did not.

12   Q.  Now, you also lied to Mr. Seabrook about owning buildings,

13   correct?

14   A.  Yes.

15   Q.  The first time you met him, you lied to him, right?

16   A.  I don't think it was the first time.

17   Q.  Shortly thereafter?

18   A.  I think it was shortly thereafter, right.

19   Q.  You told him you owned 23 Wall Street, correct?

20   A.  I did.

21   Q.  You never owned it?

22   A.  No, I did not.

23   Q.  Again you did that to impress him, correct?

24   A.  Yes.

25   Q.  In order to gain, as you say, access in your relationships,

1   correct?

2   A.   No.  It was to impress him.

3   Q.   Just to impress him?

4          You knew again that something that you could never

5   prove to be true, right?

6   A.   What couldn't be proved?

7   Q.   That you were owner of 23 Wall Street?

8   A.   Sure, it could be proved.  You can look up the title.

9   Q.   You would see you were not owner of 23 Wall Street,

10  correct?

11  A.   That's correct.

12  Q.   Why did you do it?

13         Why did you tell something that is so easily proven to

14  be a lie?

15  A.   I don't know.  I am not proud of it.  It was a mistake.

16  Q.   In your direct examination, Mr. Rechnitz, you were asked by

17  the prosecutor about the reasons that you developed

18  relationships with different law enforcement officers.  Do you

19  remember those questions?

20  A.   I do.

21  Q.   Do you remember your answers?

22  A.   Some of them, yeah.

23  Q.   So you said on direct examination as to why you entered

24  these relationships is because people like access to things

25  that they don't normally get.  Those were your words, right?

HAUJSEA5                          Rechnitz - cross

```
 1    A.  If you say so.  I don't remember exactly what I said.

 2    Q.  Is that one of the reasons that you entered into those

 3    police relationships?

 4    A.  Yes.

 5    Q.  You testified on direct examination another reason was that

 6    they earned you a lot of points.  Is that another reason that

 7    you entered into those police relationships?

 8    A.  I don't understand.  What earned points?  I don't

 9    understand your statement.

10    Q.  When you were asked questions about closing the Lincoln

11    Tunnel so that former employer could speed through the tunnel

12    unimpeded, and you were asked why you did that, you said it

13    earned me a lot of points, right?

14    A.  I closed the Lincoln Tunnel and arranged to have it closed

15    with Jeremy to impress my boss.

16    Q.  To earn points, right?  That was your testimony on Page 552

17    from the transcript --

18            MR. BELL:  Objection.

19    Q.  -- of last Thursday.

20            THE COURT:  Overruled.

21    A.  It could be I said those words, sure.

22    BY MR. MAZUREK:

23    Q.  You said that the reason that you entered into these police

24    relationships was to be a big player in town.  That was another

25    reason, right?
```

1    A.   That was one of the reasons, yes.

2    Q.   Now, you have met with these prosecutors and agents many,

3    many times over the course of the last two years, correct?

4    A.   I am not sure how many times, but I've met them.

5    Q.   Would you agree with my characterization that it was many

6    times, sir?

7    A.   Yes.

8    Q.   During all of those meetings and questions that were asked

9    of you, you were asked these same kinds of questions.  Why

10   would you enter into these relationships, right?  Do you

11   remember?

12   A.   Yes.

13   Q.   I am going to direct your attention to the meeting that you

14   had over two years ago, on May 14th, 2015.  I think you talked

15   about it on direct examination when you're in the office of

16   Robert Fink, and the FBI was asking you questions.

17        Do you remember that?

18   A.   That was the meeting when I lied, yes.

19   Q.   You didn't answer, didn't give any of the answers you gave

20   here on the stand as the reason you developed these police

21   relationships, did you?

22   A.   No.  As I told you, I lied in that meeting.

23   Q.   So you told those FBI investigators why you entered into

24   those relationships with police officers was because, as the

25   grandson of Holocaust survivors, you were raised to believe it

1    was important to maintain relations with policymakers and

2    members of the Police Department to help ensure the mistakes of

3    the past were not repeated.

4           That was your answer, sir?

5    A.  Yes, I was trying to wiggle my way out of the truth.

6    Q.  And you invoked the memory of the Holocaust to wiggle your

7    way out of the truth?

8    A.  It sounds that way, yes.

9    Q.  Are you proud of that, sir?

10   A.  No.

11   Q.  Are your grandparents proud of you for that?

12          MR. BELL:  Objection.

13          THE COURT:  Sustained.

14   BY MR. MAZUREK:

15   Q.  Do you consider yourself a religious person?

16   A.  I do.

17   Q.  But you mocked the importance of important religious

18   responsibility of an entire community by applying to be a

19   police chaplain in Westchester County.  Isn't that true?

20   A.  Can you repeat the question, please.

21   Q.  You mocked the important religious responsibility of being

22   a police chaplain in Westchester County by paying for that

23   position, correct?

24   A.  What do you mean by mocked?  I don't understand your

25   question.

HAUJSEA5                        Rechnitz - cross

1    Q.  Do you belong to any religious order?

2    A.  I still don't understand what you're saying.

3    Q.  Are you a rabbi, sir?

4    A.  No.

5    Q.  Are you a priest?

6    A.  No.

7    Q.  Are you an imam?

8    A.  No.

9    Q.  Do you belong to any religious order that would qualify you

10   to be a police chaplain?

11   A.  No.

12   Q.  You understood at the time when you got that position that

13   it was an important position in the community?

14   A.  I didn't think of it that way, but you're right.

15   Q.  Well, did you look up on the website in Westchester County

16   as to the duties and responsibilities of a police chaplain?

17   A.  No.

18   Q.  Did you know that as a police chaplain, you would be put

19   into the position of where you would give confidential

20   counseling to members of the Westchester Police Department?

21   A.  No.

22   Q.  Did you know you're supposed to provide spiritual guidance

23   to people who suffer trauma and hardships within the Police

24   Department?

25   A.  No.

HAUJSEA5                         Rechnitz - cross

1   Q.  Did you know you'd have to be delivering invocations and

2   benedictions at different ceremonies and invoking God's name?

3        Did you know that, sir?

4   A.  I wasn't told any of these things are a requirement.

5   Q.  You made that position a farce, Mr. Rechnitz, didn't you?

6   A.  I don't agree.

7   Q.  You don't agree?

8   A.  No.

9   Q.  Did you do anything in that position?

10  A.  I did not.

11  Q.  You did it, sir, for your own pleasure, right?

12  A.  I did it for my own benefit, yes.

13  Q.  You did it for a parking placard.  Is that right?

14  A.  That's correct.

15  Q.  You not only made a farce of that position, but you then

16  used it in a further lie, correct?

17  A.  Again I don't agree with your characterization of a farce.

18  I can't understand area that question.

19  Q.  I'll withdraw the question.

20       You used the position you paid for to become a police

21  chaplain to make another lie under oath?

22  A.  What was the lie?  I don't agree.  I don't follow.

23  Q.  Well, as further pursuit of your own pleasure, you filled

24  out, worked with Mr. Reichberg to fill out a gun permit in New

25  York City, right?

1    A.  Yeah.  I did not fill one out.

2    Q.  I am sorry?

3    A.  I didn't fill out a permit.

4    Q.  You signed a permit application to get the rights, the

5    privilege in New York City to carry a firearm, correct?

6    A.  Right, I just -- I don't see the connection between

7    Westchester you're trying to derive.

8    Q.  One of the positions that you put down in that application

9    as a reason for needing the gun permit is that you were a

10   police chaplain in Westchester County, correct?

11   A.  I didn't know that was in the application.

12   Q.  You didn't know you were filling out an application, sir?

13   A.  Jeremy told me just he will fill it out and I will sign it.

14   Just like the chaplaincy, I didn't read it.

15   Q.  You didn't read it, that is your testimony?

16   A.  That is my testimony, yes.

17   Q.  You know that that application was, when you signed it, was

18   signed under the penalty of perjury, correct?

19   A.  I don't know.  Maybe.

20   Q.  Well, let me help you out.  (Pause)

21       I am going to show you what has been premarked for

22   identification as 3501-24.

23       MR. MAZUREK:  Your Honor, if we can just publish it to

24   the witness at this point, put it on the screen.

25   BY MR. MAZUREK:

HAUJSEA5                          Rechnitz - cross

1    Q.  I am going to ask if we can turn to Page 9 of that exhibit.

2             (Pause) Do you recognize your signature on that page,

3    sir?

4    A.  Yes, that is my signature.

5    Q.  Do you recognize that you signed this document on or about

6    November 11th, 2014?

7    A.  Yes, that is what it says.

8    Q.  You recognize this as an application that you completed for

9    the -- or you signed for the purposes of obtaining the

10   privilege to carry a gun in New York City?

11   A.  Yes.

12            MR. MAZUREK:  I move for admission of 3501-24.

13            MR. BELL:  Objection, your Honor.

14            THE COURT:  Sustained.  Let's have a sidebar.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  Let me just see if we can shortcut this.

3    What is it you're trying to do?  You're trying to get him to

4    acknowledge he signed that under penalties of perjury?

5          MR. MAZUREK:  Yes.

6          THE COURT:  You can ask him that question.  You're

7    trying to admit this into evidence as a business record.

8          MR. MAZUREK:  I don't want to go through that whole

9    process of laying that foundation.  The government, this is one

10   of their documents.  It is something that I think may be the

11   subject of further examination later on.

12         If there is a big deal about why this is not a

13   business record, I am trying to avoid all of that.  I am hoping

14   that the government recognizes what it is and they will avoid

15   taking a lot of time later on potentially in doing that.

16         THE COURT:  Can I get the last four questions and

17   answers read back, please.

18         (Record read)

19         THE COURT:  Can you go back -- I am sorry -- four

20   questions before that first question that you read, please.

21         (Record read)

22         MR. SHECHTMAN:  I would say the following.

23         To the extent it is being offered, it is not being

24   offered for its truth.  It is being offered because it is

25   completely false.  I don't think it is a hearsay should delay

HAUJSEA5                         Rechnitz - cross

1   us.

2          MR. BELL:  Nor is that what we're primarily arguing.

3          THE COURT:  You were talking about a document,

4   double-hearsay issue.  The document very well may be a public

5   record.  It certainly may be a document that affects an

6   interest in property, other grounds for which the document is

7   admissible.

8          I am trying to see if we can keep this moving so we

9   can get this along.  It seems to me he has this in front of

10  him.  To the extent that his "I don't know, maybe" seems to be

11  sort of a lapse in recollection, it seems to be that you can

12  ask him, now that he has seen the document, doesn't that

13  refresh your recollection that when you signed this document,

14  this document was signed under the penalty of perjury?

15         Then you can move on.

16         MR. BELL:  That seems to be the sort of thing we could

17  do.  I will note the threshold objection that we have which is

18  a 608 issue.  It doesn't come in as extrinsic evidence of --

19  this seems as guard variety as 608, 608 gets.  It does seem to

20  me Mr. Mazurek can do some variation of what your Honor

21  suggested, but the exhibit doesn't come in for that purpose

22  unless I am missing something on the rule.  That, too, may have

23  the effect of shortening things.

24         THE COURT:  Anything else from defense counsel on

25  this?

