HAVJSEA1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          16 Cr. 467 ALC

5   NORMAN SEABROOK AND MURRAY HUBERFELD,

6              Defendants.

7   ------------------------------x

8

9

10                                        October 31, 2017
                                          8:57 a.m.
11

12

13  Before:

14             HON. ANDREW L. CARTER, JR.,

15                                        District Judge
                                          and a jury
16

17

18                         APPEARANCES

19  JOON H. KIM,
         United States Attorney for the
20       Southern District of New York
    KAN MIN NAWADAY,
21  MARTIN S. BELL,
    RUSSELL CAPONE,
22       Assistant United States Attorneys

23

24

25

HAVJSEA1

APPEARANCES (Continued)


BRACEWELL, LLP,
        Attorneys for defendant Seabrook
BY:   PAUL LEWIS SHECHTMAN, Esq.
      MARGARET EMMA LYNAUGH, Esq.
                Of counsel


MAZUREK LIPTON, LLP
        Attorneys for defendant Huberfeld
BY:   HENRY EDWARD MAZUREK, Esq.
      EVAN LOREN LIPTON, Esq.
                Of counsel


Also Present:
        BARD HUBBARD, Special Agent FBI
        YOLANDA BUSTILLO, Paralegal USAO
        AUGUSTA GRANQUIST, Paralegal




            (In open court; jury not present)

            THE COURT:  Okay, let's get counsel in.  (Pause)

            I think counsel and the parties are all here.  Let me

just check in with counsel while we are waiting for the jury,

we are a little early, 8:57.  Is there anything else we need to

address this morning?

            MR. BELL:  Yes, yes, there is, your Honor.

            I think with Mr. Shechtman's consent, at least we

would like to do so in the robing room.

HAVJSEA1

1           MR. MAZUREK:  Now or later?

2           MR. BELL:  We want to tee this up now and save us some

3    time later.

4           MR. SHECHTMAN:  Objection.  We can come in early

5    tomorrow morning.  The witness --

6           MR. BELL:  This strikes us as something we can talk

7    about at the break.

8           MR. SHECHTMAN:  My input is zero, sadly, on

9    cross-examination.  I understand the issue, we have spoken

10   about it, but we can do it at a break or first thing in the

11   morning or after 2:30 today.  I think we should get started

12   with the jury.

13          THE COURT:  They're not here yet.  Do you want to tee

14   this up for me briefly while we are waiting for the jury to get

15   here.  It its a little before 9:00.  I want to have a sense

16   where this is going.  Let's go in the robing room briefly.

17          (At the sidebar)

18          MR. SHECHTMAN:  One reporter asked me to express his

19   objection to doing this in the robing room.

20          THE COURT:  Okay.  Give me a sense of what we are

21   talking about here?

22          MR. BELL:  So it came to our attention by way of

23   disclosure from Mr. Shechtman last night that Mr. Seabrook,

24   during their cross-examination of Mr. Rechnitz, intends to at

25   least make --

HAVJSEA1

1          MR. SHECHTMAN:  I want to get Gussie in here so she

2     knows what is going on.  My apologies.

3          MR. BELL:  To at least --

4          THE COURT:  Hold on.

5          (Pause)

6          MR. BELL:  It is their intention, as we understand it,

7     to at least make use of if not enter into evidence some

8     exhibits that I guess would tend to make the current witness,

9     Mr. Rechnitz, look like a huge racist.

10          There is audio conversation of unflattering racial

11     things that he has said.  There are pictures of him in an

12     inflammatory -- one picture of him in an inflammatory costume,

13     the likes of which I think would have the tendency, strong

14     tendency of which I think to immediately inflame the passions

15     of the jury.  Even if the evidence itself were to be entered

16     but it were to, but testimony concerning it were to come out, I

17     think that the reflexive, almost necessary reaction of the jury

18     would be a degree of pure loathing for the racially

19     inflammatory nature of this stuff.

20          I find it difficult to imagine it not altering the way

21     that they perceive the witness in ways beyond what is

22     permissible.  By my reckoning, if this sort of evidence is

23     admissible -- setting aside the various, you know, 608, 609

24     concerns -- if this stuff comes in, we ought to retire Rule 403

25     number right now, raise it up to the rafters because there is

HAVJSEA1

1    no way that that is not more prejudicial than it is probative.

2           I am not sure what the actual purpose of this is, and

3    perhaps it makes sense to let defense articulate that for

4    themselves, but we would ask that it be excluded, categorically

5    excluded.

6           THE COURT:  Okay.

7           MR. SHECHTMAN:  I can show your Honor what it is.

8           THE COURT:  Okay.

9           MR. SHECHTMAN:  They put in, as you know, a picture of

10   the witness, and I wanted to show him that.

11          MR. BELL:  That is not what I referenced to date.

12          MR. SHECHTMAN:  That is not what the government is

13   most concerned about.  That is a picture of witness in black

14   face, and there is a tape that was provided to us in discovery

15   in which the witness is talking to someone, I think it is his

16   brother-in-law, and Jona says he is getting so screwed, it just

17   bothers me, he is a schmuck.  What it is a shvartza?  Shvartza

18   is I think it is a Yiddish word.  If you were to Google it, the

19   definition tells you that it is highly derogatory and I think

20   the first example it gives is I can't believe my son came home

21   or daughter came home and is going to marry a shvartza.

22          It is equivalent in Hewbrew or Yiddish of the N word.

23   There is another reference where his wife says she is watching

24   the state of the union, and Jona writes, President Obama

25   Shvartza.  My purpose in doing it is because I think this

HAVJSEA1

witness is biased against and holds African-Americans in low regard.

I don't know people in 2017 who still think it is appropriate to go to a party in black face.  I don't know that many people who aren't marching in Charlottesville, who think it is appropriate to call the President of the United States of the shvartza, and what he thinks of African-Americans is pretty clear, he is getting screwed, a schmuck, a shvartza.

When you hold someone in low regard, picking him as the target that you're going to frame is easier and this, I rely on the Second Circuit's opinion in Figueroa, in which the witness against the defendant had a swastika.  The court said it was relevant to show bias, that the defendant was African-American, the witness was white.

Your Honor can read the opinion.  There was the 403 question is left open because it wasn't argued below as eloquently, but the court seems to suggest even if it had been argued below, it would have been error to exclude it.

As for 608 and 609, 609 is irrelevant, it is not a conviction.  608 is irrelevant.  I am not offering it to show truthfulness.  I am offering it to show bias.  In Figueroa, bias is never extrinsic.

That is the issue teed-up and that is my reason for wanting to do it.  I have copies of Figueroa for your Honor.  I won't cross till tomorrow.  I don't mean this in a bad way.  I

HAVJSEA1

1      may be lucky if I am on Friday, but I hope not.

2              Your Honor has the issue.  I'll hand up the case to

3      your law clerk and we can talk about it at your Honor's

4      convenience.  That is exactly what I intend to do.

5              THE COURT:  Thank you for teeing this up for me.

6              What is the context of the statement of the I am

7      getting screwed by this?  Whom is he referring to?

8              MR. SHECHTMAN:  I forgot tell you, Mark said you were

9      really very helpful today.  Mark you know what he is getting so

10     screwed, it just bothers me.  Yeah, 27 percent crazy.  He is a

11     schmuck.  What is he, a shvartza?  And I don't know who Mark

12     is.  The conversation I think is with his brother-in-law about

13     somebody who is getting really screwed, so screwed that he is a

14     schmuck, he is a shvartza.

15             THE COURT:  Okay.  Thank you for raising this with me.

16     Are these mine to keep?  I will let you have these back.

17             MR. MAZUREK:  While we are back here, I have an issue.

18             I would like to move into or seek to move into

19     evidence Defense Exhibits MH 409, 10 and 11.  Those were

20     identified by the witness at the end of the day yesterday as

21     photographs of cash and keys and notes left for Mr. Gross' all

22     expense paid vacation in Beverly Hills as well as the copy of

23     the invoice of the hotel.

24             I know the government may have an objection to that

25     based on 608 (b).  I would argue that this is not extrinsic

HAVJSEA1

evidence going to collateral matter.  It goes to the bias and

motive of this witness, and it goes to the specific issue on

trial here that we have raised time and again that if the

witness is shown -- these are actual acts of the witness shown

to be in direct violation of a term of his cooperation

agreement.

We should have the ability to be able to present to

the jury all the evidence that we have that shows that he has

committed further crimes during the course, during the time of

his cooperation agreement.

MR. BELL:  As a threshold matter, your Honor, I am not

sure what the violation of the cooperation supposedly

demonstrated yesterday is supposed to be and I would welcome

some explanation from Mr. Mazurek by way of proffer what that

is.  That is first.

Second, Mr. Shechtman noted a moment ago that the

circuit has held that bias is not extrinsic, but all of that

stuff sure is, and it seems to me that that is essentially a

clear 608 situation with some lipstick on it.  It is still

extrinsic within what the rule was intended to keep out.

We actually had an application of our own this morning

that we were going to make, which is that while Mr. Mazurek

makes use of such evidence, visible only to the witness, that

he not go about describing it as if it were in evidence because

that creates its own issue and it is one we saw multiple times

HAVJSEA1

1    this afternoon and tends to eviscerate the very purposes of the

2    rule.

3            This seems an attenuated connection at best.  I don't

4    think Mr. Mazurek has yet shown us what it is within the

5    cooperation agreement that has supposedly been violated here.

6    It seems no matter how it is dressed up, a guard variety 608.

7            THE COURT:  Before we get to the issues of 608 and the

8    like, my recollection the witness testified about this stuff

9    yesterday.  The witnesses indicated that he provided $2,000 in

10   cash to this other individual.  Am I wrong there?  Is that

11   correct?

12           MR. BELL:  That is correct.

13           THE COURT:  And the witness talked about paying the

14   hotel bill?

15           MR. BELL:  That is also correct.

16           THE COURT:  What was the other document?  The other

17   document was notes and note indicating?

18           MR. MAZUREK:  That he could spend whatever he wants,

19   it is all on Rechnitz to pay.

20           THE COURT:  The note may be slightly different.

21           I guess what I am trying to figure out is -- there was

22   no objection to that evidence when it came in, that

23   testimony -- I guess what I am trying to figure out what is the

24   prejudice to the government if an actual picture of the -- I

25   don't know if this matters a whole heck of a lot.  A picture of

HAVJSEA1

1      cash, whether it comings in or not doesn't seem all of that.

2              MR. CAPONE:  That is the whole point of 608 (b).  He

3      can ask him about it and can't introduce collateral evidence.

4              MR. BELL:  Literally just the contours of the rule.

5              THE COURT:  All right.  Let's check and make sure the

6      jury is here.  We'll cross these bridges as they come up.  The

7      other thing, I will note also yesterday toward the end of

8      direct, the government had intended to ask the question of this

9      witness in terms of what are your feelings toward the

10     defendants, and the government said they wanted to ask that so

11     the witness would say he had no hard feelings one way or the

12     other or no particular motives about the defendants.

13              That was objected to.  I sustained that objection.  It

14     does seem as a hypothetical matter if the government asked that

15     question, and the defense didn't object to that, certainly this

16     other stuff might certainly seem a lot more relevant to

17     impeaching his prior statements about not having any personal

18     grudges about these witnesses.

19              MR. BELL:  We are adapting to a world in which our

20     attempt to put that stuff in was shut down.  We recognize the

21     rationale, and consistent with that, here we are.

22              THE COURT:  It wasn't shut down.  My recollection is I

23     indicated this certainly may be relevant on redirect assuming

24     the defense crosses that bridge.

25              MR. BELL:  Sure.

HAVJSEA1

| | |
|---|---|
| 1 | THE COURT:  Let's just check and make sure the jury is |
| 2 | here.  What else? |
| 3 | MR. MAZUREK:  In terms of my moving those pieces of |
| 4 | evidence in, I want to avoid having to break as soon as -- |
| 5 | THE COURT:  Do you have to do that now?  I assume you |
| 6 | have a lot of other things you want to go into. |
| 7 | MR. MAZUREK:  Yes. |
| 8 | THE COURT:  Again just to try to keep things moving |
| 9 | here -- |
| 10 | MR. MAZUREK:  Which I want to do. |
| 11 | THE COURT:  -- not meant as a stylistic critique, but |
| 12 | let's try to keep things moving.  Generally with a hostile |
| 13 | witness, if you start asking this witness if you remember |
| 14 | reading with the government, that witness is given an |
| 15 | opportunity to, rightly or wrongly, say no, I don't remember as |
| 16 | opposed to just telling the witness you met with the government |
| 17 | on this day.  We can move things along, so let's try to keep |
| 18 | things moving. |
| 19 | MR. MAZUREK:  I will, your Honor. |
| 20 | THE COURT:  All right. |
| 21 | (Continued on next page) |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

1              (In open court)

2              THE COURT:  The jury is here.  Let's bring the witness

3      out and bring the jurors in.  Please be seated.  Welcome back.

4      Let's continue.

5       JONA RECHNITZ,  (Continued)

6         having been previously affirmed, testified as follows:

7      CROSS-EXAMINATION

8      BY MR. MAZUREK:

9      Q.  Mr. Rechnitz, yesterday we were talking on a number of

10     topics, but I wanted to start, something a little bit

11     different.

12             Before I started cross-examining you yesterday, I

13     never met you before, correct?

14     A.  That's correct.

15     Q.  But you know that I had asked your counsel to meet with

16     you, and you declined my request, correct?

17     A.  Correct.

18     Q.  That is very different from the times that you met with the

19     prosecutors and the agents, you met with them, like you said

20     yesterday, several times, correct?

21     A.  Correct.

22     Q.  Beginning in June of 2016, correct?

23     A.  Yes.

24     Q.  I am sorry.  May of 2016 was the first one in around

25     Passover, correct?

1   A.  Yes.

2   Q.  You met several times in one one week, correct?

3   A.  Correct.

4   Q.  Then you met in the summer of 2016, correct?

5   A.  Yes.

6   Q.  You met later that fall, either telephonically or in

7   person?

8   A.  Yes.

9   Q.  You continued to meet during the course of 2017, correct?

10  A.  Correct.

11  Q.  You prepared for your testimony with the prosecutors and

12  the agents in conferences in August of this year, correct?

13  A.  I think so, yes.

14  Q.  You continued to meet with them in September, correct?

15  A.  Yes.

16  Q.  And you met with them even during the time that you were

17  testifying on direct examination, correct?

18  A.  Yes.

19  Q.  You also have retained able counsel on your defense,

20  correct?

21  A.  Yes.

22  Q.  You retained former Assistant U.S. Attorneys from the same

23  United States Attorney's Office to assist you, correct?

24  A.  Yes.

25  Q.  And they have been meeting with you and assisting you in

1   your testimony as well, correct?

2   A.  Yes.

3   Q.  Did you meet with them last night before you came back to

4   court today?

5   A.  Yes.

6   Q.  Did they talk to you, without getting into the substance,

7   did they talk to you about your demeanor and how that you

8   should testify?

9           MR. BELL:  Objection.

10          THE COURT:  Overruled.

11  A.  No.

12  BY MR. MAZUREK:

13  Q.  They talked to you about the subject matter of your

14  testimony today?

15          MR. BELL:  Objection.

16          THE COURT:  Sustained.

17  BY MR. MAZUREK:

18  Q.  Yesterday we talked about the Eichlers, correct?

19  A.  Yes.

20  Q.  And I just want to clear up some things this morning with

21  respect to that.  The Solomon Plaza Building was a property

22  that you had bought as a managing member in 2015, correct?

23  A.  As a general partner, yes.

24  Q.  When you bought that property, you got a two-year mortgage,

25  correct?

HAVJSEA1                         Rechnitz - cross

1    A.   Two-year mortgage with a renewal option, yes.

2    Q.   Sometimes called a balloon mortgage.  Is that right?

3    A.   I haven't heard of that, no.

4    Q.   At the end of the two-year period in 2017, you would then

5    have to think about refinancing, correct?

6    A.   I could have extended the loan, refinance or sell the

7    building.  Those are my three options.

8    Q.   All right.

9    A.   Those are my three options.

10   Q.   Those are the three options available to you.  The mortgage

11   at that point was approximately $22 million?

12   A.   Yeah.  I had two mortgages, a senior loan and mezzanine

13   loan.

14   Q.   Now, when the two-year mortgage came due, it came due in

15   May of that year, 2017?

16   A.   Yes.

17   Q.   You didn't have the money to pay down the mortgage at that

18   point, correct?

19   A.   Meaning cash sitting in the bank, no.

20   Q.   Right.  So you needed to do one of the three options you

21   just testified about, correct?

22   A.   Correct.

23             THE COURT:  I will just remind the witness to lean

24   into the microphone and keep your voice up.

25             THE WITNESS:  Better?

HAVJSEA1                       Rechnitz - cross

BY MR. MAZUREK:

Q.   The Eichler's Bookstore was the major retail tenant who
occupied approximately 60 percent of the space in the building,
correct?

A.   No.   The building is 30,000 feet.   They had 5,000 square
feet out of the 30.

Q.   They were the major retail tenant, the highest paying
tenant in the building?

A.   They have 5,000 feet on the retail out of the 15,000, which
is a third of the retail.

Q.   And they were the highest paying tenant, correct?

A.   I am not sure if they were the highest per square foot.   In
fact, they weren't.

Q.   I am going to show you what has been premarked for
identification as MH-406.   If we can publish that just for the
witness and counsel.   Do you see that document on your screen?

A.   Yes.

Q.   You're familiar that sometime in 2017 you were marketing
the building for sale, correct?

A.   Yes.

Q.   Because that was one of the options in order to take care
of the pending mortgage that was coming due, correct?

A.   Correct.

Q.   If we could just put up Page 3 of that document for the
witness.   As part of the marketing materials for the building,

1   you would post what we call the rent roll, the rental income

2   that was being generated by the building, correct?

3   A.  This is not a copy of my rent roll.  This is for working

4   purposes.  Many times brokers project rents.  I am not sure.

5   Q.  You were in charge of marketing the building at that point

6   in time in early 2017?

7   A.  I was the general partner.

8   Q.  And one of the jobs of a general partner at that point, you

9   were working very hard on was trying to sell, refinance or

10  extend the mortgage, correct?

11  A.  That's correct.

12  Q.  As the sell option, you were marketing the building for

13  potential buyers, correct?

14  A.  I was managing the process.

15  Q.  As managing the process, you were aware of these kind of

16  marketing materials like, for example, from Ariel Property

17  Advisers, correct?

18  A.  Yes. .

19  Q.  That process you were aware that as part of the marketing

20  materials, Eichler Bookstore was being shown as the current

21  market rent, monthly rent of $46,383.00, correct?

22  A.  That's correct.

23  Q.  That amount was the highest monthly rent that was shown for

24  the property in the marketing materials, correct?

25  A.  Yes, given the square footage, it was the highest dollar

HAVJSEA1                         Rechnitz - cross

1   rent.

2   Q.  In fact, the next highest monthly rent that was being shown

3   for the building was only $14,000 by a clothing store, correct?

4   A.  Yes, at that time.

5   Q.  So the Eichler's Bookstore monthly rent was being marketed

6   as four times higher than that, correct, approximately?

7   A.  A little less, yes.

8   Q.  So you would say this is the prime tenant in the building,

9   correct?

10  A.  I would say this is the prime retail tenant for the

11  property.

12  Q.  At that point in time when you were marketing the building,

13  the owners of Eichler's were having trouble paying the rent,

14  correct?

15  A.  Not exactly, no.

16  Q.  They were behind in their rent payments, correct?

17  A.  They were always current on rent.  If they had some

18  arrears, they caught up.

19          MR. MAZUREK:  If we could show the witness again just

20  for the witness, publish just for the witness MH-417.

21  Q.  Do you remember who Henry Kohn is, sir?

22  A.  No.

23  Q.  Do you know who Eli Blau is, correct?

24  A.  I do

25  Q.  Eli Blau is the owner of was the owner of Eichler's

1    Bookstore in early part of 2017, correct?

2    A.  I know he represented his father in ownership.

3    Q.  Sorry?

4    A.  He represented the ownership.  I am not sure if he was the

5    actual owner.

6    Q.  Eli Blau you're talking about --

7    A.  Yes.

8    Q.  -- when you say he?

9    A.  Yes.

10   Q.  He was the person that the new lease you negotiated for

11   $46,000 was signed by, correct?

12   A.  Yes.

13   Q.  Approximately the end of January of 2017, you were

14   explaining to Mr. Blau that you would not negotiate a new lease

15   until a bounced check of $56,000 is settled, correct?

16   A.  No, I don't remember this.

17   Q.  You don't remember that?

18   A.  No.

19   Q.  But you did know that the lease was expiring in February of

20   2017, correct?

21   A.  Yes.

22            MR. MAZUREK:  I am going to ask to put on the screen

23   what is premarked for identification as MH-404.

24   Q.  In the process of your negotiating the Eichler lease in the

25   early part of 2017, sir, you, as the general partner, would

1    have reviewed the payments that Eichler's was making under the

2    expiring lease, correct?

3    A.   No, that is not the process.

4    Q.   You would want to know if the tenant was keeping current on

5    its lease payments as you were negotiating potential new lease,

6    right?

7    A.   Yes.

8    Q.   Because if he wasn't keeping current on his payments, that

9    might influence you as to whether you want to extend the lease,

10   correct?

11   A.   Not necessarily.  Each situation is different.

12   Q.   But that is one factor you would certainly want to consider

13   his ability --

14   A.   I would want the knowledge.

15   Q.   I am sorry?

16   A.   I would want the knowledge.

17   Q.   You obtained the knowledge when you were negotiating the

18   Eichler lease, correct?

19   A.   Again I don't remember that.

20   Q.   This was the prime tenant in the building, right?

21   A.   No.  He was the prime retail tenant.  Again the building is

22   30,000 square feet.  They had 5,000 feet out of the 30.

23   Q.   It had the highest single payment of rent per month of any

24   tenant in the building, correct?

25   A.   Because they were the prime corner and they had --

1    Q.  Yes or no, sir?

2            (Multiple voices)

3    Q.  Just listen to my questions.  It is going to be a long day.

4            My question is --

5            THE COURT:  The commentary is sustained.  Rephrase

6    your question.

7            MR. MAZUREK:  Thank you.

8    BY MR. MAZUREK:

9    Q.  My question is, you knew at the time, in February 2017,

10   Eichler's was the single larger monthly paying tenant in the

11   billing, correct?

12   A.  Yes.

13   Q.  You also knew that its lease was expiring, correct?

14   A.  Yes.

15   Q.  You also knew that you had a mortgage that was expiring in

16   May of that year, correct?

17   A.  Correct.

18   Q.  That you may need to market the building for sale, correct?

19   A.  Correct.

20   Q.  You did market the building for sale, right?

21   A.  Yes.

22   Q.  And you also knew that you needed to show or would like to

23   show that Eichler's was producing rent for the building,

24   correct?

25   A.  No.  I needed to accurately show the rent roll.

1   Q.  When you marketed it, you marketed it for the new lease

2   that you were able to negotiate with Blau of $46,000 per month,

3   correct?

4   A.  Correct.

5   Q.  If we can turn to the second page of MH-404.  Just so I

6   understand, the parcel of property in Eichler's Bookstore was

7   divided into two units, correct?

8   A.  Three units.

9   Q.  Three units?

10          If we look at what is on your screen, one of the units

11  was 5002-04, correct?

12          MR. BELL:  Objection, your Honor.  This is --

13          THE COURT:  Sustained.

14          MR. MAZUREK:  Well, if we can expand the second half

15  of this page for the witness.

16  BY MR. MAZUREK:

17  Q.  If you could take a look at the portion marked February

18  2017, does that refresh your recollection, sir, that at the

19  time, February 2017, that the amount of money that you were

20  receiving as the general partner for this building was well

21  below what was owed at that point in time?

22          MR. BELL:  Objection.

23          THE COURT:  Sustained.

24  BY MR. MAZUREK:

25  Q.  If you were to take a look at this document to, does it

1    refresh your memory about the flow of money coming in from

2    Eichler's Bookstore at that point in time?

3              MR. BELL:  Objection.

4              THE COURT:  Sustained.

5    BY MR. MAZUREK:

6    Q.  Let me ask it this way.

7              Did you know what the amount of rent that was owed

8    under the expiring lease as of February 2017?

9    A.  Pardon?

10   Q.  The amount of monthly rent that was owed in February 2017

11   under the expiring lease?

12   A.  I don't remember it.

13             MR. MAZUREK:  If I could ask to put on the screen what

14   has been premarked for identification as MH-401.

15   BY MR. MAZUREK:

16   Q.  Now, the lease that was expiring in February 2017 was

17   originally a 20-year lease.  Is that right?

18   A.  I don't remember.  It may have been month-to-month.  I

19   don't remember.

20             MR. MAZUREK:  If we look at on the document in front

21   of you, if we can turn to -- just a moment, your Honor.

22   (Pause) -- to Page 3 of that exhibit.  If we can expand for the

23   witness's benefit the top half of the page.

24   BY MR. MAZUREK:

25   Q.  Taking a look at that, does that refresh your memory that

1    the lease originally was entered into on April 1997?

2    A.  No.

3    Q.  You've seen a lease before.  Is that correct?

4    A.  I don't think this is the lease I had with them.  This is I

5    think from the previous owner.  I don't think I have seen this.

6    Maybe my attorneys know.

7    Q.  If we can go to the first page of MH-401.  Was your email

8    the Jona Rechnitz email JSR Capital?

9    A.  Yes.

10   Q.  Did you receive an email from -- who is Simcha Schonfeld?

11   A.  Yes, my transactional attorney.  .

12   Q.  On or about February 12, 2015, did he send you copies of a

13   lease for Eichler's Bookstore?

14          MR. BELL:  Objection.

15          THE COURT:  I'll allow it.

16   A.  It seems that way based on this email.

17          MR. MAZUREK:  I move for admission of MH-401.

18          MR. BELL:  Objection.

19          THE COURT:  Sustained.  Please rephrase the question.

20   BY MR. MAZUREK:

21   Q.  Your emails are kept in the regular course of your business

22   at JSR Capital, correct?

23   A.  Pardon?

24   Q.  You maintained emails in the regular course of business at

25   JSR Capital, correct?

1            MR. BELL:  Objection.

2            THE COURT:  Overruled.  You may answer.

3   A.  I am sorry.  I didn't understand the question.

4   BY MR. MAZUREK:

5   Q.  As part of running your business, you maintain an email

6   address where you conducted business, correct?

7   A.  Yes, I use email.

8   Q.  And you do that and you kept your email records in order to

9   conduct that business, right?

10  A.  I conduct my business via email, yes.

11  Q.  You do that when you have created the emails, you use

12  emails for your business purposes at the time of whatever the

13  transaction, when the transaction was occurring, correct?

14  A.  Correct.

15  Q.  Part of the transactions that we are talking about today is

16  the negotiation of a lease for the Solomon Plaza building,

17  correct?

18  A.  Correct.

19  Q.  In order to do your duties as a general partner of that

20  building, you had to review certain documents and emails,

21  correct?

22  A.  No.  My attorney reviewed the leases and documents and

23  emails.

24  Q.  So your attorney would be giving you information about

25  legal documents, correct?

HAVJSEA1                          Rechnitz - cross

1    A.  Correct.

2    Q.  In or about February of 2015, one of the things your

3    attorney did was to send you a lease like this for the

4    Eichler's Bookstore, correct?

5    A.  Based on this email, that's correct.

6             MR. MAZUREK:  I would again move for admission of

7    MH-401.

8             MR. BELL:  We renew our objection, your Honor.

9             THE COURT:  That is in.

10            (Defendant Exhibit MH-401 received in evidence)

11            MR. CAPONE:  Your Honor, it is not hearsay objection.

12   If we can be heard at sidebar on this?  This is 608 objection.

13   It has nothing to do with this case.

14            THE COURT:  Let's have a quick sidebar.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1                (At the sidebar)

2                THE COURT:  All counsel in here?  You left somebody

3       out.

4                MS. LYNAUGH:  I don't think Mr. Shechtman is joining

5       us.

6                THE COURT:  Okay.  Yes?

7                MR. BELL:  It is possible that Mr. Shechtman isn't

8       joining us because these routine abuses of 608 make him sad as

9       a professor of evidence.  It is the same issue we have been

10      raising.  I don't see -- he can impeach using them.  He has

11      been impeaching using them and that is fine as long as it

12      otherwise complies with the rules, but I think the rules

13      actually pretty clear about this not coming in.

14               MR. MAZUREK:  Judge, here is my problem.

15               We have a witness on the stand who is just going to

16      deny or not have any memory refreshed as a result of looking at

17      documents.  The problem I have here is I am not seeking

18      extrinsic evidence on a collateral matter.  This goes

19      specifically to this witness' truth-telling in this case and

20      whether, in fact, he has committed further crimes in violation

21      of his cooperation agreement, which is an issue that is

22      squarely, we should be able squarely to put forward in the

23      case.

24               I have a couple of cases I can present to the court.

25      U.S. versus Beverly 5 F.3d 633 (2d Cir 1993), where extrinsic

1   evidence was allowed to impeach specific falsehoods testified

2   to by the witness.

3          U.S. verses Ramirez, another case 609 F.3d 495 (2d

4   Cir. 2010).  It also does not prohibit extrinsic evidence used

5   for impeachment.

6          Another case in 2012, U.S. versus Ingram, 490 F. App

7   3d. 366 cite.

8          THE COURT:  Let's do this.  Let me get the last 10

9   questions read back.

10          (Record read)

11          THE COURT:  Let me get a clear sense from defense

12   counsel as to where this is going again.  This information with

13   the lease, where is this going?