HAUJSEA5                           Rechnitz – cross

1            MR. MAZUREK:  No, Judge.

2            THE COURT:  What are we going to do here.

3            MR. MAZUREK:  I will move this along.  We can revisit

4    it later if we need to.  I will ask the questions based on the

5    document.

6            THE COURT:  Okay.  All right.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HAUJSEA5                          Rechnitz - cross

 1            (In open court)

 2            THE COURT:  Go ahead, counsel.  Sustained.  Go ahead.

 3            MR. MAZUREK:  For the witness, can we just republish

 4    Page 9 of 3501-24.

 5    BY MR. MAZUREK:

 6    Q.  So before you signed this, sir, were you able to glance up

 7    about a centimeter or so above the page and read the paragraph

 8    that is just above your signature?

 9    A.  I didn't.  I just signed it.

10    Q.  You just signed it?

11            So you didn't understand at the time is your

12    testimony, you didn't understand at the time you signed it that

13    despite warnings again about a centimeter above that signing

14    this document with false written statements are punishable

15    under Section 210.5 of the New York Penal Law?

16            MR. BELL:  Objection.

17            THE COURT:  Sustained as to form.  Please rephrase the

18    question again.

19    BY MR. MAZUREK:

20    Q.  When you signed this document, sir, on November 11th, 2014,

21    did you understand that when you signed it, that any false

22    written statements in the document were punishable under New

23    York Penal Law?

24    A.  No.

25    Q.  You just closed your eyes and signed the document, is that

HAUJSEA5                         Rechnitz - cross

1    your testimony?

2    A.   No.

3    Q.   Did you sign the documents at the Police Plaza?

4    A.   Is that a question?

5    Q.   Yes, it is?

6    A.   What is your question?

7    Q.   Did you sign the document at 1 Police Plaza downtown?

8    A.   I don't remember where it signed it.

9    Q.   Did you have an interview about the application with an

10   officer at 1 Police Plaza?

11   A.   I wouldn't call it an interview.  It was more of a

12   done-deal type of thing.  I went into the officers' room, and

13   he just set someone up to process me.

14   Q.   You understood what you were doing when you were at 1

15   Police Plaza, you understood you were seeking to get a permit

16   to carry a gun on the streets of New York City, right?

17   A.   Yes.

18   Q.   You understood there was an application that went along

19   with this process, correct?

20   A.   Yes.

21   Q.   You were signing this application, correct?

22   A.   Correct.

23   Q.   And you understood that by signing this application and

24   giving the information, you were trying to do something that a

25   lot of New Yorkers don't have the opportunity to do, correct?

HAUJSEA5                        Rechnitz - cross

1   A.  I am not sure I understand your question.

2   Q.  You understood when you signed this document, sir, under

3   penalty of perjury, that you were seeking to have the right to

4   carry a gun with you in the streets of New York, right?

5   A.  That's correct.

6   Q.  Not everyone has that privilege in New York, correct?

7   A.  That's correct.

8   Q.  You were seeking to do so, and you submitted this

9   application, correct?

10  A.  That's correct.

11  Q.  And it has false statements in it, correct?

12  A.  I don't know what statements are in there.

13  Q.  In the many sessions you had with the government, you never

14  took a second to look and see oh, is this the way I filled out

15  this application, is this true or not?

16          MR. BELL:  Objection.

17          THE COURT:  Sustained.  Please rephrase.

18  BY MR. MAZUREK:

19  Q.  Have you had the opportunity to review your application

20  since you started cooperating with the government?

21  A.  No.

22  Q.  Did they ever ask you is it true that you needed to have a

23  gun in order to protect your diamond business?

24  A.  They never asked me that question, no.

25  Q.  You wanted to have a gun because you thought it would be a

1  fun thing to have, right?

2  A.  I don't know why.  It was just another thing I felt that

3  was important that really isn't.

4  Q.  You didn't care that you lied to get it, right?

5  A.  Again I don't know what lie you're referring to.  I don't

6  think I lied.

7  Q.  You didn't even care enough to look at the answers in the

8  application before you submitted it?

9  A.  No.  I trusted and relied on Jeremy, who told me he filled

10  it out properly, and that is why I signed it.

11  Q.  You always like to blame others, don't you?

12  A.  No.

13  Q.  Speaking about blaming others, you testified on direct

14  examination about chartering a private plane to Las Vegas,

15  right?

16  A.  Yes.

17  Q.  And you went with Jeremy Reichberg, James Grant and some

18  other police officers, correct?

19  A.  Yes.

20  Q.  On that plane you arranged to have a prostitute go with

21  you, correct?

22  A.  No, I didn't arrange that.

23  Q.  Someone else did?

24  A.  That's correct.

25  Q.  You knew she was there, right?

HAUJSEA5                         Rechnitz - cross

1   A.  Yes, I did.

2   Q.  You knew she was going to be paid to perform sexual acts

3   along the trip?

4   A.  Yes.

5   Q.  You knew that was a federal crime, correct?

6   A.  I am not sure if it is state or federal.  I knew it was

7   illegal.

8   Q.  To travel interstate with someone that you are going to be

9   paying for sexual acts, do you remember Governor Spitzer, does

10  that ring a bell?

11          MR. BELL:  Objection.

12          THE COURT:  Sustained.

13  BY MR. MAZUREK:

14  Q.  You knew it was a federal crime, sir, right?

15          MR. BELL:  Objection.

16          THE COURT:  Sustained.

17  BY MR. MAZUREK:

18  Q.  When you went on that plane, you testified on direct

19  examination that your stomach hurt and you closed your eyes?

20  A.  That is not what I said.

21  Q.  You weren't feeling well and you closed your eyes on the

22  plane?

23  A.  I made both of those statements, not together.

24  Q.  But together, that was what your testimony was, sir?

25  A.  I was not feeling well and I slept on the plane, yes.

1   Q.  Now, again you had the opportunity to be asked about this

2   trip from the prosecutors prior to your testimony in court this

3   week, correct?

4   A.  That's correct.

5   Q.  Isn't it true, sir, that when you were asked questions in a

6   prior session with the government, you were asked questions as

7   to whether you had sex with this young lady on the plane,

8   correct?

9   A.  I was asked that question, yes.

10  Q.  And you were asked that question way back on May 12th of

11  2016, correct?

12  A.  I don't know when I was asked.  I don't know the date.

13  Q.  It was a long time ago when you first started cooperating

14  with the government, correct?

15  A.  I don't think so it was so long ago.  It was --

16  Q.  A year and a half ago?

17  A.  Right.  That is not so long, right.

18  Q.  You were asked those questions, correct?

19  A.  I think I just answered.  I was asked that question from

20  the government.  I don't know when.

21  Q.  Isn't it true, sir, that when you were asked that question

22  back in May 12th of 2016, that you stated that you felt sick

23  during the trip and probably didn't do anything with the

24  prostitute, but you weren't sure, right?

25  A.  I never said that.

HAUJSEA5                          Rechnitz - cross

1    Q.  We can put on the screen just for the witness -- let me ask

2    you this:

3              Is there anything that might refresh your memory, like

4    the reports that were issued about your meeting with the

5    government on that day?

6    A.  No.  I am positive I never said that.

7              MR. MAZUREK:  Your Honor, I would then seek to move

8    into evidence under Rule 613 a portion of 3501-26.

9              MR. BELL:  Objection.

10             THE COURT:  Let's have a sidebar.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HAUJSEA5                          Rechnitz - cross

1          (At the sidebar)

2          MR. MAZUREK:  Your Honor, here's the statement.

3          THE COURT:  Okay.

4          (Off-the-record discussion)

5          THE COURT:  Okay.  All right.  So talk to me.  What is

6     it you plan to do?

7          MR. MAZUREK:  Your Honor, I have, according to the

8     rule, I have confronted the witness, challenged him on his

9     prior statement.  He continues to deny it.  It is inconsistent

10    with what he has testified on direct examination, and so under

11    the Rule 613 (b), I think it is admissible.

12         THE COURT:  I don't think that is necessarily

13    inconsistent with what the witness said.  Can you read that

14    into the record.

15         MR. MAZUREK:  "Rechnitz stated he felt sick during the

16    trip and probably didn't do anything with the prostitute but

17    wasn't sure."

18         THE COURT:  The next sentence, please.

19         MR. MAZUREK:  Rechnitz -- another topic -- "Rechnitz

20    stated he might have had sex with a prostitute in New York City

21    called the Royalty."

22         THE COURT:  You're making this incredible between the

23    trip and necessarily being on the flight, and that you haven't

24    drawn his attention to.  That is not clear on the record.  This

25    statement that you wish -- first of all, I don't think you have

1   actually given him word-for-word what is in that statement.

2           MR. MAZUREK:  I read it.

3           THE COURT:  Let's have the last four questions read

4   back then.

5           (Record read)

6           THE COURT:  So again the statement that preceded those

7   questions was about the plane.  So you're defining "trip" by

8   "on the plane" because you asked this question about on the

9   plane, and that statement isn't referring to specifically on

10  the plane.

11          It is talking about on the trip, which you asked

12  later, but that is after the question about on the plane,

13  making it seem as if you're talking about on the flight itself.

14  That statement seems to indicate he doesn't remember, he felt

15  sick and doesn't remember if he had sex with the prostitute

16  during the trip, but that is not necessarily talking about the

17  flight.

18          MR. MAZUREK:  If you read the sentence before, it

19  seems to be referring to the flight.

20          THE COURT:  I understand that, but this is all in one

21  paragraph and it says:

22          Rechnitz saw Grant with the prostitute on the flight

23  and Grant told him something happened with the prostitute.

24  Rechnitz stated he felt sick during the trip and probably

25  didn't do anything with the prostitute but wasn't sure.  Then

1    says Rechnitz stated he might have had sex with the prostitute

2    at a hotel in New York City."

3              MR. MAZUREK:  That is different,.

4              THE COURT:  That is the same paragraph.

5              MR. MAZUREK:  A different occasion.  On direct

6    examination he said he didn't have sex with her any time on the

7    trip.

8              THE COURT:  Ask that question then, What I am saying

9    is the question -- you can't impeach him with that if it is not

10   clear what you're impeaching him with.  If you want to ask him

11   that, forgetting the plane, if you want to ask about the trip,

12   right, because that is what that statement says, and if you

13   want to draw his attention to what he specifically said, then

14   you can impeach him with that.  You have to draw his attention

15   to that.  What I am saying right now, it is not so clear this

16   is inconsistent.

17             Who is this statement made to?

18             MR. MAZUREK:  The FBI agent and prosecutors.

19             THE COURT:  So draw his attention even more to that.

20             He says he doesn't remember the date, but if draw his

21   attention perhaps to the fact there is an FBI agent there and

22   whatever prosecutors were there, and then they asked you

23   questions about this prostitute and they asked you whether or

24   not you had sex with the prostitute with the trip, right, but I

25   guess first you have to get the inconsistency and draw out from

1    him he didn't have sex with this prostitute at all during this

2    trip.  If he says no to that, then that is certainly relevant

3    to that.

4            MR. MAZUREK:  Okay.

5            THE COURT:  And is impeachment.

6            MR. CAPONE:  To the extent this document or page comes

7    in, we request a redacted version comes in with only the --

8            MR. MAZUREK:  Yes, of course.

9            MR. NAWADAY:  We can do a stipulation.

10           MR. MAZUREK:  If you agree it should come in maybe --

11           MR. CAPONE:  We --

12           MR. BELL:  Should we get there.  There is no guarantee

13   we will.