14          MR. MAZUREK:  Judge, to show the reason why this

15   witness worked to negotiate an email through the broker to show

16   that the $46,000 lease, which is about $20,000 more per month

17   than the expiring lease, was a fraudulent lease.  Let me step

18   back.

19          The lease that was expiring was $27,000 per month.

20   The building had a mortgage that was coming due in two months.

21   This witness negotiated a so-called new lease for $46,000 a

22   month which almost doubles the expiring lease.  That was used

23   to market the property and to give to banks in order to

24   refinance the mortgage.

25          Mr. Blau, the owner of Eichler's, said that in this

process that he never intended to pay $46,000 per month because

Mr. Rechnitz told him he didn't have to.  As a result of that,

this witness contacted the middleman in the deal, Ari Gross,

and sent Ari Gross on an all expense paid vacation in August of

2017.

He then worked with Ari Gross, who was friends of

Blau, to write an email that apologized, supposedly apologized

to Jona in a way that Eli Blau was writing, saying I am sorry,

I should never have said I never had to pay this.  I am totally

wrong and I am sorry that I hurt you, Mr. Rechnitz.

That email was drafted, and we have evidence of it in

deleted WhatsAp messages off of Jona's phone was word-for-word

written by Jona Rechnitz to Ari Gross, who then had Eli Blau

write that e-mail to Jona to give to the government to show

look, I did not commit any kind of mortgage fraud, I was

doing -- I believed this was a real lease and it was negotiated

at $46,000, whatever you're hearing from Mr. Blau is just

totally wrong and there is my proof of it, Eli Blau apologized.

THE COURT:  What is the relevance of this, of this

lease of actually putting the lease into evidence and all the

other stuff because we heard a lot of that yesterday.

MR. MAZUREK:  Here is the problem.

The problem is I think it is extremely relevant for

this jury to hear that in February 2017 this tenant was paying

$26,000 a month, and that this new lease that was being

1    negotiated was $46,000, two times that amount.  There is

2    nothing -- that is credible, relevant evidence to show that

3    this was not a lease that was negotiated fairly at a market

4    price.

5              THE COURT:  Hold on.  Before you go there, there has

6    been lots of testimony that you brought out about the lease

7    being $47,000.  There was lots of testimony from what I recall

8    yesterday about the lease amount being raised.  I don't know if

9    you mentioned in 2017, but you mentioned something about the

10   lease amount being raised by approximately $20,000.

11             Am I wrong there?

12             MR. MAZUREK:  He fought me all the way.  I looked at

13   the transcript, and it is just not clear in the evidence.

14             THE COURT:  What do you mean it is not clear?  He did

15   acknowledge, I remember him acknowledging he raised the rent to

16   $47,000, correct, or 46,000?

17             MR. MAZUREK:  Right, but sometimes the quantity of how

18   much it is raised is relevant.

19             MR. CAPONE:  This is from 1997, your Honor, 20 years

20   ago.

21             THE COURT:  Stop, stop, stop.

22             MR. MAZUREK:  It is what he was paying in -- I tried

23   to show him the rental income of the building.  The rent roll

24   clearly indicated $26,000 was the amount that was owed per

25   month.  He said I don't remember, I didn't remember this

1    document.  I haven't seen this document, which was the actual

2    rent roll for the building.  I tried to do it that way.

3           He says I don't remember or I don't know what this

4    document -- this doesn't refresh my memory.  So why can't I

5    just get in the lease?

6           MR. BELL:  Because --

7           MR. MAZUREK:  This is from the JSR Capital email.  We

8    have stipulated that the JSR Capital, all the JSR Capital

9    emails coming into evidence.  I just don't know why this

10   particular one is now --

11          (Multiple voices)

12          MR. MAZUREK:  Is something they don't want to

13   introduce.

14          THE COURT:  You want this in for the simple fact that

15   the prior rent was --

16          MR. MAZUREK:  By January 2016 according to the

17   schedule, January 2016, that year, this was divided into two

18   parcels.  It is in Schedule A the lease.  So January 16th, the

19   combined two parcels were generating a rent of $27,000 per

20   month.

21          THE COURT:  And this all goes toward what?  All of

22   this goes to what?

23          MR. MAZUREK:  That Mr. Rechnitz, while he was

24   cooperating with the government and said he couldn't commit any

25   further crimes, was actively committing mortgage fraud and

1    obstructing justice by tampering with the witness, by paying

2    for him in order to assist him to write a coverup email to the

3    government so they wouldn't know what crimes he was committing.

4            We have the email.  Just this morning I made a Giglio

5    request, your Honor, and I obtained from the government the

6    email that Eli Blau sent to Jona Rechnitz, that Rechnitz in a

7    September 29th proffer session with the government indicated

8    here is the proof that this was a real lease.

9            THE COURT:  We have a jury waiting.  I thought there

10   was some other basis you were trying to put this in.  This does

11   seem to raise 608 issues.  I will sustain the issue for now and

12   move on.

13           MR. BELL:  Can I note this because this may save us

14   some time.  Ultimately what is going to happen here is that if

15   Mr. Mazurek continues to try to essentially circumvent 608, get

16   in these collateral matters, is that we are going to have to

17   call witnesses to testify as to those same collateral matters.

18   One of the reasons why the rule exists is to shorten

19   proceedings and make them efficient in this way.

20           MR. MAZUREK:  By the same time.

21           MR. BELL:  We sent Mr. Mazurek going on three weeks

22   ago an email requesting -- a letter, rather -- requesting some

23   notice of exhibits that he was going to try to get in in this

24   exact same fashion so we can hash them out in the interests of

25   time and get this trial done promptly.  We heard nothing.  So I

HAVJSEA1                         Rechnitz - cross

1    am noting that.  I don't think this should goes down this path

2    because the rule is clear and remained clear no matter how

3    often Mr. Mazurek is trying to dress this up as something than

4    a 608 scenario.

5            MR. MAZUREK:  It cannot be this witness can shield

6    this --

7            THE COURT:  Let's move on.  Let's stop.  Again let's

8    try to move on.  That is sustained for now.  We can revisit

9    that later.  Let's keep moving.

10           (Continued on next page)

1           (In open court)

2                THE COURT:  That objection is sustained.  Go ahead,

3      counsel.

4                MR. MAZUREK:  Thank you, Judge.

5      BY MR. MAZUREK:

6      Q.  So Mr. Rechnitz, let me just step back and understand.

7           The importance of negotiating this lease with Mr. Blau

8      at the time that you are trying to refinance or sell the

9      building is that commercial buildings are generally valued

10     based on a multiple of the rent roll?  You'll agree with that?

11     A.  That is one of the aspects.  It could be price per square

12     foot, it could be development rights.  That is one of many

13     factors that people use to value it.

14     Q.  When a bank determines how much mortgage to give on a

15     commercial property, they base the value of the building on, at

16     least in part on a multiple of that rent roll, correct?

17     A.  I think my original loan was based on comps, comparable

18     sales of properties of that magnitude and size, not necessarily

19     the rent roll.

20     Q.  But it is certainly one of the factors that you were

21     considering at the time when you were assisting in the

22     marketing materials for that building, right?

23     A.  Yes.

24     Q.  Because you wanted to show a prospective buyer how much

25     money they can expect the building would generate if they owned

HAVJSEA1                    Rechnitz – cross

1    it, correct?

2    A.  Yes.

3    Q.  And so in February of 2017 when the lease was expiring for

4    Eichler's, you tried to get a new lease from Mr. Blau, correct?

5    A.  I renewed them at a new rent, yes.

6    Q.  And it was an increase in rent from the expiring lease in

7    2017, correct?

8    A.  Right.  Their old rent was increased to new rent.

9    Q.  You just don't remember the numbers at this point, correct?

10   A.  I remember that I signed a new lease for 46,000.  I believe

11   they were paying around 36,000.

12   Q.  So based on your memory, that is still a $10,000.00

13   increase per month on the rent, correct?

14   A.  Yes.

15   Q.  At that point in time when you had Mr. Blau sign that lease

16   in February of 2017, you were still general manager of the

17   building, right?

18   A.  Technically.  I didn't have him sign it.  I sent him a

19   lease draft, which he reviewed and signed while I was the

20   general manager, yes.

21   Q.  You were removed as general manager in July of 2017,

22   correct?

23   A.  No.

24   Q.  That is not the right date?

25   A.  I wasn't removed.

HAVJSEA1                          Rechnitz - cross

1    Q.  You no longer were the general manager as of July of 2017,

2    correct?

3    A.  I resigned as the general manager, that's correct.

4    Q.  At that point a new ownership came in?

5    A.  It was the same ownership group.

6    Q.  But with a new general manager, correct?

7    A.  Correct, a new general partner.

8    Q.  That was Charles Herbfeld?

9    A.  That's correct.

10   Q.  So at that point, as of July of 2017, you had nothing more

11   to do with Solomon Plaza, correct?

12   A.  That is not correct.

13   Q.  You weren't the general partner any more?

14   A.  That is correct.

15   Q.  So what role did you have in July of 2017?

16   A.  I was a source of information for Charles.  He had called

17   me very often asking me for history with certain tenants,

18   asking me for information, transition of information.

19        It was very important for Charles that publicly I was

20   out of the picture, given my status of pleading guilty to a

21   crime.  I couldn't, you can no longer be on the loan, so I

22   resigned, but they still kept me in the loop and was getting a

23   lot of information from him.

24   Q.  You had no legal responsibilities at that point in time?

25   A.  That's correct.

HAVJSEA1                          Rechnitz - cross

Q.   In September of this year, in 2017, you heard that people
were coming to interview Mr. Blau about the lease that you and
he signed for $46,000 a month?

A.   That was before September.

                    (Continued on next page)

HAVTSEA2                          Rechnitz - cross

 1   BY MR. MAZUREK:

 2   Q.  In August?

 3   A.  Yes.

 4   Q.  And at that point in time you heard that Mr. Blau was

 5   telling people that the $46,000 lease was a fraud, right?

 6   A.  Yes.

 7   Q.  That you never intended -- he never intended to pay $46,000

 8   a month, correct?

 9   A.  That's what he was telling Charles.

10   Q.  And you never intended him to pay $46,000, correct?

11   A.  That's not the case.

12   Q.  Well, you were concerned that Mr. Blau was saying that to

13   Mr. Herzka?

14   A.  Mr. Herzka and I had a conversation about it.  It's a

15   little more detailed than that.

16   Q.  You were -- my question is you were concerned at that point

17   in time that Mr. Blau was saying that lease was a fraud, right?

18   A.  That's correct.

19   Q.  Because that lease was being used to market the building to

20   other investors, correct?

21   A.  No.

22   Q.  In the marketing materials it was listed at $46,000 per

23   month, the rent, correct?

24   A.  No, we already got a new mortgage for the building by that

25   point.

HAVTSEA2                    Rechnitz – cross

```
 1   Q.  My question is prior to you getting the ownership at the
 2   timing a new mortgage, it was being marketed at $46,000 a month
 3   being received, correct?
 4   A.  That's right.
 5   Q.  And also you were attempting to refinance the mortgage
 6   possibly, correct?
 7   A.  Sorry, did you say at the end of the question "being
 8   received?"  I want to go back to that, because as I was
 9   answering I think you added those words.  We weren't receiving
10   46,000, the rent deal was they would pay 46,000 a month but
11   they got four months free rent.  The four months was expiring
12   well after I resigned from the property.
13   Q.  Sir, my question is the building was being marketed with
14   Eichler's being a tenant at $46,000 a month, correct?
15   A.  That's correct.
16   Q.  You also were attempting to refinance the building with
17   lenders, correct?  Banks.
18   A.  Yes, that's correct.
19   Q.  And the lease that was being presented that point in time
20   showed $46,000 per month, correct?
21   A.  That's correct.
22   Q.  Now let's move forward to August of 2017, just a few months
23   ago, right?
24   A.  Yes.
25   Q.  At this point in time you were no longer legally
```

HAVTSEA2                    Rechnitz - cross

1    responsible as general partner of the building, correct?

2    A.   Correct.

3    Q.   You were in contact with the fellow by the name of Ari

4    Gross at this point in time, right?

5    A.   Correct.

6    Q.   Ari Gross was someone who was negotiating potentially the

7    sale of the Eichler's bookstore to a new owner, correct?

8    A.   I believe so, yes.

9    Q.   And Ari Gross was someone who was in contact with Eli Blau,

10   correct?

11   A.   Yes.

12   Q.   Ari Gross was someone that in August of 2017, and you

13   testified to this yesterday, you paid for an all expense paid

14   vacation to Beverly Hills, correct?

15   A.   Yes.

16   Q.   And that was over the weekend of August 9 through the 11th,

17   correct?

18   A.   Yes.

19   Q.   And during that period of time, you and Ari Gross decided

20   to try to draft an email that would come from Eli Blau,

21   correct?

22   A.   Not exactly the way you're putting it.  That's not exactly

23   how it happened.

24   Q.   Well, let me ask you this, during that weekend in August of

25   2017, you paid for Ari Gross' stay at the hotel, right?

HAVTSEA2                     Rechnitz - cross

1   A.  Yes.

2   Q.  You gave him $2,000 spending money, correct?

3   A.  Yes.

4   Q.  You told him that whatever he wants to do at this hotel,

5   whatever spa services, whatever services -- all expenses paid,

6   you would take care of it, right?

7   A.  Yes.

8   Q.  That he shouldn't have to spend one dollar, right?

9   A.  Yes.

10  Q.  During that period of time you are communicating with him

11  on WhatsApp messages, correct?

12  A.  Yes.

13  Q.  And WhatsApp is an application to send and receive text

14  messages, right?

15  A.  Yes.

16  Q.  It has certain secrecy to it, correct?

17  A.  I don't understand.  What secrecy?

18  Q.  Well, it is encrypted messaging system, correct?

19  A.  That's what they say.

20  Q.  And you used it for certain of your correspondence, right?

21  A.  Yes.

22  Q.  On your iPhone, correct?

23  A.  Yes.

24  Q.  Before this, you hadn't given your iPhone to the

25  government, correct?

HAVTSEA2                          Rechnitz - cross

1   A.   Correct.

2   Q.   And so you were corresponding with Mr. Gross in the summer

3   and August of 2017 on the WhatsApp messages exchanging messages

4   about the text of an email that you wanted Eli Blau to send,

5   correct?

6   A.   That's correct.

7   Q.   And after that time, sometime in September or so, you were

8   asked to provide the government with a copy -- with your

9   iPhone, correct?

10  A.   Correct.

11  Q.   And that was for the purposes so they could download all

12  relevant information that was contained on that iPhone,

13  correct?

14  A.   I'm not sure the reason, but I respected the request.

15  Q.   And you gave them your phone, right?

16  A.   Yes.

17  Q.   Now before you did that, you deleted a whole set of

18  WhatsApp messages, correct?

19  A.   It's possible.

20  Q.   You don't remember whether you deleted messages off the

21  WhatsApp just a month ago before you handed your phone over to

22  the government?

23  A.   I often delete messages once I read them.  That's one of

24  the things that I do.

25  Q.   So you deleted all the messages between you and Mr. Gross

HAVTSEA2                    Rechnitz - cross

1    before the weekend of August 9 through the 11th of 2017?

2    A.  At what point?  I don't understand.

3    Q.  I would love to know, too, sir, if you would give me the

4    answer of when you deleted all the messages.

5              MR. BELL:  Objection.

6              THE COURT:  Sustained to the commentary.  Please

7    rephrase the question.

8    A.  When the request came in for my iPhone, nothing was deleted

9    from that point, if that's what you're asking.

10   Q.  Well, before they requested the iPhone, you were using

11   WhatsApp messages to converse by text with Ari Gross, right?

12   A.  Yes.

13   Q.  At some point you deleted those messages, correct?

14   A.  Yes.

15   Q.  And those messages contained your communications relating

16   to this email that you wanted Eli Blau to write for you, right?

17   A.  That's correct.

18   Q.  And at that point in August of 2017, Eli Blau didn't even

19   own Eichler's anymore, did he?

20   A.  That could -- maybe.  I'm not sure if the deal went through

21   by that point.

22   Q.  He sold the store eventually, right?

23   A.  He did.

24   Q.  You had no legal responsibility as general partner anymore,

25   right?

HAVTSEA2                         Rechnitz - cross

1    A.  I did not.

2    Q.  But you wanted a letter of apology from Mr. Blau for your

3    records, right?

4    A.  Yes.

5    Q.  And you wanted a letter of apology to say to you,

6    Mr. Rechnitz, that I'm so sorry, I know that I said that

7    Mr. Rechnitz had forced me to sign this lease and it wasn't a

8    real lease, but I take it all back, right?

9    A.  That's not exactly what the letter said.

10   Q.  In sum and substance?

11   A.  Yes.

12   Q.  And you wanted this letter of apology because at this point

13   you were a cooperator for the government, right?

14   A.  That's not why.

15   Q.  I didn't ask you that.

16            You were --

17            MR. BELL:  Objection.

18            THE COURT:  Overruled.  You did ask him that.  Go

19   ahead, counsel.

20   Q.  At that point you were a cooperator for the government,

21   correct?

22   A.  Yes.

23   Q.  And according to the terms of that cooperation agreement,

24   you knew that if you were found to commit any further crimes

25   while you were a cooperator, the government could rip up that

1  agreement, right?

2  A.  That's the case.

3  Q.  And so when you and Mr. Gross were in Beverly Hills

4  drafting an email from Eli Blau, that was on your mind, wasn't

5  it?

6  A.  No.

7  Q.  Well, at the end of the day, the email that you drafted

8  with Mr. Gross was the email that Eli Blau eventually sent to

9  you, right?

10 A.  Correct.

11 Q.  And it was the email that you told the government about to

12 show that you were doing the right thing, wasn't it?

13 A.  That's not why I showed it to them.  I showed it to them,

14 though.

15 Q.  You showed the email from Eli Blau to you with the letter

16 of apology that you drafted, right?

17 A.  Not exactly how you're saying it, no.

18 Q.  Well, let's break it down.  There was an email that Eli

19 Blau wrote to you on August 10 of 2017, correct?

20 A.  Yes.

21 Q.  The contents of that email --

22         MR. MAZUREK:  If I could have a moment, your Honor.

23 Q.  The contents of that email was something that you provided

24 to the government, right?

25 A.  Yes, I gave them a copy of an email.

1    Q.  And it basically said that the email is to confirm that

2    Eichler's is under new ownership, I have nothing to do with the

3    place or the lease anymore, correct?

4                MR. BELL:  Objection.

5                THE COURT:  Overruled.  You may answer.

6    A.  Can you repeat the question?

7    Q.  The email said that it was to confirm that Eichler's is

8    under new ownership and I have nothing to do with the place or

9    the lease anymore, correct?

10   A.  If I see the email I can answer that, but it sounds about

11   right.

12   Q.  And that Eli Blau wrote to you:  I hope you forgive me for

13   all the misunderstandings between us, and we could put the past

14   behind us and be friends again.

15               MR. BELL:  Objection.

16               THE COURT:  Overruled.

17   A.  Again, if I saw the email I can answer that question, but

18   it sounds familiar.

19   Q.  And that Eli Blau wrote to you:  I think you are an honest

20   and straightforward person.  You have been very kind to trust

21   me with the lease and giving me a break on the rent when I

22   needed it most.

23   A.  It's the same answer as the last two.  If I see the email I

24   can answer that.

25               MR. MAZUREK:  Your Honor, may I approach?

1    THE COURT:  Yes.

2    MR. MAZUREK:  I only have one copy, your Honor.

3    Q.  Let me know when you've finished reading.

4    A.  Okay.

5    Q.  So on August 10, 2017, in the email from -- supposedly from

6    Eli Blau to you, he wrote to you:  You never lied to me and I

7    deeply apologize for accusing you of lying to me.  I only did

8    it because I was so desperate with Eichler's.  And also please

9    understand I'm in business for the last ten years, and the

10   notion that I could be forced to sign an agreement without my

11   will and without my due diligence is absolutely wrong.  Every

12   lease that I sign I am aware and I know exactly what I sign,

13   and obviously if my signature is on that it means I agreed to

14   it fully, and the deal that I signed is the deal we made,

15   period, and there were no side agreements.  Thanks for

16   everything.

17   MR. BELL:  Objection.

18   THE COURT:  Overruled.

19   Q.  Is that familiar to you?

20   A.  Yes.

21   Q.  Because that was exactly your words, correct?

22   A.  Not exactly, no.

23   Q.  You didn't write those words for Mr. Blau?

24   A.  What happened was --

25   Q.  My question, sir --

1            MR. BELL:  Objection.

2            THE COURT:  No, no, no.  Please, the objection is

3    sustained.  Please rephrase the question, counsel.

4    Q.  Yes or no, did you write those words for Mr. Blau?

5    A.  No.

6            MR. MAZUREK:  If we could put on the screen what's

7    been premarked for identification as MH415, only for the

8    witness.

9            If we could turn to the page that's Bates stamped with

10   the last four numbers 2160 on the bottom right.  If we can

11   expand the bottom third of that page, starting with the entry

12   on 8/10/17 at 1:21 p.m.

13   Q.  As they're doing that, Mr. Rechnitz, did you know at the

14   time that you handed in your phone to the government that the

15   government had the ability to recover deleted WhatsApp

16   messages?

17   A.  Yes.

18   Q.  If we could look -- if you could take a look at what's on

19   the screen, compare the text message that's at 8/10/2017 at

20   1:21 with email that Eli Blau sent to you on August 10, 2017.

21           MR. BELL:  Objection.

22           THE COURT:  Sustained to form.

23   Q.  If you could look at the screen and see if that refreshes

24   your recollection whether the email that we read that was from

25   Eli Blau to you matches what you were writing with Ari Gross?

1           MR. BELL:  Objection.

2           THE COURT:  Sustained as to form.

3    Q.  Well, let me ask you this, you are exchanging text messages

4    with Ari Gross regarding the content of the email that you

5    wanted Eli Blau to send to you?

6    A.  Yes.

7    Q.  If you could take a look at the screen, does that refresh

8    your memory about the fact that you and Ari Gross drafted the

9    email for Eli Blau?

10   A.  This is a message Ari sent me, not that I sent him.

11   Q.  Sorry?

12   A.  I think you're mistaken.  This is a message I believe that

13   Ari sent me.

14   Q.  It was a message from Ari to you and then you responded to

15   Ari, correct?

16   A.  Where is my response?

17   Q.  Below.

18   A.  So you asked me if this language is what I wrote, the

19   answer is no.

20   Q.  The language is what you and Ari Gross were corresponding

21   in text message over the weekend of August 9 through 11 about

22   how Eli Blau's email should be written, correct?

23   A.  Sorry, I don't understand how to read this.  Could you

24   explain it to me a little better?  What did I send, what did

25   Ari send?

HAVTSEA2                          Rechnitz - cross

1    Q.  You just tried to explain it to me.

2                The incoming message --

3                THE COURT:  Sustained.  Let's have a sidebar, and

4    bring the document with you.

5                We'll have a ten-minute break.  Don't discuss the

6    parties or the case.

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In robing room)

2          THE COURT:  Let me see the document again.  The

3   portion that was highlighted on the screen was this portion

4   that was highlighted at 1:21.  That's what was highlighted.

5   When you were talking to the witness, that section was

6   highlighted.

7          So tell me where this is going, because --

8          MR. MAZUREK:  The email that he had Eli Blau send to

9   him was written by Mr. Gross and him in combination.  They went

10  back and forth, and Mr. Rechnitz was telling Mr. Gross -- was

11  editing the email message.

12         THE COURT:  I think you got that.  That wasn't quite

13  what you were asking.  You asked the question that made it

14  appear as if Mr. Rechnitz wrote this himself.  That's the

15  question that you asked.  He had given you before that he had

16  done this with this other person.  He gave you that yesterday

17  and he gave you that again today.  Then you asked the question,

18  and we can have it read back if you would like, basically

19  making it seem as if Mr. Rechnitz wrote this as a solo author

20  as opposed to more of a joint thing, and I don't think that

21  demonstrates that, but --

22         MR. MAZUREK:  I could clarify that he did it together

23  with Mr. Gross who had the relationship with Mr. Blau.

24         THE COURT:  I don't think you need to.  I think that's

25  been done about three or four times.  I think that's been asked

1    and answered.  We have been down that road many times before.

2    If you want to, we could have it read back just in case.  I

3    think my recollection is correct.  Counsel have any different

4    recollection on this?

5         MR. BELL:  Your recollection comports with ours, your

6    Honor.

7         MR. SCHECHTMAN:  I think it's clear.

8         MR. BELL:  While we are here, unless we have something

9    else on this, I spoke briefly to Mr. Schechtman, and my

10   understanding is he spoke to Mr. Mazurek.  Because of the very

11   nature of the topic that we discussed before the jury came in

12   this morning is such that one of the potential costs either

13   way, and one of the reasons why we're asking for the relief

14   that we do is so that this isn't something that has the

15   principal effect of potentially polluting the jury directly,

16   but also the jury indirectly by way of press and potential

17   press interests.  It would be our request, and I think this is

18   with consent, that the transcript of the colloquy prior to the

19   jury coming in today be sealed.

20        THE COURT:  Why?  I think you have given me a reason.

21   This is a public trial.  It seems as if this is an issue you

22   want me to rule on in some way.  The public has a First

23   Amendment presumptive right of access to what I am doing and

24   what I am ruling on.  We told the jury not to read any things

25   in the newspaper, if they see something, to stop reading.

HAVTSEA2                        Rechnitz - cross

1        MR. CAPONE:  That could be on the front page tomorrow

2    in a way that the jury would not be able to avoid.  If your

3    Honor rules against it, it's unsealed, because it is what it is

4    at that point.

5        THE COURT:  Well, there were things on the front page

6    on Friday, I believe, there are lots of things on the front

7    page over the weekend.

8        MR. BELL:  I think, your Honor, it is somewhat easier

9    mechanically for a juror to see a picture from an exhibit they

10   have already seen and turn away without any damage being done,

11   little bit different, I think, particularly having seen the

12   full color version of whatever --

13       THE COURT:  I don't think there's -- in terms of the

14   transcript, there's no picture in the transcript.

15       MR. BELL:  I'm touching on the other part of that.

16   But as to your Honor's broader question, it's just a logical

17   and inevitable consequence of our colloquy having happened.  We

18   note the concern that we have, and your Honor can rule.

19       THE COURT:  Okay.  Defense counsel?

20       MR. SCHECHTMAN:  Couple things, Judge.  The Hasidim

21   picture that I know the press has, they asked me about the

22   other one, and my sense is they don't have it.  So if we're

23   worried about the picture being on the newspaper, I don't think

24   they have it.

25       MR. BELL:  I think though, your Honor, that in

1    inevitably what will happen is because your Honor I think has

2    been shown that, there's a sort of presumptive notion that that

3    becomes public and available on request.  I think that's how

4    our office would have do treat it, although I'm no master of

5    these press --

6           MR. SCHECHTMAN:  I don't know that I have to turn it

7    over.  But I guess I would say the following:  We made a 404(b)

8    application that we hope to have under seal.  Your Honor turned

9    us down.  I understand why we did it, I understand why they're

10   doing it.  I don't oppose sealing, but you have a different

11   First Amendment barometer than I do.

12          THE COURT:  Let me make sure I fully understand.  The

13   concern that you have is that the press will pick this up, and

14   as a result of that the jurors are going to violate their oath

15   and look at these documents or look at these articles?

16          MR. BELL:  I think the jurors will probably violate

17   their oath by walking to the newsstand to buy some Lifesavers

18   and looking down, and staring back at them, in all likelihood,

19   is this picture.

20          THE COURT:  That doesn't violate their oath.

21          MR. BELL:  I'm not saying it does, I'm saying it's an

22   inevitable consequence, but a preventable one.

23          MR. CAPONE:  The 403 concern, if your Honor were to

24   agree with it, would be entirely undercut if this was staring

25   the jury in the face in the morning.  Not that they would

HAVTSEA2                         Rechnitz - cross

1    violate their oath, but the 403 concern would be present no

2    matter what.  So I guess we're asking is it to be sealed

3    pending a ruling tomorrow.

4                THE COURT:  Okay.  I'll think about it and talk about

5    it over the next break.  I don't think -- I'll think about it.

6    I'm inclined to deny the application.  I'm inclined to not seal

7    it.  But I will think about it.  I am inclined to decline.

8                Anything else?  Counsel need to use the restroom

9    before we come back out?

10               MR. SCHECHTMAN:  Thank you, your Honor.

11               (Recess taken)

12               (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (In open court)

2                THE COURT:  Let's continue.  Go ahead, counsel.

3                MR. MAZUREK:  Thank you, your Honor.

4   BY MR. MAZUREK:

5   Q.  Before the break we were talking about the email that you

6   wrote with Ari Gross, the draft from Eli Blau, right?

7   A.  Yes.

8   Q.  And that email was sent on August 10, 2017, correct, to

9   you?

10  A.  Yes.

11  Q.  And it was after you and Mr. Gross spent time working on

12  drafting it, correct?

13  A.  I wouldn't put it that way.  Mr. Gross drafted it with Eli.

14  It wasn't acceptable to me, so I told him certain things that I

15  needed inside in order for it to be effective for my purposes.

16  Q.  And the things you needed was to make sure that Mr. Blau

17  apologized and to say that the lease that you and he signed was

18  absolutely true and correct, right?

19  A.  That's correct.

20  Q.  And you needed that for the purposes of your cooperation

21  with the government, right, sir?

22  A.  No.

23  Q.  Well, this topic, the Eichler lease, was something that you

24  discussed with these prosecutors and the agents, correct?

25  A.  Yes.

HAVTSEA2                         Rechnitz - cross

1   Q.  On September 29, 2017, you had a session with the

2   government when this was discussed, correct?