14           MR. CAPONE:  We can stipulate.

15           (Off-the-record discussion)

16           MR. MAZUREK:  If he does say that he did not have sex

17   on any part portion of the trip, and he never said that to

18   these prosecutors and the agents, then I am going to move again

19   for introduction of that statement into evidence under 613.

20           THE COURT:  If he says that, then you have to bring

21   his attention to the inconsistency first.

22           MR. SHECHTMAN:  It will be inconsistent and we will be

23   back in here and it just --

24           THE COURT:  We won't necessarily have to be back here.

25           You have to draw his attention, you have to ask him

HAUJSEA5                          Rechnitz - cross

1    the question, ask him if he had sex with this prostitute during

2    this trip at all, the trip we are talking about because there

3    were several trips.

4              MR. MAZUREK:  Yes, the Las Vegas trip.

5              THE COURT:  If he says no, then you draw his attention

6    to this meeting with the FBI agent and prosecutors and say that

7    you said to them when you were asked about this, and it might

8    be more, might be easier to go with that next statement there

9    instead of this other one because this is a hostile witness and

10   he is going to fight with you.

11             If you ask the question that is somewhat loose, you're

12   going to get it is not a long time ago, yes, I didn't say my

13   stomach hurt, but I did say I was sick, and you draw his

14   attention to that.  The minute he says no, we'll see where we

15   are.  You have to draw his attention to that particular

16   statement.

17             MR. MAZUREK:  Yes.

18             THE COURT:  Okay.

19             (Continued on next page)

20

21

22

23

24

25

HAUJSEA5                              Rechnitz - cross

 1          (In open court)

 2          THE COURT:  Okay.  Let's do this.  Let's take a quick

 3     bathroom break of 8 minutes.  Don't discuss the case with

 4     anyone else.  Don't discuss it amongst yourselves and we'll see

 5     you in 8 minutes.  Thank you.

 6          (Jury excused)

 7          THE COURT:  So the parties know, I got a note from my

 8     Deputy indicating some of the jurors wanted a bathroom break.

 9     That is why we took the break.  I'll see you in 8 minutes.

10          (Recess)

11          THE COURT:  Are the jurors ready?

12          THE CLERK:  Yes.

13          MR. BELL:  I am happy to do this here.

14          Your Honor, there have been a number of points, and

15     today is the first day where in response to witness testimony,

16     particularly with this witness, there has been audible response

17     not only from the gallery, but the back table.  This is a jury

18     proceeding.  Obviously, we want to minimize that so we ask for

19     the judge to issue the admonishment accordingly.

20          THE COURT:  Yes.  For all the people in this

21     courtroom, do not have any outburst, do not make any audible

22     gasps, sighs or any comments.  We don't need any heckling or

23     anything like that from the people in the audience.  If you

24     continue to do that, you will be removed from the courtroom,

25     right?  Let's not do that.  Let's bring the witness in and

1    let's bring the jury in.

2              (Jury present)

3              THE COURT:  Please be seated.  We are just waiting for

4    the witness to come out.

5              (Pause)

6              (The witness returned to the courtroom)

7              THE COURT:  Go ahead, counsel.

8    BY MR. MAZUREK:

9    Q.  Mr. Rechnitz, we were talking about the trip that you took

10   to Las Vegas to view the 2013 Super Bowl, correct?

11   A.  Yes.

12   Q.  On that trip, sir, in Las Vegas, did you have sex with the

13   young lady that was hired to accompany you and your friends?

14   A.  No.

15   Q.  On May 12th, 2016, and I know you don't remember the

16   specific date, but you were interviewed on this topic by the

17   same prosecutors who are sitting in front of you and an FBI

18   agent.  Do you remember those kinds of meetings?

19   A.  I don't remember that date.  I had, as you said, many

20   meetings with them.

21   Q.  But you remember being interviewed on the topic of what you

22   did with this young lady on the trip to Las Vegas when you were

23   going to view the Super Bowl?

24   A.  No.  I remember them asking me about the details from that

25   entire trip.

HAUJSEA5                         Rechnitz - cross

1    Q.   The details of that entire trip?

2         You gave them answers which you believed to be

3    complete and truthful at that time, correct?

4    A.   I did.

5    Q.   I am sorry?

6    A.   Yes, I did.

7    Q.   And specifically when you were asked about that trip, your

8    answer to them on May 12th, 2016 -- and the reference for the

9    government and the court -- it is 3501-26, Page 12, your answer

10   to them about having sex on that trip with the prostitute, you

11   answered:

12        "Rechnitz stated he felt sick during the trip and

13   probably didn't do anything with the prostitute but wasn't

14   sure."

15        Correct?

16   A.   No.   I never said that.

17        MR. MAZUREK:   Again I move under Federal Rule of

18   Evidence 613 for admissibility of that line in 3501-26.

19        MR. BELL:   The same objection.   Confrontation.

20        THE COURT:   You wish to admit that line?

21        MR. MAZUREK:   Yes, your Honor.

22        THE COURT:   Granted.   Go ahead.

23        (Pause)

24        MR. MAZUREK:   No, not on the screen.

25        MR. SHECHTMAN:   We can redact it and have that line,

1    and we won't show it now, your Honor.

2              THE COURT:  Thank you.

3              MR. MAZUREK:  We'll publish it later.

4              THE COURT:  Go ahead.

5    BY MR. MAZUREK:

6    Q.  Mr. Rechnitz, in the litany of lies that we have gone

7    through, you also lied on your 2013 and 14 tax returns by not

8    disclosing the cash that you received from Hamlet Peralta in

9    the liquor business, correct?

10   A.  No.

11   Q.  I am sorry?

12   A.  No.

13   Q.  You disclosed the 200 to $400,000 in cash that you claimed

14   to have received from the liquor business during those years?

15   A.  Which years?

16   Q.  2013 and 2014?

17   A.  I believe I may have 14, maybe not for 13.  I don't recall

18   when I started doing business with them.

19   Q.  Well, did you intend to disclose that cash on your tax

20   returns?

21   A.  I didn't intend to not disclose it, if that is what you're

22   asking.

23   Q.  Do you know, as you sit here today, whether you disclosed

24   it or not?

25   A.  I do not.  I think I did, but I am not sure.

HAUJSEA5                          Rechnitz - cross

1   Q.  Did you intend to tell the truth on your taxes with respect

2   to that income?

3   A.  I did not intend to keep it out of my return.

4   Q.  Well, you met with these same prosecutors and FBI agents on

5   or about April 9th, 2017, and you were asked similar sets of

6   questions about your declaring taxes from the liquor business.

7            Do you recall that?

8   A.  No.

9   Q.  Would it be helpful to refresh your memory to look at the

10  agents' report from that date?

11  A.  I wasn't asked that question.  I was asked how much cash I

12  received.  You are welcome to show me whatever you like, but I

13  don't think it will help refresh my recollection.

14  Q.  You don't think it would help to look at what the agents

15  reported when you were answering questions on April 9th, 2017

16  about whether you declared the cash from Mr. Peralta's

17  business?

18  A.  I don't think it will help, no.

19  Q.  Isn't it true that you told them back then on April 9th,

20  2017 that you did not declare that cash on your taxes because

21  you ended up with a loss.  However, you did not intend to

22  declare it either way?

23           Wasn't that your testimony then?

24  A.  I recall ending up with a loss, which is why I did not have

25  to declare it.  I don't think I told them I was intentionally

HAUJSEA5                          Rechnitz - cross

1    not going to, though.

2    Q.  I am sorry?  I didn't hear your answer.

3    A.  You're right, I did have a loss for the money I invested

4    with the liquor.  Therefore, I did not have to report any

5    income from him in cash because the loss was greater than the

6    cash I received.  I did not intentionally omit mention of cash

7    and it was not my intention.

8    Q.  So when you told the prosecutors on April 9th, 2017 you did

9    not intend to declare the cash either way, whether you had a

10   gain or loss, that wasn't the truth?

11   A.  I don't think I said that.

12            (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MR. MAZUREK:  Can we show what has been premarked for

2      identification as 3501-66 just for the witness, your Honor?

3              THE COURT:  Okay.

4              MR. MAZUREK:  If we can expand.

5      BY MR. MAZUREK:

6      Q.   Just take a look at the line in the report.  Does that

7      refresh your recollection that you told the agents and

8      prosecutors that you did not declare on taxes but you did not

9      have to because you ended up with a loss, however, you did not

10     intend to declare the cash either way?

11             MR. BELL:  Objection.

12             May we confer briefly, your Honor?

13             THE COURT:  Sure.

14             (Pause)

15             MR. MAZUREK:  I'll rephrase, your Honor.

16             THE COURT:  All right.

17     BY MR. MAZUREK:

18     Q.   After reviewing 3501-66, does that refresh your

19     recollection, sir, that you told the agent and these

20     prosecutors that you did not declare the cash on the taxes but

21     you did not have to because you ended up with a loss.  However,

22     you did not intend to declare the cash either way?

23     A.   No.

24     Q.   You just have no memory of saying that today as you testify

25     under oath?

HAUTSEA6                        Rechnitz - cross

1    A.  I am under oath, and my answer is no, I don't think I said
2    that.
3    Q.  You're testifying under the terms of a cooperation
4    agreement, right?
5    A.  Yes.
6    Q.  And I believe toward the end of direct examination you
7    reviewed some of the terms of that agreement, right?
8    A.  Right.
9    Q.  And that agreement requires you to testify truthfully in
10   this courtroom, correct?
11   A.  Correct.
12   Q.  And also says you cannot commit any further crimes since
13   the time of your cooperation, right?
14   A.  Correct.
15   Q.  Now you also testified on direct examination about a number
16   of business deals that you did regarding real estate, right?
17   A.  Right.
18   Q.  You're a real estate broker, right?
19   A.  Pardon?
20   Q.  You're a real estate broker?
21   A.  No.
22   Q.  You're a licensed broker in New York, unless your license
23   has expired, I'm not sure.
24   A.  No, I'm not.  I'm a salesperson.  A broker is a different
25   type of license.

HAUTSEA6                        Rechnitz - cross

1   Q.  Did you ever file for a real estate broker license,

2   associate broker license?

3   A.  No, a salesperson license.  I never filed for a broker

4   license.

5   Q.  You're a real estate salesperson, correct?

6   A.  Yes.

7   Q.  And as part of your job as a real estate salesperson, you

8   ended up at times organizing different investigator groups to

9   purchase buildings, right?

10  A.  No, as part of my salesperson license I sold, under a

11  broker, property to individuals.

12  Q.  So this is just another part of your real estate business,

13  as you call it, to syndicate loans, correct?

14  A.  No.  I don't understand what that even means.

15  Q.  Well, you used the term syndicate loans on direct

16  examination, right?

17  A.  I did not say that.  I said I syndicate deals.  I don't

18  think I said the word syndicate loans, because I don't know

19  what that means.

20  Q.  You syndicate deals, is that the word you prefer to use?

21  A.  I do syndicate deals, yes.

22  Q.  And that is to organize a group of investors to purchase

23  real estate at times, right?

24  A.  Correct.

25  Q.  You said on direct examination you own a hundred million

HAUTSEA6                          Rechnitz - cross

1   dollars worth of real estate in New York, right?