3   A.  If you say it was September -- two months after the email

4   is what you're asking me?

5   Q.  On September 29, 2017, you met with the government and in

6   that meeting discussed the Eichler lease that you and Mr. Blau

7   signed in February 2017, correct?

8   A.  Yes.

9   Q.  And the government asked you lots of questions about the

10  background to this lease, correct?

11  A.  Yes.

12  Q.  How it came to be, right?

13  A.  They asked me for the entire background on this entire

14  situation.

15  Q.  Right.  How you and Mr. Blau entered -- negotiated, entered

16  into that lease, right?

17  A.  Yes.

18  Q.  How there was a consultant by the name of Ari Gross who

19  helped you correspond with Mr. Blau, correct?

20  A.  Yes.

21  Q.  And that Mr. Blau had said some bad things to people about

22  this lease, correct?

23  A.  Yes.

24  Q.  That were not true, right?

25  A.  Right.

HAVTSEA2                    Rechnitz – cross

1   Q.  And Eli Blau later send you an email apologizing for all

2   the things he said about you about that lease, correct?

3   A.  Yes.

4   Q.  Mr. Rechnitz, you never told these prosecutors or the

5   agents that you paid Mr. Gross for weekend stay at the Beverly

6   Hills Four Seasons Hotel, did you?

7   A.  Nope.

8   Q.  You never told them that that email that you showed the

9   government from Eli Blau was something that you and Ari Gross

10  helped to draft, did you?

11  A.  I'm not sure.  I don't think so though.

12  Q.  You told these prosecutors and agents that the email from

13  Eli Blau was his and his only words, right?

14  A.  Yes.

15  Q.  And that was a lie, sir?

16  A.  No.

17  Q.  The email was not drafted by Eli Blau, it was drafted by

18  you and Mr. Gross, correct?

19  A.  The email was sent to me by Eli Blau.

20  Q.  But you didn't tell the prosecutors and the agents.

21          Didn't you think it was important to tell them how

22  this email was generated?

23  A.  No.

24  Q.  You still have your cooperation agreement today?

25  A.  Yes.

HAVTSEA2                    Rechnitz - cross

1  Q.  And in that session on September 29, 2017, you told the

2  agents it was my client's fault, right?

3  A.  No, you are taking it out of context.

4  Q.  You told these agents and prosecutors on September 29, 2017

5  that Mr. Huberfeld was sending people around trying to force

6  Eli Blau into saying something, right?

7  A.  No.

8  Q.  You didn't tell them that?

9  A.  No, they were sending people to force Ari Gross.

10 Q.  Ari Gross.  They were forcing Ari Gross to say something

11 that wasn't true.  You were blaming my client, right?

12 A.  Yes.

13 Q.  Just like you're blaming him for bribing Norman Seabrook in

14 this case, right?

15 A.  No.  He did bribe Norman through me.  I'm not blaming

16 anybody, I'm just telling the truth.

17 Q.  Mr. Rechnitz, on September 29, 2017, when you told these

18 agents and prosecutors that my client was out trying to force

19 Mr. Gross to say something that wasn't true, you were the one

20 who were telling the agents and the prosecutors a lie about

21 Mr. Gross, right?

22 A.  No.

23 Q.  Because you never told them that he helped draft this email

24 from Eli Blau, right?

25 A.  The two are unrelated.  You're trying to put them together,

HAVTSEA2                          Rechnitz - cross

1    but it's very different circumstances you're neglecting to ask
2    me about.
3    Q.   If we didn't show you the Four Seasons Hotel and the
4    pictures of cash and Mr. Gross, these prosecutors and agents
5    would never know about that, right, sir?
6              MR. BELL:  Objection.
7              THE COURT:  I'll allow it.
8    A.   They had a copy of my phone just like you did.
9    Q.   And thankfully, the deleted messages were able to be
10   forensically retrieved, correct?
11             THE COURT:  Sustained as to thankfully.  Please
12   rephrase the question.
13             MR. MAZUREK:  Yes.
14   Q.   And the deleted messages were able to be forensically
15   retrieved, correct?
16   A.   I don't know how you got them.  I can't answer that.
17   Q.   But that's the only reason we know what really happened,
18   isn't it?
19             MR. BELL:  Objection.
20             THE COURT:  Sustained.
21             MR. MAZUREK:  I'll move on, your Honor.
22   Q.   One last question, all of this just happened a month ago,
23   isn't that right?
24             MR. BELL:  Objection.
25             THE COURT:  Overruled.

HAVTSEA2                          Rechnitz - cross

1    A.  No, you just showed me an email from August 10.  I believe

2    we are at the end of October.

3    Q.  Let me rephrase.  The information you gave the prosecutors

4    and agents about the Eichler's lease just happened one month

5    ago, is that true?

6    A.  Yes.

7    Q.  Ever hear of a man named Hamlet Peralta, sir?

8    A.  Yes.

9    Q.  Hamlet Peralta told you he was the owner of liquor retail

10   business at 125th Street, correct?

11   A.  Yes.

12   Q.  And you started doing business with Mr. Peralta sometime in

13   2013, correct?

14   A.  Yes.

15   Q.  This was not a real estate business, right?

16   A.  Right.

17   Q.  This was another business that you entered into, what you

18   call on direct testimony something called hard money lending,

19   right?

20   A.  Yes.

21   Q.  Hamlet Peralta's business turned out to be a Ponzi scheme,

22   correct?

23   A.  Yes.

24   Q.  Do you know what a Ponzi scheme is?

25   A.  A little bit.

HAVTSEA2                          Rechnitz - cross

1  Q.  Why don't you tell the jury of what your understanding of a

2  Ponzi scheme is.

3  A.  When you use money to pay other investors who you owe money

4  to.

5  Q.  As opposed to doing what with the money?

6  A.  Paying it back to the people and investing it.

7  Q.  That is correct.

8          MR. BELL:  Objection.

9          THE COURT:  Sustained as to that is correct.

10         MR. MAZUREK:  Withdrawn.

11 Q.  Mr. Peralta's business was a Ponzi scheme, right?

12 A.  Yes.

13 Q.  Mr. Nissen, the ticket business, was a Ponzi scheme, right?

14 A.  He's been charged for Ponzi.

15 Q.  He's been charged by the same prosecutors for Ponzi scheme,

16 right?

17 A.  Yes.

18 Q.  And in your time of doing business at JSR Capital, 2013 to

19 '15, these were the only two significant hard money lending

20 deals you were involved in, right?

21 A.  Yes.

22 Q.  And they just both happened to be Ponzi schemes, right?

23 A.  Yes.

24 Q.  But you were a victim of these Ponzi schemes, is that your

25 testimony?

1   A.  Yes.

2   Q.  Just a lot of bad luck, right, Mr. Rechnitz?

3   A.  I was involved in two businesses that ended up being Ponzi

4   schemes.

5   Q.  And your testimony is you didn't know about them?

6   A.  Correct.

7   Q.  And let's look into some of that.  Let's go back to

8   Mr. Peralta on the West 125th Street.

9           When you went -- you started the business of lending

10  money to him, you understood that he owned a retail liquor

11  store in Harlem, correct?

12  A.  Yes.

13  Q.  And I'm going to show you what's been premarked for

14  identification as MH51, if we could put that on the screen.

15          Do you see what's on the screen, sir?

16  A.  I do.

17  Q.  Do you see a photograph of what was Mr. Peralta's business,

18  the storefront?

19  A.  Can't be sure that's the store, but it looks like it could

20  be.

21  Q.  And you're saying this is a business that you had your

22  friends and family invest in, correct?

23  A.  No, we didn't invest in this store, no.

24  Q.  Well, into the business of Mr. Peralta, right?

25  A.  We didn't invest in his business either, no.

HAVTSEA2                          Rechnitz - cross

1    Q.  Was West 125th Street Liquors one of the businesses that

2    you understood Mr. Peralta was operating?

3    A.  Yes.

4    Q.  And did you raise investor money, upwards to millions of

5    dollars, that were money that was sent to the West 125th Street

6    liquor store account?

7    A.  I'm not sure if it was sent to the account.  This was part

8    of my collateral, overall collateral for the loans that we made

9    to him.

10   Q.  "This" means the business of West 125th Liquor?

11   A.  Yes.

12   Q.  Had you ever been to that business?

13   A.  Yes.

14   Q.  You had been to the store?

15   A.  Yes.

16   Q.  You saw what kind of business it was?

17   A.  Yes.

18   Q.  And is the photograph at Image 51 a true and accurate

19   depiction of the store that you visited?

20   A.  Again, I'm not sure if that's the store, but it could be.

21   I was only there once or twice.  I don't recognize it.

22   Q.  I'll move on if you can't recognize -- this is the

23   storefront that you said that you obtained collateral for the

24   loans that were being extended to Mr. Peralta?

25   A.  Again, I don't know if this picture is that.  He had a

HAVTSEA2                         Rechnitz - cross

1   liquor store on 125th Street that was part of our collateral.

2   Q.  And let me just understand, the nature of your business

3   with him was that you would raise money for Mr. Peralta to buy

4   and sell liquor, is that your understanding?

5   A.  That was part of business I had with him.

6   Q.  Let's talk about that business.  You would find investors

7   that would put in investments into this liquor business,

8   correct?

9   A.  Loans, not investments.

10  Q.  Loans with promissory notes, correct?

11  A.  Yes.

12  Q.  And these promissory notes were unsecured, correct?

13  A.  No, we had collateral.

14  Q.  When you say we had collateral, let me understand.

15          You would find a lender to Mr. Peralta's business,

16  right?

17  A.  I loaned him as well, I found other lenders as well, yes.

18  Q.  Some of these lenders were Michael Weinberger, correct?

19  A.  Yes.

20  Q.  Your self-proclaimed best friend, correct?

21  A.  I never said he's my best friend.

22  Q.  He was a friend of yours?

23  A.  Yes.

24  Q.  You solicit him for investments into the liquor business,

25  correct?

HAVTSEA2                        Rechnitz - cross

1    A.  Yes.

2    Q.  David Kohn, he's your father-in-law, correct?

3    A.  Yes.

4    Q.  You solicited him for money into the liquor business,

5    correct?

6    A.  Yes.

7    Q.  Naftali Weiss, correct?

8    A.  Yes.

9    Q.  What was his relationship to you?

10   A.  Friend.

11   Q.  And Harvey Kushitsky, correct?

12   A.  Yes.

13   Q.  He was a cousin, correct?

14   A.  Yes.

15   Q.  Now I want to understand how these loans were -- the terms

16   of those loans.  These were promissory notes that you had that

17   the lender signed, correct?

18   A.  No, not always.

19   Q.  There are promissory notes between 125th Street and

20   lenders, correct?

21   A.  Yes.

22   Q.  The terms of those loans were that -- these were all

23   short-term loans, correct?

24   A.  Most of them.  Some were longer than others.

25   Q.  Most of the terms of loans were six to eight weeks,

HAVTSEA2                         Rechnitz - cross

1  correct?

2  A.  In the beginning.

3  Q.  And the loans generated interest on a monthly basis,

4  correct?

5  A.  Yes.

6  Q.  Over the term of the loan, if it was a two-month loan, then

7  the interest rate would apply to the two months, correct?

8  A.  Correct.

9  Q.  And these were on -- the loans, the face of the loans,

10 these were two percent loans, correct?

11 A.  No, not always.  No, not correct.  There are many different

12 loans, many different interest rates.  No.

13 Q.  Well, most of the time when you entered into those

14 promissory notes in beginning of 2013 and into 2014, the loans

15 with Mr. Weinberger for example, with Mr. Kohn, were written up

16 as two percent loans.

17 A.  I don't think that's the case.  There were many different

18 interest rates on different contracts and loans.  Some of the

19 time it was two percent, some of the time it was six percent.

20 It was always different.

21 Q.  Let me start with the two percent loans.  Just so I

22 understand again how they would function, if Michael Weinberger

23 lent one million dollars at two percent over eight weeks, at

24 the end of the eight week period he would receive $40,000 in

25 interest, correct?

HAVTSEA2                    Rechnitz - cross

1   A.   This is a hypothetical.  I don't know if that happened.  If

2   you could show me something, I would be able to speak to it

3   better.

4   Q.   Well, you did -- is it fair to say you did more than ten or

5   maybe even more than 20 of these loans during the course of the

6   year 2013 into '14 with Mr. Peralta?

7   A.   In 2013 I think I did two loans.  In 2014 it's possible

8   that I did ten or less.

9   Q.   And this was only one of two hard money lending operations

10  that you were doing at the time, correct?

11  A.   Correct.

12  Q.   And this was a pretty substantial part of your business in

13  2013 into '14, correct?

14  A.   Not particularly.

15  Q.   Well, you were raising -- just let's do Mr. Weinberger

16  alone.  He invested more than $6 million of his money into this

17  business, correct?

18  A.   He was by far the largest investor, correct.

19  Q.   That's a lot of money, isn't it?

20  A.   It's a lot of money, yes.

21  Q.   And you were the one vouching for the business as the

22  middle man in this deal, correct?

23  A.   I did not vouch on anyone's behalf.

24  Q.   Mr. Weinberger relied on your due diligence for this,

25  correct?

HAVTSEA2                         Rechnitz - cross

```
 1              MR. BELL:  Objection.

 2              THE COURT:  Sustained.  Please rephrase the question.

 3              MR. MAZUREK:  Sorry?

 4              THE COURT:  Sustained.  Please rephrase the question.

 5   Q.  Mr. Weinberger wouldn't know Hamlet Peralta if it weren't

 6   for you, correct?

 7   A.  Correct, I don't think he ever met him.

 8   Q.  You brought Mr. Weinberger into the deal with Peralta,

 9   right?

10   A.  Yes.

11   Q.  And Mr. Weinberger relied on the fact that you were

12   investing on the deal, correct?

13              MR. BELL:  Objection.

14              MR. SCHECHTMAN:  Could I get a second just to talk to

15   Mr. Mazurek?

16              THE COURT:  Sure.

17              (Pause)

18              THE COURT:  Please restate the question.

19   Q.  Let me ask this:  For all of these investors that you

20   brought to 125th Street Liquor, you were the one who was

21   representing to the investor that this was a deal that they

22   could make money, correct?

23   A.  I believed they could make money.

24   Q.  And they relied on you, correct?

25              MR. BELL:  Objection.
```

HAVTSEA2                          Rechnitz - cross

 1           THE COURT:  I'll allow it.

 2   A.  They ended up investing based on my recommendation, yes.

 3   Q.  Based on your representations, correct?

 4   A.  On my recommendation, not my representation.

 5   Q.  I'll let you use whatever word you want.

 6   A.  Well, there's a difference.

 7           THE COURT:  Hold on.  Please stop with the extra

 8   colloquy between counsel and the witness.

 9           Go ahead, counsel, pose your next question.

10   Q.  And prior to your recommendation for these loans, you

11   didn't do any due diligence as to the business, did you?

12   A.  I did.

13   Q.  You didn't obtain financial records of the business,

14   correct?

15   A.  I did not.

16   Q.  You did not determine whether this business had licensing

17   with the Alcohol, Trade and Tariff Division of the New York

18   State Department, correct?

19   A.  I saw a liquor license hanging in his restaurant.

20   Q.  You saw a liquor license, so he was able to sell alcohol in

21   his restaurant, is that your testimony?

22   A.  Yes.

23   Q.  And you had lawyers working for JSR Capital, correct?

24   A.  I don't have any in-house lawyer at JSR.

25   Q.  Koss & Schonfeld was the outside law firm that you used to

HAVTSEA2                          Rechnitz - cross

1   help draft the promissory note for Mr. Peralta, correct?

2   A.  Yes, I retained attorneys for transactions that JSR did.

3   Q.  You didn't ask them to do any due diligence of the liquor

4   business, did you?

5   A.  Nope.

6   Q.  In fact, you didn't obtain any documentation about whether

7   Mr. Peralta had the ability to repay these loans, correct?

8   A.  I don't understand what I would have done -- could you

9   repeat the question?  It doesn't make sense to me.

10  Q.  Yes.  You did not obtain any of his financial history

11  records to determine the financial state of the business,

12  correct?

13  A.  Correct.

14  Q.  You did not determine what the profit margins of the liquor

15  business was to determine whether he could repay the loans,

16  correct?

17  A.  He told me what they were.

18  Q.  And you took his word for it?

19  A.  I did.

20  Q.  And you put your close friends and family in investments in

21  the millions of dollars, correct?

22  A.  I did.

23  Q.  And you took commissions as a result of these investments,

24  correct?

25  A.  I did.

HAVTSEA2                         Rechnitz - cross

1    Q.  And these commissions that you took were in the form of

2    cash, correct?

3    A.  Yes.

4    Q.  And they were in the amounts of about six to eight percent

5    of each loan, correct?

6    A.  It varied on each loan.

7    Q.  On direct examination last week or Monday of this week you

8    said that that was the average rate of your commissions,

9    correct?

10   A.  Yes.

11   Q.  And that was the same interest rate that basically you said

12   you were -- that the investors were getting, correct?

13   A.  No, again, each deal was different.

14   Q.  But you had said on your direct testimony that it was about

15   six to eight percent for the investors, correct?

16   A.  On average.

17   Q.  On average?

18   A.  Yes.

19   Q.  So you and the investors were basically making the same

20   amount of money on these loans, correct?

21   A.  Yes.

22   Q.  You were making yours in cash, correct?

23   A.  Yes.

24   Q.  And the investors were receiving wires or checks in the

25   amount that was indicated on the promissory notes to these

HAVTSEA2                         Rechnitz - cross

 1   loans, correct?

 2   A.  Yes.

 3   Q.  And then they were also receiving cash payments in addition

 4   to that, correct?

 5   A.  At times, yes.

 6   Q.  And just so I understand how that worked, you had

 7   Mr. Peralta come to your office to pay the cash?

 8   A.  Yes.

 9   Q.  And he would come every six to eight weeks with bags of

10   cash to your offices at 580 Fifth Avenue, correct?

11   A.  No.

12   Q.  No?  You would have other places where he would drop off

13   the cash?

14   A.  No, I think you asked me if he would come every six to

15   eight weeks and he had bags of cash, so the answer to that is

16   no.

17   Q.  But he would deliver cash to your office, correct?

18   A.  He would.

19   Q.  And when he would come, he would come to your office,

20   provide the cash, you would count it, correct?

21   A.  No.

22   Q.  What would you do with it?

23   A.  Jeremy Reichberg would count it.

24   Q.  So Jeremy Reichberg was in the office every time

25   Mr. Peralta came, right?

HAVTSEA2                        Rechnitz - cross

1    A.  Yes.

2    Q.  And you and he split these cash proceeds, correct?

3    A.  Yes.

4    Q.  And also sometimes you would divide some of the cash to be

5    provided to investors, correct?

6    A.  Yes.

7    Q.  You wanted only the cash to be in 100-dollar bills, is that

8    right?

9    A.  I may have made that request but it wasn't right for every

10   time, no.

11   Q.  But you were unhappy with him if he were to come to your

12   office with small bills like 20s or 10s are 50s?

13   A.  Correct.

14   Q.  Because smaller bills are indications potentially that the

15   money was illegal, correct?

16   A.  No.

17   Q.  The hundred dollars was something that you could pass off

18   more than you could the small bills, right?

19   A.  What do you mean pass off?

20   Q.  That the money was being generated from a legitimate

21   business.

22   A.  No, he told me that he got the money from the bank or from

23   clients that paid him.  I preferred hundreds because it's less

24   to handle than 20s.

25   Q.  So when he was dropping off these cash payments to your

1   office, did you ask to see his bank statements to make sure

2   these were withdrawals from the bank?

3   A.   No.

4   Q.   You understood he was in the -- I believe on direct

5   testimony -- the wholesale liquor business, right?

6   A.   Yes.

7   Q.   Typically in your experience, businesses deal in wire and

8   check transfers, correct?

9   A.   Yes.

10  Q.   And --

11  A.   Well, not always.

12  Q.   Generally speaking.

13  A.   Not always.

14  Q.   But in this instance, you were getting substantial payments

15  in cash from Mr. Peralta?

16  A.   I was.

17  Q.   You didn't ask him to see any documentation to verify that

18  this cash was legally generated, right?

19  A.   I did not.

20  Q.   And initially when investigators came to ask you questions

21  in February and March of 2015 about your business dealings with

22  Mr. Peralta, you didn't tell them the truth about the cash,

23  right?

24  A.   No, I lied.

25  Q.   You lied to them about receiving these substantial cash

HAVTSEA2                         Rechnitz - cross

1   commissions?

2   A.   Correct.

3   Q.   And at that point in time you had a reason to believe that

4   Mr. Peralta was dealing in an illegal business, correct?

5   A.   At what point in time?

6   Q.   When the investigators came to visit you in February and

7   March of 2015.

8   A.   They made me nervous.  Didn't know what to think.

9   Q.   Well, is it true, sir, that in December of 2013 you

10  traveled to the Dominican Republic with Hamlet Peralta?

11  A.   Yes.

12  Q.   And in fact, by this point in time at the end of 2013 you

13  were spending a lot of time with Mr. Peralta.

14  A.   Every time he needed money or every time money was due was

15  when I was really spending time with him.  Other than that, a

16  handful of times I visited his restaurant other than that trip.

17  Q.   You would socialize are him at the Grand Havana club,

18  right?

19  A.   I may have taken him once or twice, I don't think more.

20  Q.   But you socialized with him, correct?

21  A.   Again it was business in my mind, not social.

22  Q.   Well, you went to the Dominican Republic with him in

23  December of 2013, correct?

24  A.   Right.  Keep him happy.  He was providing good business for

25  me, and that was something that I was doing.

HAVTSEA2                         Rechnitz - cross

1   Q.  So you had a lot of opportunities to speak to Mr. Peralta

2   about how he was generating the money in response to the

3   promissory notes, correct?

4   A.  Correct.

5   Q.  And when you took this trip with him to the Dominican

6   Republic in 2013, you learned about at that time that he was

7   under criminal investigation, correct?

8   A.  I'm not sure, no.

9   Q.  Well, you were on that trip to Dominican Republic with the

10  then New York City Police Chief Phil Banks, correct?

11  A.  Yes.

12  Q.  And Mr. Banks at that point in time told you that

13  Mr. Peralta was under criminal investigation, correct?

14  A.  Not in December of 2013, no.

15  Q.  I'm going to show you what has been premarked for

16  identification as 3501-27.

17          Specifically we can turn page 7 of that document.

18  Enlarge the third paragraph.

19          Sorry, that's not the right one.  Thank you.  If you

20  take a look at that paragraph that's on your screen, sir.  When

21  you're done, let me know.

22  A.  I read this.

23  Q.  Does that refresh your memory that Mr. Banks or Chief of

24  Police Banks told you on the trip in December of 2013 that

25  Mr. Peralta was under investigation?

1  A.  He did not tell me it in December 2013.  This refreshes my

2  memory very well.  He was upset that Hamlet was coming along to

3  the Dominican Republic because he didn't feel comfortable with

4  someone he didn't know well, and much later on he told me about

5  Hamlet's being under investigation.

6  Q.  So your testimony is that you didn't know when Banks and

7  Peralta were on the same trip that Mr. Peralta was under

8  investigation?

9  A.  Correct, or I would not have brought him with the chief of

10  police.

11  Q.  You learned sometime after that trip that Chief of Police

12  Banks told you that?

13  A.  A long time after that, yes.

14  Q.  Well, starting in 2014, you never -- withdrawn.

15          You never told any of your investors that Mr. Peralta

16  was under investigation when they were investing in him,

17  correct?

18  A.  No, I did not, because they were not investing with him

19  once I found that out.

20  Q.  But in December of 2013, just to be clear, you were on a

21  trip to the Dominican Republic with both the Chief of Police

22  Banks and Peralta, correct?

23          MR. BELL:  Objection.

24  A.  Can you repeat the question, please?

25  Q.  In December of 2013 you were on a trip to the Dominican

HAVTSEA2                    Rechnitz - cross

1    Republic with both the Chief of Police Banks and Mr. Peralta,
2    correct?
3    A.  Yes, and Jeremy and Norman.
4    Q.  And Chief of Police Banks told you that he was
5    uncomfortable with Peralta being on that trip, correct?
6    A.  Yes.
7    Q.  And when you got back, to New York, you did no further due
8    diligence or investigation at all of Mr. Peralta, correct, and
9    his business?
10   A.  No, I had no reason to.
11   Q.  You continued to collect the hundreds of thousands of
12   dollars cash that was being delivered to your office by him?
13   A.  I did.
14   Q.  And just so I understand the math of Peralta deals, on
15   average -- and I understand that you say that the deals were
16   different, and let's just take an average of eight-week deal,
17   is that fair, that --
18   A.  You're welcome to do what you want.
19   Q.  -- some of the loans were a two-month variety, correct?
20   A.  Yes.
21   Q.  And these were loans that were short-term loans that the
22   investor could turn over, roll over.  That is, they could
23   continue to invest that same money after the end of the
24   eight-week period, right?
25   A.  Rather than a hypothetical, let's take an actual case

HAVTSEA2                        Rechnitz - cross

```
 1  study.  I think that would be easier for me to answer.
 2  Q.  Sir, I think I'm the one who gets to ask questions.
 3          MR. MAZUREK:  I move to strike that answer, your
 4  Honor.
 5          THE COURT:  That answer is struck.
 6          MR. BELL:  I object to the commentary, your Honor.
 7          THE COURT:  The commentary is struck.
 8          Go ahead, counsel.
 9  BY MR. MAZUREK:
10  Q.  On an average eight-week deal, if the returns are six to
11  eight percent, right, for the investor, on average?
12  A.  Okay.
13  Q.  And your commission was six to eight percent, correct?
14  A.  Again it depended each deal.  It could have been two
15  percent, it could have been five percent, it could have been
16  ten percent.  Everything was different.
17  Q.  I'm talking on average.
18  A.  On average, okay.  But actually on the bigger deals it was
19  less, so it depends what dollar amount you're dealing with now.
20          THE COURT:  Counsel, are you asking him on average or
21  asking him a hypothetical?
22          MR. MAZUREK:  On average.
23  A.  Average, six to eight percent.
24  Q.  For both the investor and broker, correct?
25  A.  Yes.
```

HAVTSEA2                         Rechnitz - cross

1    Q.  So on the high end, that's 16 percent every two months,

2    correct?

3    A.  No.  Four percent a month.

4    Q.  If eight percent is due at the -- if we could do it in the

5    two-month period, the period of loan, if it's a two-month

6    period, eight percent both for the investor and for you

7    receiving your commission, that's a total of 16 percent.

8    A.  Between me and the investor, yes.

9    Q.  Okay.  And we're in agreement on that.  That's 16 percent

10   every two months, correct?

11           So that --  correct?

12   A.  Yes.

13   Q.  And if we could annualize that --

14   A.  It didn't work that way.

15   Q.  What's the annualized interest rate on 16 percent every two

16   months?

17   A.  I don't know.  I didn't deal that way.

18   Q.  You know what an annualized interest rate is?

19   A.  No.  Could you please tell me?

20   Q.  It's an interest rate that would cover a period of one

21   year, correct?

22   A.  Again --

23           MR. BELL:  Objection.

24           THE COURT:  Overruled.

25           Go ahead.  Keep going, counsel.

HAVTSEA2                          Rechnitz – cross

1    Q.  So 16 percent every two months, and if we multiply that by

2    six, then we would have the annualized interest rate, which is

3    about 96 percent for the year, is that correct?

4    A.  Right.  If it would have been an annual loan, start to

5    finish, that's what it would come out to.

6    Q.  96 percent, right?

7    A.  Yes.  But that did not happen.

8    Q.  Well, if Mr. Peralta needed to raise this money, that was

9    what the rates were that you were offering, correct?

10   A.  This case did not happen.

11                (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HAVJSEA3                    Rechnitz - cross

1    Q.  My question is, the interest rates that you were offering

2    Mr. Peralta to raise money for his business at the time on

3    average had an annualized rate would be 96 percent, correct?

4    A.  I did not offer him any interest rate.  That is not

5    correct.  He proposed interest rates to me.

6    Q.  He proposed your commission of six to eight percent?

7    A.  Yes.

8    Q.  And you just accepted it, is that your testimony, sir?

9    A.  Yes, of course.

10   Q.  It wasn't something you negotiated?

11   A.  No.  Jeremy is the one who really dealt with him in terms

12   of the negotiation of our cut.

13   Q.  So you would rely on Jeremy on this particular part of your

14   business, correct?

15   A.  I relied on Jeremy for the negotiations with Hamlet and to

16   conduct all the due diligence on a weekly basis, as he told me

17   he had done.

18   Q.  Mr. Reichberg at the time, he was the police liaison in

19   Brooklyn.  Is that right?

20   A.  I am not sure if he was still liaison in 2013 or 14.  When

21   I first met him, he was.

22   Q.  JSR Capital was your business, correct?

23   A.  Correct.

24   Q.  And this was a business deal you were doing out of JSR

25   Capital, correct?

HAVJSEA3                         Rechnitz - cross

1    A.  Through JSR Capital.

2    Q.  You don't take any responsibility for the deals that were

3    being done with the liquor business?

4              MR. BELL:  Objection.

5    A.  I never said that.  You're putting words in my mouth.

6    Q.  Do you take any responsibility for the deals that you were

7    doing with the 125th Street Liquor?

8    A.  Yes.

9    Q.  These were loans that you were putting your friends and

10   family in, sir, right?

11   A.  Yes.  I thought it was a great deal.

12   Q.  These were commissions you were taking a sizeable amount

13   of, correct?

14   A.  Yes.

15   Q.  And you were taking them in cash payments?

16   A.  Correct.

17   Q.  You didn't tell all of your investors that you were taking

18   these cash payments in these amounts?