2   A.  Yes.  I said I had owned at a certain time, yes.

3   Q.  Sorry?

4   A.  I was asked what I estimate my dealings in real estate to

5   be that I owned, and I said $100 million, correct.

6   Q.  But you yourself didn't own a building in New York City,

7   correct?

8   A.  No, the entity of which I had full control over that I was

9   the managing member for and that I signed at times personal

10  for, did.

11  Q.  So when you said I owned $100 million worth of real estate,

12  that wasn't actually correct, correct?

13  A.  I don't agree with you.  I don't think it's not accurate.

14  I think there's a fine line.

15  Q.  Just to be clear, it would be that the entity has a number

16  of partners, and each of those partners has an interest in the

17  entity that owns the building, correct?

18  A.  Yes and no.  It depends.  If it was set up as a limited

19  partnership, general partnership, or an LLC.  In most instances

20  I was purchasing a building, I invite people to come in to join

21  me, I make a split on their profit, I run the day to day, I'm

22  the managing member and I get fees for doing that.

23  Q.  And other people actually retain the equity interest in the

24  piece of property, correct?

25  A.  Not always.  Each building is set up differently.  So my

1   portfolio consists of $100 millions for my company.

2   Q.  Let me direct your attention to a specific property, a

3   property known as Solomon's Plaza in Brooklyn.  Do you remember

4   that?

5   A.  Sure.

6   Q.  That was one of the properties that you syndicated a deal,

7   that is, you brought people together to invest in, correct?

8   A.  Correct.

9   Q.  And it is located in Borough Park in Brooklyn, right?

10  A.  Yes.

11  Q.  And that particular property you were able to close with

12  your investor groups I think sometimes in 2015, is that right?

13  A.  Sounds about right.

14  Q.  And this was a mixed use commercial and residential

15  property, correct?

16  A.  No.  That is not correct, no.

17  Q.  There was a retail tenant on the ground floor, correct?

18  A.  Correct.

19  Q.  And there were residential units above it, correct?

20  A.  No, that's not correct.

21  Q.  There was no residential units in the building?

22  A.  None.

23  Q.  One of the commercial tenants in the building of the ground

24  floor and the biggest tenant in the building was a Judaic book

25  store called Eichler's, correct?

HAUTSEA6                        Rechnitz - cross

1    A.   That's correct.

2    Q.   And you had a role in helping set up the lease for the

3    Eichler's bookstore, correct?

4    A.   Yes, I was in charge of the property.

5    Q.   You were in charge of the property, meaning you were the

6    property manager for the building?

7    A.   I was the managing member, the general partner for the

8    partnership until I removed myself and Charles Herzka took

9    over.

10   Q.   So you were a managing member and there was an expiring

11   lease of the Eichler's bookstore coming due at the beginning of

12   2017, correct?

13   A.   It was 2016 or 2017, that is correct.

14   Q.   After the time that you were already cooperating with the

15   government, correct?

16   A.   That's correct.

17   Q.   Now you helped negotiate a new lease with the owner of

18   Eichler's bookstore in February 2017, correct?

19   A.   I did.

20   Q.   And you signed the lease along on behalf of the ownership

21   group, correct?

22   A.   I may have.  I'm not sure who signed it, but it would make

23   sense that it was me.

24   Q.   And you negotiated with a fellow by the name of Eli Blau

25   who was the owner of the Eichler's bookstore at the time.

1  A.  No, I negotiated with a middleman that he hired to

2  represent his interests named Ari Gross.

3  Q.  So you negotiated with a middleman to accomplish the new

4  lease in 2017, correct?

5  A.  That's correct.

6  Q.  But you also had contact with Mr. Blau during the time that

7  the lease was being negotiated?

8  A.  I did.

9  Q.  Now this subject matter of the lease, of the Blau lease in

10  2017, was something that you brought to the attention to these

11  prosecutors and the FBI agents, correct?

12  A.  Yes.

13  Q.  You did so as recently as the end of September of 2017,

14  correct?

15  A.  Sounds about right.

16  Q.  And you called saying you wanted to have the opportunity to

17  speak with -- you were in California at the time, correct?

18  A.  I'm not sure if that's what happened.

19  Q.  Do you remember calling in a telephonic interview with the

20  prosecutors here and Special Agent FBI Bard Hubbard?

21  A.  I remember discussing with them that the tenant was being

22  harassed by your client, so that's why I called them.  I don't

23  remember discussing the lease.

24  Q.  Tenant was being harassed.  Is that the tenant that you're

25  referring to as Mr. Blau?

1    A.  Ari Gross.

2    Q.  Sorry?

3    A.  Ari Gross.

4    Q.  Ari Gross?

5    A.  I always dealt with Ari, not Eli.

6    Q.  Ari Gross who was the broker to the deal?

7    A.  I don't know exactly, I think was he was a paid consultant

8    from the Eichler's bookstore.

9    Q.  And you called -- you told the agents and these prosecutors

10   about the fact that Mr. Gross was helping negotiate this lease

11   with Blau, and you were having contact with Mr. Gross, correct?

12   A.  Pardon?

13   Q.  You told these agents and the prosecutors that you were

14   having contact with Mr. Blau and Mr. Gross over the lease that

15   we're talking about at Eichler's bookstore, correct?

16   A.  What do you mean, I had or I was having current?  I don't

17   understand your question.

18   Q.  The end of September of 2017 when you met with the

19   prosecutors you talked about this issue, you raised the fact

20   that you were in communications with Mr. Gross and Mr. Blau

21   over this lease, correct?

22   A.  About Mr. Gross, yes.

23   Q.  About Mr. Gross.

24   A.  Yes.

25   Q.  In fact, you told these agents and prosecutors to speak to

1   Mr. Gross about the lease because there was some confusion that

2   had arisen as a result of the lease, right?

3   A.  I don't tell them what to do, I just give the information

4   as it comes.  I'm not sure what they did.

5   Q.  You suggested that Mr. Gross would be available to discuss

6   the matter with the prosecutors and provide the prosecutors

7   with his telephone number, correct?

8   A.  No, I gave them his number when they asked me for it.

9   Q.  And they asked you for it because you were telling the

10  prosecutors at the time that there was a mistake that Mr. Blau

11  had made about that lease, correct?

12  A.  No.

13  Q.  Well, Mr. Blau had signed a lease on February 17, 2017 for

14  an amount of about $46,000 a month for the Eichler store,

15  correct?

16  A.  Correct.

17  Q.  But Mr. Blau was telling people in the building that he

18  never intended to pay $46,000 a month for rent on that

19  bookstore, is that correct?

20  A.  I don't know.  That's hearsay.  I don't know what you're

21  talking about.

22  Q.  You never heard that Mr. Blau claimed that you told

23  Mr. Blau that he would have to pay $30,000 month per rent but

24  just to sign the lease agreement for $47,000?

25          MR. BELL:  Objection.

1          THE COURT:  Sustained to form.  Please rephrase the

2    question.

3    Q.  You had asked Mr. Blau to sign a lease in February of 2017

4    for $47,000 a month, correct?

5    A.  Mr. Blau signed a lease for $46,000 a month, that is

6    correct.

7    Q.  You also signed that lease, correct?

8    A.  If you say so.  If I see it, I'm sure it would be possible

9    I did.

10   Q.  We'll get to that.

11          You negotiated that lease with Mr. Gross?

12   A.  Yes.

13   Q.  And --

14   A.  And Mr. Blau in two meetings.

15   Q.  And you told Mr. Blau that he would never have to pay

16   $47,000 per month?

17   A.  I never said that.  That is false.

18   Q.  You told him that the prior rent, which was approximately

19   $30,000 a month, would be all that he had to pay?

20   A.  I did not say that, and it was actually 36,000.

21   Q.  $36,000.

22          Well, let me ask you this, did Mr. Blau send you an

23   email?

24   A.  Yes.

25   Q.  About the $30,000 per month lease that he was expecting to

1    pay?

2    A.  No, he sent -- I don't know, but he sent me an apology

3    email for making that lie up for claiming that I had told him a

4    lesser rent.  You see, once I was removed from the building, he

5    had a new audience to try to renegotiate with, and he

6    apologized to me for being dishonest.

7    Q.  He apologized for being dishonest about what?

8    A.  About making up a version that I told him a different rent

9    than he actually signed.  He sent me an email to that effect.

10   Q.  Did you speak to Mr. Gross about the fact that Mr. Blau was

11   saying that he had this misunderstanding about the value of the

12   lease?

13   A.  Yes.

14   Q.  And was Mr. Gross someone that you told the prosecutors and

15   the FBI agents that he would be the person that could help sort

16   it out?

17   A.  No.  When he was approached, again by representatives of

18   your client, he told me, and I immediately told the

19   prosecutors.

20   Q.  When Mr. Gross was approached by investigators from the

21   defense, you say?

22   A.  No, by friends of Murray's.  He became uncomfortable and he

23   told me, so I told the prosecutor about that.

24   Q.  And did you tell the prosecutors that you expected that the

25   $47,000 lease that was signed by Mr. Blau was a legitimate

1    lease?

2    A.   It was a legitimate lease.  It was a signed lease, reviewed

3    by my attorney, Mr. Blau's attorney, and whatever we wrote out

4    in the lease were the terms of the deal.

5    Q.   But you never expected him to pay $47,000 per month.

6    A.   Yes, I did.

7    Q.   You knew that he already called or would call for chapter

8    eleven bankruptcy at the time that he signed the lease?

9    A.   No.  Once I was removed from the picture, or a few weeks

10   prior, he said that he realized he signed too high a lease.

11   Because part of his lease had a free rent period for four

12   months, once the four months expired, he tried to renegotiate

13   and said that he might file chapter eleven.  I said do what you

14   need to do, that's your rent.

15   Q.   Did he negotiate that, or Mr. Gross?

16   A.   Both.

17   Q.   Was that before Blau sold Eichler's store sometimes later

18   in 2017?

19   A.   I wasn't involved in that sale, I don't know.

20   Q.   But you were involved in the lease and the negotiations

21   that led up to that the lease in February.

22   A.   Correct.

23   Q.   And when you went to the prosecutors here at the end of

24   September 2017, you explained that Blau had told you that if

25   the cost of the rent was not reduced, Blau would call for

1    chapter eleven bankruptcy, correct?

2    A.   Sorry, I'm trying to understand.  You said when you met

3    them, phone call or in person meeting?

4    Q.   Regardless of the mode, do you remember speaking to them on

5    the subject at the end of September 2017?

6    A.   Yes, I filled them in on the situation.

7    Q.   And you were telling them about the communications you had

8    with Blau regarding the lease, correct?

9    A.   I gave them the history of the transactions since I now got

10   a phone call that they were being harassed by your client.  So

11   I had to fill the government in A to Z on that entire

12   transaction.

13   Q.   So you explained the transaction, and as part of that

14   explanation you told them that Blau informed you that if the

15   cost was rent was not reduced, Blau would call for chapter

16   eleven bankruptcy.

17   A.   Ari Gross told me that was his plan if I didn't reduce the

18   rent.

19   Q.   But you didn't reduce the rent or increase the rent because

20   the rent was at some point in the $30,000, but you increased it

21   to 47,000, correct?