19   A.  Correct.

20   Q.  You never intended to report these cash payments on your

21   tax returns, did you?

22   A.  That is false.

23   Q.  You didn't, did you?

24   A.  Again we went through this yesterday.

25   Q.  My --

1    THE COURT:  Old on.  Just answer the question.

2  Q.  Did you report these cash payments that you received on

3  your tax returns?

4  A.  No.  I did not need to.

5  Q.  Now, there came a time in 2014 when Mr. Peralta stopped

6  paying back your investors, correct?

7  A.  Yes.

8  Q.  Before we do that -- (Pause) -- one of the investors, I

9  think you said you put into the liquor business was a fellow by

10  the name of David Kohn, correct?

11  A.  Yes.

12  Q.  He is your father-in-law, correct?

13  A.  He is.

14  Q.  You mentioned a little a while ago that you never

15  represented anything to your investors about the liquor

16  business, right?

17  A.  What I said is that I vouched for what I thought and I

18  recommended the liquor business.

19  Q.  You recommended the liquor business?

20  A.  Yes, that I felt it was a good, viable business.

21  Q.  But Mr. Kohn, as your father-in-law, he was not just your

22  father-in-law, he was also a CPA accountant, right?

23  A.  Yes.  He still is.

24  Q.  For a big firm called Kohn & Resnick, right?

25  A.  Yes.

HAVJSEA3                    Rechnitz - cross

1   Q.  Before he put $350,000 of his own money into this, this

2   business, he wanted to know a little bit about it, right?

3   A.  I don't remember.  It is possible, but he took my word for

4   it.

5   Q.  He wanted to know that he had no reason to worry, correct?

6   A.  Right.  I assured him he had no reason to worry.

7   Q.  So you represented to him that the business was a good one,

8   right?

9   A.  I assured him that he had no reason to worry.

10  Q.  And the reason he had no reason to worry is because you had

11  done the proper background to know that his loan would be

12  something that would be repaid, right?

13  A.  I felt comfortable and I know if he would lose that amount

14  of money I would reimburse him, which I did.

15  Q.  When he specifically confronted you with his concerns, you

16  told him don't worry, I know everything that I need to know

17  about this business, right?

18  A.  I don't know exactly what I said, but I made him

19  comfortable because I believed in it.

20  Q.  At the same time, you were taking on from his loan six to

21  eight percent commissions in cash?

22  A.  On his, I was taking less but, yes, I took.

23  Q.  And the only person who would know exactly what you took,

24  persons that would know exactly what you took are you, Jeremy

25  Reichberg and Hamlet Peralta, correct?

HAVJSEA3                          Rechnitz - cross

1    A.   No.  I told the government everything about my conduct with

2    Hamlet.  I think they know as well.

3    Q.   The only way we know about how much money you actually took

4    is what you say, correct?

5    A.   That's correct.

6    Q.   You kept no records of that cash, correct?

7    A.   I did not.

8    Q.   There came a time toward the end of 2014 that you were

9    upset with Mr. Peralta because he was falling behind in his

10   payments, correct?

11   A.   Yes.

12   Q.   You took several actions in response to that, correct?

13   A.   I wouldn't say there were in response to that.  It was in

14   response to a culmination of events that occurred in Hamlet's

15   life.

16   Q.   One of the things that happened in hamlets life is he was

17   arrested in the summer of 2014, correct?

18   A.   Yes, for assault.

19   Q.   And he had pending state grand larceny charges at the time?

20   A.   I don't know about that at that time, no.

21   Q.   You actually paid for Mr. Peralta's attorney then, right?

22   A.   Not for a larceny case.

23   Q.   For representation in the state court matters when he was

24   arrested in July of 2014?

25   A.   No.  What I gave him an attorney for is there was a dispute

1    over one of the restaurants he owns for my collateral, and

2    somebody was claiming the restaurant had belonged to them, so I

3    became very concerned since he owed my group millions of

4    dollars and now the collateral was subject to a legal dispute.

5            This was something very important for my interests to

6    make sure it belonged to Hamlet, so I gave him a lawyer to

7    represent him.

8    Q.  You paid for his lawyer, correct?

9    A.  Yes, I did.

10   Q.  You corresponded with that lawyer about what Mr. Peralta

11   was telling the lawyer, correct?

12   A.  Yes, with Hamlet's knowledge and permission.

13   Q.  While that case was pending, he was released on bail,

14   correct?

15   A.  I am not sure how he was released.  I had recommended him

16   to a criminal attorney, and they sent Norman and Jeremy to go

17   visit him in the cell, and I think that is maybe how he got

18   released.  I don't remember the details.

19   Q.  You met with him after July of 2014, correct?

20           MR. SHECHTMAN:  May we have a stipulation with the

21   government Mr. Seabrook, despite all his powers, can't release

22   anyone from jail.

23           THE COURT:  No, we are not going to do that.

24           Go ahead, counsel.

25   BY MR. MAZUREK:

HAVJSEA3                    Rechnitz - cross

1   Q.  You met with Mr. Peralta subsequent to his arrest in July

2   of 2014, correct?

3   A.  I met him many times that year.

4   Q.  You never met him in jail, right?

5   A.  I did not.

6   Q.  After July of 2014 you asked your attorney to assist you in

7   getting a life insurance policy on Mr. Peralta, right?

8   A.  I did.

9   Q.  JSR Capital would be the beneficiary of that life insurance

10  policy, right?

11  A.  Yes.

12  Q.  You had Mr. Peralta go visit your attorney in order to fill

13  out the paperwork for that, correct?

14  A.  I had him visit my attorney on many occasions.  One of the

15  items discussed was filling out a life insurance application.

16  Q.  Did you get life insurance policies on all of the people

17  you did business with?

18  A.  No.

19  Q.  You did for Mr. Peralta, right?

20  A.  There was a different circumstance, yes.

21  Q.  And you did to Mr. Nissen, right?

22  A.  I was not successful in obtaining it on Mr. Nissen.

23  Q.  You tried?

24  A.  I did.  He didn't fill out the application.

25  Q.  You were betting on the deaths of these people in order to

HAVJSEA3                              Rechnitz - cross

```
 1    repay the loan?
 2    A.  No, not at all.
 3    Q.  Now, in December of 2014 you later learned that Mr. Peralta
 4    had a wiretap on his phone and his text messages, correct?
 5    A.  When?
 6    Q.  At some point you learned that Mr. Peralta's text messages
 7    were being wiretapped, correct?
 8    A.  No.  There were rumors.  I didn't learn about it factually.
 9    Q.  You used text messaging in talking with Mr. Peralta,
10    correct?
11    A.  That was one of the methods of communication.
12    Q.  In December of 2014 you were in the process of asking your
13    lawyers to take steps to try to seize control of Mr. Peralta's
14    restaurant and liquor store, correct?
15    A.  Yes.
16    Q.  Because he wasn't paying back your investors, right?
17    A.  I was contemplating calling in the collateral, that's
18    correct.
19    Q.  And your investors were complaining to you, correct?
20    A.  No.
21    Q.  They were owed millions of dollars, right?
22    A.  They weren't complaining to me.
23    Q.  You took steps at that point in time to try to get Mr.
24    Peralta to pay, right?
25    A.  Yes.
```

HAVJSEA3                         Rechnitz - cross

1   Q.   In fact, on December 11th of 2014, Mr. Peralta confronted

2   you about the fact that you had made millions of dollars on

3   these loans, correct?

4   A.   That's what he had claimed at the time, yes.

5   Q.   And he had told you on December 11th of 2014 that, "I made

6   you millions and you know my situation," correct?

7   A.   Yeah.  He didn't mean me personally.  He meant the whole

8   group, anyone who invested, me, my group.

9   Q.   By the way, December 11th, 2014, that was actually the same

10  day that you alleged to have made a cash payment to Mr.

11  Seabrook, right?

12  A.   That is the day I paid Norman.

13  Q.   When we looked at videotape around 6:30 pm on direct

14  examination in and out of your building, in one hand you had

15  what appeared to be your iPhone, correct?

16  A.   Yes.

17  Q.   At that very moment around that very time you were having

18  correspondence with Mr. Peralta about his status of not paying

19  you, right?

20  A.   I don't know.  It is possible.

21  Q.   Well, if I were to show you a document, including text

22  messages, might that refresh your recollection?

23  A.   Again I don't know if what you're showing me will be

24  factual or not, but again it is possible.

25  Q.   I am just asking whether you think a document with text

1   messages might help refresh your memory?

2           MR. BELL:  Objection.

3           THE COURT:  Overruled.

4   A.  Sure.

5           MR. MAZUREK:  I am going to put in front of you, it

6   might be easier to use a hard copy for this one, what has been

7   premarked for identification as MH-70.

8           (Pause)

9           THE WITNESS:  What am I looking at here?  I don't

10  recognize this document.

11  BY MR. MAZUREK:

12  Q.  I would like for you to take a look at it and focus your

13  attention on Column F and tell me if that helps to refresh your

14  memory about your communications with Mr. Peralta in the early

15  evening of December 11th, 2014?

16  A.  No, I don't remember this conversation.

17  Q.  Isn't it true, sir, that on December 11th, 2014, Mr.

18  Peralta told you that everything was great when I walked up to

19  your office with millions in cash and profit?

20  A.  I don't remember him saying this.

21  Q.  Isn't it true he was also telling you at that time, that

22  same evening, on December 11th, 2014, I guess I am only good in

23  the good times.  Do you remember that?

24  A.  Again I don't remember these conversations.

25  Q.  Isn't it true that you responded, "Cash, what cash?  You're

HAVJSEA3                      Rechnitz - cross

1    a liar.  Never dealt with cash even though you tried."

2    A.  I don't remember this specific conversation, but any time

3    he would write about cash, I would deny it by text so I

4    wouldn't get caught.

5    Q.  You wouldn't get caught in the commission of a crime,

6    correct?

7    A.  Correct.

8    Q.  In December of 2014, you knew you were committing a crime

9    with Mr. Peralta, right?

10   A.  No.  That is false.

11   Q.  You just said it was because you wouldn't get caught, that

12   is why you didn't answer that, right?

13   A.  No.  The reason is that if someone had written cash, I

14   would have said not.  Again I don't remember this, is because

15   it is not the subject that people like to discuss by text or

16   phone, as we heard in earlier tapes at trial.

17   Q.  Sir, you would tell, respond in text message to Mr. Peralta

18   that he was lying to you about saying he was delivering you

19   lots of cash to your office, right?

20   A.  Can you repeat the question.

21   Q.  You told Mr. Peralta in text messages that Peralta was

22   lying about delivering cash to you, right?

23   A.  I may have.  Again, I don't know what I'm looking at here.

24   I don't remember this conversation.

25   Q.  But you remember that that is the way you communicated with

HAVJSEA3                          Rechnitz - cross

1   him in texts when he would say he was delivering you cash,

2   right?

3   A.   I don't remember actually writing that.  I am telling you

4   what I may have done he had wrote that to me.

5   Q.   Didn't you just say a few minutes ago that is what you said

6   in response to Peralta's text message?

7            MR. BELL:  Objection.

8            THE COURT:  I will allow it.

9   A.   No, I don't think that is what I said.  I think what I said

10  was that's something I would have answered.  I don't think I

11  said I actually answered that.

12  Q.   Do you also remember when Mr. Peralta would text to you and

13  saw, "You don't have to worry, Jona, I'm not a rat."  Do you

14  remember that?

15  A.   Yes.

16  Q.   What was your understanding of why he was telling you don't

17  worry, I'm not a rat?

18  A.   That's the cash that I received from him.

19  Q.   That he wouldn't tell on you about the crimes you were

20  committing with him, correct?

21  A.   No, I did not commit any crimes with him.  That is not

22  correct.

23  Q.   These text messages that you were sending to Peralta, this

24  was on an iPhone that you had the end of 2014, correct?

25  A.   Again I am not sure.

1    Q.  You were using an iPhone at the end of 2014 to communicate

2    by text with Mr. Peralta, correct?

3    A.  Yes.

4    Q.  That iPhone you destroyed, correct?

5    A.  Correct.

6    Q.  When the investigators from the Police Department came to

7    visit you in March of 2015, you earlier testified you lied to

8    them about your dealings with Peralta, correct?

9    A.  Can you repeat the question, please.

10   Q.  Investigators from what you believed to be the New York

11   City Police Department came to interview you in or about March

12   2015, correct?

13   A.  Yes.

14   Q.  They asked about your business with Mr. Peralta, correct?

15   A.  That's correct.

16   Q.  And you lied to them about your dealings in cash, cash

17   commissions?

18   A.  Yes, I lied.

19   Q.  After you lied to them, you had consulted with counsel,

20   correct?

21   A.  At some point I talked to Bob Fink, as we discussed.

22   Q.  Before that you were having discussions with another

23   criminal defense lawyer who you had paid for Mr. Peralta,

24   correct?

25   A.  Yes.

HAVJSEA3                    Rechnitz - cross

1   Q.  And you also had conversations with your father about the

2   fact that you were receiving large amounts of cash from Mr.

3   Peralta, correct?

4   A.  I had a lot of conversations with my father.  I don't

5   remember if I told him about the cash.

6   Q.  You were very, very concerned after you were visited by

7   police investigators, correct?

8   A.  Of course.

9   Q.  You were concerned also because you knew that Mr. Peralta

10  had already been arrested in state court, right?

11  A.  I was concerned because I was visited by the Internal

12  Affairs Bureau of NYPD.  That is a very unpleasant visit in

13  one's office.

14  Q.  Yes, and you were collecting large amounts of unreported

15  cash, correct?

16  A.  I wouldn't have to report it that year, that is not

17  correct.  I had received a lot of cash, that's correct, and I

18  was afraid because there were cops involved in his business

19  that I dealt with.

20  Q.  And you were concerned because now the police were

21  involved, right?

22  A.  Yes.

23  Q.  So you had talked with Mr. Peralta's criminal defense

24  attorney, correct, about this?

25  A.  I did.

HAVJSEA3                    Rechnitz - cross

1   Q.  You had talks with your father about it, right?

2   A.  I did.

3   Q.  And one of the things that you said to your father about

4   your concerns is if I made money on the side without my

5   investors knowing, that is a fraud on my investors, right?

6   A.  I don't remember saying that.  It is possible.

7            MR. MAZUREK:  If we could put on the screen just for

8   the witness what has been marked for identification as

9   Defendant's Exhibit MH-223.  Put it on the screen at the bottom

10  of Page 4.

11  BY MR. MAZUREK:

12  Q.  Before we get to that, just to be sure, you came to learn

13  during the course of this investigation that the government

14  wiretapped your cell phone, right?

15  A.  No.  I only came to learn about it after it was in the

16  press.

17  Q.  During your cooperation you knew that, correct?

18  A.  No, they never told me that my phone was tapped.  They

19  wouldn't confirm that when I asked.

20  Q.  You were asked during meetings and interviews with the

21  government agents and prosecutors to listen to your own phone

22  conversations, right?

23  A.  This is a very broad investigation.  I think --

24            THE COURT:  Hold on.  Just understand the question.

25            THE WITNESS:  I didn't understand the question.  I

HAVJSEA3                         Rechnitz - cross

 1   think he meant when I first --

 2                THE COURT:  Please just rephrase the question.

 3   BY MR. MAZUREK:

 4   Q.  During interviews with the government prosecutors and

 5   agents, you were asked to listen to your own voice recorded on

 6   telephone conversations, correct?

 7   A.  Yes.

 8   Q.  Now I will ask you to look at the bottom of Page 4 which is

 9   on your screen.  Does this refresh your memory that you had

10   told your own father if I made money on the side without my

11   investors knowing, that is fraud on my investors?

12   A.  I don't know what I am looking at, but I may have said

13   that.

14   Q.  Because you were committing investor fraud in the Peralta

15   scheme, correct?

16   A.  No.  I was worried that it was potential fraud by not

17   disclosing it to investors.

18                MR. MAZUREK:  Might this be a good time to break

19   before I move on?

20                THE COURT:  Okay.  Let's go ahead and take our morning

21   break.  We'll take a 35 minute break.  See you back here 11:55.

22   Don't discuss the case with anyone else.  Don't do any research

23   regarding the people or issues in this case.  See you at 11:55.

24                (Jury excused)

25                THE COURT:  Please, everyone be seated and let's give

HAVJSEA3                         Rechnitz - cross

1    the jurors a three minute head start.  Is there any reason why

2    we should not excuse the witness at this time?

3             MR. BELL:  No, your Honor.

4             MR. SHECHTMAN:  No, your Honor.

5             THE COURT:  The witness may go out through the back.

6             (The witness left the courtroom)

7             THE COURT:  Let's talk about some other housekeeping

8    matters.  There was a request made by counsel in the robing

9    room to keep a certain portion of the transcript under seal.  I

10   indicated that I was inclined not to do that.  I have thought

11   about that some more and I am not going to do that.

12            So although I will give counsel one more shot if they

13   have anything they wish to say about this, but my inclination

14   is not put that portion on the transcript under seal.

15            Anything else from the government?

16            MR. BELL:  No.

17            MR. SHECHTMAN:  No.

18            THE COURT:  That is not going to be sealed.

19            At the end of the day I plan to again instruct the

20   jurors as always not to read anything or listen to anything,

21   not to do any research, get them here at 9:00 o'clock.  Is

22   there anything else that counsel think I should discuss with

23   them today, the end of the day today?

24            MR. BELL:  No, your Honor.

25            THE COURT:  Counsel for defense?

HAVJSEA3                        Rechnitz - cross

1              MR. MAZUREK:  No, your Honor.

2              MR. SHECHTMAN:  No.  I mentioned a case in the robing

3    room.  My guess is your law clerk's skills are pretty good, but

4    I will hand it to him.

5              THE COURT:  You're talking about Figueroa?

6              MR. SHECHTMAN:  Yes.

7              THE COURT:  I have the cite on it.  Thank you.

8              I guess regarding that issue, can I get a sense in

9    terms of timing.  Again I will give counsel plenty of scope.

10   How much longer do you think the cross-examination of this

11   witness will be by Mr. Mazurek?  Do you think we're finishing

12   today?

13             MR. MAZUREK:  No, your Honor.

14             THE COURT:  Do you have a sense of whether you think

15   we'll be finished by the mid-point tomorrow?

16             MR. MAZUREK:  I think so.

17             THE COURT:  Then perhaps on this issue it may help to

18   get something in writing if the parties wish to put anything in

19   writing on this issue.

20             MR. MAZUREK:  Which issue is that?

21             THE COURT:  The issue that was discussed in the robing

22   room regarding an application by counsel for Mr. Seabrook to

23   cross-examine this witness about certain things in terms of

24   certain potential bias against one or more of the defendants,

25   animus against one or more of the defendants.

1    If counsel wish to submit something in writing, I can

2    have defense counsel submit something by 6:00 o'clock tonight

3    and the government respond by 9:00 or 10:00.  Does that work

4    for everyone?

5         MR. SHECHTMAN:  I don't intend to submit anything.  I

6    made my argument.

7         THE COURT:  We can speed up the government's response

8    if you want to put anything in writing, you can put it in by

9    6:00 o'clock tonight.

10        MR. BELL:  That is fine, your Honor.  Thank you.

11        THE COURT:  Is there anything else we need to discuss?

12        MR. MAZUREK:  On the exhibits I moved in, 09, 10, 11,

13   do you want further briefing on that?

14        THE COURT:  Those are the exhibits that you want to

15   have in?  I suppose you can get briefing on that.

16        It does seem to me, based on what you were saying,

17   that 608 was implicated.  I wasn't sure we were really dealing

18   with a 608 issue until you gave me your rationale for why this

19   was relevant.  If you want to give me that, that is fine.  You

20   can give me something by 6:00 o'clock tonight if you want to

21   give me something in writing on those exhibits.

22        MR. MAZUREK:  Okay.

23        THE COURT:  The government can respond to that by

24   9:00, all right?  Is there anything else we need to discuss?

25        MR. BELL:  Only that your Honor admonished I think

1   both the gallery and counsel tables about reactions, audible

2   reactions.  We're still having them.  I am facing this way, but

3   it seems to be awfully close, which is to say, counsel table

4   behind me.  I know that this is eventful testimony and we are

5   human here, but I'd ask -- particularly counsel should

6   appreciate the importance of this -- to not react audibly.

7         THE COURT:  I don't believe counsel were reacting

8   audibly.

9         MR. SHECHTMAN:  I may be guilty of that on one or two

10  occasions there.  There are things like, "I recommend that.  I

11  recommend.  I didn't make representations," that I had trouble

12  with.  I may have said something -- not words, but I may have

13  said something audible.  I will try to do better.

14        THE COURT:  Yes.  Let's have counsel and the parties

15  again not have any sort of verbal response to what the witness

16  is saying or the questions posed by counsel or anything that is

17  happening here.

18        Again for the people in the audience, it is a public

19  trial.  You are free to be here, but if you're going to make

20  noise and be disruptive, we will have you removed from the

21  courtroom.  You can go to the overflow room which I believe may

22  be in Room 850 across the street, and there you may observe the

23  trial as well, and then that is up to you whether you wish to

24  treat this as a horror move and have outbursts over there, but

25  I can't have that happening in the courtroom.

1          Is there anything else we need to deal with?

2          MR. SHECHTMAN:  One thing.  It is an abuse of

3     discretion standard that we talked about yesterday afternoon.

4     That gives you plenty of leeway.  Just for the record, the

5     lawyers were in with the witness this morning and are back in

6     with him now. .

7          THE COURT:  Are you making an application to me?

8          MR. SHECHTMAN:  You told me that I should know when I

9     lost.  I am not making an application.  I am just making a

10    record.

11         THE COURT:  So the record is complete, I denied the

12    defense request to forbid counsel for the witness to speak to

13    the witness, but I did allow counsel the opportunity to make a

14    general inquiry whether or not this witness spoke to counsel

15    before taking the stand, and I know that Mr. Mazurek has done

16    some of that already.  To the extent that counsel for Mr.

17    Seabrook wishes to go into that, counsel for Mr. Seabrook is

18    welcome to do that as well.

19         MR. SHECHTMAN:  I won't overdo this.  So we're clear,

20    one can ask did you talk to him, but your Honor's ruling is any

21    question beyond that about what was said is impermissible.

22         That is, indeed, a very limited inquiry.

23         THE COURT:  It is a limited inquiry, but counsel are

24    all very experienced and you know how to organize the

25    chronology of your questions such that the import that you want

HAVJSEA3                          Rechnitz - cross

1    the jury to take from that can certainly be dealt from the

2    jury.  I don't know what counsel -- again I am not here to

3    comment how well or poorly the witness is doing, but to the

4    extent counsel had concerns the witness's performance was going

5    to be starkly different than yesterday, it doesn't seem that is

6    true.

7              MR. MAZUREK:  So stipulated.

8              MR. SHECHTMAN:  Mr. Seabrook noted we are still

9    getting notes.  At least that part wasn't cured.

10             THE COURT:  Anything else from counsel?

11             MR. BELL:  No, your Honor.

12             THE COURT:  Anything else?

13             MR. MAZUREK:  No, your Honor.

14             THE COURT:  Let's get counsel here at like 11:55 to

15   avoid the unnecessary bumping into the jury.

16             (Luncheon recess)

17             (Continued on next page)

18

19

20

21

22

23

24

25

                          AFTERNOON SESSION

1                              (12:00 p.m.)

2

3          (Jury present)

4          THE COURT:  Welcome back.  Let's continue, go ahead,

5     counsel.

6          MR. MAZUREK:  Thank you, Judge.

7     BY MR. MAZUREK:

8     Q.  Mr. Rechnitz, before the break you were talking about

9     conversations that you were having with your father after you

10    were visited by the police investigators in 2015, do you recall

11    that?

12    A.  I do, yes.

13    Q.  And in approximately April of 2015 you were talking to your

14    father about ways that you could avoid investigators getting to

15    know the fact that you were collecting all this money, right?

16    A.  Possible.

17    Q.  And you were talking about how you could continue to lie to

18    investigators because they didn't have the information, they

19    didn't know how much cash you actually received, right?

20    A.  Maybe, it's possible.

21    Q.  And you were having specific conversations with your father

22    about the fact that even if Mr. Peralta were to give

23    information about how much cash you were receiving during the

24    course of your business with him, you can lie because no one

25    would believe Peralta, right?

HAVTSEA4                         Rechnitz - cross

1   A.  That's something that may have come up, yes.

2   Q.  And that it would just be your word against his word,

3   right?

4   A.  Right.

5   Q.  And that you agreed with your father back then that he's

6   just a low life criminal who will do anything to get out of it

7   and you are an upstanding person, right?

8   A.  I remember the first part, saying that, yes.

9   Q.  You're a businessman, you're a lender, you would be

10  believed over him, right?

11  A.  I don't remember that conversation.

12  Q.  It's a conversation that you had multiple times over the

13  course of the spring of 2015, right?

14  A.  Again, I don't know if I did, but it's possible.

15  Q.  You had it with multiple people, not just your father,

16  right?

17  A.  I don't think so, I'm not sure.

18  Q.  You're talking to Mr. Brafman, right?

19  A.  I did speak to Mr. Brafman.

20  Q.  And during the spring of 2015 you put that plan in action,

21  right?

22  A.  What plan?

23  Q.  The plan of just denying everything that you were doing,

24  right?

25  A.  No.

1    Q.  You lied to the investigators in March of '15, right?

2    A.  Yes.

3    Q.  You lied to them in April of 2015, right?

4    A.  Yes.

5    Q.  You hired new counsel, Mr. Fink, in May of '15?

6    A.  Yes.

7    Q.  And you had the FBI come to Mr. Fink's offices and you

8    continued to lie there?

9    A.  Yes.

10   Q.  You believed that if it was just your word against another,

11   your word would be believed, right?

12   A.  No.

13   Q.  Over Mr. Peralta.

14   A.  Yes.

15   Q.  Now we talked about Mr. David Kohn, your father-in-law,

16   investing in Peralta, right?

17   A.  Yes.

18   Q.  You had conversations with him about the concern of

19   receiving cash, right?

20   A.  Yes.

21   Q.  And he was concerned because he's an accountant receiving

22   cash, right?

23   A.  Yes.

24   Q.  You had cash delivered to his house in New Jersey, is that

25   right?

HAVTSEA4                     Rechnitz - cross

```
 1   A.  I gave him cash, yes.
 2   Q.  And you were helping him commit tax fraud by not -- by only
 3   having a certain percent shown on the books on these promissory
 4   notes?
 5   A.  No, I was not helping him commit tax fraud.
 6   Q.  Well, you and he talked about saying that the cash, that
 7   never ever happened, right?
 8   A.  I don't remember that conversation.
 9   Q.  Do you remember having a conversation with Mr. Kohn in or
10   about April of 2015 talking about the fact that if someone
11   called Mr. Kohn that he could just deny it like you were
12   denying it?
13   A.  I remember telling him that, but he was uncomfortable with
14   that.
15   Q.  You were willing to get your own -- to give instruction to
16   your own family on how to get away with your crime, right?
17   A.  No.
18   Q.  You were asking Mr. Kohn to lie to the authorities so they
19   would never know about your cash, right?
20   A.  No, I didn't ask him to lie.
21   Q.  You told him that listen, if anyone asks, that never ever
22   ever happened.  Didn't you say that?
23   A.  I don't think I used those words, no.
24            MR. MAZUREK:  Well, if we could put on the screen,
25   your Honor, what's been premarked for identification MH229.
```

HAVTSEA4                          Rechnitz - cross

1   Q.  And if we could take a look at the first page of that on

2   your screen.  And again, you learned during the course of your

3   cooperation that the government had recordings of your

4   telephone conversations during a certain period of time, right?

5   A.  Sorry, I'm reading.

6            I didn't hear your question.  What was that?

7   Q.  You learned that the government had telephone recordings of

8   your conversations during a certain period of time, right?

9   A.  Yes.

10  Q.  And they made you listen to some of those calls, correct?

11  A.  Yes.

12  Q.  I'm going to direct your attention to page 4 of MH229.

13           MR. MAZUREK:  And you can just blow up the center

14  portion of that.

15  Q.  Does that refresh your recollection that you told your

16  father-in-law --

17  A.  You're highlighting, but it doesn't blow up.

18           So give me a minute to read it, it's hard to see.

19           Thank you.  I don't know what this is referring to,

20  sorry.

21  Q.  Isn't it true that you told your father-in-law, sir, in or

22  about April of 2015 that if anyone ever showed up asking

23  questions about the cash, that all you had to say was never

24  ever happened?

25  A.  I don't remember telling him that, no.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  Q.  You don't remember saying to him that's all he has to do is

2  be very solid, like that never happened?

3  A.  I don't think this is referring to what you're alluding it

4  does.

5  Q.  You remember a conversation with Mr. Kohn?

6  A.  I have spoken to him many times.  He's my father-in-law.

7  Q.  You remember a conversation where you're talking about cash

8  payments that he received as a CPA from the liquor business

9  that he invested in through you?

10  A.  Not by phone.  It's not something that I remember or

11  something that I think I would do.

12         MR. MAZUREK:  Could we put page 12 of that exhibit on

13  the screen.  If we could blow up the first half of that page.

14  Q.  You told Mr. Kohn the game you were playing with the

15  investigators about lying to them, correct?

16  A.  Can I read this for a minute?  Do you want me to read it or

17  answer your question?

18  Q.  Sorry?

19  A.  Would you like me to answer your question or read what's on

20  the screen?  I can't do both at the same time.

21  Q.  You can read it, sir.

22  A.  Thank you.

23         Okay, what's your question?

24  Q.  My question is does that refresh your memory that you told

25  Mr. Kohn, your father-in-law, about how you were lying to

HAVTSEA4                          Rechnitz - cross

1    investigators?