22   A.   I'm sorry, can you repeat that?

23   Q.   The old lease was for 36,000 per month, correct?

24   A.   Correct.

25   Q.   You increased it to $47,000 per month, correct?

1  A.  Correct.

2  Q.  You're saying that Ari Gross was telling you that if the

3  rent was not reduced it would lead to chapter eleven bankruptcy

4  for Mr. Blau?

5  A.  Correct.

6  Q.  And when you told the prosecutors this, did you also tell

7  them that you were marketing the building for sale in the

8  spring of 2017?

9  A.  I'm not sure.

10  Q.  Did you tell them that you submitted applications to

11  potential lenders showing the $47,000 lease?

12  A.  I may have, I'm not sure.

13  Q.  And did you tell the prosecutors that you were in constant

14  contact with Mr. Gross after the lease had been executed in

15  February of 2017?

16  A.  I didn't neglect to mention it.  I don't know, I may have.

17  Q.  The prosecutors wanted know about this transaction,

18  correct?

19  A.  Right.

20  Q.  You were trying to be complete and truthful about it,

21  right?

22  A.  Any questions they asked me, I answered.

23  Q.  And you were trying to explain why this $47,000 lease was a

24  legitimate lease, that you weren't trying to defraud the bank

25  or potential buyers of the property?

HAUTSEA6                          Rechnitz - cross

1   A.  I did not have to explain why it was legitimate.  It was a

2   legitimate lease.  I told them the situation.

3   Q.  And when Mr. Blau sent you an email saying that he

4   apologized for telling other people that you had told him that

5   the 47,000 lease was not legitimate, you told the prosecutors

6   about that, too, right?

7   A.  Yes.

8   Q.  But you didn't tell the prosecutors about how that email

9   was generated, did you?

10  A.  I think I may have.  I don't understand your question.

11  Q.  Do you know how Mr. Blau came to write that email?

12  A.  Yes.

13  Q.  How?

14  A.  I think through Ari Gross.  I think I told Ari that Ari --

15  sorry, I know what happened.

16          They also threatened Charles Herzka, the new manager,

17  that they would go chapter eleven, so he told them to vacate

18  the space.  And then he tried to force them to sign an

19  affidavit per the request of your partner, your client, that I

20  had made up this whole lie.  And then he wouldn't sign the

21  affidavit.  He said it was sworn testimony, he won't do it.

22          So Ari Gross showed me his lawyer at the time wrote a

23  letter alleging that I had a different understanding than what

24  was signed in the lease.  So I said to Ari -- Ari showed me

25  that letter, I said you better go on record and change it,

1   because it's not true.  And Eli had remorse, and did the right

2   thing.

3   Q.  So you coordinated with Ari Gross about how to respond to

4   the Blau allegations?

5   A.  Yes.  Ari Gross was the one that I communicated with on

6   anything to do with Eichler's.  He is the one I called.

7   Q.  And you didn't tell these prosecutors and the agent that

8   during that time you are the one who worked with Ari Gross to

9   come up with the Eli Blau email apology, did you?

10  A.  I may have.  Again, I don't know if I did or didn't.  And I

11  didn't come up with it and I didn't create it.  Ari sent me

12  several emails showing me drafts of what he wrote, and if that

13  would be acceptable to me.  And I said no, until he admits what

14  he did, I don't need an email.

15  Q.  And you didn't tell these prosecutors and the agent that

16  the way that you got Ari Gross to help you change the story of

17  Eli Blau was by bribing him, did you?

18          MR. BELL:  Objection.

19          THE COURT:  Sustained as to form.

20  Q.  Let me change the question.

21          You didn't tell the agents or the prosecutor when you

22  told the story that, in drafting this email, you did it after

23  paying an all expense paid trip to the Four Seasons in Beverly

24  Hills for Ari Gross, did you?

25  A.  The two had nothing to do with each other.  That's not

HAUTSEA6                         Rechnitz - cross

1    correct.

2    Q.  Well, let me break it down.  On the weekend of August 9th

3    to the 11th, you paid for Ari Gross, all expenses paid, at the

4    Four Seasons Hotel in Beverly Hills, correct?

5    A.  Correct.

6    Q.  And you gave him cash to spend in addition to paying for

7    about $3,000 hotel bill?

8    A.  I treated him to a trip, yes.

9    Q.  You treated him to a trip to a Beverly Hills hotel, you

10   gave him cash, correct?

11   A.  Correct.

12   Q.  And during that time when you were at the Beverly Hills

13   hotel and paying him cash, you and Ari Gross drafted the email

14   that you made Eli Blau send, correct?

15   A.  No.

16   Q.  Well, I'm going to show you what has been premarked for

17   identification as MH 415.

18           MR. MAZUREK:  Your Honor, if we could you put that on

19   the screen.

20   Q.  As we do that, I will ask you, you provided the cell phone

21   that you had been using in 2017 to the government upon their

22   request, correct?

23   A.  Yes.

24   Q.  So that they could download information that they had on

25   that cell phone, correct?

HAUTSEA6                          Rechnitz - cross

1   A.  Yes.

2   Q.  And you were using, at that point in time in the summer of

3   2017, a messaging app calls WhatsApp, correct?

4   A.  Yes.

5   Q.  And you were using that application in order to communicate

6   with Ari Gross, correct?

7   A.  Yes.

8              THE COURT:  Let me just remind the witness to lean

9   into the microphone, please.

10             THE WITNESS:  Yes.

11             THE COURT:  Go ahead, counsel.

12   Q.  Now I think you testified on direct examination the phone

13   that you were using back in 2015 you had destroyed, correct?

14   A.  Correct.

15   Q.  This is the 2017 phone that you gave to the prosecutors,

16   correct?

17   A.  Correct.

18   Q.  Now you deleted a lot of the messages that you had between

19   Gross and yourself that weekend when he was in Beverly Hills,

20   correct?

21   A.  I'm not sure.

22   Q.  Well, I'm going to show you a certain page of what should

23   be only on for the witness, MH 415.

24   A.  It comes up as dark.

25             MR. MAZUREK:  If we could turn to the page that's

1   marked Bates stamped 2156.  If we could expand just for the

2   witness the middle portion of the page.

3   Q.  I'll direct your attention specifically to an entry dated

4   8/9/2017 at 3:36:40 p.m.  Do you see that on the screen?

5   A.  I do.

6   Q.  You're familiar with the telephone number 212-498-9756.

7   A.  That's Ari Gross.

8   Q.  That's Ari Gross.

9        At this point in time Ari Gross was in Beverly Hills

10  at the Four Seasons Hotel, is that right?

11  A.  Could be.

12  Q.  You met him there, correct?

13  A.  Yes.

14  Q.  You were texting at that point in time and he was telling

15  you that Eli, meaning Eli Blau, asked me not to tell you

16  anything of what was planned and done, but I think you should

17  know.  Therefore, please keep it between us.

18        Do you see that?

19  A.  Yes.

20  Q.  And you went on that weekend drafting Eli Brau's email

21  between you and Ari Gross, correct?

22  A.  I would not say drafting, but I went back and forth making

23  sure the letter was to my satisfaction.

24        MR. MAZUREK:  Well, let's turn to page Bates stamped

25  page 2159 at the bottom right, and expand the middle portion of

HAUTSEA6                           Rechnitz - cross

1    the page.

2    Q.  Now there are a number of drafts that went back and forth

3    on your WhatsApp between you and Ari Gross on August 10, 2017,

4    correct?

5    A.  Yes.

6    Q.  And directing your attention to the entry on 8/10/2017 at

7    12:01 p.m., do you see that, two-thirds down?

8    A.  Yes.

9    Q.  And your phone number is 646-283-3283, correct?

10   A.  Yes.

11   Q.  You're writing to Ari Gross:  I'll write something with you

12   later.  I don't like this version.  Thanks.  Correct?

13   A.  Yep.

14   Q.  You're writing the apology email for Ari to Eli Blau,

15   correct?

16   A.  I was not satisfied with the draft he sent me, so I told

17   him what I would need changed in order for me to forgive him,

18   correct.

19   Q.  And you were doing it poolside with Ari Gross after

20   spending thousands of dollars on his behalf to fly him out to

21   Beverly Hills so you guys could do this together, correct?

22   A.  No, I did not go anywhere poolside with that.

23   Q.  I'll withdraw the poolside question.

24         You were negotiating this email that was going to be

25   written by a third person with Ari Gross, who you paid

HAUTSEA6                              Rechnitz - cross

1    thousands of dollars to, to fly out at the Four Seasons Hotel.

2    A.  I did not pay him thousands of dollars.

3    Q.  Well, I'm going to show you what has been premarked for

4    identification both as MH 409, MH 410 and MH 411?

5              THE COURT:  Counsel, we need to break in about five

6    minutes.

7              MR. MAZUREK:  Five minutes and I'm done.  That's all I

8    need.

9    Q.  If you look at those, I'll start with MH 409, do you

10   recognize that as an invoice that you paid for Ari Gross for

11   his stay at the Four Seasons Hotel in Beverly Hills?

12   A.  Yes.

13   Q.  And that's the last four digits of your American Express

14   card?

15   A.  Yes, I paid for his hotel stay.

16   Q.  That was the amount of $2,298.38?

17   A.  Yes.

18             MR. MAZUREK:  Your Honor, move for admission of MH

19   409.

20             MR. BELL:  Objection, 608.

21             MR. MAZUREK:  I won't move it in.

22   Q.  I will ask you to look also at MH 410 and 411.  Are those

23   accurate depictions of the cash and notes that you left for

24   Mr. Ari Gross when he arrived at the Beverly Hills at the Four

25   Seasons?

HAUTSEA6

1    A.  Yes, this is the spending money we discussed before.

2    Q.  And that's that spending money was approximately $2,000

3    given in hundred dollar bills, correct?

4    A.  Yes.

5    Q.  And you told Ari Gross at the time:  Ticket for your car,

6    charge any food, spa, message, parking to your room number 403,

7    paid for on the credit card on the file, correct?

8    A.  Yes, he was my guest.

9    Q.  And you told him in an envelope with the $2,000 cash

10   spending money for your vacation, I insist that you give --

11   that you are my guest.  Correct?

12   A.  Yes.

13   Q.  And you told him I don't want you to spend even one dollar

14   out of your pocket, correct?

15   A.  Yes.

16   Q.  And then you drafted a fraudulent email about the Blau

17   lease, correct?

18   A.  No.

19       MR. MAZUREK:  I have nothing further, your Honor, at

20   this time.  I'm not done with cross-examination.

21       THE COURT:  Members of jury, we'll take our break for

22   the day and finish for the day.  I will instruct you, as I

23   always have, don't read anything about this case.  If you were

24   to see something about this case in writing, stop reading.

25   Don't listen to anything about this case.  If you hear anything

1    about this case, stop listening.  Don't discuss this case with

2    anyone else.  Don't allow anyone to discuss this case with you.

3    Don't do any research related to any of the people or issues

4    involved in this case.

5           As usual, I would like you here at 9:00 o'clock

6    tomorrow, and we'll go until 2:30.  Also, make sure that you

7    don't leave any -- leave the notebooks in the jury room, but

8    don't leave any other personal items in the jury room.

9           We'll see you tomorrow at 9:00 a.m.

10          (Jury not present)

11          THE COURT:  Any reason not to excuse the witness?

12          MR. BELL:  That's fine.

13          MR. SCHECHTMAN:  Could I ask for the witness's lawyer

14   to remain in the room for a minute?