2    A.  I repeated to him the conversation that I had with the

3    investigators, and in that, that I had lied.

4    Q.  Yes.  And you were telling him that because if he were to

5    get a visit by investigators, you wanted him to protect your

6    lies, right?

7    A.  No, I was telling him for the same reason that I told my

8    dad, to tell him what was going on with me.

9    Q.  Well, you knew other investors were visited by

10   investigators, right?

11   A.  I did.

12   Q.  And you were concerned because you had already told the

13   investigators you received no cash, right?

14   A.  I was concerned that I was the subject of the

15   investigation.

16   Q.  The criminal investigation about the business of

17   Mr. Peralta?

18   A.  Anything.  I didn't know what it was about.

19   Q.  They were asking you questions about Mr. Peralta, correct?

20   A.  No, they were asking questions if we knew of any cops that

21   invested with Mr. Peralta.

22   Q.  They were asking what business you did with Mr. Peralta,

23   sir, yes or no?

24   A.  That was one of things they asked me, yes.

25   Q.  And the concern that you were talking to Mr. Kohn about and

HAVTSEA4                          Rechnitz - cross

1    your father about was the fact how you could get out of it,

2    right?

3    A.  Not with Mr. Kohn.  I was discussing that with my father,

4    yes.

5    Q.  Mr. Kohn, you were telling him that what you did was say

6    that did I ever get cash?  I said no, of course not.  Did you

7    get ever gifts from him in the value of money?  No.

8            You told him that, right?

9    A.  Yes, I repeated to him what I told the investigators at

10   that time.

11   Q.  You also told them about all the complaints that Peralta

12   owes people money, right?

13   A.  Pardon?

14   Q.  You also told Mr. Kohn you know there's a lot of complaints

15   that he owes people money.

16   A.  What do you mean?

17   Q.  Is that true?

18   A.  I don't understand what you're saying.

19   Q.  You also told Mr. Kohn that your concern was that Peralta's

20   business was not doing well because he wasn't paying back

21   money, right?

22   A.  I don't remember telling him that.  It's possible.

23   Q.  Does it refresh your recollection to see the highlighted

24   portion on the screen, sir?

25   A.  No, not at all.

HAVTSEA4                         Rechnitz - cross

1   Q.  Is that because you just don't want to admit the truth to

2   this jury?

3   A.  I have admitted that I lied.  I have no problem admitting

4   the truth.  I have said many things I'm not proud of in this

5   courtroom, and I have admitted that I lied many times and all

6   of my misconduct.  I have no problem telling you when I have

7   done something wrong.  This does not refresh my recollection.

8   Q.  You spent hours, hours with prosecutors and agents

9   preparing for your testimony, right?

10  A.  Yes.

11  Q.  You know that your cell phone was recorded at times, right?

12  A.  Yes.

13  Q.  You know that there were -- that these recordings were

14  things that the government used to investigate the case, right?

15  A.  Yes.

16  Q.  You reviewed these recordings and transcripts of these

17  recordings with your own attorneys at times?

18  A.  No, I did not.

19  Q.  And being confronted now with transcripts of those

20  recordings doesn't refresh your memory, is that your testimony?

21  A.  No, the only recordings that I have been privy to are the

22  ones that were played in trial.  I don't think I have seen any

23  other recordings or transcripts to date.

24  Q.  There are multiple times when you sat with prosecutors and

25  agents where they played recordings for you in their offices,

HAVTSEA4                          Rechnitz - cross

1   correct?

2   A.  Yes.

3           MR. BELL:  Objection.

4           THE COURT:  Overruled.

5   A.  Yes, the ones that were played in the courtroom.

6   Q.  Now I want to ask you some questions --

7           MR. MAZUREK:  We can take that off the screen.

8   Q.  I want to ask you some questions about another business

9   that you conducted at JSR Capital involving a company called

10  National Events Company.  You know what that is?

11  A.  Yes.

12  Q.  That is a ticket broker business, is that correct?

13  A.  Yes.

14  Q.  And the owner of that business was a man by the name of

15  Jason Nissen?

16  A.  Yes.

17  Q.  Mr. Nissen has been charged in a criminal complaint with

18  conducting a Ponzi scheme out of that business, correct?

19  A.  Yes.

20  Q.  That is also a business that you recommended to both family

21  and friends, correct?

22  A.  Yes.

23  Q.  It's also a business that you made millions of dollars in

24  commissions on, correct?

25  A.  Yes.

1   Q.  You began to do business with him in or about 2012, is that

2   about right?

3   A.  I think so.

4   Q.  And just so I can understand the nature of this business,

5   is it correct to say that Mr. Nissen resold high-end sports and

6   entertainment tickets?

7   A.  I don't think just high end.  He resold all types of

8   tickets to concerts and to sporting events.

9   Q.  And he did so in the retail market, correct?

10  A.  I think so, yeah.

11  Q.  And you did business with him in -- a little business in

12  2012, but the business really picked up in 2013 and 2014,

13  correct?

14  A.  I think the business picked up in 2013 right when we

15  started doing business.

16  Q.  And you were putting a lot of the same investors that you

17  were in the liquor business into the ticket business, correct?

18  A.  I put a lot of the same investors from the ticket business

19  into the liquor.  The tickets happened well in advance of the

20  liquor.

21  Q.  It was basically a lot of the same players involved,

22  correct?

23  A.  Yes.

24  Q.  People who were in your own office in who were involved in

25  the diamond business, correct?

1   A.  Yes.

2   Q.  Mr. Weinberger, again, we spoke about before, correct?

3   A.  Yes.

4   Q.  And even some family members, correct?

5   A.  Yes.

6   Q.  Now the way this business worked was that you would have

7   promissory notes drafted between the lender and National Events

8   Company, correct?

9   A.  Yes.

10  Q.  Ticket business?

11  A.  Yes.

12  Q.  And these would be for a specific event or purchase of

13  tickets, correct?

14  A.  For the most part, that's correct, yes.

15  Q.  And so for example, if Mr. Nissen needed to purchase

16  Superbowl tickets, there would be a determination of an

17  investment into Superbowl tickets at a certain interest rate

18  for the length of the loan, correct?

19  A.  Yes.

20  Q.  Now your role would be, again, as a middle man, correct?

21  A.  Yes.

22  Q.  And a middle man being that you were introducing the

23  investor to Mr. Nissen, correct?

24  A.  I didn't necessarily always introduce them, but I managed

25  their investment for them with Mr. Nissen.

HAVTSEA4                         Rechnitz - cross

1    Q.  And the money that the investor would send would oftentimes

2    go directly into Mr. Nissen's business, correct?

3    A.  It would often.

4    Q.  Sorry?

5    A.  Often it would.  Sometimes it went through me, yeah.

6    Q.  Generally, though, you didn't want to have the money going

7    through JSR Capital, is that correct?

8    A.  Probably happened that way 30, 40 percent of the time.

9    Q.  And your take on that would be you would take a cut or a

10   commission on the investments into the ticket business?

11   A.  Yes.

12   Q.  And that cut generally was approximately ten percent on

13   average?

14   A.  No, it was not an average of ten percent.

15   Q.  It was always ten percent?

16   A.  No, it was five percent and ten percent at times.

17   Q.  It was ten percent during the time before Falcon came in to

18   lend money to Mr. Nissen, correct?

19   A.  I'm not sure when it changed.  It's possible.

20   Q.  Well, if I can show you what's been premarked for

21   identification as 3501-34.

22          MR. MAZUREK:  If we could put that on the screen just

23   for the witness.  If we could turn to page 4.

24          If we could highlight 3501-73, sorry, page 4.  If we

25   could highlight the section.

HAVTSEA4                         Rechnitz - cross

1    Q.  If you could take a look at that on your screen.

2    A.  It's hard to see.

3            Thank you.

4    Q.  Let me know when you've read it.

5    A.  Okay.

6    Q.  Does that refresh your recollection that --

7    A.  Hold on, it's a long paragraph.  You have to give me a

8    moment, please.

9            What's your question?

10   Q.  That in approximately 2015 is when the Falcon investment

11   was being discussed with Mr. Nissen.

12   A.  Yes.

13   Q.  And it was in approximately 2015 when he sold his ticket

14   company to the Falcon investment advisers?

15   A.  No.

16   Q.  Sorry?

17   A.  No, I never said he told his ticket company to them.

18   Q.  They invested in his ticket company?

19   A.  They provided him with a credit line.

20   Q.  And that was an after -- and after that point in time when

21   Falcon came in to invest, your commission went down to a five

22   percent commission on investment deals through after the Falcon

23   company came?

24   A.  I don't remember when it went down to five percent, it may

25   have been before.

HAVTSEA4                         Rechnitz - cross

```
 1   Q.  But certainly this doesn't refresh your recollection when

 2   you spoke with the government on this topic in June of 2017?

 3   A.  No, there could be a mistake in there.  It does not refresh

 4   my recollection.

 5              MR. MAZUREK:  We'll take that off.

 6              And if we put on the screen what's be premarked for

 7   identification as MH2.

 8   Q.  Again, just so I understand how the transactions with

 9   Nissen worked, if a commission was set at ten percent, the

10   money would come in from the investor for the amount of the

11   ticket deal, is that right?

12   A.  Yes.

13   Q.  And you would receive ten percent off of that investment

14   amount?

15              MR. BELL:  Objection, I'm sorry, your Honor, is this

16   exhibit being offered?  I'm not quite sure how it's being used.

17              THE COURT:  Let's do this, let's have a brief sidebar.

18              (Continued on next page)

19

20

21

22

23

24

25
```

1          (In robing room)

2          THE COURT:  What's your objection?

3          MR. BELL:  He's asking a number of questions with an

4    exhibit on the screen that I don't think has been offered

5    before.

6          MR. MAZUREK:  It's there to refresh his memory.

7          MR. BELL:  If there is an attempted refreshment of his

8    recollection happening, I think there's a way to.  That doesn't

9    appear to be what is going on.

10          THE COURT:  I overrule that objection for now, and you

11   can ask that question and witness can answer that question.

12          The reason I brought counsel back here is my deputy

13   whispered something in my ear when we came back from the break

14   about another newspaper in the jury room, so I asked her to

15   send me an email.  She indicated there's a newspaper, she

16   believes it's either the AM or Metro free daily newspaper.

17   Juror No. 8 brought it in this morning.  The juror seemed to be

18   working on a puzzle in the paper.  She saw it on the table in

19   the jury room.  After she escorted the jury to the courtroom

20   she went back to the jury room, looked in the newspaper, and

21   saw immediately an article about this case.

22          So I wanted to let counsel know that.  I don't know if

23   there's anything that we need to do about that, but I wanted to

24   do this outside the presence of the jury in case counsel want

25   me to send my deputy to go in and grab the paper.  I don't know

1    counsel wish me to do.  It seems to me that given what happened

2    in the past with this case, I don't think there's anything that

3    we should do.  The jurors have been following their obligations

4    not to read anything about this case, but I wanted to give that

5    information to counsel.

6         How do counsel wish to proceed?

7         MR. BELL:  We agree, your Honor, and we think that the

8    jury not only having been repeatedly admonished but having had

9    the exercise every day where they were each individually

10   questioned should understand the importance of your Honor's

11   instruction.  I don't think that they were ever told that they

12   can't bring stuff in, and so this doesn't appear to be a

13   violation of your Honor's instruction in any way.  And with

14   that in mind, I think that they ought to collectively or

15   individually be able to do the Jumble or the crossword to their

16   heart's content.

17        THE COURT:  Counsel for Mr. Seabrook?

18        MR. SCHECHTMAN:  I'm in the same place as the

19   government on this.

20        I don't know if this needs to be on the record, my

21   daughter writes crossword puzzles for The New York Times, so

22   I'm a big fan of them.

23        MR. MAZUREK:  I'm fine with that approach, your Honor.

24        THE COURT:  So for the record, you don't want me to do

25   anything about, correct?  No one?

HAVTSEA4                         Rechnitz - cross

1             MR. MAZUREK:  Correct.

2             THE COURT:  Sound good.  Let's continue.

3             (Continued on next page)

1           (In open court)

2           THE COURT:  Okay, that objection is overruled.

3           MR. MAZUREK:  Thank you, Judge.

4   BY MR. MAZUREK:

5   Q.  So we were talking, Mr. Rechnitz, about the operations of

6   the money flow here.  So an investor would make an investment

7   into Neco and you would take ten percent of that, correct?

8   A.  No, an investor -- I would not take ten percent of his

9   investment, no.  An investor would invest, and Jason would pay

10  me a ten percent fee of the total investment amount or five

11  percent, depending on the deal.

12  Q.  So let's talk about the ten percent deals.  The way that

13  that would work is if you -- if Jason received a wire for say

14  $1.16 million, you would receive $110,000 from Neco, correct?

15  A.  No, it would be 116,000 if it was 10 percent.

16  Q.  With some rounding error, it would be 110 or 116,000,

17  correct?

18  A.  No, it would be 116 if it was ten percent.  It's a $6,000

19  difference.  It's a lot of money.

20  Q.  So $116,000 is the amount that you would receive, correct?

21  A.  If the deal was ten percent, I would have received a

22  $116,000 fee for bringing him a million 160.

23  Q.  And that fee would be due as soon as the investment came

24  in, correct?

25  A.  It depended.  It was different at different times.  I

1   wanted it up front.  Sometimes he couldn't pay it up front and

2   he owed me it and paid it months later or weeks later at the

3   end of the investment.  It depended on each deal.

4   Q.  But it had be an -- the commission would be based on the

5   investment amount, not the profits of Neco, correct?

6   A.  Correct.

7   Q.  However, the investment -- the promissory notes indicated

8   that all amounts that were being submitted by the investor were

9   to be used for purposes of ticket purchases, correct?

10  A.  That's correct.

11  Q.  But that wasn't the way the money was actually being used,

12  right?

13  A.  No, it was.  If they invested a million 160, Jason had put

14  that amount of money into the event, or that's the amount he

15  paid back plus profits to them.

16  Q.  So --

17  A.  He stuck to his agreements.

18  Q.  So just so I -- let's break that down a bit so I understand

19  it.  So if a million dollars of investments came in, you were

20  owed $100,000, correct?

21  A.  Correct.

22  Q.  And Mr. Nissen would have to find that $100,000 to pay you

23  from his business, right?

24  A.  Yeah.

25  Q.  And he would have to use a million dollars -- need to use a

1    million dollars to buy Superbowl tickets, correct?

2    A.  Again, he did different things at different times.

3    Sometimes he used the money off the top from the million,

4    sometimes he used it from money he had coming in in cash flow,

5    and sometimes he used it from money he had in the account.

6    Q.  Just so I understand this correctly, if a million dollars

7    came into his account and he needed to use that million dollars

8    for purposes of buying tickets, he also needed to pay your

9    commission, so he needed a total of $1,100,000 in order to do

10   that, right?

11   A.  If he had to pay me on the same day that he got a wire --

12   Q.  Let's move aside from the same day, sir.

13            MR. BELL:  I'll object, your Honor, to the extent that

14   Mr. Mazurek would let the witness answer a question.

15            THE COURT:  Overruled.  Go ahead.

16            MR. MAZUREK:  Thank you, Judge.

17   Q.  The total amount of money that Mr. Nissen needed, if a

18   million dollars was raised through you, was $1,100,000 to buy

19   tickets and pay you, right?

20   A.  No, he only needed a million dollars to buy tickets, and he

21   owed me $100,000.

22   Q.  Thank you.  And you took the ten percent off the top of

23   each investment, or sometimes five percent, for every investor

24   that you raised for Jason Nissen's company, correct?

25   A.  I wouldn't say on top of the investment, I would say,

1   again, to use your example, if there was a million dollars, he

2   would either owe me 50 grand or 100 grand.  So if he used that

3   money for six months and he made profits on it, I am not a

4   partner in the profit, I just got a fee for bringing him those

5   funds based on the amount invested.

6   Q.  And he would have to come up with the money to pay you back

7   in addition to paying the interest rate back to the investor,

8   right?

9   A.  Yes.

10  Q.  In the instance where you were taking a ten percent fee,

11  let's use the example -- actually why don't we use a real

12  promissory note that was used during the course of your

13  business with Mr. Nissen.

14          MR. MAZUREK:  If we could put on the screen MH13 for

15  the purposes of the witness, your Honor.

16          THE COURT:  Okay.

17  Q.  Do you see what's on the screen?

18          MR. BELL:  Objection, your Honor.

19          THE COURT:  Overruled.

20  Q.  Do you have it?

21  A.  I do.  I don't see an attachment, I just see an email.

22          THE COURT:  What's the question, counsel?

23  Q.  We could turn to page 2.  If you take a look at what's on

24  page 2 on your screen, take a look at that and let me know if

25  you recognize it to be one of the promissory notes that you

HAVTSEA4                          Rechnitz - cross

1    were familiar with in the business.

2            MR. BELL:  Objection, your Honor, there's been no

3    failure of recollection.

4            THE COURT:  Sustained, sustained, sustained.

5    Q.  Let me know if you recognize what is on page 2 of your

6    screen.

7            MR. BELL:  Objection.

8            THE COURT:  Are you seeking to admit this, counsel?

9            MR. MAZUREK:  I may, your Honor, depending on what the

10   witness says.

11           THE COURT:  Okay.  Go ahead, rephrase the question

12   then.

13   BY MR. MAZUREK:

14   Q.  So does what's on your screen help you remind you of how

15   you structured promissory notes for --

16           MR. BELL:  Same objection.

17           THE COURT:  Sustained.

18   Q.  The terms of the promissory note that you entered into for

19   your investors was often in a dollar amount, correct, principal

20   amount of the loan, right?

21   A.  Can you repeat the question?

22   Q.  The promissory notes that you helped manage your investors

23   were in a principal amount of the loan, that's one of the

24   terms, correct?

25   A.  I don't understand your question.

HAVTSEA4                          Rechnitz - cross

1    Q.  I'll rephrase.  Let me ask this, promissory notes with

2    respect to your investors for the Neco business were drafted by

3    the Koss & Schonfeld firm?

4    A.  I don't remember.

5    Q.  They were the firm that you used to do your transactional

6    work at JSR Capital, correct?

7    A.  Yes.

8    Q.  And Jason Nissen didn't write his own promissory notes for

9    your investors, correct?

10   A.  I don't remember who drafted it originally.  There was a

11   form that we both found mutually acceptable.  I don't remember

12   how that came out.

13   Q.  But you used the law firm as your outside counsel to assist

14   you in drafting the specific notes for your investors at Neco?

15   A.  No, not always.  Sometimes we would do it in-house,

16   sometimes the lawyer did it.  There were different

17   circumstances for each investor.

18   Q.  But some of the times you used Koss & Schonfeld?

19   A.  Yes.

20   Q.  And those promissory notes would have the terms of the

21   arrangement, the loan agreement, between your investor and

22   Neco, correct?

23   A.  Yes.

24   Q.  And it would have a principal amount in the amount of the

25   ticket purchase, correct?

HAVTSEA4                      Rechnitz - cross

1    A.  It would have the amount that is owed back if it's a

2    promissory note, so it lists the amount that needs to be paid

3    back.

4    Q.  So let's use the example of $700,000 purchase of Superbowl

5    tickets and tickets to the NBA All Star game, okay?

6    A.  Sure.

7    Q.  And the way that the loan agreement would be drafted would

8    be that Neco would promise to use the principal amount to

9    purchase the tickets that were specifically mentioned in the

10   promissory note, correct?

11   A.  I don't know.  If you show me a case study I could speak to

12   it.

13   Q.  Look at what's on your screen right now.  Does that help to

14   refresh your memory?

15             MR. BELL:  Objection.  Same objection.

16             THE COURT:  Overruled.

17   A.  It would if I could see the last page.  Could I see the

18   last page, please?

19   Q.  Sure.

20   A.  Thank you.

21         This is not a signed copy, so I don't know if this is

22   a draft or what it is.

23   Q.  Sir, you did dozens of these deals on behalf of investors

24   when you were at JSR Capital over 2013 and '14, correct?

25   A.  I did dozens of deals with Neco.

HAVTSEA4                         Rechnitz - cross

1    Q.  Yes, and you used promissory notes on them, correct?

2    A.  They were documented via promissory notes, that's correct.

3    Q.  And you did this, you said, on a template, that it was a

4    form-type promissory note, correct?

5    A.  No, that's not what I said.

6    Q.  Sir, you know what notes -- the basic terms of the

7    agreement that you had between Neco and the investor, right?

8    A.  Yeah, I do.

9    Q.  So are you surprised to see the kind of note that I show

10   you that you say is draft?  Does that look different than what

11   you're used to seeing in your business?

12           MR. BELL:  Objection.

13           THE COURT:  Sustained.

14   Q.  So you understood -- you can put the note aside.

15           In the basic deal that you had with your investors for

16   the ticket business, the money that was coming in that they

17   were signing notes for, the investors believed that that money,

18   a hundred percent, would be used for tickets, correct?

19   A.  Yes.

20   Q.  You didn't tell them that you were taking ten percent off

21   of the investment amount, did you?

22   A.  Not all of them.  I told some of them.

23   Q.  There were many investors that you had in this business who

24   had no idea that every time that they were making an investment

25   into Neco that you were taking out ten percent from that

HAVTSEA4                      Rechnitz - cross

1   business, correct?

2                 MR. BELL:  Objection.

3                 THE COURT:  Overruled.  You can answer.

4   A.  They may not have known how much I made, that would be

5   correct.

6   Q.  Because you didn't disclose it, right?

7   A.  I disclosed that I was making.  I'm not sure that I can

8   answer you precisely in terms of how much I told them I made.

9   Q.  In fact, there were times, sir, that you would tell

10  investors that your fee would only get paid on the exit when we

11  will take ten percent of the profits to our investors, right?

12  A.  In certain scenarios I may have done that, yes.

13  Q.  But that wasn't true because you were taking the money off

14  the top of the investment, right?

15  A.  Not always.

16  Q.  Sir, you would take ten percent, or five percent in later

17  instances, from the investors based on the investment amount,

18  correct?

19  A.  Right.  We calculated my commission based on the money that

20  I brought to Jason.

21  Q.  And so I understand, the note was for -- the notes were

22  generally on average for two or three months, is that right?

23  A.  No, every deal was different.

24  Q.  Based on the event?

25  A.  Superbowl could have been four months.

1  Q.  These were short loans?

2  A.  World Cup was a year and a half.  No, that's not correct.

3  The U.S. Open was six months.  So no, that's not correct.

4  Q.  Let's take the example of the Superbowl.

5  A.  Okay.

6  Q.  How long was the event, the loan agreement?

7  A.  It was different each time.  This is what I'm telling you,

8  sometimes there was an intended agreement but the timing worked

9  out differently, so it could have been from three to six to

10  seven months.

11  Q.  And the investor would be making three to four percent per

12  month?

13  A.  No.

14  Q.  What was the usual term of the event?

15  A.  Anywhere between one and a half to three percent per month

16  for the investor.

17  Q.  So if the investor had a three percent loan per month, on a

18  six month loan, what's the interest rate?

19  A.  18 percent.

20  Q.  And you were making ten percent off the top of that,

21  correct?

22  A.  Sometimes five percent, sometimes ten percent, correct.

23  Q.  Let's say for the ten percent one, the interest rate that

24  Neco would have to pay, based on your commission and the return

25  for the investor on that three-month loan, would be 28 percent

1  for the three months, correct?

2  A.  You said six months, you went back to three months.  I

3  think three months -- three percent at six months is how got to

4  18 percent?  Three months would be only nine percent.

5  Q.  Let's do this again.  On a six month loan at three percent

6  per month that's 18 percent for the investor, correct?

7  A.  Yes.

8  Q.  And ten percent for you, correct?

9  A.  Five percent or ten percent.  We're talking hypothetical

10 here, so I want to be precise.

11 Q.  So we're doing the hypothetical at ten percent, so for six

12 months that's 28 percent, correct?

13 A.  If it was ten percent and it was a six month loan and it

14 was three percent, and it was an event that that exactly

15 happened, that would be 18 percent plus ten percent, which is

16 28 percent over six months, which is 56 percent per year.

17 Q.  Right.  And that is just -- at 56 percent per year,

18 Mr. Nissen was raising --

19 A.  Actually it's not 56 percent per year.  I only get paid

20 once, remember?  So if I was to get, in your example, ten

21 percent, okay, and someone was supposed to get three percent a

22 month, so they would get 36 percent and I would get ten

23 percent, so it's 46 percent for the year.

24 Q.  But you would get paid ten percent every time that that

25 investor would roll over into another event, that could be the

HAVTSEA4                          Rechnitz - cross

1   same money.  So if the investor is investing one million

2   dollars on a Superbowl event -- correct, following me?

3   A.  I'm trying to.

4   Q.  One million dollars on a Superbowl event, you would get

5   $100,000 on a ten percent deal, correct?

6   A.  We established if there was a million dollar investment,

7   and you want to work with your hypothetical ten percent, I

8   would receive $100,000.

9   Q.  If that same -- at the end of that period, that investor

10  uses the same million dollars to invest in the next event, like

11  the World Series, you would again get ten percent for the next

12  event's investment, correct?

13  A.  You are you saying if he goes into a new investment for a

14  million dollars?

15  Q.  Yes.

16  A.  Anytime there's a new investment that I'm bringing to the

17  table, I'm getting paid a fee for bringing that money.

18  Q.  And so on the same million dollars that that investor

19  invested three times at three events for the year, you were

20  making 30 percent on same million dollars, correct?

21  A.  I don't know what you mean by the same million.  If someone

22  went into an event for a million dollars and now they get their

23  money back or choose to keep it in the company and go into a

24  new investment and have the same decision and go into a new

25  investment, that's three investments, I get paid three times,

1   just as if I went to three different investors who each put in

2   money separately.

3   Q.  But it's the same million dollars that's been rolled over

4   three times.

5   A.  Sometimes people roll their money, sometimes people took it

6   out.  It depends on each situation and each investor.

7   Q.  You testified on direct examination that your investments

8   were short term and continuous in this business, correct?

9   A.  Yes.

10  Q.  And the continuous part is the fact that if, for example,

11  Mr. Weinberger put in a million dollars for one event, that

12  event is finished, he gets his return, he decides to keep the

13  million dollars in that business, he invests it in the second

14  event.  At that point in time you collect another $100,000 on

15  that million, correct?

16  A.  If he decided to puts it in a new investment, I would get

17  paid again, yes.

18  Q.  At the end of that second event, if he goes to a third

19  event in that same year, that same million dollars is being

20  used to invest in the third event and you take another

21  $100,000?

22  A.  Again, anytime that I bring any money to the table for

23  Jason, such as in your example, I get paid on each investment I

24  bring money to the table for.

25  Q.  And the money that you took in for the commission that you

1    were raising for your investors into JSR Capital in total came

2    to about $10 million dollars in 2013 to 2015, correct?

3    A.   That is not correct.

4    Q.   Let me show you what has been premarked for identification

5    MH28.  I'm going to give you a hard copy, so you can look at

6    this one.

7            If you take a look at that document, tell me if that

8    refreshes your recollection about the amounts that Neco was

9    transferring money into your accounts at JSR Capital.

10           MR. BELL:  Objection.

11           THE COURT:  Sustained.

12   Q.   Did you have a chance to look over -- withdrawn.

13           JSR Capital had two bank accounts, a Chase account and

14   a Citibank account at different times, right?

15   A.   Yes.

16   Q.   And the entities that you were familiar with relating to

17   Jason Nissen was National Events Group -- or National Events

18   Company, sorry?  Yes?

19   A.   Yes.

20   Q.   World Events Group, correct?

21   A.   Yes.

22   Q.   National Events Company II, correct?

23   A.   Yes.

24   Q.   National Events of America, Inc., correct?

25   A.   Yes.

HAVTSEA4                      Rechnitz - cross

1    Q.  And the transfers that would be made into the JSR Capital

2    accounts were either by check or by wire, correct?

3    A.  Yes.

4    Q.  And isn't it true, sir, that the total amount of checks or

5    wires into either the Citibank or Chase account at JSR Capital

6    was a total of 11.197 million dollars?

7    A.  I don't know.

8    Q.  Never checked?

9    A.  No.  I think you just gave me a twelve-page document.  I

10   don't even know what it is or where you got to from.  I don't

11   know how I could know by heart --

12   Q.  My question is --

13           THE COURT:  Hold on, hold on.

14           Go ahead.

15   Q.  On direct examination you said that you only received $5

16   million from Neco related entities, is that correct?

17   A.  As income, yes.  And I said I thought it was around five.

18           MR. MAZUREK:  Your Honor, move to strike.  No

19   question.

20           THE COURT:  No, that's denied.

21           Go ahead.

22   Q.  You also knew that at a certain point in time in Neco's

23   business on approximately a dozen occasions, new investor money

24   was used to pay what old lenders were due, is that correct?

25   A.  I don't know how many times, but I remember that

HAVTSEA4                          Rechnitz - cross

1    circumstance, yes.

2    Q.  That is, that when you found a new investor, the money was

3    going not to purchase tickets but to pay the old investor,

4    correct?

5    A.  Not exactly.  I wouldn't explain it that way.

6    Q.  Well, you testified on direct examination about how this

7    worked just a couple of days ago, correct?

8    A.  I did.

9    Q.  On at least a dozen occasions, Mr. Rechnitz, you testified

10   that there were times when an event was up and Nissen owed

11   money to an investor, he asked me -- he told me he had used the

12   money he was supposed to give back to that investor for future

13   ticket for future event.  Right?

14   A.  Can you reread that?

15   Q.  You understood that there were times when an event was up

16   and Nissen owed money to an investor, and he asked you, he told

17   you he had used the money he was supposed to give back to that

18   investor for future tickets and future events?