15          THE COURT:  Okay.

16          MR. SCHECHTMAN:  Two requests.  The witness is on

17   cross-examination, and I know that the government has no

18   intention of talking to him during his cross-examination.  I

19   just wanted to confirm that that's the case.

20          MR. BELL:  It always is, your Honor, it is now.

21          MR. SCHECHTMAN:  He has two lawyers who watched this

22   whole thing, and I ask that they he be instructed not to talk

23   to him while he's on cross-examination.  Because they sat in on

24   every proffer and sat in the courtroom and sat in the courtroom

25   at times when the witness hasn't been here.  And what they're

HAUTSEA6

1    going to do -- I say this respectfully, I was called

2    disingenuous the other day -- they're perfectly capable of

3    coaching this witness as well.

4           So I would ask that nobody coach this witness this

5    evening because he's on cross-examination.  He already hasn't

6    done very well, and it seems to me that he doesn't need to be

7    coached.

8           MR. BELL:  Your Honor --

9           THE COURT:  Hold on.  Let me find out from defense

10   counsel, what authority are you citing for this proposition

11   that I should keep a witness's lawyers from talking to this

12   witness while the witness is being cross-examined?

13          MR. SCHECHTMAN:  I don't mind that they talk to him

14   and say keep up the good work, but if they're allowed to come

15   and shape his cross-examination, I don't know what world this

16   is.

17          And so if you're asking me:  Do I have a case?  No.

18   But there's a reason they can't talk to him, and reason they

19   can't talk to him is because you can't coach a witness on

20   cross-examination.  Why should they be able to do it?  They

21   will walk out here and say that answer wasn't perfect, you

22   could say this if the subject comes up again.  How does one

23   allow that?  He's on cross-examination.  When our witnesses are

24   on cross-examination, we can't use proxies.  So I don't know a

25   case, I will try and find one, but I would be taken aback by

HAUTSEA6

1    the notion that they're allowed to do what the government

2    can't.

3            THE COURT:  What sort of coaching is it that you're

4    concerned about?  I don't think there's a lot of mystery as to

5    what some of this cross-examination is going to be.  Give me a

6    sense.

7            MR. SCHECHTMAN:  Why do we have a rule they can't

8    coach them?

9            MR. BELL:  I will tell why we're not going to speak to

10   Mr. Rechnitz, your Honor, it's because it would open itself to

11   a fairly easily identifiable avenue of cross, and more to the

12   point we don't think there's any need.

13           I struggle to come up with any sort of authority for

14   the extraordinary relief that Mr. Schechtman seeks here.  And

15   with your Honor having been a defense counsel, it doesn't sound

16   like your Honor is familiar with any such authority either.  I

17   tend to think that, much like earlier, we all sort of

18   recognized the need for the Court not to police the seating

19   arrangements within the court, so too, do I find little

20   justification or authority for the Court, or Mr. Schechtman

21   through the Court, to police Mr. Rechnitz's communications with

22   his counsel.

23           THE COURT:  Let's do this, because I think we may be

24   arguing over something that is entirely moot.  His counsel are

25   here.  I would assume they have no desire to coach him anyway.

HAUTSEA6

 1    But let's hear, his counsel are here, put your name on the

 2    record, please.

 3              MR. LEVINE:  Alan Levine and Laura Birger.  We

 4    represent Mr. Rechnitz.  I don't know of any legal basis for

 5    Mr. Schechtman's application, and we have our professional

 6    responsibilities.  We'll need to live up to them.

 7              THE COURT:  But my question is without --

 8              MR. LEVINE:  Your Honor, the word "coaching" has

 9    different meetings.  I never, quote, coached a witness, whether

10    I have been at the front table or the back table.  So I have my

11    professional responsibilities to my client, and I will live up

12    to them, your Honor.

13              MR. SCHECHTMAN:  That's a lovely answer, which I take

14    it means the following, that he has full intentions to talk to

15    this witness about his questions and answers.  I'm asking that

16    he not be able to do it, because you have a witness on

17    cross-examination who is struggling.  That answer says I plan

18    to go out and talk to him about how he answered questions.

19              My good friend here says the following:  We wouldn't

20    do it because it opens a line of cross-examination.  If I tried

21    to ask what did Mr. Levine say to you, the answer is it's

22    privileged, so I can't open up that line of cross-examination.

23    So we now have a situation where he can coach, or whatever word

24    he wants, and I can't inquire about it because it's privileged.

25              MR. BELL:  This is the latest --

HAUTSEA6

1          THE COURT:  Hold on.  Let me get a clearer sense from

2     defense counsel as to what you mean by coaching.  Are we

3     talking about there was conversations before with this witness

4     about the San Antonio Spurs and Cleveland Cavaliers, are we

5     talking about Popovich-style coaching or something a little

6     more laid back?

7          I'm saying, without characterizing how the witness may

8     or may not be doing, in terms of how well or not well the

9     witness is doing on the stand, the witness is on the witness

10    stand, the witness has been asked questions by counsel, and it

11    is what it is.  I just want to make sure I'm clear as to --

12    just give me an example of what it is you think, because I'm

13    trying to get my mind around this.  So if his lawyers says to

14    him what, try to be as evasive as you can, that is something

15    that --

16          MR. SCHECHTMAN:  I know both of them to better to say

17    that.  But if he said the following:  If you get that question

18    again, or if you get an opportunity tomorrow, clarify it this

19    way, or even if it is when you do this, you're being smug,

20    which is it to say, he's on cross-examination, and they should

21    not be able to tell him anything about how he should be

22    answering questions.

23          THE COURT:  I will say this:  Counsel are very

24    experienced lawyers.  If a witness is asked a short leading

25    question and the witness becomes evasive, that will be very

1    obvious to the jury.  If the question is such that gives the

2    witness the opportunity to elaborate or to give an answer if

3    it's a more open ended question, yes, there is a risk that the

4    witness is going to volunteer more information that may be not

5    particularly helpful to the person cross-examining that adverse

6    witness.

7             I will certainly be watching closely, and if the

8    questions are of such -- counsel can ask questions however me

9    wish to ask them, if the questions are such where I feel that

10   the witness is avoiding answering the questions or giving a

11   narrative question when it is clearly not required by the

12   question, then there are remedies that we can have for that.

13            But give me a clearer sense, again, if you're talking

14   about basically body language, like his lawyers acting like

15   body language experts?

16            MR. SCHECHTMAN:  I'm talking about the following:  He

17   got hurt badly this afternoon, because as far as I can tell --

18   this is my second point.  As far as I can tell, this fellow

19   bribed somebody to write an email that they gave to the

20   government.  So that's not a really good piece of

21   cross-examination if you're a witness.

22            Now if the question is you weren't clear about this,

23   or clarify that, or if you get a chance tomorrow, make sure you

24   say this, I'm not saying it because I'm telling him to lie but

25   telling them how to make his testimony better, clearer,

HAUTSEA6

1    whatever it may be.

2              Now if I say to him did you talk to your lawyers last

3    night, I did, what did they say to you, objection, privileged.

4    What do I do?

5              THE COURT:  Wait a minute, let's find out here.  I

6    guess if we play that out, in terms -- if you ask this witness

7    a question, give me an example of a question you would ask this

8    witness in terms of did you talk to your lawyers last night,

9    yes, I did.

10             MR. SCHECHTMAN:  Did they discuss any of the questions

11   that were put to you today.

12             THE COURT:  And if he said --

13             MR. SCHECHTMAN:  Privileged.

14             THE COURT:  Well, I don't know if that's necessarily

15   privileged, that kind of general question.

16             MR. SCHECHTMAN:  Did they give you any advice,

17   privileged.

18             THE COURT:  I don't know if giving advice about a

19   general topic matter invokes the attorney-client privilege.  If

20   you ask a general question such as did they talk to you about

21   your testimony here in court, and if he says yes, it seems to

22   me that you have an answer that you do whatever you want to do

23   with that answer.

24             MR. SCHECHTMAN:  What did they say to you.

25             THE COURT:  There may very well be a privileged

HAUTSEA6

1      objection.

2                  MR. SCHECHTMAN:  That's my problem.

3                  THE COURT:  Why is that a problem?  Some of what

4      you're saying is this witness's mind is cloaked in mystery and

5      cloaked in the desire to lie, and such --

6                  MR. SCHECHTMAN:  You have a very good prosecutor stand

7      up and saying they don't do it because it opens a line of

8      cross-examination.  What did the government tell you to say?

9      If I try that now, right, the answer is privileged.  All I'm

10     saying is let him be a witness.  Let him get on the witness and

11     testify.  Ask him about the Cleveland Cavaliers, they lost last

12     night, I'm surprised.  Let him talk about the Cavaliers, but

13     don't let him talk about his testimony.

14                 MR. BELL:  Your Honor, may I be heard here?

15                 THE COURT:  Sure.

16                 MR. BELL:  Mr. Schechtman is raising an issue that is

17     not unique to this case.  The witnesses testified.  Witnesses

18     testify pursuant to cooperation agreements and testify.  If

19     Mr. Schechtman, notwithstanding the fact that the number of

20     cooperating witnesses who have testified over the course of

21     more than a day, have come through here probably like

22     McDonald's, billions and billions served, if there is a bit of

23     case law that actually supports what he is asking for here, I

24     will be pretty surprised.

25                 But the other thing that I will offer, just by way of

HAUTSEA6

1   helping to -- the other thing that I offer is we are not

2   planning to talk to Mr. Rechnitz's counsel about the substance

3   of his testimony at all, or really at all except to coordinate

4   his getting here in the morning.  But I think fundamentally

5   there's nothing that distinguishes this case from every other

6   case in which a witness has had counsel.  And there's no

7   authority that I am aware of, and that I think that Mr. Levine

8   is aware of, that supports that sort of remedy.

9           MR. SCHECHTMAN:  How is this, Judge, one month ago in

10  this courtroom in United States versus Billy Walters, Judge

11  Castel granted this exact request.

12          MR. BELL:  I would love to see it.

13          MR. SCHECHTMAN:  16 CR 338.

14          MR. BELL:  It seems to me Mr. Schechtman is reading

15  from a written note that says Judge Castel granted that

16  request.  We would like an opportunity to look into this some

17  more.  But it seems an extraordinary remedy, objectively,

18  Judge.  It's not one that I'm aware of, it's not one that your

19  Honor seems to be aware of, it's not one that Mr. Levine seems

20  to have been aware of, and between --

21          MR. SCHECHTMAN:  What is extraordinary by saying let

22  him be a witness?

23          THE COURT:  Docket number 16338.

24          MR. SCHECHTMAN:  I don't know if the order is on the

25  docket, but I know he was ordered not to talk to him.

HAUTSEA6

1          MR. BELL:  If it is possible for Mr. Schechtman, if

2     he's aware, to provide some color as to what in that instance

3     provided that rare and extraordinary relief, I would love to be

4     educated as well.

5          MR. SCHECHTMAN:  As far as I know, the color was this:

6     The witness was in the middle of cross-examination, he had his

7     lawyer, and an instruction was given so that no one would tell

8     him how to do anything other than testify on his own.