19   A.  That's correct.

20   Q.  And you would then bring him a new investor for the new

21   event knowing that the money would pay back the previous

22   investor for the days he was short, right?

23   A.  Can you read to me exactly what I said?

24           THE COURT:  Just answer the question that's posed to

25   you.  Go ahead.

HAVTSEA4                        Rechnitz - cross

1   A.  Can you repeat it, please?

2   Q.  Yes.  You would then bring Jason Nissen a new investor for

3   the new event knowing that the money would pay back the

4   previous investor, correct?

5   A.  Yes.

6   Q.  So the old investors were being paid by new investors,

7   right?

8   A.  In that scenario --

9   Q.  Yes or no.

10          THE COURT:  Hold on, let him answer.

11          Go ahead.

12  A.  In that scenario, technically, yes.

13  Q.  Not being used for purposes of ticket buys, correct?

14  A.  I couldn't hear you.

15  Q.  In that scenario, the money was not being used to purchase

16  tickets.

17  A.  What money?  Jason had already purchased them.  This was

18  paying Jason back.  It's not as simple as what you're asking.

19  Q.  You testified on direct examination just two days ago that

20  on at least a dozen times new investor money was being used for

21  the purposes of paying old investors, right?

22  A.  In certain scenarios, yes.

23  Q.  And that is the definition of a Ponzi scheme, right?

24  A.  Not as I understand it, no.

25  Q.  The same definition you already gave earlier in your

HAVTSEA4                          Rechnitz - cross

1    testimony today, correct?

2    A.   No.

3              (Continued on next page)

1  Q.  Now, you also, taking your number that you have given of $5

2  million that you received from the Neco Companies, you didn't

3  even believe that you needed to report this as income, did you?

4  A.  First of all, I said I think it is around $5 million.  I

5  just want to correct that in your question, and anything I

6  received I believe was reported accurately.

7  Q.  My question to you, the money that you received -- and

8  we'll take it by year, start in 2013 -- the money you received

9  in 2013 from the National Event Company or Jason Nissen you

10  believed was not income?

11  A.  I don't know what money you're referring to and I don't

12  know the amounts that I received in 2013.

13  Q.  We'll break this down, sir.  You were receiving monies as

14  commission from Neco, correct?

15  A.  I did.

16  Q.  In 2013, right?

17  A.  I did.

18  Q.  You didn't receive any other monies from Nissen or Neco

19  during that year, right?

20  A.  That is not true.

21  Q.  You received other monies other than commissions on these

22  deals?

23  A.  Yes.

24  Q.  What was it for?

25  A.  First of all, some people sent me money, and I sent it to

1    Jason, so he sent it back to me.  Other times he sent me back

2    for other investors.  I had a loan from him that year for a

3    million dollars.

4    Q.  We'll get to that.

5    A.  You're asking me a question.

6          THE COURT:  Let him answer the question.

7    A.  So I don't know exactly what you're referring to.  There

8    are all different sorts of monies coming in from Jason.

9    Q.  The lion's share of the money you received from Jason

10   Nissen and Neco Companies was from the 5 or 10 commissions you

11   were taking from those investments as your role as a middleman,

12   right?

13   A.  Which year are you referring to?

14   Q.  2013?  Any year?

15         MR. BELL:  Objection.

16   A.  I don't know.

17         THE COURT:  Sustained.

18   BY MR. MAZUREK:

19   Q.  2013?

20   A.  I don't know.

21   Q.  Do you want to look at your bank account again?

22         MR. BELL:  Objection.

23         THE COURT:  Sustained.

24   BY MR. MAZUREK:

25   Q.  Do you recall telling your accountant that any money that

1   you received from National Event Company or Jason Nissen in

2   2013 is not income and that you made a mistake, suggesting that

3   it was?

4   A.   I know the email you're referring to.  I think you're

5   taking it out of context.  That is not what I meant and that is

6   not what I wrote.

7   Q.   Do you want to see the email?

8            MR. BELL:  Objection.

9   A.   I don't need to.  I know it.

10           THE COURT:  Sustained.

11  BY MR. MAZUREK:

12  Q.   Isn't it true, sir, that you wrote on October 14th, 2013 to

13  your own accountant that any money I received from National

14  Event Company or Jason Nissen is not income I made a mistake?

15           MR. BELL:  Objection.

16           THE COURT:  Overruled.

17  A.   If I see the email, I can confirm, but that sounds exactly

18  what I wrote.

19  Q.   I am sorry?

20  A.   It sounds like what I wrote.  If I saw the email, I can

21  tell you with accuracy, but I believe that statement is what I

22  wrote.

23           MR. MAZUREK:  Your Honor, I will show him what is

24  marked for identification as MH-260.  If we can highlight the

25  first third of the page, an email to Mr. Weberman on Friday,

HAVJSEA5                          Rechnitz - cross

1    October 4th, 2013 at 9:52 am.

2              THE COURT:  Hold on.  Just highlight it.  Can you

3    magnify it for the witness.

4              MR. MAZUREK:  We'll magnify it.  Has the witness had a

5    chance to see that?

6              THE WITNESS:  Yes.

7    BY MR. MAZUREK:

8    Q.  Does that refresh your recollection that you told your

9    accountant on October 4th, 2013 that also any money I receive

10   from neck or National Event Company or Jason Nissen is not

11   income I made a mistake?

12             MR. BELL:  Objection.

13             THE COURT:  Overruled.

14   A.  I remember having a phone call with my accountant.

15   Q.  I am asking whether you wrote this on an email to him on

16   that date?

17             MR. BELL:  Objection.

18             THE COURT:  Sustained.

19             Please rephrase the question.

20   BY MR. MAZUREK:

21   Q.  Isn't it true on Friday, October 4th, 2013 at approximately

22   9:52 am, you wrote to your accountant also any money I received

23   from neck, National Event Company or Jason Nissen is not income

24   I made a mistake?

25   A.  Yes.

HAVJSEA5                          Rechnitz - cross

1   Q.  Isn't that true?

2   A.  Yes, that is an email I sent.

3   Q.  You just mentioned a loan, so-called loan agreement that

4   you entered into with Jason Nissen in 2013, right?

5   A.  Yes.

6   Q.  This was a loan agreement for five million dollars, right?

7   A.  I believe so.

8   Q.  You were the borrower in this instance?  You were borrowing

9   money from Jason Nissen?

10  A.  Yes, against a future sale of the company.

11  Q.  This is on the date of January 3, 2013, sir, correct?

12  A.  I don't know.

13  Q.  I am sorry?

14  A.  I am not sure.

15  Q.  We can put on the screen what has been premarked for

16  identification as MH-8.  Do you recognize that document, sir?

17  A.  Can I see the last page, please.

18  Q.  We can turn the page for him.  Do you recognize your

19  signature?

20  A.  I do.  Can you go back to the previous page?  (Pause)

21  Okay, I have reviewed it.

22  Q.  That is a true and correct copy of the loan agreement you

23  entered into with Jason Nissen on January 2nd and signed on

24  January 3rd, 2013?

25          THE COURT:  Sustained.

HAVJSEA5                          Rechnitz - cross

1   BY MR. MAZUREK:

2   Q.  This was money that this loan agreement indicated, you

3   said, was based on a potential sale of the company.  Is that

4   right?

5   A.  Pardon?

6   Q.  The reason that you have testified that you entered into

7   this loan agreement was based on an advance on a potential sale

8   of the company.  Is that right?

9   A.  That was one of the reasons, yes.

10  Q.  Wasn't the real reason, sir, that you were attempting to

11  evade paying taxes on a million dollars of commissions?

12  A.  No.

13  Q.  Sir, you entered or helped investors enter into loans or

14  loan agreements in many businesses, right?

15  A.  Yes.

16  Q.  You're familiar with the workings of interest rates, right?

17          MR. BELL:  Objection.

18          THE COURT:  Overruled.

19  A.  I don't understand the question.

20  Q.  You know that in entering a loan agreement, you want to

21  know what the rate of return is going to be on the loan, right?

22  A.  If it is business loan, yes; if it is a personal loan like

23  I've done for many of my friends, I don't charge interest.

24  Q.  For a business loan you charge interest, right?

25  A.  Not always.

HAVJSEA5                          Rechnitz - cross

1   Q.  You just loan money for the --

2   A.  I am a middleman, sir.  Not always.  It depends.  I have a

3   friend in Los Angeles.  I have given him business loans and I

4   don't charge interest because I look at the entire picture and

5   the entire relationship.

6           Someone like Jason looked at the whole picture with me

7   and what I was providing to him, so charging interest to me

8   would not be appropriate.

9   Q.  This particular loan that you entered into in January 2013

10  with the National Event Company, you were the borrower, right?

11  You were borrowing money from Neco, correct?

12  A.  Yes, I was going to borrow money.

13  Q.  You just testified sometimes, "I have really good friends

14  and I don't charge them any interest," right?

15  A.  Yes.

16  Q.  That is as a lender, right?

17  A.  Yes.

18  Q.  So you're telling me on this loan agreement that as a

19  borrower, you got the best deal possible from Jason Nissen,

20  right?

21  A.  No.  I wanted more money.

22  Q.  You wanted more money, of course, but the interest rate was

23  zero percent on this loan, right?

24  A.  Yes.

25  Q.  Zero percent, you didn't have to pay a dime in interest,

HAVJSEA5                          Rechnitz - cross

1    correct?

2    A.   That's correct.

3    Q.   This was during a period of time in 2013 where you were

4    making a lot of commission fees from Mr. Nissen, right?

5    A.   I was.

6    Q.   Millions of dollars, right?

7    A.   I don't know how much I made in 2013.

8    Q.   Of course you don't.

9              MR. BELL:  Objection.

10             THE COURT:  Sustained.

11   BY MR. MAZUREK:

12   Q.   In 2013 you didn't know anything about Falcon Investment

13   Advisers, did you?

14   A.   I knew Jason was looking for --

15   Q.   That is not my question.

16             THE COURT:  Hold on.

17             MR. BELL:  Objection.

18             THE COURT:  Hold on.  Please rephrase the question,

19   please.  Go ahead.

20   BY MR. MAZUREK:

21   Q.   In 2013 you never heard the group Falcon Investment

22   Advisers, right?

23   A.   I am not sure.  That is what I was trying to explain to

24   you.

25   Q.   You're not sure?

1   A.  No.  Can I elaborate?

2   Q.  I will ask you a question and then you can answer it.

3          You know that sometime in mid-2015, Jason Nissen

4   entered into a deal with the Falcon Investment Advisers,

5   correct?

6   A.  Yes.

7   Q.  That was approximately two and a half years before the date

8   of this loan agreement that we have been talking about, right?

9   A.  I don't think it was.

10  Q.  Sorry.  Two and a half years after this loan agreement we

11  have been talking about?

12  A.  Yes.

13  Q.  In 2013 when you entered into this zero percent loan

14  agreement with Jason Nissen, you were trying to avoid paying

15  taxes on the millions of dollars of commissions you were being

16  paid, right?

17  A.  No, that is not right.

18  Q.  And Jason Nissen agreed to sign this document, right?

19  A.  No.

20  Q.  He signed it, right?

21  A.  He signed it because it is a real loan.

22  Q.  And it is for the term of five years, correct?

23  A.  Yes.

24  Q.  At zero percent interest, right?

25  A.  Right.

1    Q.   You were charging on, you know, to some extent up to 56

2    percent on an annualized rate for giving loans to Jason Nissen

3    at the time, right?

4    A.   No, that is not right.

5    Q.   Between your commission and the interest rates that you

6    were getting or he was having to pay for investors, we just

7    went over one of those deals, right?

8    A.   That wasn't 56 percent.  I think it was 46 in your

9    hypothetical scenario.

10   Q.   I will give you 46 percent in my annualized right?  That

11   was the companies of his raising money at the time?

12   A.   In your hypothetical scenario.

13   Q.   Yes?

14   A.   I don't remember such an instance that ever occurred like

15   that.

16   Q.   Jason Nissen was raising money at that point in time from

17   you at 10 percent, 5 or 10 percent commission rates plus three

18   to four percent interest rates from invest stores, right?

19   A.   My commission was not interest.  It was a fee.

20   Q.   It was money?

21   A.   It was a fee for bringing investments.

22   Q.   It was money he had to pay out of his pocket, out of his

23   business, right?

24   A.   Yeah.

25   Q.   He was just giving you a million dollars in January of 2013

HAVJSEA5                         Rechnitz - cross

1   and saying here, free money for you, Mr. Rechnitz?

2            MR. BELL:  Objection.

3            THE COURT:  I'll allow it.

4   A.  So again you didn't ask me the circumstances of it.  I am

5   not sure how to answer that.  You are making it appear the way

6   it wasn't.  Yes, he did give me that loan and it was

7   interest-free and it was for five years.

8   BY MR. MAZUREK:

9   Q.  You haven't repaid it because the five-year term hasn't

10  come up, right?

11  A.  I haven't repaid it because he has not sold the company to

12  date and the five-year term has not expired.  Those were the

13  two conditions, so it is due next year.

14  Q.  For 2013, so I understand it, that million dollars that you

15  said was a loan to you and your company, you didn't have to

16  declare that money on your taxes, right?

17  A.  It wasn't income.  There is nothing to declare.

18            MR. SHECHTMAN:  Judge, one second.

19            (Off-the-record discussion)

20  BY MR. MAZUREK:

21  Q.  You have no documentation to show that you received the

22  million dollars based on this loan agreement, correct?

23  A.  I may have had.  I think everything I had was provided to

24  the government.

25  Q.  It would be all of the stream of income of the monies that

1   you were getting from Neco would just be by wire or check into

2   JSR Capital, right?

3   A.   And he paid credit cards on my behalf.

4   Q.   And he paid your credit card bills, correct?

5   A.   Yes.

6   Q.   And that is in the tune of millions of dollars we have

7   already talked about, right?

8   A.   I don't think so.  I don't know the amount.

9   Q.   Well, you said you had at least $5 million in wires or

10  checks coming into your JSR Capital accounts, right?

11  A.   I don't think that is what I said.  I think I said I think

12  the total I have made from Jason was approximately five

13  million.

14  Q.   And that one million dollars that is the subject of this

15  so-called loan agreement would be among that five million,

16  correct?

17  A.   No.  That would be on top of that.

18  Q.   There is no way for you to distinguish where that money

19  came from?  Which wire transfer?

20          Do you want to to see your wire transfers again in

21  your bank accounts at JSR Capital?

22          MR. BELL:  Objection.

23          THE COURT:  Sustained.

24          MR. SHECHTMAN:  Could I see the court at sidebar.  I

25  apologize to the court.

HAVJSEA5                              Rechnitz - cross

1            THE COURT:  Let's do this.  While we are doing the

2    sidebar, I'll give the jury a bathroom break.  You have a

3    10-minute break.  Don't discuss the case with anyone else.

4    Don't do any research related to the issues or people in this

5    case.  See you in 10 minutes.

6            (Jury excused)

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HAVJSEA5                          Rechnitz - cross

1                  (At the sidebar)

2                  MR. SHECHTMAN:  Judge, I will be brief.

3                  I grew up in the Southern District of New York in the

4     U.S. Attorney's Office, and I have had supervisory positions

5     there.  I think this is the phoniest loan agreement I have ever

6     seen because if I understand it right, it means that Mr. Nissen

7     lent him $1 million, right?

8                  They have seen his bank accounts.  They also know that

9     Falcon didn't appear on the scene until late because they have

10    spoken to Falcon, right?

11                 And there is no way this is a loan.  This is a cover

12    for income that he received as fees, and so I asked my good

13    friends in the Southern District of New York to admit what this

14    witness will not, which is this is a sham loan agreement.

15                 THE COURT:  Good luck with that.  I don't think that

16    is happening.

17                 MR. SHECHTMAN:  It might.  If it were a different age,

18    it might.

19                 MR. CAPONE:  (Inaudible).

20                 THE COURT:  Stop, stop, stop.  Are you willing to make

21    such a stipulation?

22                 MR. BELL:  Of course not.

23                 THE COURT:  Hold on.  Yes, here is what I am most

24    concerned about right now.  I am most concerned with the pace

25    of the trial.  Let's just try to keep things moving.

1          MR. MAZUREK:  This is a difficult witness.  I am

2     trying my best, your Honor.

3          THE COURT:  Here is the thing.

4          There is the issue on cross-examination frequently of

5     the one question too many.  I understand counsel sometimes want

6     a little momentum so they start repeating questions asked

7     previously to get the moment going.

8          When you do that toward the end when the witness has

9     given you the answer that is the best you're going to get and

10    you kind of -- you're not allowed to generally, it doesn't

11    usually make sense as a defense attorney to do a celebration

12    dance when you get a good answer and ask the witness that again

13    and the witness realizes that was an answer that you liked and

14    the answer tends to grow and the answer tends to change.

15         Ordinarily I don't really care if people want to use

16    that kind of style, that is fine, but it is taking longer

17    because then we have to come back and unpack that when the

18    witness talked about this being zero percent loan frequently.

19    The witness said that at least five or six times.  You have got

20    that.

21         To the extent you wish to make whatever arguments you

22    want to make in summation about that, that is fine.  The

23    likelihood you're going to get this witness to agree, a hostile

24    witness to agree with you that this is a sham loan is pretty

25    doubtful.

1            MR. MAZUREK:  I understand.

2            THE COURT:  You are tilting at windmills.

3            MR. MAZUREK:  Can I move for admission of this

4    document?

5            THE COURT:  For what?

6            MR. MAZUREK:  What is that?

7            THE COURT:  For what?  He has already testified.

8            MR. MAZUREK:  I don't understand why I can't introduce

9    documents about his testimony.

10           THE COURT:  This is extrinsic evidence.  He has

11   already testified about this.

12           MR. BELL:  I agree, your Honor.  I don't think Mr.

13   Mazurek understands why.  It has been a recurring evidentiary

14   problem, but setting that aside, look, I understand that Mr.

15   Shechtman has his understanding of what the loan agreement is

16   based on the fractured testimony that has come out on

17   cross-examination.  It sounds like he should cross on it.  That

18   is the only appropriate remedy that there is.

19           I will note, though, since it came up, that I would

20   ask I guess, not looking for any particular relief right now,

21   but I want to flag the issue, there are judges who feel

22   different ways about this, your Honor.  A substantial number

23   that I have appeared before I tend to agree with them, tend not

24   to be big fans of attempting to strong-arm the government into

25   stipulations before the jury.

1           The Nicks stuff, rhetorical stuff, that is fine, but

2      there have been a couple of instances --

3           MR. MAZUREK:  Once.

4           MR. BELL:  -- I seem to remember literally a couple,

5      but it shouldn't happen and I would ask that it not.

6           THE COURT:  Okay.  I will say this.  Again I want

7      counsel to remember it is important for counsel to get along

8      with each other and be civil toward each other.

9           It is, in my experience as a trial lawyer and as a

10     judge, it is frequently the case that any defense attorney who

11     has previously worked in the U.S. Attorney's Office of the

12     Southern District of New York for any period of time frequently

13     says about their current adversaries that this is the most

14     outrageous thing I have ever seen, that when I was an

15     Assistant, I never would have done that.

16          MR. SHECHTMAN:  So stipulated.

17          THE COURT:  I have seen that all the time.  I have

18     never came across in which a former Assistant has not said

19     that.  It is kind of par for the course.  That is what happens.

20          Again back to the other thing.  See if we can move

21     this along.  I will give you plenty of scope.  I am just saying

22     as a time-saving mechanism when the witness says something, for

23     example, like I don't charge my friends interest for business

24     loans, then just move on to the next question and say so for

25     business loans you don't charge interest, that is again the

HAVJSEA5                         Rechnitz - cross

1    touchdown celebration and now the --

2              MR. MAZUREK:  He did it backwards.  He said he was the

3    lender.  He doesn't charge this.  He was the --

4              THE COURT:  That is the touchdown situation and the

5    witness, rightly or wrongly, I am not saying the witness is

6    doing anything wrong or right, but the witness has incentive to

7    shade that answer a little bit more.

8              Anything else we need to talk about back here?

9              MR. BELL:  I offer one thing on the record, your

10   Honor, just to address your Honor's vital concern before the

11   trial.  As testy as these issues can get, just a temporary

12   check, I think we are getting along really, really well, not

13   quite so well that Mr. Shechtman and I are going to go trick or

14   treating as each other tonight, although we have discovered

15   other reasons why that might be a bad idea.

16             Like we love these guys.  I think they tolerate us.

17   We are going --

18             MR. SHECHTMAN:  I want to say for the record I really

19   like Mr. Nawaday.

20             THE COURT:  All right.  I will let counsel use the

21   restroom if they need to and let's get back out there.

22             (In open court)

23             (Recess)

24             THE COURT:  Counsel, let's get the witness in.  Are

25   all the parties here?  Is Mr. Seabrook here?

1    MR. SHECHTMAN:  I'll get him.

2         (Pause)

3         MR. SHECHTMAN:  Judge, he is in the men's room I think

4    one floor down.

5         THE COURT:  Okay.  Everyone have a seat for a second.

6         (Pause).

7         (Defendant Seabrook entered the courtroom)

8         THE COURT:  Okay.  Let's bring the jury in.

9         (Jury present)

10        THE COURT:  Be seated.  Let's continue.  Go ahead,

11   counsel.

12        MR. MAZUREK:  Thank you, Judge.

13   BY MR. MAZUREK:

14   Q.  On direct examination, Mr. Rechnitz, you had testified that

15   there came a time when you found that Jason Nissen was late in

16   repaying loans.  Is that right?

17   A.  Yes.

18   Q.  That he was sometimes strapped for cash?

19   A.  Yes.

20   Q.  Sometimes would lie to you about his ability to repay a

21   certain loan on time?

22   A.  I thought he was lying, but then I checked it out, and it

23   panned out.  I don't think I said he lied.

24   Q.  But, in any case, there were times during the course of

25   your relationship with him you realized he was unable to meet

HAVJSEA5                          Rechnitz - cross

1    the terms of the agreements when loans were due?

2    A.   There were instances where he was not able to fulfill his

3    obligations in a timely manner.

4    Q.   And that made you upset at times, right?

5    A.   Yep, it frustrated me and it made me concerned.

6    Q.   It made you concerned about his financial ability to pay,

7    right?

8    A.   It made he concerned in general because I expect somebody

9    who signs an agreement to uphold that agreement.

10   Q.   You were putting millions of dollars of friends and

11   family's money into his business, correct?

12   A.   I was.

13   Q.   You were back in 2013 and 2014, right?

14   A.   Yes.

15   Q.   During this period, January 2013, you're saying you were

16   getting an interest-free loan from him of a million dollars,

17   right?

18   A.   Yes.

19   Q.   Despite the concerns that you had of his own financial

20   condition, right?

21   A.   Those were not my concerns.  If that had been my concern, I

22   wouldn't have done further business with him.

23   Q.   Just to complete the issue on this loan agreement, in five

24   years' time when your million dollars is supposedly having to

25   be repaid under this loan, Jason Nissen accosted him at an

1   average of 46 percent interest rate that he was raising money

2   during that period of time, and that means that that loan,

3   interest-free loan costs him upwards of two and a half million

4   dollars, right?

5   A.  Not at all.  I don't know what he borrows on his home

6   mortgage.  You're taking something apples and oranges.  I don't

7   see the correlation.

8   Q.  You knew the interest rates that were being charged for his

9   business was not a home mortgage, right?

10  A.  I know what my investors were charging.  I don't know what

11  his other investors or lenders were charging.  That is what he

12  was willing to give us because of the profit margins he was

13  making.

14  Q.  You knew at that period of time you were one of his larger

15  lenders, right?

16  A.  Yes.

17  Q.  You knew you were charging 5 to 10 percent commission,

18  right?

19  A.  Yes.

20  Q.  And that your investors were charging 3 to 4 percent per

21  month, right?

22  A.  No.  We never said 3 to 4 percent.

23  Q.  All right.  Sometimes percent?

24  A.  That is not what I said, either.  I said one a half to 3

25  percent.  It was usually one and a half to two.  There were a

1    few investors who charged 3 and above.

2    Q.  Per month?

3    A.  Yes.

4    Q.  So we're still talking about 20 to 36 percent annualized

5    rate of interest, right?

6    A.  I can only think of one client, one investor who charges

7    that rate.

8    Q.  I am talking about from 1 and half to 3 percent, on the

9    high end of that 3 percent, that is 36 percent on an annualized

10   rate that he is having to pay out, correct?

11   A.  Yes.

12   Q.  In addition to your 10 percent for every time a loan is

13   generated, right?

14   A.  Yes.

15   Q.  If there were 10 loans generated by you during the one-year

16   period, and each of those loans are a million dollars, you are

17   making a million dollars, right?

18   A.  Yes.

19   Q.  He has to fund all of that, right?

20   A.  Not exactly.  You're calling it interest.  It is coming out

21   of profits out of the sales from the tickets.  From a cash flow

22   projection, he is able to pay it per diem with ease.

23   Q.  So his profits have to exceed the combination of your

24   commissions and the interest rates that are being received by

25   your investors, right?

HAVJSEA5                        Rechnitz - cross

1   A.   If he doesn't want to lose money, they should --

2   Q.   If he loses money, then he has to find new sources of money

3   to pay back these people, right?

4   A.   Or he has to make out payment plans.  That is usually what

5   happens when people can't pay their obligations.

6   Q.   But you demanded the money up front, right?

7   A.   Yes, I wanted my money up front.  I didn't demand it and it

8   never -- it didn't always come up front.  There were times it

9   came far along in the process.

10   Q.   You made sure you had about over $5 million in the years

11   that you were dealing with him that you claim was income,

12   right?

13   A.   What is claiming?  What is claiming?  I don't understand

14   that.

15   Q.   I will put the quotes aside, but we are relying on your

16   word for the $5 million, correct?

17   A.   I was asked to guess.  I think it was approximately $5

18   million of income over the years.

19   Q.   You would --

20   A.   I could be wrong.  I think it was approximately 5 million,

21   according to my records.

22   Q.   Approximately a million dollars in American Express credit

23   cards were paid?

24   A.   No, I never said that.

25   Q.   You don't know how much that was?

1   A.  I don't.

2   Q.  We'll get back to that.

3   A.  I wish I did.

4          THE COURT:  There is not a question.  Go ahead,

5   counsel.

6   BY MR. MAZUREK:

7   Q.  Some of the lies that you told the investors to get them to

8   invest in the ticket business was that you were actually

9   co-investing in the same ticket purchase, right?

10   A.  That's correct.

11   Q.  When, in fact, you weren't putting your own money in,

12   correct?

13   A.  Correct.

14   Q.  You did that, in fact, to Mr. Huberfeld, correct?

15   A.  I am not sure I did that with him.

16   Q.  Do you remember a ticket purchase for a Floyd Mayweather

17   fight sometime in 2015?

18   A.  I do.

19   Q.  Do you remember telling Mr. Huberfeld that you're sending

20   $1.1 million of JSR money to purchase Mayweather boxing

21   tickets?

22   A.  I don't remember saying it was JSR money.  I remember

23   telling him I was putting in 1.1.

24   Q.  Whether it was JSR, yourself, someone related to Jona

25   Rechnitz was going to invest $1.1 million for this ticket

1    purchase, correct?

2    A.   No.   Meaning my group, right.

3    Q.   Sir, you told Murray Huberfeld in April of 2015 that you

4    were sending $1.1 million for purchases of Mayweather tickets,

5    right?

6    A.   I don't remember, but possibly.

7             MR. MAZUREK:   If we can put up what has been premarked

8    for identification as MH-20.   If we can expand the bottom half

9    of that page.

10   Q.   If you take a look at that and tell me does that refresh

11   your memory --

12   A.   It does.

13   Q.   -- that you told Mr. Huberfeld that you were sending $1.1

14   million for purchases of Mayweather boxing tickets, yes?

15   A.   Please confirm we are sending, yes.

16   Q.   In fact, you did not purchase $1.1 million of Mayweather

17   tickets, right?

18   A.   I am not sure.   I think my group may have.

19   Q.   Sir, when you corresponded to Mr. Huberfeld, you were

20   corresponding with him about what you were doing, right?

21            MR. BELL:   Objection.

22            THE COURT:   Overruled.

23   Q.   What you, Jona Rechnitz, was doing?

24   A.   No.

25   Q.   You didn't say anything about a group, that a group, I am

1   going to get a group together to purchase $1.1 million, right?

2   A.  No.  The way that we speak is if sometimes Murray says he

3   will come in with some and bring in partners.  He is a

4   spearhead.  That is the way we build real estate.  I am buying

5   a building.  You asked me yesterday am I buying it or a whole

6   group.  I am the GP, I am putting together 1.1.

7   Q.  You were buying some group of investors out there to invest

8   $1.1 million in Mayweather tickets.  Is that your testimony,

9   sir?

10  A.  My testimony is I am not sure if I ended up putting in the

11  1.1 with the group, but I think I may have.

12  Q.  Do you want to see your bank account for April 2015 to see

13  if $1.1 million went to Neco?

14          MR. BELL:  Objection.

15          THE COURT:  Sustained.

16  BY MR. MAZUREK:

17  Q.  So there was no group that you told Mr. Huberfeld was going

18  to match his $1.1 million investment, was there?

19  A.  I wrote back to him that we were each sending a million

20  100,000.  That was an email to Jason, and Murray is copied on

21  it, so I believe I did.

22  Q.  In your bank account of April 2015, there is no transfer of

23  $1.1 million to Neco?

24  A.  That's correct.  As you pointed out, a lot of the monies

25  came directly from investors, not through me.