9          MR. BELL:  If those are the essential facts, then it

10    is a remarkable thing that nobody ever heard of this happening

11    before.

12          THE COURT:  Hold on.

13          MR. SCHECHTMAN:  Judge, could I propose the following?

14    Both parties have until six to see what authority we can find,

15    including this case, that counsel for the witness will be

16    instructed not to have such conversations until six o'clock.

17          THE COURT:  Okay.  Hold on.

18          (Pause)

19          THE COURT:  I don't see anything evident on the

20    docket.

21          MR. SCHECHTMAN:  May we have until six?  I think we

22    could get the transcript.  Barry Burke tried the case.  I think

23    I could call him, and he's usually pretty quick to respond.

24    But all we're asking is that the lawyers be instructed until

25    six o'clock that they not talk about the case, and if we don't

HAUTSEA6

1    persuade you by six o'clock there's precedent for this —— it

2    does make good sense, but if we don't persuade you, you could

3    put an order on the docket saying they're free to coach him.

4              THE COURT:  Hold on.  It does seem that not talking

5    about the case is a little broad.  If your concern is really

6    about not talking about the subject matter of his testimony ——

7              MR. SCHECHTMAN:  That's right, Judge.

8              THE COURT:  That seems more cabined to what we're

9    talking about.

10             MR. LEVINE:  Your Honor, I object.  Absent an order

11   from this Court, I have absolutely every intention of following

12   my professional responsibility to this client.  The fact that

13   there was going to be cross-examination of Mr. Rechnitz or any

14   other witness has been known to the defense.  If they wanted to

15   impose this kind of order on me during this trial they have had

16   months to think about it and present that legal authority to

17   the Court.

18             I don't see any —— I have never heard of this kind of

19   instruction given to a defense counsel, and I'm surprised that

20   a fellow defense counsel is seeking to prevent a witness's

21   lawyer from giving that client legal advice.  I certainly

22   understand what the word "coaching" means, and Mr. Schechtman

23   knows me well enough to know that I know my professional

24   responsibilities and I don't see any legal basis for this Court

25   to impose that kind of order.

HAUTSEA6

1      THE COURT:  I suppose this is what I was trying to

2  find out, if there was a way that we could come to some sort of

3  agreement.  It seems to me if not, I will need some time to

4  look into this, but it seems to me it doesn't sound as if

5  counsel for Mr. Rechnitz has any desire to coach Mr. Rechnitz

6  regarding the subject matter of his testimony.  If that is in

7  fact correct, it seems to me that you don't need an order from

8  me if counsel will state that that is not the intention of

9  counsel, as an officer of the Court, you don't need any order

10  by me.

11      MR. LEVINE:  I don't know how Mr. Schechtman is using

12  the word "coaching."

13      THE COURT:  What I'm saying is talking about the

14  subject matter of a witness's testimony.

15      MR. LEVINE:  I'm not going to represent to the Court

16  what I'm going to talk to my client about.  That's protected by

17  the attorney-client privilege.

18      THE COURT:  Okay, let's do this --

19      MR. BELL:  Your Honor, the other thing that I note,

20  this is extraordinary relief to seek on any timeline.  It's

21  extraordinary to seek between now and sometime tonight, it's

22  extraordinary to seek for the reminder of the trial, it's not

23  something that we're aware of there being any authority.

24      THE COURT:  What we're doing now is free-styling.

25  Give me 30 minutes to look, and let's have everyone hang out

HAUTSEA6

1    for 30 minutes, and let's not have --

2                MR. BELL:  I will put one other thing on the record

3    your Honor, it only goes to the premise Mr. Schechtman's

4    argument.  We disagree with his characterization of the

5    testimony.  I think the witness is doing awesome.

6                THE COURT:  So give me 30 minutes and let me look into

7    this.  I will be back in 30 minutes.

8                (Recess taken)

9                THE COURT:  Have counsel had a chance to look into any

10   cases or Judge Castel's transcript?

11               MR. BELL:  We did, your Honor.

12               THE COURT:  Let me hear you.

13               MR. SCHECHTMAN:  Judge, I can start.  I stopped

14   looking for cases when I found the Supreme Court case.

15               THE COURT:  Okay.

16               MR. SCHECHTMAN:  *Perry v. Leeke*, 488 U.S. 272, 281.

17   If I understand it right, it says you have discretion to do it.

18   He has no right to consult with counsel.

19               THE COURT:  Speak up.

20               MR. SCHECHTMAN:  It says you have discretion to do

21   this, to issue such an issue, preventing communication about

22   the subject matter of the cross-examination.  It's in your

23   discretion.  It's 488 U.S. 272 at 281.

24               MR. BELL:  I'll add some meat to those bones, your

25   Honor.  I think the tail end of the opinion is perhaps clearest

HAUTSEA6

about this.  This concerned a 15-minute break over which the

judge had reason to believe that that was the only thing that

they might talk about, and the opinion was very narrowly

cabined.  We certainly don't disagree with the notion that your

Honor has the discretion to order such a thing, but that should

inform to some degree how that's carried out.

        I note this with respect to the Walters case before

Judge Castel, our understanding is that Mr. Burke -- and we

have not just an understanding, we have reviewed the

transcript -- Mr. Burke originally broached this because of a

relationship that existed between the witness's counsel, whose

twin brother was still a member of the office, and there was

some agent entanglements as well.  Judge Castel, for the first

evening, essentially used his discretion to order that counsel

not talk to the witness.  The next day -- and I gather that

this was relatively early on in the witness, Mr. Davis',

testimony.  The next day he pulled back, and he pulled back for

reasons that I think are instructive here.  And perhaps the

most useful thing that I could do is give your Honor the

relevant pages of testimony.

        But the upshot is that the witness's attorney

represented that he understood that there was going to be

cross-examination, quote, about whether the witness has

committed certain crimes and whether he violated his

cooperation agreement.  Counsel agreed, believed in good faith

1   that, as his counsel, he's going to have questions about that

2   for him.  He, therefore, asked specifically not to talk to him

3   about his testimony or how he should testify later in the day.

4   I'm quoting from the transcript here, but then noted if he

5   wants to ask me about the issues he has been questioned about,

6   I would like to be able to give him legal advice.  At which the

7   court said:  Well, I understand your point.  There was some

8   colloquy as to why that couldn't wait until the witness was off

9   the stand, but ultimately there was a ruling that he couldn't,

10   and that was appropriate, again, in the Court's discretion to

11   pare back that initial ruling.  That is in the Walters

12   transcript on pages 1070 through 1073, and I'll hand that up to

13   your Honor, because it's a quick read.

14        THE COURT:  Okay.

15        MR. BELL:  But the upshot is the reason why Judge

16   Castel pared back his ruling is because there was an active

17   concern, as there very clearly is here, about questioning that

18   was going to go to whether the defendant had committed a

19   criminal act, specifically fraud, whether the defendant might

20   be in violation of his cooperation agreement.

21        The seal's already been broken on both of those topics

22   when it comes to this witness.  So I would think, if anything,

23   if we were going to follow the example of Walters here, again

24   at baseline an extraordinarily rare example of a judge even

25   using discretion in this way, then it ought to be done not in

HAUTSEA6

blanket fashion but such that Mr. Rechnitz can legitimately

seek counsel in areas that are live clearly and important

clearly.

         More than that, though, at best, the Supreme Court

opinion is that this is the sort of thing that is within your

Honor's discretion.  This doesn't seem to me to be

distinguished from any number of other circumstances, literally

hundreds, your Honor, in which cooperation testimony begins one

day and concludes another day or cross-examination begins one

day and concludes another day.  And for that reason, we would

ask specifically that this not be treated in any way different

than cross-examination in most instances, because I don't think

that there's been any specific reason presented that

distinguishes it here.

         But more than that, if your Honor is inclined to

entertain this motion of providing this extraordinarily rare

remedy, a remedy sufficiently rare that nobody in the room was

sure it existed, we would ask that it be appropriately pared

down at least to follow the contours of Walters.

         I don't know if Mr. Rechnitz's counsel wants to add to

that, but that's the government's position.

         THE COURT:  Let me ask defense counsel, what is your

view on the distinction between the time frame in terms of the

time of the break and the time of the prohibition between

counsel speaking to her client between such as a *Perry v. Leeke*

HAUTSEA6

case or a *United States v. Geddes* case, which is kind of what

started this about an overnight break with the defendant.  And

let me get the government's take on whether it's a non-party as

opposed to a criminal defendant.  Let's start with defense

counsel first.

MR. SCHECHTMAN:  I think the *Perry v. Leeke* case is a

witness, and I think it's clear you have discretion.

If it was earlier in the day, 11 o'clock, and he said

he wanted to talk to his lawyer, I suppose the answer is if he

really has a legal issue, he's not sure whether he should

invoke, not sure whether this testimony is violative of the

agreement, I don't think I could stand in the way of that.

So to the extent you have a modification here, it

strikes me as a sensible one.  I don't want to get in the way

of giving legal advice.  But what I do want to get in the way

of is having lawyers talk about what the right answer is, how

to answer questions better, how to change answers, not so that

they're false, but that they're come across better or any of

that.

So if you want to make the modification that has been

suggested and say that they can give legal advice, I'm okay

with that.  But there's a part of me that is sort of taken

aback by all this, which is they know they can't talk to this

witness.  That has been the rule in this courthouse forever.

And I'm surprised that you have an Assistant United States

Attorney who stands up and says I can't do it, but God am I
lucky because I have someone else who can.  And it's not coming
from them, it's coming from this seat.  We would like him to be
able to do what we can't do.

So my view is you have discretion.  There's a
limitation that is Judge Castel imposed, which strikes me as
very sensible, because you can't stop a lawyer from giving
legal advice, particularly to someone who may need it.  But to
go beyond that and to talk about the subject matter of the
examination where it's not giving legal advice, it's just
talking about how to answer questions and how to answer
questions better and demeanor and other things, seems to me
they can't do it, they shouldn't be able to do.

Now it's not for me to pry, but they have been back
there for the last hour and ten minutes.  I guess the answer is
there's no order.  So maybe this is moot.  Which is I wouldn't
have gone back there if it was me, if I had a judge out who was
trying to decide this issue.  But if I asked Mr. Levine did you
talk about his testimony, I know what the answer is going to
be, I know my professional responsibility.  But I assume he was
back there, he certainly wasn't here, so what am I supposed to
to about that?

But all I can say is it seems to me you have
discretion.  It's not unreasonable.  This is a highly important
witness.  This is the only real witness in this case, and all

HAUTSEA6

1   we're asking is, other than giving legal advice, don't talk to

2   this person about the subject of his testimony so that we can

3   cross-examine him on counsel.

4           THE COURT:  Let me ask you this question before we go

5   further down this road.  I don't believe that the government

6   has indicated a desire to have counsel for this witness speak

7   to this witness on their behalf or at their behest.  If that is

8   the concern, the concern is that counsel for the witness is

9   going to basically be the assistant coach for the government

10  and going to try to attempt to coach this witness in a way that

11  the government would approve of, it certainly seems there's

12  nothing barring me from prohibiting the government from

13  speaking to Mr. Rechnitz's lawyers about the subject matter of

14  his testimony, if that was your concern.