HAVJSEA5                          Rechnitz - cross

1    Q.  Do you have any memory or do you have any document you can

2    provide us to show who this group of investors were that bought

3    Mayweather tickets?

4              MR. BELL:  Objection.

5              THE COURT:  I'll allow it.

6    A.  I don't know.  As you said, we did dozens of deals, so I

7    don't know which one.

8    Q.  Mr. Rechnitz, do you know you're testifying under oath

9    right?

10             MR. BELL:  Objection.

11             THE COURT:  I will allow it.  We have to get an

12   answer.

13   A.  Yes, I do.

14   BY MR. MAZUREK:

15   Q.  You are giving an oath to testify truthfully, completely of

16   what your memory is, right?

17   A.  Yes.

18   Q.  And in April of 2015 it is not that long ago, you did not

19   have any investor group try to purchase tickets and tell Murray

20   Huberfeld that there was another $1.1 million that was going

21   into this deal, did you?

22   A.  I think I had investors come into this fight as well.  That

23   is what I am telling you.  I want to be precise because I am

24   under oath and I am not sure exactly.

25   Q.  Let me ask you something.  Why don't tonight you go home

1    and find the documents that prove that?

2              MR. BELL:  Objection.

3              THE COURT:  That is sustained.  The jury should

4    disregard that.  Go ahead.

5    BY MR. MAZUREK:

6    Q.  In fact, it was your modus operandi on a number of these

7    occasions to tell investors that you were co-investing in

8    dealings in order to entice them to invest, correct?

9    A.  As I told you, and I am not proud of it, I lied to

10   investors many times.

11   Q.  One of these times is to Mr. Huberfeld, or you can't just

12   admit that here?

13   A.  I am not sure.

14             MR. BELL:  Objection.

15             THE COURT:  Stand as to form.  Rephrase.

16   BY MR. MAZUREK:

17   Q.  One of the times you lied to investors to coax them to

18   invest with you is on April 2015 on the Mayweather fight that

19   you said you were investing together with Mr. Huberfeld, right?

20   A.  April 22, not the 20th, and no, that is not right.  I don't

21   think that is the case.

22   Q.  Let's go to the top of that page, sir, because after you

23   sent an email saying you were confirming that we are sending

24   $1.1 million each into that ticket purchase, you wrote to

25   Mr. Nissen and copying Murray Huberfeld, okay, "We will wire in

1  the morning," right?

2  A.  That's what it says, yes.

3  Q.  It doesn't include an investor group.  It is Jona Rechnitz

4  saying we will wire in the morning, from you, right?

5  A.  Yes, it says "we," yes.

6  Q.  And there is no wire in your bank account in April 2015 to

7  Neco of $1.1 million purchase, right?

8  A.  Not in my bank account, no.

9  Q.  You would tell Mr. Nissen time and time again not to ever

10  speak to your investors directly, right?

11  A.  Correct.

12  Q.  You would use foul language with him at times, correct, to

13  get that point across?

14  A.  Possibly, yeah.

15  Q.  You would threaten him sometimes that he is ruining the

16  whole deal as a result of trying to speak directly to your

17  investors?

18  A.  I don't see that as a threat.  I don't think I was

19  threatening him ever.

20  Q.  And the reason you would tell Mr. Nissen over and over

21  again not to talk to your investors directly is because he

22  might give up information that you were not telling your

23  investors, right?

24  A.  That is not why.  There is another reason.

25  Q.  Well, let me ask you this:  You weren't telling investors

1    that you were taking 10 percent off the top, right?

2    A.  Not all of them, no.

3    Q.  There came times during 2013 when you were taking in

4    commissions on deals that Jason Nissen was providing what are

5    called Form 1099 tax forms to your investors.  Do you remember

6    that?

7    A.  I don't understand your question.

8    Q.  There were times in 2013 when Jason Nissen was providing

9    tax Form 1099 forms to your investors, yes?

10   A.  Again I am not understanding what you're asking me.  Are

11   you asking me if Jason provided 1099 forms to investors?

12   Q.  Yes.

13   A.  Yes.

14   Q.  You understand that 1099 form is a form with interest or

15   capital gains have been earned, these would be forms that would

16   report to the IRS the amount at that time was being paid to the

17   taxpayer, right?

18   A.  Right.

19   Q.  So if NYW Holdings, Michael Weinberg's -- sorry -- Moshe

20   Weinberger's company, made $528,000 in interest in 2013 from

21   Jason Nissen's company, Jason Nissen would provide NYW Holdings

22   a 1099 form to show that, right?

23   A.  No, Jason is not required to as an LLC.  That was my

24   understanding.

25   Q.  I am not understanding what he is required to do.

1       He provided those 1099 forms to various investors that

2   you brought to the table, right?

3   A.   No, not necessarily.   Sometimes he did and many times he

4   didn't.   He left the onus on the lender to report their income.

5   Q.   Well, you've seen the 1099 forms that he produced through

6   you to the investor, right?

7   A.   Any that were produced through me were he sent to me and I

8   forwarded I saw, yes.

9   Q.   You understood that these forms would be, copies of these

10   forms would go to the IRS, right?

11   A.   Yes, they're 1099 forms.   They go to the IRS.

12   Q.   At that point the IRS has a 1099 form, it is very hard not

13   to report it on your tax return, correct?

14   A.   Correct.

15   Q.   You never had a single 1099 form prepared, you never asked

16   Jason for a single 1099 form for any of your commissions in the

17   entire time the National Event Company, you were dealing with

18   National Event Company, right?

19   A.   Okay, right.

20   Q.   So the IRS would not be getting any reports from Neco about

21   the fee income you were receiving, right?

22   A.   Correct.

23   Q.   Now, I want to ask you about your credit card.

24       You've testified on direct examination that you can't

25   complete your 2015 and 2016 tax returns because partly you

1    don't know how much money Jason Nissen was paying for your

2    credit card bills, right?

3    A.  I don't have a record of that, correct.

4    Q.  Let me understand this because I think many of us have

5    credit cards.  You had a credit card in your name, right?

6    A.  Yes.

7    Q.  An American Express Card, right?

8    A.  Yes.

9    Q.  And this American Express Card was a Platinum card, right?

10   You had a Platinum card?

11   A.  Yes.

12   Q.  And it had the last five digits of 01002, right?

13   A.  I don't know what the number was.

14   Q.  You have the ability to access your own credit card

15   statements through American Express, right?

16   A.  No, I do not.

17   Q.  It is your card, right?

18   A.  That's correct.

19   Q.  The bills come to you, Mr. Rechnitz, right?

20   A.  They came to me, yes.

21   Q.  And you knew each month when suddenly the bill was paid,

22   that your American Express monthly bill was being reduced by

23   that payment, right?

24   A.  That's true.

25   Q.  You knew you weren't paying the bill, right?

1    A.  No.  I had portions of the bill paid by Jason, portions I

2    paid.  There is different charges that add up to those amounts,

3    and I don't know what amounts Jason paid or what amounts I

4    paid.

5    Q.  Sir, if a payment is made on your own account, all you have

6    to do is call up American Express and ask them about your own

7    card activity, right?

8    A.  No.  They shut me out of my account as soon as there was an

9    investigation going on.  They closed my accounts, compliance

10   shut them down, and then some of the people with whom I was

11   dealing with seemed to be under investigation, and they blocked

12   all the access from my records.

13           I tried very hard to get the information because it

14   was requested from me from the government and I want to file my

15   taxes.

16   Q.  Did you ask the government can I see copies of my own

17   American Express bills so I can pay my taxes?

18   A.  I have asked if they can provide me with copies.

19   Q.  You didn't get anything?

20   A.  No.

21   Q.  You have no idea how you're going to repay all those bills?

22   A.  I know how they were being paid here.  That is not a

23   dispute here.

24   Q.  Did you ask Jason Nissen, can you just tell me how much you

25   paid on my American Express Bill?

HAVJSEA5                          Rechnitz - cross

1    A.  Unfortunately, I was not in communication with him.

2    Q.  When was your American Express statements shut down so you

3    couldn't contact anyone at American Express ever again?

4    A.  That is not what I said.

5    Q.  When were they shut down?

6    A.  That is not what I said.

7            MR. SHECHTMAN:  Come now!

8            MR. BELL:  Objection.

9            MR. SHECHTMAN:  Come on now!

10           THE COURT:  Sustained.  Sustained.  Disregard that.

11   No more outbursts, counsel.  Go ahead.

12   BY MR. MAZUREK:

13   Q.  When did you lose access to your own personal American

14   Express account?

15   A.  I don't remember.  This has been a long process.  It has

16   been several years.

17   Q.  Several years?

18   A.  Of investigations, yeah.

19   Q.  There were bills that were being paid in December of 2016,

20   right?

21   A.  I don't know.

22   Q.  You were spending the money, right?

23   A.  I pay my bills.  I don't know what Jason paid and what I

24   paid.

25   Q.  Well, you were actually making charges in December of '16

1   on that same credit card, a Platinum American Express Card.

2          Did you forget that?

3   A.  No.  I remember that.  I am not disputing that.

4   Q.  And so you knew you were making charges, you knew that you

5   weren't paying the bills, but you can't figure out your taxes.

6          Is that your testimony?

7   A.  Again your question is not accurate.  I was paying my

8   bills.  Jason paid some of them.

9   Q.  Don't tell me what my questions are.

10          MR. BELL:  Objection.

11          THE COURT:  Hold on.  Stop, stop, stop, stop, stop,

12   stop.  Calm down.  Objection sustained.  Please rephrase the

13   question.  Please answer the question that is put to you.

14   Don't make characterizations about what you think the question

15   ought to be or what question you hope to be asked.

16          Go ahead, counsel.

17          MR. MAZUREK:  I am producing what is marked for

18   identification as MH-366 and 367, American Express bills.

19          MR. BELL:  May I see them?

20          MR. MAZUREK:  Yes.

21          (Off-the-record discussion)

22   BY MR. MAZUREK:

23   Q.  I am showing you what has been premarked for identification

24   MH-366 and 367.  Take a look at these and tell me if you

25   recognize your American Express bills?

1   A.   Okay.

2   Q.   Maybe you can do your taxes now?

3             MR. BELL:  Objection.

4             THE COURT:  Sustained.

5   A.   What you'll notice, which is my problem, it doesn't say

6   which account paid my Bill.  That is the problem here.

7   BY MR. MAZUREK:

8   Q.   Let me see if I can fix your problem.  I am showing you

9   what has premarked for identification as MH-14.

10            MR. BELL:  Objection once again on the commentary.

11            THE COURT:  Overruled.  Go ahead.

12            (Pause)

13  BY MR. MAZUREK:

14  Q.   Take a look at those.

15  A.   Yes.

16  Q.   Do you know whose bank account ends in 7834?

17  A.   That is Jason's.

18  Q.   Isn't it true that Jason Nissen sent you screen-shots of

19  his bank account information every time that he made a payment

20  on a credit card ending 01002?

21  A.   No.  It looks to me there is five times out of three years,

22  did you say?

23  Q.   Do you want me to count the others for you?

24            MR. BELL:  Objection.

25  A.   I would like them all.  I pay my taxes, please.  They don't

HAVJSEA5                          Rechnitz - cross

1   exist.

2   Q.  Let me ask you this.

3        Do you recognize what I put in front of you is at

4   least five months of payments of Jason Nissen sending

5   screen-shots to you from his account ending in 7834 in the

6   amounts of $50,000, $45,606, $15,000, $50,000, $18,750?

7        Do you recognize those, sir?

8        MR. BELL:  Objection.

9        THE COURT:  Overruled.

10  A.  These are payments for November and December of 2016.

11  Those I recognize.  2016, that is not the year I have an issue

12  with.

13  BY MR. MAZUREK:

14  Q.  You haven't paid 2016 taxes?  You haven't filed your 2016

15  return, right?

16  A.  No, I have not.

17  Q.  You haven't filed --

18       (Multiple voices)

19       THE COURT:  Hold on.  Wait for the question.  Go

20  ahead, counsel.

21  BY MR. MAZUREK:

22  Q.  Let me ask you something else.

23       These payments that Jason Nissen is making on your

24  American Express Card that I just presented to you for the last

25  four or five -- three months --

HAVJSEA5                          Rechnitz - cross

1   A.   Two months.

2   Q.   -- of 2016, that is after you were signed up as a

3   cooperator in this case, right?

4   A.   Yes.

5   Q.   You were still receiving money from Jason Nissen after you

6   signed up as a cooperator, right?

7   A.   Yes.

8   Q.   But you weren't receiving money from him in wire transfers

9   that said Neco to JSR Capital at that point in time, were you?

10  A.   No, I was not.

11  Q.   You were receiving these as secret screen-shots to pay your

12  American Express Bill, right?

13  A.   That is false characterization, no.

14  Q.   I will strike the word, "secret."

15          You were getting them paid based on direct payments

16  from Jason Nissen's personal bank account on to your American

17  Express Bill, right?

18  A.   Yes.

19  Q.   And the expenses that are being paid were your own personal

20  expenses, right?

21  A.   Right.

22  Q.   You didn't even have a business at that point in time,

23  right?

24  A.   I don't follow.

25  Q.   JSR Capital had a bad turn after you admitted to being a

HAVJSEA5                         Rechnitz - cross

1   felon, right?

2   A.   No.   Thank God, I'm still operating.

3   Q.   The expenses on this Platinum card were personal expenses?

4   If you need to check, take a look, they're sitting right in

5   front of you?

6            MR. BELL:   Objection.

7            THE COURT:   Sustained as to form.

8   BY MR. MAZUREK:

9   Q.   They were personal expenses, right?

10  A.   Probably.

11  Q.   And they were being paid by a third party, right?

12  A.   Yes.

13  Q.   And that is income to you, sir, right?

14  A.   Yes.

15  Q.   But you're too good to pay taxes, right?

16  A.   This is 2016, and I don't appreciate that comment.

17  Q.   We're in 2017, correct?

18  A.   We are.

19  Q.   Your tax return was due at the very latest in October of

20  this year, correct?

21  A.   Yeah, but I can't pay it until 2015 is filed.

22  Q.   Let me ask you about that.   You testified on direct

23  examination about you don't want to file a fraudulent tax

24  return, right, is that what you said?

25  A.   Yes.

1   Q.  You know something called estimated tax payments?  Have you

2   ever heard of that?

3   A.  No.

4   Q.  You never heard of it?

5   A.  No.

6   Q.  You were in business for yourself for several years and you

7   never heard of estimated income taxes?

8   A.  No.

9   Q.  You never paid estimated income taxes?

10  A.  I may have.  I don't even know what it is.

11  Q.  I am going to show you what is premarked for identification

12  as MH-254.  We can put that on the screen just for the witness.

13  You have hired an accounting firm that Jeff Weberman was your

14  accountant for JSR Capital and your personal taxes, right?

15  A.  He is my accountant, yes.

16  Q.  The certified accounting firm of Naftalis & Weberman?

17  A.  Ha?

18  Q.  He was attempting to do your taxes for many years, right?

19  A.  He does do my taxes for many years.

20  Q.  Not in the least in 2015 and '16, right?  You haven't filed

21  anything, correct?

22  A.  That's correct.

23  Q.  Take a look at your screen-shot.

24          Does this refresh your memory of a conversation by

25  email that you had with Mr. Weberman about in 2014 the payment

1    of estimated taxes?

2            MR. BELL:  Objection.

3            THE COURT:  Sustained.  Sustained as to form.

4            MR. MAZUREK:  I will rephrase the question.

5    BY MR. MAZUREK:

6    Q.  In March of 2014 you had specific email correspondence with

7    Jeff Weberman, your CPA, about the approximate amounts that you

8    should pay in estimated taxes, right?

9            MR. BELL:  Objection.  Failure of memory.

10           THE COURT:  Overruled.

11   A.  Ask me the question, please.

12           MR. MAZUREK:  May I have it read back?

13           THE COURT:  Yes.

14           (Record read)

15           THE COURT:  Go ahead.

16           THE WITNESS:  I am not sure that email is alluding to

17   that.

18   BY MR. MAZUREK:

19   Q.  When Jeff Weberman tells you let's estimate about a hundred

20   thousand to pay went on subject line of email, it says 2013

21   taxes, you don't understand that.  Is that your testimony?

22           MR. BELL:  Objection.

23           THE COURT:  Sustained.

24   BY MR. MAZUREK:

25   Q.  Mr. Rechnitz, you understand that every taxpayer in America

1    has an obligation to pay taxes whether they filed a return or

2    not, right?

3    A.  No.

4    Q.  If you have income and you have to pay your taxes, you

5    can't say I didn't get my American Express bill, can you?

6    A.  No.  You have to file your tax return and if you are late,

7    have to pay penalties.  That is my understanding.

8    Q.  You don't understand you have an obligation to pay taxes if

9    you earned income?

10   A.  I do understand that obligation.

11   Q.  You don't have an understanding you have to make payments

12   that you believe were estimated to be due at the time that

13   every other American has to pay taxes?

14   A.  No.

15   Q.  You make up your own rules in every aspect of your life.

16   Isn't that true, Mr. Rechnitz?

17   A.  No.

18            MR. BELL:  Objection.

19            THE COURT:  Overruled.

20   BY MR. MAZUREK:

21   Q.  You helped Jason Nissen commit accounting fraud in 2015

22   related to his deal with Falcon Investor Advisers, right?

23   A.  No, not that I am aware of, no.

24   Q.  Let's talk about that.

25            In or about October, on or about October 13th, 2015,

1   JSR Capital received a wire of $950,000 from NEA, one of the

2   entities owned by Jason Nissen, correct?

3   A.  Yes.

4   Q.  On the very next day, October 14th, 2015, JSR Capital wrote

5   a check in the same amount of $950,000 back to National Events

6   Company, right?

7   A.  Yes.

8   Q.  Let me understand this to make it clear.

9           On October 13th, you received a wire from National

10  Events, correct, in that amount?

11  A.  Yes.

12  Q.  And on the very next day you send it to another entity of

13  Jason Nissen, National Event Company?

14  A.  Isn't that the same entity?  I don't follow.

15  Q.  You understood that Jason Nissen had multiple entities that

16  he used for his business, right?

17  A.  I think he had two accounts that we dealt with.

18  Q.  You're familiar with National Events of America, sir?

19  A.  Yes.

20  Q.  That was one of the holding companies, right, for his

21  ticket business?

22  A.  I knew it was one of the accounts he sent money and we sent

23  money to.  I don't know the specifics of how he set it up.

24  Q.  You understood that to be one of his businesses, correct?

25  A.  His business I understood was Neco and he had different

1  checking accounts.  That was the name on one of his accounts.

2  Q.  You are also familiar, you just testified about Neco the

3  National Event Company, right?

4  A.  That is the only company I knew that Jason had..

5  Q.  You received a wire of $950,000 from National Events of

6  America on October 13th, 2015, right?

7  A.  Again I don't know who it came from, one of the national

8  event checking accounts or the like.

9  Q.  Fair enough.  You didn't focus on what particular entity

10  was sending you the money.  You understood it to be an entity

11  related to Jason Nissen, right?

12  A.  Yes.

13  Q.  Was he owing you $950,000?

14  A.  No.

15  Q.  Was he paying you a commission for $950,000?

16  A.  No.

17  Q.  He asked you to accept this money and to return it by check

18  the next day, right?

19  A.  That's correct.

20  Q.  You understood that in that period of time his company was

21  in agreement, a deal with Falcon Investment Advisers, right?

22  A.  I knew that he had a credit line from Falcon and other

23  lenders, correct.  I did not know the specifics of the deal.

24  Q.  But you knew that he was working with them as his investor,

25  one of his investor sources at that point in time?

HAVJSEA5                         Rechnitz - cross

1    A.  Not as an investor, as a working credit line.

2    Q.  A place where he was getting money, correct?

3    A.  Yes, like a bank.

4    Q.  So when he asked you to accept this money and to return the

5    money the next day by way of check, you understood that he was

6    doing that to wipe out a particular debt that he had on the

7    books of National Event Company, right?

8    A.  No.  His reasoning made sense to me at the time.

9    Q.  His reasoning made sense to you that he was asking to put

10   money into your account for no legitimate transaction, right?

11   A.  No, that is not how he explained it to me.

12   Q.  I am asking you was there any transaction related to that

13   $950,000 going into your account?

14   A.  No.

15   Q.  At that point in time your company, JSR Capital, you knew

16   that he provided about a million dollars of tickets to you,

17   correct?

18   A.  No, that is not correct.

19   Q.  You didn't know that he had an account receivable on his

20   books at National Event Company saying that you owed him

21   $950,000 for tickets?

22   A.  What he told me was for some reason --

23   Q.  My question to you, sir --

24   A.  Can you repeat then.

25   Q.  Yes.  It is whether you understood that in October 2015

1    that Neco had on its books an account receivable -- meaning

2    you, JSR Capital -- owed $950,000 to Neco?

3    A.  Yes, I did.

4    Q.  And that was because of an accrual of tickets that Neco

5    provided to you and JSR Capital?

6    A.  No, that is not how it was explained to me.

7    Q.  Well, you knew he had a debt on the books, or a payment was

8    required from JSR Capital for $950,000, right?

9    A.  He told me there was an account receivable for 950,000 to

10   JSR Capital.

11   Q.  So you agreed to take $950,000 into your account, return it

12   to him so that he could cancel that debt, correct?

13   A.  That's correct.

14   Q.  But it wasn't your money that you were using to purchase or

15   to have that debt wiped off the Neco books, was it?

16   A.  No.  It was the money he advanced to me to pay him back the

17   next day.

18           MR. MAZUREK:  Now, may I have a moment, your Honor.

19           THE COURT:  Yes.

20           (Off-the-record discussion)

21   BY MR. MAZUREK:

22   Q.  Just to be clear, the money, the $950,000 that --

23           THE COURT:  Hold on.  Go ahead.

24   Q.  -- the $950,000 that JSR Capital sent into National Event

25   Company was not your money, right?

HAVJSEA5                         Rechnitz - cross

1   A.   Correct.

2   Q.   You started cooperating in the spring of 2016 with the

3   government, right?

4   A.   Yes.

5   Q.   And during that time you never told the government that

6   hey, you know, I've been involved in this ticket business that,

7   you know, I think there may be some issues with because of how

8   my dealings have been with this fellow Jason Nissen, did you?

9   A.   Can you repeat the question.

10  Q.   You never had a conversation with the prosecutors or the

11  agents after you started cooperating in the spring of 2016 that

12  reported the fact that there were problems with the Jason

13  Nissen ticket business, right?

14  A.   That is not correct.  I told them everything from the first

15  moment I met them.

16  Q.   Isn't it true that Jason Nissen continued to do his

17  business while you were a cooperator in 2016?

18  A.   Yes.

19  Q.   He continued to do his business in the first half of 2017,

20  right?

21  A.   Yes.

22  Q.   Until the hole in his business just got so great that his

23  business collapsed, correct?

24  A.   I don't know what happened.  It happened in 2017.

25  Q.   You read that in May of 2017, that Jason Nissen surrendered

1    to the authorities for operating a Ponzi scheme, right?

2    A.  Correct.

3    Q.  And from the time period of June, spring of 2016 until the

4    time that he surrendered in May of 2017, you were cooperating,

5    right?

6    A.  Yes.

7    Q.  Just to be sure, based on your testimony, you had about $5

8    million income that you earned during the years with Jason

9    Nissen, right?

10   A.  I think approximately around five, yeah.

11   Q.  And you didn't have to plead guilty to being involved in a

12   Ponzi scheme with Jason Nissen, did you?

13   A.  No.

14   Q.  You didn't have to return a single cent of that $5 million

15   that you received as your reported income from Jason Nissen,

16   did you?

17   A.  No, not to them.

18   Q.  Mr. Rechnitz, on direct examination you claim to have

19   access to Mayor DiBlasio from the fact that you made campaign

20   contributions, right?

21   A.  Yes.

22   Q.  You testified about what you got in return for your

23   campaign contributions was the mayor's personal cell phone

24   number, right?

25   A.  Yes.

HAVJSEA5                        Rechnitz – cross

1    Q.  I think on direct examination you said that you feel like

2    you had power, correct?

3    A.  I don't know --

4    Q.  Access?

5    A.  Access and influence.

6    Q.  It made you feel like you were a big shot, right?

7    A.  Yes.

8    Q.  You were able to email with the mayor, right?

9    A.  Ah-huh, yes.

10   Q.  Talk to him on the phone?

11   A.  Yes.

12   Q.  Even get a personal meeting sometimes?

13   A.  Yes.

14   Q.  You testified on direct about what you said you got in

15   return from Mayor DiBlasio and his office, right?

16   A.  Yes.

17   Q.  You testified you had a problem at one property at 238

18   Madison based on Airbnb-type violations, correct?

19   A.  Yes.

20   Q.  Let me ask you, your investor group paid hundreds of

21   thousands of dollars in fines on 238 Madison, right?

22   A.  I don't know the amount, but it was well over a hundred

23   thousand dollars, yes.

24   Q.  You testified another thing that your concern was that

25   Mayor DiBlasio helped you out with was this building on Ocean

1  Parkway.  Do you remember that?

2  A.  Yes.

3  Q.  In Brooklyn you wanted to negotiate with DCAS to be placed

4  on a list of potential spots that an NYPD station could be

5  built at, right?

6  A.  Those are not the circumstances, no.

7  Q.  That building on Ocean Parkway, you were hoping that the

8  NYPD would purchase it as a station, right?

9  A.  No.  Those are not the circumstances.

10  Q.  Why don't you tell us the circumstances.

11  A.  A friend of mine owned the property and called me and said

12  that one time he tried to sell this property previously, and

13  there was that concept of eminent domain, and he had a buyer,

14  and the sale got ruined because he precinct identified his

15  property as a property they wanted to purchase.

16         In the end, they didn't purchase it so it ruined his

17  sale.  A friend called me, came and met with the owner of the

18  building to tell me that they have the same situation and they

19  just want an answer, they don't need a favor, but want an

20  answer to understand if the precinct doesn't want it, if they

21  could send a letter not to kill their active sale on the table.

22  Q.  They just wanted an answer where the NYPD was interested in

23  the property.

24         MR. BELL:  Objection.

25         THE COURT:  Overruled.

1    A.  Correct.

2    BY MR. MAZUREK:

3    Q.  And you got that answer?

4    A.  I don't remember if I ultimately got it.  I got Ross to put

5    me in touch with the head of DCAS.  I think his name was

6    Foster, if I remember correctly, and Michael Harrington tried

7    to get me an answer through the NYPD channels.

8    Q.  As you sit here, you don't know what the answer was?

9    A.  I don't remember.

10   Q.  Another one of the acts that you said that you were able to

11   get through your special access of making political

12   contributions was that water bills that were fixed on behalf of

13   Terry Skydell, right?

14   A.  That is something Jeremy Reichberg dealt with -- excuse

15   me -- and nothing was fixed.

16   Q.  Nothing was fixed, right?

17   A.  I never used the word, "fixed."

18   Q.  So there was, in fact, you know that with respect to those

19   water bills, it was determined that the water meter was simply

20   broken, right?

21   A.  I don't know the specifics.  The point was I had access and

22   expedited access.  That is what I have said.

23   Q.  You charged your investor -- sorry -- Mr. Reichberg and you

24   charged Mr. Skydell for those services, right?

25   A.  Mr. Reichberg did, and for a few months I received half the

1    fee for helping expedite this with him, and then he continued

2    to charge him without me in the loop.

3    Q.   In fact, the water bills were never owed because the meter

4    was broken, you learned that, right?

5    A.   No, I didn't learn.  I don't know exactly what happened.

6    Q.   You don't know what happened?

7    A.   No.  Jeremy dealt with that.

8    Q.   Mr. Rechnitz, your special access to the the mayor, in your

9    mind, did not result in anything that a normal citizen wouldn't

10   be able to accomplish, right?

11   A.   I don't agree with that.

12   Q.   The three instances that you mentioned on direct

13   examination we just talked about led really to almost nothing

14   for you, right?

15   A.   There was those specific instances.  There are many

16   instances I wasn't asked about.

17   Q.   Well that is up to the government I guess to find out now.

18            MR. BELL:  Objection.

19            THE COURT:  Sustained.  Sustained.

20   BY MR. MAZUREK:

21   Q.   These were the instances you testified to on direct

22   examination, right?

23   A.   These three were amongst instances that I testified about,

24   that is correct.

25   Q.   These instances, the government, these prosecutors, have

1    never asked you to provide testimony against Mr. DiBlasio,

2    correct?

3                MR. BELL:  Objection.

4                THE COURT:  Sustained.

5    BY MR. MAZUREK:

6    Q.  You don't believe, sir, that these instances are things

7    that are going to give you credit off what you're looking at as

8    a 20-year-prison term, correct?

9    A.  Can you repeat the question.  I am not sure I follow.

10   Q.  The instances of these official favors that you testified

11   on direct examination, you don't expect that that is going to

12   be the thing that gets you off if you're facing 20 years in

13   prison, right?

14               MR. BELL:  Objection.

15               THE COURT:  Sustained.  Let's have a quick sidebar.

16               (Continued on next page)

17

18

19

20

21

22

23

24

25

1    (At the sidebar)

2    THE COURT:  I want to get a sense of where you're

3    going because my recollection is there was a big objection

4    raised by both defense counsel to the government getting into

5    other cases that this witness may or may not be testifying

6    about in terms of the specifics of those cases.  I want to find

7    out where you're going with this.  If you want to open that

8    door, you can open it.

9    MR. MAZUREK:  I was about to ask if he was going to

10   testify against others in other proceedings, and because he

11   testified on --

12   MR. SHECHTMAN:  What he is not allowed to do is

13   specifics.  I am with them on this because if he can testify

14   against the mayor, they can testify about Grant Harrington and

15   keep this door closed.