15          MR. LEVINE:  Your Honor --

16          THE COURT:  Hold on.  If that's the concern.  I do

17  want to make sure I have a clear sense of what the concern is,

18  because what you have talked about thus far is coaching, and it

19  seems that you're talking about coaching this witness in a way

20  so that this witness will come across better in terms of

21  demeanor and in terms of what the witness is saying.  Is that

22  what the concern is?

23          MR. SCHECHTMAN:  This guy, every time you ask him a

24  question he says nope, nope, and he does it each time more

25  arrogantly than the time before.

HAUTSEA6

1          THE COURT:  Hold on.  What my concern is is this -- go

2      ahead.

3          MR. SCHECHTMAN:  Can we say to him don't say nope, say

4      no, say no, sir, but don't say nope, it's not coming across

5      well.  My view is he shouldn't be able to do it.  That's not

6      legal advice.

7          THE COURT:  To the extent that there was a concern

8      about the lawyers trying to coach them, again, this is not --

9      it doesn't take a psychic do be able to make some of these

10     determinations and to get some of this out, but to the extent

11     that that's a concern, obviously you're expressing this concern

12     here, and maybe the lawyer will do this.

13          It does seem to me some of this is readily apparent in

14     terms of what you're talking about, perhaps, in terms of

15     witness's demeanor.  If the witness's demeanor somehow changes

16     drastically tomorrow, if the witness's manner in answering

17     questions somehow changes drastically, I do think that it may

18     be appropriate for counsel to ask this witness if this witness

19     had conversations with counsel about the subject matter of

20     testimony.  That's a yes or no answer.  That's some of the

21     things that Judge Castel talked about also in this colloquy.

22     If the answer is yes, then the jury will do with it as it must

23     or as it wants to.  If the answer is no, you're stuck with that

24     and we move on.  But it seems that kind of deals with the

25     concern.

HAUTSEA6

1          MR. SCHECHTMAN:  The if the answer is yes, I'm stuck

2     with it.  If I want to say did they tell you yesterday all day

3     you said nope, now today you haven't said nope once, did your

4     counsel tell you not to say that?  The answer is privileged.

5          THE COURT:  I don't know if that's necessarily

6     privileged.

7          MR. SCHECHTMAN:  If that's not, I may be okay.

8          THE COURT:  I don't think that's necessarily legal

9     advice in terms of did your counsel tell you to say no instead

10    of nope.

11         MR. SCHECHTMAN:  If I could ask those questions, I'm

12    okay.

13         MR. BELL:  Couple of things, I guess.  I imagine, your

14    Honor, should that happen tomorrow, of course, it could be

15    because Mr. Mazurek asks better questions, could also be

16    because he will have taken the stand on a day when his Dodgers

17    didn't lose heart breakingly the night before.

18         But more than that, your Honor, we would ask that,

19    again, we come back to this idea of discretion.  The whole

20    thing of discretion is that you have it, but that you employ it

21    where there's an actual reason to do so.  Chris Rock had a line

22    about how just because technically you can drive a car with

23    your feet doesn't mean it need to be done.  I'm not sure that

24    there has been a reason provided to distinguish this from the

25    lion's share of cases of instances generally.  And so we would

HAUTSEA6

1    still ask that the Court not do anything here.

2              And by the way, under that -- in that view of the

3    world, Mr. Schechtman would be able to ask the same questions

4    that he alluded to a moment ago.

5              MR. SCHECHTMAN:  Judge, at one o'clock today he said

6    your Honor, may I just -- could we take a break, I would like

7    to talk to the witness.  You would say:  About what?  And if

8    the answer was about his demeanor and the way he's answering

9    questions, you would say you got to be kidding me.  Right?  So

10   all I'm saying is give legal advice, but don't talk to him

11   about the way he's answering questions.  Let him be himself.

12             MR. LEVINE:  Your Honor --

13             THE COURT:  Hold on.  Okay.  Here's what I'm concerned

14   about.  I'm going to get from counsel for Mr. Rechnitz -- I

15   know counsel very rarely want to concede anything, but let me

16   ask this question anyway:  What is your view on the propriety,

17   of if you speak to Mr. Rechnitz about counsel making an inquiry

18   in a general way about Mr. Rechnitz's -- if Mr. Rechnitz's

19   testimony is somehow different or his manner of testifying is

20   different or even if it's the same, what is your position on

21   whether or not it invades attorney-client privilege for counsel

22   to simply ask if Mr. Rechnitz had a conversation with his

23   lawyer between yesterday at 2:30 and today?

24             MR. LEVINE:  First, your Honor, let me clear up one

25   speculation of Mr. Schechtman that is ill founded, and the

1    government hasn't asked me or Ms. Birger to talk to our client.

2              THE COURT:  Okay.

3              MR. LEVINE:  And if the Court wants a representation

4    from me that I will not discuss during cross any concerns or

5    issues they have about Mr. Rechnitz with the government, I'm

6    prepared to give the Court that representation.  I have no

7    intention of talking to the government about the legal advice

8    that I'm going to give Mr. Rechnitz if it occurs that he needs

9    it.  So the concern that Mr. Schechtman has that me being

10   essentially an agent for the government to do indirectly what

11   the government can't do itself, I put to rest that issue, your

12   Honor.

13             Second --

14             MR. SCHECHTMAN:  That doesn't put it to rest.

15             MR. LEVINE:  You just made a big point --

16             THE COURT:  Hold on, counsel.  We have very

17   experienced lawyers going at each other in a way that's not

18   appropriate.  How about you answer my question.

19             MR. LEVINE:  Your Honor, I think a question of whether

20   he had a conversation with his lawyer between last night and

21   today is not an objectionable question as far as the attorney-

22   client privilege goes.  The fact of a conversation is not

23   protected by the privilege, so far as I know.

24             A second question of what was discussed in any way,

25   that would be a violation or invasion of the privilege.

HAUTSEA6

1          THE COURT:  So it seems to me that what makes sense

2     is, given the record before me, to the extent that I have

3     discretion to order counsel for Mr. Rechnitz not to give any --

4     not to speak to Mr. Rechnitz, I decline to do that.

5          It does seem to me that it's certainly appropriate, if

6     counsel chooses tomorrow, to go into whether or not in a

7     general sense Mr. Rechnitz spoke to his attorney before

8     testifying today, which would be tomorrow.  I think that that's

9     fine, and I think that sort of cures most of the concerns that

10     Mr. Schechtman has, and that Mr. Huberfeld has.  Certainly

11     not -- I don't know if counsel particularly cares as to what

12     might be the reason if in fact Mr. Rechnitz's testimony is

13     somehow different, if he answers in a different way or has a

14     different demeanor, there certainly may be reasons that counsel

15     could bring out as to why Mr. Rechnitz changed his tone or his

16     way of answering in terms of whether or not he spoke to his

17     attorneys, whether or not he thought about how he was doing,

18     whether or not he spoke to anyone else, whether or not whatever

19     the case may be.

20          I think that that's all fine, and I don't think

21     there's any problem there, and I think that certainly solves

22     the concern that counsel raised in the most appropriate way.  I

23     don't want to interfere with Mr. Rechnitz's right to obtain

24     legal advice because Mr. Rechnitz is testifying pursuant to a

25     cooperation agreement which certainly covers many crimes.  But

HAUTSEA6

1    my recollection of the cooperation agreement is not that it

2    covers everything, it covers basically the crimes that the

3    government has indicated Mr. Rechnitz talked about.

4           So if there are other crimes out there that counsel

5    may wish to go into, and from the opening statement and from

6    earlier legal arguments we have had here, I have a sense that

7    counsel may wish to do that.  I would certainly give counsel

8    scope to do that if they chose to do that.  It seems to me it

9    would be appropriate for Mr. Rechnitz to be able to talk to a

10   lawyer about that.

11          So that's is what I'm inclined to do, but I will hear

12   if there's anything for counsel from the government,

13   Mr. Seabrook, Mr. Huberfeld or Mr. Rechnitz.

14          MR. BELL:  That sounds fine, your Honor.

15          MR. SCHECHTMAN:  Six days ago you told me that I

16   should know when I'm winning, I suppose I should also know when

17   I'm losing.  Nothing more.  I hope that we can limit what is

18   said legal advice, but counsel will do what he thinks is

19   appropriate.

20          I want to raise one other issue briefly.  Mr. Seabrook

21   said I don't have him over for dinner I'm in trouble.  If I

22   understand the testimony at the end of the day, your Honor, the

23   testimony at the end of the day came out a little bit

24   disjointed, but the testimony at the end of the day was that

25   there was an email prepared that was given to government to

HAUTSEA6

1    exonerate this witness about inflating a rent presumably to get

2    a bigger mortgage.

3            What we learned was the witness essentially wrote it,

4    he didn't like the first version and he rewrote it.  What we

5    also learned is, coincidentally, I suppose, the witness was at

6    a fancy hotel on the West Coast, paid for by Mr. Rechnitz, with

7    cash left for him and the like.

8            It is the case and that at the end of this case the

9    government is going to stand up and say there is a cooperation

10   agreement here and that's why he's being so truthful.  That's a

11   horse that's been pounded before, but I simply ask that the

12   government go back, take a look at that testimony, because I

13   think what happened is that witness was bribed to write an

14   email that suited this person's interest, and when he didn't

15   get that interest, he wrote it himself.

16           If that's the case, all of which happened after June

17   of 2016, the government should not be standing up and saying we

18   have a cooperation agreement.  I'm not asking for any relief,

19   I'm just asking that the government take a look tonight at that

20   testimony, because I think it's -- at bottom, it's pretty

21   damning.

22           THE COURT:  Okay.  Anything else from the government

23   on that?

24           MR. BELL:  I can only add okay of my own, your Honor.

25           THE COURT:  All right.  Is there anything else that we

HAUTSEA6

1     need to discuss today, counsel?

2                 MR. BELL:  No, your Honor.

3                 MR. SCHECHTMAN:  No, your Honor.

4                 MR. MAZUREK:  No, your Honor.

5                 THE COURT:  Okay.  I will see everyone here.  Let's

6     get everyone here at ten minutes to nine in the morning.  Can I

7     get a sense -- I will give you plenty of scope with this

8     witness, counsel, do you have a sense to whether or not you

9     will be finished with this witness tomorrow?

10                MR. MAZUREK:  I will try to do all my cross tomorrow.

11                THE COURT:  Okay, see you then.

12                (Adjourned to October 31, at 9:00 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                     INDEX OF EXAMINATION

2    Examination of:                        Page

3    JONA RECHNITZ

4    Direct By Mr. Bell . . . . . . . . . . . . 800

5    Cross By Mr. Mazurek . . . . . . . . . . . 882

6                     GOVERNMENT EXHIBITS

7    Exhibit No.                        Received

8     1011   . . . . . . . . . . . . . . . . . 810

9     1032   . . . . . . . . . . . . . . . . . 812

10    1023   . . . . . . . . . . . . . . . . . 814

11    660 through 663  . . . . . . . . . . . . 823

12    716   . . . . . . . . . . . . . . . . . . 829

13    666   . . . . . . . . . . . . . . . . . . 830

14    1065 and 1066  . . . . . . . . . . . . . 831

15    901, 902, 905 through 908, 911 and 912   . . 840

16    1506   . . . . . . . . . . . . . . . . . 842

17    15, 19, 1201 through 1204, 1207 through . . . 856

18              1216, and 1219 through 1226

19

20

21

22

23

24

25
```