16   MR. BELL:  I am not sure it is still closed, your

17   Honor.  My understanding of where we were is where Mr.

18   Shechtman was.

19   MR. SHECHTMAN:  The objection was sustained.

20   THE COURT:  I sustained the objection.  That is where

21   I thought we were.  I thought you also objected on those same

22   grounds, they shouldn't be -- both defense counsel were

23   objecting the government shouldn't be allowed to get into the

24   specific names of the trials in which this witness might be

25   called to testify.  My recollection is you objected to that as

HAVJSEA5                        Rechnitz - cross

1    well.

2                MR. MAZUREK:  I understand.  My concern is that I

3    don't want to hear an argument during summations that this

4    witness doesn't have an incentive to lie about Murray Huberfeld

5    because he has given the mayor of New York City to the

6    prosecutors.

7                THE COURT:  I thought that is why I had sustained the

8    objection before so that we didn't get into any of that.

9                MR. MAZUREK:  I will move on if that is the

10   understanding.

11               MR. CAPONE:  We are certainly going to argue he

12   provided information about a number of people, and that has

13   come out.

14               MR. BELL:  That is clear on the record.

15               MR. CAPONE:  We are not going to reference specific

16   trials or --

17               MR. MAZUREK:  It is different if they argue in

18   summation he has given up the mayor of New York City and he is

19   getting credit for that information.

20               MR. CAPONE:  It should be all or nothing.

21               THE COURT:  I thought that they were not going to be

22   making that argument.

23               MR. MAZUREK:  That is my understanding.

24               THE COURT:  Consistent with that.  I don't know.

25               MR. BELL:  The version of the argument that Mr. Capone

1   articulated, as we understand it, is still very much on the

2   table, which is he has provided information about a wealth of

3   individuals.

4   　　　　　MR. MAZUREK:  Including the mayor, I imagine.

5   　　　　　MR. BELL:  Again he provided information concerning a

6   wealth of individuals.  I think your Honor has correctly

7   identified the problem that comes, a problem that comes with

8   this particular line of cross.

9   　　　　　There is another one as well, of course, which is

10  actually a little different, which is that if you're going to

11  ask questions about whether he is going to testify about

12  Mr. DiBlasio, that implicates a number of issues, entirely

13  unrelated ones, about whether there would even be an

14  opportunity to do so.

15  　　　　　Since he is like framing that in terms of testimony,

16  it is misleading and skewed in ways that are concerning.  I do

17  think that we have an understanding of what was actually on the

18  table.  I think Mr. Nawaday articulated as well.

19  　　　　　MR. NAWADAY:  If I can add, your Honor, the issue is

20  the cooperation agreement and this witness' understanding of

21  his obligations under the cooperation agreement.

22  　　　　　What I expect we would be arguing is, frankly, that he

23  has an understanding that he has to tell the government about

24  everybody he did crime with and he has an understanding, which

25  I think we're allowed to do and elicit, at the end of the day

1    if called upon, he would have to testify against everybody he

2    has done criminal conduct with because the defense has already

3    raised his understanding of substantial assistance, and so I

4    think we should be able in redirect to bring that out.

5              THE COURT:  Bring out what?

6              MR. NAWADAY:  The fact or in argument, in summations,

7    that he's provided information about other people and his

8    understanding is he would have to testify against other people

9    if called upon.  I understand they are not raising that there

10   are particular proceedings and charges that have come about.

11             MR. BELL:  It happens.

12             MR. MAZUREK:  My concern is that it is an unfair

13   argument by the government if they would stand up in summation

14   and say --

15             THE COURT:  If that is your concern, you can ask that

16   question.  I want to make sure you're aware you're kicking that

17   door wide open.  If you want to ask the question, ask the

18   question.  That door that is closed will now be open.

19             MR. MAZUREK:  Before I ask that question, maybe I

20   won't, but --

21             MR. SHECHTMAN:  To get a preliminary ruling if I

22   object, will you sustain it?

23             MR. MAZUREK:  My concern if they're going to be able

24   to make arguments at the end of the case look, he has given up

25   Mayor DiBlasio and going to get enormous credit for DiBlasio,

1   what is Murray Huberfeld?  He is nothing compared to the mayor

2   of New York City.  That is unfair argument because he has never

3   been asked to offer testimony against Mayor DiBlasio.

4           MR. BELL:  No.

5           THE COURT:  I thought we were on board with, and the

6   reason I sustained the joint defense objection before is to not

7   talk about any specific trials that are happening or may be

8   happening or who the defendants are in any of those trials.

9   That was a concern raised by the defense.  So now you're

10  talking about -- I think what you're saying you, want to open

11  that door.

12          (Multiple voices)

13          MR. MAZUREK:  Not to other trials.  I want to be able

14  to show the jury at the end of the day that what he provided in

15  these instances is basically ice in the wintertime, there is

16  nothing there.  That is all I am doing.

17          MR. SHECHTMAN:  Henry, be careful.  What he provided

18  gave them Harrington, Grant and Jona Rechnitz.  If you do this

19  argument -- presumably they're going to say that -- if you do

20  this, I am going to object, and I hope he will rule in my favor

21  because this door kills you.  He has given up four other people

22  they have indicted.  Why do you want to do it?

23          MR. MAZUREK:  Okay.

24          MR. SHECHTMAN:  Sorry for being on the wrong side.

25          THE COURT:  I understand.  Again counsel you can make

1    that strategic decision.  I warn you, you are opening this door

2    because again I thought, my recollection is both defense

3    counsel had objected to the government trying to go down that

4    line.

5              If that is what you wish to do, you make that

6    strategic decision because you're worried about this one sort

7    of sub-argument there so much that you want to open this up,

8    that is a decision for you to make in terms of weighing the

9    costs and benefits of that, whatever you want to do.

10             MR. MAZUREK:  Fair enough.

11             THE COURT:  Give me a sense, Mr. Mazurek.

12             MR. MAZUREK:  I won't do it.

13             THE COURT:  I sustained the objection.

14             MR. MAZUREK:  I will move on.  I am not doing it.

15             THE COURT:  How much longer do you have?  It is 2:15.

16             MR. MAZUREK:  I have more than 15 minutes.

17             THE COURT:  Where is a good stopping point?  How long

18   is the next chapter of cross-examination?

19             MR. MAZUREK:  It will be more than 15 minutes.

20             THE COURT:  Let's go to about 2:25 and give the jury

21   the usual instructions.  It doesn't seem there is any need for

22   me to say anything else, or do counsel want me to say anything

23   else in light of I guess the fact the press may get hold of

24   this other stuff.  Is there anything you want me to say?

25             MR. BELL:  No.  Just remind them to clean up.

1    MR. CAPONE:  Briefly, we were going to put in a letter

2    on the issue of the photograph and recordings by 6:00 pm

3    tonight.  Could you indulge us a couple more hours so we can

4    trick or treat with our children, around 8:00 o'clock, your

5    Honor?

6              THE COURT:  Where what the kids going as?

7              MR. BELL:  Russell is first.

8              MR. CAPONE:  Abby, Elmo and a doctor.

9              MR. BELL:  A lion.

10             THE COURT:  Yes.  How about you just give them both to

11   me at 9:00.

12             MR. SHECHTMAN:  Judge, when we get to 2:30, not the

13   issue that we have been briefed, but there is another just

14   evidentiary issue that shouldn't take more than 10 minutes to

15   raise that will help me tomorrow.

16             (Continued on next page)

1        (In open court)

2        THE COURT:  Again, that objection is sustained.  It's

3   2:18, we'll go another seven minutes or so and then we'll stop.

4        Go ahead, counsel.

5        MR. MAZUREK:  Thank you, Judge.

6   BY MR. MAZUREK:

7   Q.  Mr. Rechnitz, you testified that it was Jeremy Reichberg

8   who introduced you and started your relationship with the

9   police officers, right?

10  A.  That's correct.

11  Q.  Jeremy Reichberg would tell you the kinds of gifts or

12  things that they wanted, right?

13  A.  We would discuss them together, yes.

14  Q.  You testified that Jeremy Reichberg is the one who helped

15  you fill out the online gun permit application, correct?

16  A.  He filled it out, yes.

17  Q.  He filled it out.  Right.

18        You testified that it was Jeremy Reichberg who put you

19  in touch with the people at One Police Plaza to complete that

20  application, right?

21  A.  Yes.

22  Q.  You testified that it was Jeremy Reichberg or an Officer

23  Grant who brought the prostitute on the plane to Las Vegas,

24  right?

25  A.  Yes.

1  Q.  And that you had nothing to do with arranging or paying for

2  that prostitute, right?

3  A.  Correct.

4  Q.  That was other people who did it, right?

5  A.  Yes.

6  Q.  You testified that bringing the police officers to Las

7  Vegas to do the Superbowl that you had nothing to do with them

8  there.  Didn't even hang out with them, right?

9  A.  Not much.

10  Q.  It was Jeremy Reichberg's idea go with them, not yours,

11  right?

12  A.  That's correct.

13  Q.  You testified that it was Fernando Mateo who told you how

14  to bundle political contributions to help you obtain access to

15  different politicos, right?

16  A.  I did not say that.

17  Q.  Was it Mr. Mateo who arranged for your introduction to

18  certain people like Ross Offinger?

19  A.  Yes.

20  Q.  You testified that you brought the Chief of Police Phil

21  Banks to Israel, according to your testimony, to change his

22  view of Israel, right?

23  A.  That was one of the reasons, yes.

24  Q.  Not to continue to have special access that you wanted,

25  right?

HAVTSEA6                          Rechnitz - cross

1   A.  That was one of the reasons as well.

2   Q.  You testified that you were the victim of two different

3   Ponzi schemes, right?

4   A.  That's correct.

5   Q.  You batted a thousand with respect to the hard money

6   lending businesses you got involved with, correct?

7   A.  So far, yeah.

8   Q.  You have testified that you lost money in the Peralta

9   liquor business, correct?

10  A.  That's correct.

11  Q.  Despite making hundreds of thousands of dollars in cash,

12  right?

13  A.  That's correct.

14  Q.  And even had the government include you on a restitution

15  order from Mr. Peralta that he owes you $100,000, right?

16          MR. BELL:  Objection.

17          THE COURT:  Overruled.

18  A.  I didn't have the government do anything of the sort.

19  Q.  Well, there's a restitution judgment in the name of Hamlet

20  Peralta as the creditor for $100,000, right?

21  A.  Then there must be a reason it's on there.  They must have

22  had an investigation and put my name on.

23  Q.  You said that you lost $100,000 in that deal, right?

24  A.  I lost a half a million dollars.

25  Q.  So the government only agreed to put down $100,000, is that

HAVTSEA6                         Rechnitz - cross

1    your testimony?

2    A.   I don't know what the government put down, but I know that

3    my direct loss through Hamlet was 100 or 150,000.  Then I had

4    other losses for paying investors back and taking over their

5    debt.

6    Q.   And that loss is based on what you reported as the cash

7    that you actually received from Mr. Peralta, correct?

8    A.   Could you repeat the question?

9    Q.   Those calculations are based on the amounts of cash that

10   you reported to them that you received, correct?

11   A.   Correct.

12   Q.   There's no record otherwise, correct?

13   A.   That's correct.

14   Q.   Mr. Rechnitz, you often blame other people for your own

15   conduct, right?

16   A.   No, I take full responsibility for everything I have done

17   wrong.  I have been sitting here for days humiliating myself

18   about my poor conduct that I have come forward to talk about,

19   including the reason we're here.  I'm not proud of it, and I'm

20   not blaming anybody but myself.

21   Q.   You're never responsible for the things that you do because

22   they're always brought to you by other people.  That's what

23   your testimony has been over the last couple of days, isn't it?

24   A.   No, I have been answering questions I'm asked.  And when I

25   am asked who introduced me, I gave an answer.  I'm fully

HAVTSEA6                         Rechnitz - cross

1   responsible for all of my behavior.

2   Q.  Well, you have admitted to lying to loved ones, correct?

3   A.  Yes.

4   Q.  To business investors, correct?

5   A.  Yes.

6   Q.  To government investigators, correct?

7   A.  Yes.

8   Q.  That you claim to be victim in business deals, correct?

9   A.  Yes.

10  Q.  And you were hoping that through the testimony in this

11  courtroom in front of these jurors that, based on your

12  testimony, that you're going to be given, despite all of these

13  things, a second chance, right?

14  A.  No, that's not the case.

15  Q.  That's what you're hoping for, sir?

16  A.  I'm hoping for a 5K letter in the hopes of leniency for my

17  truthful testimony.

18  Q.  And you're he hoping not to spend a single day in jail,

19  right?

20  A.  That's correct.

21  Q.  You haven't spent a single day in jail yet, correct?

22  A.  No, thank God I have not.

23  Q.  And you're living in Los Angeles, correct?

24  A.  Yes.

25  Q.  Paying $15,000 a month rent, or about that?

HAVTSEA6                         Rechnitz - cross

1    A.   No.

2    Q.   Someone else is paying for it?

3    A.   No, that's not my rent.

4    Q.   It was your rent here in New York City, right?

5    A.   Maybe at one point.

6    Q.   Sorry?

7    A.   Maybe at one point.  It changes each year.

8    Q.   And your life has not altered a bit since you pled guilty

9    in June of 2016.

10   A.   So that is the biggest mischaracterization.  I have

11   suffered tremendously in many ways, and it has altered very

12   much.

13   Q.   But you have --

14            THE COURT:  Okay, it's 2:25.

15            MR. MAZUREK:  Your Honor, may I have one last

16   question.

17            THE COURT:  Make it will quick.

18   Q.   But you haven't lost the most important thing, sir, right,

19   your own liberty?

20   A.   I have.  I'm restricted where I travel.  I have, as you

21   know, all your investigators all over me all day long, public

22   scrutiny, and I have been living miserably for the last few

23   years because of this crime that I committed.

24   Q.   But it's better than --

25            THE COURT:  Hold on.  That was your last question.

1    Counsel, we're going to take a break for the day.

2              Members of the jury, I'm going to let you go.  I'm

3    going to instruct you as always, don't read anything about the

4    case.  If you see anything in the papers, on the internet about

5    this case, stop reading it.  Don't listen to anything about

6    this case.  If you hear anything about this case, stop

7    listening.  Don't do any research regarding any of the people

8    or the issues involved in this case.  Don't let anyone talk to

9    you about this case.  Don't talk to anyone else about this

10   case.

11             We will see you bright and early at 9:00 a.m. tomorrow

12   to continue with the trial.  And make sure again you remove

13   your personal items from the jury room, leave your notebooks

14   there.  See you tomorrow morning at 9:00 a.m.

15             (Jury not present)

16             THE COURT:  Let's give the jurors a three-minute head

17   start.  Any reason not to excuse the witness?

18             MR. MAZUREK:  No, your Honor.

19             THE COURT:  I think, counsel, there was something you

20   wanted to raise on the record.

21             MR. BELL:  Sorry, your Honor?

22             THE COURT:  I think there was something that counsel

23   wanted to raise.

24             MR. SCHECHTMAN:  I was trying to see if I could put

25   something on the screen to help the Court.

1          THE COURT:  Okay.

2          MR. SCHECHTMAN:  My reason for asking for a few

3    minutes of the Court's time is I think I'm likely to get on

4    cross-examination sometime soon, and I'm well aware of the

5    strictures on 608(b) and extrinsic evidence, but it's really

6    impossible to cross-examine this witness about this gun license

7    without showing it both to him and to the jury.

8          And the reason I think 608(b) doesn't apply in this

9    instance is I just think that the door has been opened so wide

10   on this.  And I will show the Court what I mean.  The testimony

11   on direct was -- and I think it was repeated -- was that I

12   didn't fill out this report and I didn't even know its

13   contents.  Jeremy did it all.

14         And if you put it up on the screen, and if you --

15         THE COURT:  I don't know if that was necessarily the

16   testimony.  I think the testimony was he didn't fill out it.  I

17   think he indicated that Jeremy filled it out.  I think earlier

18   in his direct he did indicate that he knew that as he was

19   applying for this or having the application filled out he was

20   using the fact that he was a diamond dealer to apply for this

21   and very well knew that he was not a diamond dealer.

22         MR. BELL:  That's our understanding as well.

23         MR. SCHECHTMAN:  I thought that, too, Judge, but then

24   there's something about that in the transcript.  But when you

25   look at what was said here, and it's the transcript at -- I

1      didn't know what statements are there, did you know the

2      application --

3               THE COURT:  Is this on direct or on cross?

4               MR. SCHECHTMAN:  904 on cross.  And he repeats that, I

5      didn't -- and so look with me at -- if you go to page 25 of 40,

6      he said he didn't know any mention of the chaplain, that's at

7      897, he didn't know there was any discussion.

8               If you go to this page, there's his signature.  And if

9      you look right above, it says I'm a police chaplain in

10     Westchester County in the State of New York.  Now it is, I

11     suppose, possible for a human being to sign that and not see

12     those words, but I would say beyond a reasonable doubt if you

13     signed it, you saw those words.

14              So I can't cross-examine him and say did you see this

15     without seeing it.  And so all I ask is, because the door is

16     open here and he said he didn't know this, that the jury is

17     allowed to see that those words appear in bold letters right

18     above his name.  That's not a 608(b) issue, that is a witness

19     opening the door and saying I didn't know, in a situation where

20     there's no one in the world who couldn't know that given that

21     his signature is right below it.

22              THE COURT:  So let me just make sure I fully

23     understand what you're saying.  You're saying this entire

24     document should come into evidence?

25              MR. SCHECHTMAN:  I will take that portion, Judge, that

1    they should see that his signature is right below that so that

2    when he said I didn't know it was there, it is not humanly

3    possible.

4            THE COURT:  So when he says that he didn't know the

5    statement about being a police chaplain was there --

6            MR. SCHECHTMAN:  I want to be able to say it's right

7    above your signature.  And if he says I don't know, I don't

8    recall, I can't be stuck with that answer when the entire world

9    would look at this and say he had to know.  And he opened the

10   door to it when he says I don't know, I just signed it, Jeremy

11   did it.

12           THE COURT:  Let me ask you this, counsel --

13           MR. SCHECHTMAN:  If he says, look -- he may say I knew

14   it was filled out with the diamond company.  I think he said

15   that on direct but then he backed away from it.  But it if he

16   doesn't, then I should be able to show that part of this

17   application, and if we go back a page --

18           MR. BELL:  It seems to --

19           THE COURT:  Hold on, let him go.

20           MR. SCHECHTMAN:  His earnings from the diamond

21   company.  There's one.  If you go to 22 of 40, there's another.

22   And these were patched to what he submitted.  So I'm okay, I

23   heard the answer that your Honor heard, I think he ran away

24   from it, but if he says I didn't know exactly what was filled

25   out but I knew they said the diamond company, I'm fine, I won't

1    go there.  But if he doesn't, the notion that Jeremy filled it

2    out when his earnings statements are attached to it, it seems

3    to me that's crazy, and the jury should know that.  That really

4    is a situation where you can't let him get away with what is a

5    bald-faced lie on that and on the chaplain.

6            THE COURT:  Is the concern primarily about the fact

7    that this is in the document and attached to the document in

8    and of itself, or is the concern about whether or not he gave

9    this information to Jeremy who filled it out?  He certainly

10   testified that Jeremy filled it out.  He said that he signed

11   it, he didn't read it.

12           MR. SCHECHTMAN:  On this one we can hold, because

13   maybe he will say he knew, and maybe if I say to him the

14   earning statements are there.  I don't know how Jeremy gets his

15   earning statements without him giving them to him, but we'll

16   see where we are.  But just heads up for the Court, if his

17   answer is no, it can't be I'm stuck with that.

18           And then similarly, the only way this jury can know

19   how absurd the answer is about the chaplain is to see it.  I

20   can't say to him, sir, isn't it written there in capital

21   letters one inch below, and the answer is what?  Yes, no.  But

22   the jury needs to see it to know, they just need to know how

23   false that is.

24           THE COURT:  Why do they need to see it?

25           MR. SCHECHTMAN:  Because I'm not that good.  I mean

HAVTSEA6                         Rechnitz - cross

1    look at it, Judge.  If I say to him it's one inch above there,

2    he will say I didn't see it.

3              THE COURT:  Does it matter if it's an inch or 2.5

4    centimeters?  Isn't it clear on the document right above his

5    signature is this statement about being signed under penalty of

6    perjury, and the line right above that has a statement about a

7    police chaplain?

8              MR. SCHECHTMAN:  Would you instruct the jury that

9    anyone in his right mind would have seen it?

10             THE COURT:  No, I won't instruct them as to that.

11             MR. SCHECHTMAN:  If they see it, they know anybody

12   would see it and they know what he said was false, and that's

13   what we're trying to establish for a day and a half.  And I

14   would like to think I'm good, but I'm not good enough.  If he

15   says I didn't see it, to say come on now, you really had to see

16   it.  I know what happens when you say come on now, you had to

17   see it.  The answer is objection because I'm commenting.  But

18   if the jury sees this, they know that he knew, and that's all

19   I'm asking is just that.

20             THE COURT:  You want them to know that he knew what?

21   That it was on the application?

22             MR. SCHECHTMAN:  That you could not sign this document

23   and not know that there was a reference to police chaplain.

24   You just couldn't.

25             THE COURT:  But I think -- I guess if we go back

1   through the cross-examination you have the testimony there, my

2   sense -- my recollection of the cross-examination on this issue

3   was about whether or not this witness used his police

4   chaplaincy on the application in order to get a firearm.  And

5   this witness said no, or something to that effect, and then

6   went down this line of saying that he didn't look at it,

7   repeated what he said on direct that he didn't look at it, he

8   just signed it.  And I think that that may be where some of the

9   confusion is coming from, because my recollection of what the

10  witness said on direct is that his reason for -- his purported

11  reason to why he needed it was because he claimed to be a

12  diamond dealer, not because he claimed to be a police chaplain.

13          MR. SCHECHTMAN:  But the question to him was:  Didn't

14  the document also say that you were a police chaplain and

15  weren't you trying to take advantage of that?  The answer was I

16  don't know what the document said.  And no one could believe

17  that answer if they saw that.

18          You could reserve until tomorrow morning and see what

19  he says, but the notion that he said I didn't see that, if you

20  see the document, you can't believe that when you see what it

21  says.

22          THE COURT:  What is the value added in him being able

23  to potentially score a point and say okay, maybe this witness

24  was less than forthright when the witness said he didn't see

25  this.  Although I don't remember if the witness was actually

1    shown this document yesterday, so I'm not sure about that,

2    but --

3              MR. BELL:  He was not.

4              MR. SCHECHTMAN:  Refresh the recollection.

5              THE COURT:  But the witness saying that he didn't see

6    it or the witness signing something without caring about what

7    is in it because he wanted his license and he told Rechnitz a

8    bunch of lies to put on there, I don't know which is better for

9    you or worse.  I don't know if it makes a difference.

10             MR. SCHECHTMAN:  Judge, it's a heads up.  I will

11   refresh -- I will do everything, but at some point if he says

12   he didn't see this, I'm going to ask to offer it.

13             Then the second evidence point -- we could put up NSA?

14             And this also was asked on direct, and this is one

15   where seeing is also believing.  He testified on direct that

16   Andrew Henson sent him this email on May 30.  And you will see

17   it was sent at 2:06, and you get the gist of it by paragraph

18   four, it's unfair and probably unconstitutional, this involves

19   the air rights issue and the Vanderbilt one I think it is that

20   is being negotiated.

21             He then sends it to the mayor and said Andrew just

22   sent this to me, FYI.  You see it goes to the mayor at 5:35.

23   Then we see the following, NSD.  He takes the same email and he

24   writes:  Andrew just sent this to me for your information.  How

25   could you let this happen under your watch and embarrass me

1    like this when I introduced you to Andrew, I told you he was

2    very close, et cetera?  Call me as soon as possible.

3          That is, as he said on direct, that is his editing

4    this email, because all he said to the mayor was Andrew just

5    sent this to me, FYI.  He literally goes in and edits this

6    testimony.  I don't have friends that do this, but it's pretty

7    extraordinary.  He then, as you might imagine, sends to it to

8    Andrew.  I think that is NSF.  He sends it to Andrew.

9          Andrew sends back:  Zowie, you got big ones.  I'm not

10   quite sure what that means, but I have a guess.  Then he says:

11   He called me, I didn't pick up, I want you to be present when I

12   speak to him next.  That was also completely false.

13         And it was brought out on direct, but you cannot

14   appreciate how extraordinary this is to take an email and edit

15   it this way unless you see it.  So all I'm asking is permission

16   that they can see it.  You're actually see what a human being

17   can do, which is take this darn thing, rewrite it, send it to

18   his friends, get a response that says, zowie, you got big ones,

19   and write this.

20         And the question is:  Do the rules of evidence, once

21   somebody has brought this out on direct examination, do the

22   rules of evidence -- where we have already gone through it, do

23   the rules of evidence prevent a jury from seeing it?

24         I didn't raise this.  This isn't 608(b).  I didn't say

25   this is another bad act.  They did to try to take the sting out

1    of it, and all I'm saying is it stings.  It stings badly, and

2    it stings worse when you see it.  So I'm asking for permission

3    so that the jury can see it so they know just how manipulative

4    this fellow is.  You don't have friends that do it, I don't

5    have friends that do it, Mr. Bell doesn't, and you don't

6    appreciate was done here until you see it.  I didn't open this

7    door, it was opened, and I want the jury to see it.

8              MR. BELL:  May I be heard, your Honor?

9              THE COURT:  Yes.

10             MR. BELL:  This fits into what is now a somewhat

11   lengthy sequence of issues where there's an effort to exempt

12   this proceeding from what are fairly well-worn applications of

13   rules of federal evidence.

14             I will touch on very briefly the first of these first.

15   Mr. Schechtman's response is yet another example of a clear

16   608(b) application, and your Honor ought to deny the request on

17   that basis.

18             I also think it's premature because Mr. Schechtman has

19   not done not only what he knows how to do, but what he has been

20   teaching law students to do for quite some years, which is to

21   cross effectively and elicit what he wants.  I think it will

22   work.

23             But as to the second example, your Honor, that

24   argument is premised on the notion that there is some vast real

25   estate between what Mr. Rechnitz described, which I think he

1    described pretty clearly and vividly, and what's on the paper.

2    There is no difference.  He said this is what I did in the

3    document.  That's exactly what Mr. Schechtman just described

4    and showed us all.  There isn't a basis in some vast gulf

5    between what is on paper and what Mr. Rechnitz testified that

6    needs to be taken account of here, let alone the very basic

7    rules of evidence issues beyond that.

8            The rules are inconvenient sometimes, it can be

9    frustrating, but they are there.  And we have prepared for the

10   trial with the understanding that they would govern here.  We

11   ask that those rules continue to be honored as your Honor has

12   been doing.

13           MR. SCHECHTMAN:  Judge, one last and I will stop.

14           608(b) is like every other rule in the Federal Rules

15   of Evidence, all the hearsay rules are subject to an

16   open-the-door exception.  They brought this out.  You know what

17   the government knows?  The government knows seeing is

18   believing.  The government knows that a picture is worth a

19   thousand words.  You see this and your breath is taken away.

20           So all I'm asking is if it really is indifferent, they

21   win, the jury will say hell, he already said that.  But I bet

22   you when the jury sees this they will say this is alarming and

23   this really is opening the door.  We didn't raise this issue,

24   we're not stuck with anything.  They raised it, and all we're

25   asking is the jury to see his handy work.

1           MR. BELL:  I have yet to see a breath-taken-away

2     exception to any applicable rule here, your Honor.

3           MR. SCHECHTMAN:  But I have seen an open-the-door

4     exception to every rule, and you can't just bring it out on

5     direct and say stop.

6           THE COURT:  Okay.  Government have any response to

7     that?

8           MR. BELL:  I don't know that there is a matter for

9     your Honor to actually attend to here.  I think we're sort of

10    lighting the lamp for a future, presumably tomorrow,

11    disagreement that may or may not take shape.  What we can argue

12    now is that there is an actual process, there's a process for

13    impeaching Mr. Rechnitz or any other witness on this stuff.

14    Mr. Schechtman shouldn't, for volume or complaint, be able to

15    circumvent that process.  It's a time-honored one.

16          THE COURT:  Thank you for fronting this issue for me,

17    and I will think about it and hopefully maybe we'll deal with

18    this tomorrow.  Maybe not.

19          Let me get a sense from Mr. Huberfeld's lawyer, how

20    much longer do you think you have with this witness?

21          MR. MAZUREK:  About three hours, your Honor.

22          THE COURT:  Okay.  Is there anything else that we need

23    to deal with today?

24          MR. BELL:  I don't think so, your Honor.

25          THE COURT:  I will say this in response to

HAVTSEA6                          Rechnitz - cross

1    Mr. Schechtman's comment regarding the need for this in terms

2    of his saying that he's not that good.  I will say this,

3    Mr. Schechtman's response reminds me of an interview that was

4    done with the philosopher and marshal artist Bruce Lee.  And

5    when was asked how good he was, and he said if he says he's

6    very good, people will think that he's bragging, but if he says

7    he's not very good, everyone will know that he's lying.  So

8    I'll just leave that.  I'm not saying that you're lying, but I

9    do think that while your false humility is appreciated, I do

10   think that we'll see.

11              Anything else from counsel?

12              MR. BELL:  No, your Honor, thank you.

13              THE COURT:  Let's get counsel here again at like ten

14   minutes to nine tomorrow.

15              (Adjourned to November 1, 2017 at 8:50 a.m.)

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                               Page

 3   JONA RECHNITZ

 4   Cross By Mr. Mazurek . . . . . . . . . . . . 981

 5                      DEFENDANT EXHIBITS

 6   Exhibit No.                                Received

 7    MH-401    . . . . . . . . . . . . . . . . . 995

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```