UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

UNITED STATES OF AMERICA                         :

   -v.-                                                          :

NORMAN SEABROOK,                                 :        S1 16 Cr. 467 (AKH)

                                        Defendant.              :

                                                               :
--------------------------------------------------------------x

# THE GOVERNMENT'S SENTENCING MEMORANDUM

                                                        GEOFFREY S. BERMAN
                                                        United States Attorney
                                                        Southern District of New York
                                                        Attorney for the United States of America

Martin S. Bell
Russell Capone
Lara Pomerantz
Assistant United States Attorneys
- Of Counsel -

Defendant Norman Seabrook is to be sentenced on February 8, 2019 at 11 a.m. after having been found guilty after trial of conspiracy to commit honest services wire fraud and substantive honest services wire fraud. The Government respectfully submits this memorandum in connection with the sentencing, and in response to the defendant's sentencing submission, dated January 28, 2019 ("Def. Mem.").

## PRELIMINARY STATEMENT

For two decades, Norman Seabrook was the President of the Correction Officers' Benevolent Association ("COBA" or the "Union"). As the leader of COBA, Seabrook had a fiduciary duty to the thousands of correction officers who elected him to represent their best interests. But Seabrook put his duty to represent the men and women of COBA up for sale. He betrayed the rank-and-file workers he represented once he saw an opportunity to get paid. Seabrook monetized his power and influence, investing $20 million of COBA's money in a hedge fund not because the investment was wise or prudent, but because he stood to personally profit on the side.

Specifically, as proven at trial, Norman Seabrook illicitly steered millions of dollars of his Union's retirement funds into Platinum Partners ("Platinum") in exchange for the promise of hundreds of thousands of dollars in kickbacks, $60,000 of which he received on a fateful evening in December 2014. Seabrook knew that the movement of COBA's money into Platinum pursuant to this corrupt bargain was not without risk—risk that COBA's own attorneys had outlined in letters Seabrook received and hid from his fellow Board members. And those risks materialized, to COBA's significant harm; when Platinum collapsed in 2016, COBA and its members lost $19 million of its ultimate $20 million investment.

1

Seabrook entered into a corrupt bargain and in so doing violated the duty vested in him to provide impartial and honest services to COBA. Yet despite his shameful conduct, Seabrook protests in his sentencing submission that "[w]hat distinguished [him] most as a union leader was his devotion to the welfare of individual officers." (Def. Mem. at 12). Not so. While Seabrook won gains for correction officers in dealing with city and state lawmakers, his steadfast refusal to accept responsibility for his criminal conduct and his betrayal of thousands of correction officers further compounds his insult to those officers. Put simply, even if Norman Seabrook gaveth for two decades, that fact alone did not entitle him to taketh away. What chiefly distinguishes him now is not his past record as a union leader, but his status as the only principle member of the kickback conspiracy not to have taken any responsibility for his actions or to have expressed any remorse for the calamity that resulted. Murray Huberfeld and Jona Rechnitz have pled guilty. Only Seabrook continues to maintain his innocence, a posture that is well within his legal rights but does not render him immune from judgment for failing to reckon with his criminal acts.

This Court is well positioned to and should send a strong message to those who might consider engaging in such audacious corruption schemes. For his crimes, Seabrook faces an advisory Guidelines range of 51 to 63 months' imprisonment, as set forth in the United States Probation Office's ("Probation Office") Presentence Investigation Report ("PSR"). The Probation Office recommends a sentence of 60 months' imprisonment. The Government respectfully submits that a 63-month sentence, at the top of Seabrook's Guidelines range, would be sufficient but not greater than necessary to provide just punishment, to reflect the nature, circumstances, and seriousness of the offense, to promote respect for the law, and to afford adequate deterrence to Seabrook and others in positions of trust and consequence who might make the same choices.

**BACKGROUND**

I.  **The Defendant and the Offense Conduct**

Norman Seabrook was the President of COBA—New York City's largest correction officers union and the largest municipal jail union in the United States, representing over 20,000 active and retired New York City correction officers—from approximately 1995 through June 2016. Seabrook also served on COBA's Executive Board, from which perch he wielded enormous power over COBA's affairs. This included near unilateral control over the Executive Board members' assignments, pay, and hours, as he determined whether they worked in COBA's lower Manhattan offices or the New York City jails. Seabrook's control extended to the Union's finances, including the administration of the Annuity Fund, a retirement benefits program. (PSR ¶ 11).

In late 2013, Seabrook was presented with the opportunity to invest the Annuity Fund's money into Platinum—specifically, the Platinum Partners Value Arbitrage Fund ("PPVA"). Unbeknownst to Seabrook, the PPVA had at the time begun to see significant investor redemptions—that is, requests to withdraw money from the fund. The redemptions were not exceeded by incoming subscriptions or new investor money. (*See, e.g.*, GX 1041).[1] In light of the growing imbalance between redemptions and subscriptions, according to the testimony of Jona Rechnitz, Murray Huberfeld, one of the founders of Platinum, told Rechnitz that the fund needed larger institutional investor clients. In response, Rechnitz suggested that he might be able

---

[1] Unless otherwise noted, GX references are to Government Exhibits admitted into evidence in the August 2018 retrial of *United States v. Norman Seabrook*, 16 Cr. 467 (AKH), which were also admitted in evidence in the first trial against Seabrook and Huberfeld before the Honorable Andrew L. Carter, United States District Judge, in October 2017. Transcript references, unless otherwise noted, are to the second Seabrook trial transcript.

3

to recruit institutional clients using his relationships with people in law enforcement, to include Seabrook. (Tr. 621-22).

In December 2013, Rechnitz took Seabrook and others on a trip to the Dominican Republic, during which Rechnitz suggested to Seabrook that he (Seabrook) might be able to make money personally by investing COBA's money into Platinum. (Tr. 636). Seabrook, who told Rechnitz that he controlled COBA's Annuity Fund, agreed and said, "It's time Norman Seabrook got paid."[2] Huberfeld agreed as well, and they worked out a formula under which Seabrook would be paid between $100,000 and $150,000 per year. (Tr. 641-42; PSR ¶ 12). Within weeks, Platinum was presenting to COBA at COBA's offices in lower Manhattan. (GX 1019, 1021). The presentation, however, was just a formality; Seabrook, who wielded enormous influence over the affairs of COBA, had already committed to steering Union money to Platinum. After the meeting, the COBA Annuity Fund members agreed that COBA's attorneys and financial advisor were to perform due diligence and report back to Seabrook with the results. If the advisors believed that an investment was prudent, Seabrook was authorized to invest up to $10 million in Platinum. (GX 310).

While Seabrook may have expected the legal diligence to be a formality, it came back as anything but. Instead, COBA's attorneys expressed significant concern about the investment. In a February 5, 2014 letter COBA's attorneys sent to Platinum (and Seabrook) via email, the attorneys listed several concerns about the investment and noted that if the Annuity Fund was to make such an investment, "enhanced protection for the participants" was needed. (GX 1027). COBA's attorneys emailed Seabrook another letter, addressed to the Board of Trustees, on

---

[2] At the time, Seabrook made a healthy six-figure salary between his stipend as COBA President and his salary from New York City as a senior correction officer.

4

February 14, 2014.  This letter emphasized that hedge funds were an unusual investment vehicle for a retirement fund and flagged serious concerns for the Annuity Fund Board members to consider *before* investing in Platinum, including that no other "supplemental benefit funds were invested in this type of hedge fund" and that "the structure of [Platinum] makes it difficult to recover in the event of fraud or other misconduct."  (GX 1072).  Critically, the attorneys emphasized that to proceed with the investment, the Annuity Fund had to represent that "it can withstand the loss of the entire investment and does not need its investment to be liquid."  (*Id.*).  The attorneys advised that the Annuity Fund "should not make this representation" as it was "inconsistent with the needs of the Annuity Fund."  (*Id.*).[3]  Seabrook did not share these letters with the Annuity Fund Board members.  Instead, he concealed these letters in order to get the deal done.  (PSR ¶ 13).  As then First Vice President of COBA Elias Husamudeen testified, "If I knew anything in this letter, I would not have voted to invest any of our money with this company. The answer is no. No. No. No. No."  (Tr. 117).

Over the next year, at Seabrook's instigation, COBA invested $20 million in Platinum in three separate tranches: a March 2014 $10 million Annuity Fund investment; a June 2014 $5 million investment of operating account money; and an August 2014 $5 million Annuity Fund investment.  (PSR ¶ 13).  The June 2014 investment was particularly notable, as Seabrook secretly invested $5 million from the Union's basic operating account—money that comes from

---

[3] On February 18, 2014, Gilad Kalter emailed Huberfeld and others at Platinum about COBA's investment, noting that COBA "had dropped the first 3 points." (GX 1083). At trial, Kalter explained that COBA "agreed not to ask for points one, two and three," which were "nonstarters." (Tr. 290-91). COBA's attorneys emailed Seabrook the letter addressed to the Board of Trustees on February 14, 2014 detailing their concerns about the investment. (GX 1072). The executed version of that same letter is dated February 18, 2014, the same day as Kalter's email. (GX 318). In other words, COBA's attorneys did not drop their concerns about the investment.

5

the Union dues account used to cover basic operating expenses and that served as COBA's safety net. With that, approximately forty percent of the Union's operating account was tied up in Platinum. (GX 304; Tr. 523). Seabrook made this investment without getting anyone's permission, without even telling anyone else on the Executive Board. (PSR ¶ 13; Tr. 142, 509, 517-18, 976-77). At trial, Husamudeen testified that this $5 million investment "just was not a good idea. . . . I would have never condoned that. . . . Unions always need a reserve. We have to be in a position to protect our members." (Tr. 247-48). By the end of July 2015, the balance of the bank account for COBA's reserve fund was approximately $306,000, a figure Husamudeen described as "scary" because the monthly bills to operate the Union are sometimes more than $300,000. (GX 102, 113; Tr. 150).

Toward the end of 2014, when it was time to pay Seabrook, Huberfeld told Rechnitz that the fund had underperformed and Seabrook would only get $60,000. (PSR ¶ 14). Rechnitz agreed to lay out the cash, and Huberfeld agreed to get Platinum to reimburse Rechnitz. Huberfeld suggested that to paper over the reimbursement, Rechnitz invoice Platinum for a number of Rechnitz's courtside tickets to New York Knicks games, in the amount of $60,000, for tickets that had not, in fact, been given to Platinum. Platinum would then cut a check to Rechnitz. (Tr. 684-88).

Rechnitz paid Seabrook the $60,000 kickback on December 11, 2014, memorably handing the Union leader a newly purchased Ferragamo bag containing the cash. (PSR ¶ 15). On the same day, Rechnitz's assistant prepared a $60,000 invoice to Platinum for Knicks tickets, which Rechnitz forwarded by e-mail to Huberfeld. (GX 1062, 1063). Three days later, Platinum

6

paid Rechnitz by check. Huberfeld, through another associate named Jeremy Reichberg,[4] continued to lobby Seabrook for more money in 2015, but after a lawsuit against the Union was filed by William Valentin, a former COBA Board member, and the Government's investigation of Seabrook became known, no further investments were made. (PSR ¶ 16; Tr. 59-60, 523).

As part of Valentin's state court lawsuit, Seabrook submitted an affidavit under oath in which he responded to claims by Valentin that the $5 million movement of operating account funds had been unauthorized and that individuals connected to the investment had gifted Seabrook a trip to Israel. Specifically, Seabrook claimed in the affidavit that (1) the Union's Board had approved of his "strategy" to invest operating account funds in Platinum before he transferred the funds, and (2) contrary to Valentin's assertions, he had paid for his March 14, 2014 trip to Israel himself. (GX 99). At trial, Rechnitz testified—and bank records confirmed—that he arranged, and paid for, Seabrook's trip to Israel in March 2014, as he had paid for numerous other trips for Seabrook. (Tr. 663; GX 214). Seabrook's fellow Board members also testified at trial that not only did they not approve an investment of operating account funds in Platinum *before* he transferred the funds, but that they only found out about the investment *after* the transfer. (Tr. 142, 509, 517-18, 976-77). As demonstrated at trial, Seabrook not only hid things from his Union to make the investment happen, but he also lied to cover it up.[5]

In total, Seabrook caused COBA to invest approximately $20 million of its funds into Platinum, including $15 million in retirement money and $5 million from the Union dues account. (PSR ¶ 17). In late 2016, the PPVA filed for bankruptcy; at the time, COBA had

---

[4] Reichberg was recently convicted at trial of honest services fraud conspiracy, bribery conspiracy, honest services fraud and obstruction of justice in connection with a separate scheme that did not involve Seabrook in *United States v. Jeremy Reichberg*, 16 Cr. 468 (GHW).

[5] Notably, Seabrook has refused to accept responsibility for the kickback scheme even though his counsel conceded during closing arguments that Seabrook lied in the affidavit. (Tr. 1186).

7

redeemed only $1 million of its $20 million investment. (Tr. 530-31).[6] The remaining $19 million will likely never be recovered.[7]

## II. The Charges, *Seabrook I*, and *Seabrook II*

Indictment 16 Cr. 467 (ALC) charged Huberfeld and Seabrook in two counts, alleging honest services fraud conspiracy and the substantive crime of honest services fraud in connection with the kickback scheme. A jury was unable to return a verdict against either defendant on either count at the conclusion of a trial before the Honorable Andrew L. Carter that began in October 2017 ("*Seabrook I*"). The case was subsequently reassigned to this Court.

On May 17, 2018, the grand jury returned Superseding Indictment S2 16 Cr. 467 (AKH), which added an additional count of wire fraud against Seabrook, alleging, on a right-to-control theory, that he deprived COBA of its right to control its assets.[8]

On August 15, 2018, after a second trial ("*Seabrook II*"), a jury found Seabrook guilty of conspiracy to commit honest services fraud and the substantive crime of honest services fraud.

## III. The Applicable Guidelines Range

In every case, the Guidelines range is the "starting point and the initial benchmark" for a sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007); see also 18 U.S.C. § 3553(a)(4)

---

[6] In August 2015, Seabrook wrote a letter to the Union in which he exercised a liquidity provision to redeem $1 million. (GX 316). The trial testimony showed that this happened at the prompting of COBA Treasurer Michael Maiello because the operating account money was low. (Tr. 530).

[7] The circumstances of Platinum's collapse led to the indictment of several individuals in *United States v. Mark Nordlicht, et al*, 16 Cr. 640 (BMC) (EDNY). Trial in that case is scheduled to begin later this month before the Honorable Brian M. Cogan, United States District Judge for the Eastern District of New York.

[8] This Court subsequently dismissed the right-to-control fraud count against Seabrook. In addition, on or about May 25, 2018, Murray Huberfeld pleaded guilty to wire fraud in connection with his submission of the false Knicks ticket invoice to Platinum Partners.

8

(requiring consideration of applicable Guidelines range in determining appropriate sentence). The Government, the defense, and the Probation agree on the following calculation of the defendant's advisory Guidelines range. Pursuant to U.S.S.G. § 3D1.2(b), Counts One and Two are grouped because they involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. Pursuant to U.S.S.G. § 2B4.1,[9] the base offense level is 8. Pursuant to U.S.S.G. § 2B4.1(b)(1)(B) and § 2B1.1(b)(1)(H), because the value of the improper benefit to be conferred (approximately $1.2 million in fees earned by Platinum resulting from the bribery arrangement) was more than $550,000 but less than $1,500,000, the offense level is increased 14

---

[9] This is a private honest services fraud case, rather than one involving misconduct by a public official in that capacity. While Seabrook was a "public official" in his role as correction officer, the counts of conviction relate to his role as union leader, in which he was not a "public official." His crimes consisted of taking kickbacks not in exchange for official action as a correction officer (such as awarding a government contract), but rather in exchange for directing the private retirement benefits of the Union members. As a result, the parties believe the applicable Guideline is 2B4.1. *See* U.S.S.G. § 2B1.1(c)(3) and Application Note 17 (where offense conduct more aptly covered by a guideline within Chapter Two other than § 2B1.1, more specific guideline should be used); U.S.S.G § 2B4.1 Application Note 1 ("This guideline covers commercial bribery offenses and kickbacks that do not involve [public] officials. . . ."); *United States v. Williams*, 952 F.2d 1504, 1514 (6th Cir. 1991) ("Section 2C1.1 is designed for the punishment of a person who bribes a public official or 'a public official who solicits or accepts such a bribe.' Defendant, however, was not a public official, and Sheriff Thomas, whose political force was the weapon employed by defendant, was to be bribed in a matter not involving his official actions, for he was not a member of the Planning Commission or the Metropolitan Council." (quoting U.S.S.G. § 2C1.1, cmt. (backg'd.)); *see also United States v. Valladares*, 544 F.3d 1257, 1266 (11th Cir. 2008) (district court did not err by using Section 2B4.1 as the case involved fraud achieved through bribery rather than "straight fraud"); *United States v. Poirier*, 321 F.3d 1024, 1035 (11th Cir. 2003) (agreeing with the parties that Section 2C1.7—a Guideline which has since been deleted, but addressed, among other things, fraud involving the deprivation of the right to the honest services of public officials—was not applicable, and finding that Section 2B4.1 applied where the fraud "more closely resembled a fraud achieved through bribery than straight fraud") (quotation marks and citation omitted); *United States v. Lanas*, 324 F.3d 894, 904-05 (7th Cir. 2003). Indeed, in charging the jury, the Court did not require that it find Seabrook took official government action, but rather that he took action in his capacity as a union leader that violated his fiduciary duty to the Union.

9

levels.  Pursuant to U.S.S.G. § 3B1.3, because the defendant abused a position of private trust in a manner that significantly facilitated the commission or concealment of the offense, the offense level is increased by two levels.  (PSR ¶¶ 24-28).

In accordance with the above, the total offense level is 24.  (PSR ¶ 33).  The defendant has no known prior convictions, so his Criminal History Category is I.  (PSR ¶ 36).  Based upon these calculations, the defendant's advisory Guidelines range is 51 to 63 months' imprisonment.  (PSR ¶ 72).

## DISCUSSION

### I. A Guidelines Sentence of 63 Months is Warranted

A sentence at the top of the Guidelines range, or 63 months, is appropriate and would meet the objectives set forth in 18 U.S.C. § 3553(a), given (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant.  *See* 18 U.S.C. § 3553(a)(1), (2)(A)-(C).

Seabrook was one of New York City's most powerful labor leaders.  For years, he wielded outsized influence within and beyond the Union, while raking in a combined average salary of approximately $275,000 from both the Union and the City of New York.  (PSR ¶ 62).  But he wasn't satisfied with his power or his paycheck.  He betrayed the rank-and-file correction officers whose interests he ostensibly represented for his own private gain.  Seabrook was a fiduciary—an individual entrusted to act in the best interests of others.  But instead of fulfilling those fiduciary obligations, he acted greedily, recklessly, and brazenly.  He plunged $20 million

of other people's money—his own officers' money—into a risky hedge fund, plowing past his advisers' concerns and going so far as to deplete his Union's rainy day fund, all in order to pad his own wallet.  At the end of the day, he became $60,000 richer—with the hopes of so much more—and his Union members $19 million poorer.  Such egregious conduct—such betrayal of trust and priority of greed over responsibility—should be punished severely, not meekly.  Seabrook's participation in one of the more infamous union bribery schemes in the history of New York City cries out for a serious response.

Beyond the seriousness of the offense and the need for just punishment, both specific and general deterrence militate in favor of a meaningful sentence.  The defense argues that Seabrook's good works as the President of COBA warrant a sentence reduction.  However, those good works were, at least in part, what he was expected to do in exchange for his salary as COBA's President, and not a reason to reward him when he corruptly used that same position for his own private gain.  The Government respectfully submits that allowing Seabrook's achievements as the President of COBA to prevail substantially over the need for a punishment commensurate with the crime would send the wrong message to society and to the hardworking correction officers whose retirement money Seabrook jeopardized for an easy buck.  While Seabrook won gains for correction officers as a leader of COBA, he chose to take advantage of his position, conceal information from his fellow Annuity Fund Board members, and engage in a serious bribery scheme to enrich himself.  What's more, Seabrook deliberately lied in a sworn affidavit about the investment of operating account money to cover up his crimes.  These were Seabrook's choices, and warrant substantial punishment.

The cause of general deterrence also strongly weighs in favor of a substantial sentence.  Seabrook's sentence must communicate to others, including union leaders, that such abuses of

power and trust will be met with serious consequences. If the Court were to grant the defendant's request for a substantially below-Guidelines sentence, it would send a very clear—and regrettable—message to union leaders. A serious sentence is necessary in this case to reinforce and amplify the message that the judicial system takes corruption offenses seriously; that fiduciaries' legal and professional obligations—and not their bank accounts—must inform their every decision as a fiduciary; and that the union leader who fails to give the people he represents the benefit of his honest services will fail to receive the benefit of leniency at sentencing. Indeed, as the Probation Office explained in justifying their recommended sentence of 60 months, "We hope this imprisonment term restores union members' confidence in their officials representing them and promote respect for the law." (PSR at 24). Only the Court can send the message that bartering away one's fiduciary obligations for personal benefit is punishable by the loss of one's liberty.

Further, the nature of this offense as a calculated, difficult-to-detect white collar offense also makes it a prime candidate for general deterrence. *See*, *e.g.*, *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). Seabrook committed his offense hiding behind

the position of trust he occupied and accepting a payoff in the front seat of his tinted COBA vehicle.

Finally, Seabrook's complete lack of acceptance of responsibility counsels in favor of a significant sentence of incarceration. *See, e.g.*, *United States v. Martinucci*, 561 F.3d 533, 535 (2d Cir. 2009) (lack of remorse is a pertinent sentencing factor under Section 3553(a)); *see generally United States v. Keskes*, 703 F.3d 1078, 1090-91 (7th Cir. 2013) ("A lack of remorse is a proper sentencing consideration 'because it speaks to traditional penological interests such as rehabilitation (an indifferent criminal isn't ready to reform . . .).'" (citation omitted)). His sentencing submission is bereft of any remorse, other than a conclusory sentence about the "shame" Seabrook lives with "knowing that the union's annuity fund lost money because of an investment he promoted." (Def. Mem. at 16). The most charitable description one can apply to that concession is: "understatement." The loss resulted not merely because of an investment Seabrook promoted; it's because, as the trial exposed, he sold out his Union. Seabrook did not just "promote" an investment. He agreed to sell his sacred duties as a fiduciary to make an investment happen. He ignored his lawyers' serious concerns. He hid due diligence from his fellow Board members. He nearly emptied out the Union's entire reserve funding without so much as an advance conversation with those same Board members. And on December 11, 2014, he sat in the driver's seat of his luxury SUV and accepted a Ferragamo bag full of cash, the first payment for his complete and total betrayal of the Union. Seabrook's offense was serious. Its consequences were serious. 19 million dollars of the 20 million dollar investment of COBA's money in Platinum is lost and will likely never be recovered, and the rank-and-file's confidence

in its leadership and the security of the Union's gains are forever shattered.[10] Seabrook's sentence should reflect the reality of his choices and their ramifications.

## II. Comparable Sentences for Corruption Offenses

There are numerous corruption cases in this district and elsewhere in New York in which defendants principally responsible for the offense, as Seabrook was, were sentenced to significant sentences of imprisonment. In each of these cases, the sentencing court stressed the compelling need to deter public corruption. While the examples provided below include primarily elected officials, and Seabrook's misconduct occurred in his capacity as a union leader and not a "public official," Seabrook's influential role as the President of COBA—a position to which he was elected by the COBA members to whom he owed a fiduciary duty—renders him comparable to the defendants in those cases. Seabrook had analogous and sacred responsibilities given his direct impact on the Union members' lives.

- In *United States v. William Boyland, Jr.*, 11 Cr. 850 (E.D.N.Y.), a former New York State Assemblyman convicted of four separate corrupt schemes was sentenced to 168 months' imprisonment, following conviction at trial. The applicable Guidelines range was 235 to 293 months' imprisonment. In one of the schemes, the defendant accepted over $14,000 in bribes, which he represented he could accept through non-profit organizations he controlled and through consultancy fees, in exchange for assistance with holding carnivals in the defendant's Assembly district. In another one of the schemes, the defendant accepted $7,000 in cash in exchange for assistance with a real estate development project.

- In *United States v. Efrain Gonzalez*, 06 Cr. 726 (WHP), a former New York State Senator pleaded guilty to corruption charges involving the embezzlement of more than half a million dollars from nonprofit groups to cover his personal expenses. The applicable Guidelines range was 108 to 135 months' imprisonment, and the defendant received 84 months' imprisonment.

---

[10] To be clear, the Government does not aver, and the evidence did not show, that Seabrook knew of Platinum's internal financial struggles at the time he agreed to his corrupt bargain. That said, Seabrook did know—and did ignore, and did conceal from others—that the investment was risky and, for funds like the Annuity Fund, unusual. And it is a fair inference from the evidence that Seabrook would never have subjected his Union to that risk unless he stood to personally profit from it.

- In *United States v. Sanjaya Bahel*, 06 Cr. 918 (TPG), a former Chief United Nations procurement officer was convicted of fraud charges relating to his diversion of United Nations contracts to his friend in exchange for gifts. The applicable Guidelines range was 97 to 121 months' imprisonment, and Bahel was sentenced to 97 months' imprisonment.

- In *United States v. Dean and Adam Skelos*, 15 Cr. 317 (KMW), the defendants were convicted at trial, sentenced before their convictions were overturned, and retried and convicted again. Dean Skelos, the former Senate Majority Leader, abused his position to obtain more than $300,000 in bribes and extortion payments made to his son and co-conspirator, Adam Skelos. During their second sentencing, Dean Skelos faced a Guidelines range of 151 to 188 months and was sentenced to 51 months' imprisonment. Adam Skelos faced a Guidelines range of 121 to 151 months and was sentenced to 48 months' imprisonment.

- In *United States v. Sheldon Silver*, 15 Cr. 093 (VEC), Silver, the former New York State Assembly Speaker, was convicted at trial, sentenced before his conviction was overturned, and retried and convicted again. Silver was found guilty of using his position to obtain nearly $4 million in bribes in exchange for his official acts. During the second sentencing, Silver faced a Guidelines range of 262 to 327 months and was sentenced to 84 months' imprisonment.

- In *United States* v. *Joseph Percoco*, 16 Cr. 776 (VEC), Joseph Percoco, the Executive Deputy Secretary for the State of New York, was convicted at trial of two bribery schemes. In one of the schemes, Percoco agreed to use his influence to persuade various state officials to award an agreement to a client of Percoco's longtime friend; in exchange, that client paid Percoco's wife for a low-show job. In the other scheme, Percoco agreed to and obtained state agency decisions favorable to a client in exchange for $35,000 in bribes. The applicable Guidelines range was 188 to 235 months' imprisonment, and Percoco was sentenced to 72 months' imprisonment.

- In *United States v. Rocco Fazzolari*, 17 Cr. 471 (AT), the defendant, who was the president of a labor union and a trustee of the union's employee welfare benefit plan, pleaded guilty to embezzlement from a labor union, embezzlement from an employee benefit plan, and conspiracy to embezzle from an employee benefit plan. The applicable Guidelines range was 37 to 46 months' imprisonment, and the defendant received 37 months' imprisonment.

**III.     The Court Should Order Restitution in the Amount of $7 Million**

In consultation with COBA, the Government respectfully requests that the Court order restitution in the amount of $7 million, an amount that represents roughly one-third of COBA's loss as a result of a conspiracy that principally involved three persons: Seabrook, Rechnitz, and

15

Huberfeld. As the Court is aware, COBA has withdrawn its claim to further restitution from Huberfeld as a result of Huberfeld's having agreed to pay it $7 million. *See* Dkt. No. 283. The Government respectfully submits that the $7 million figure as to Seabrook represents a fair apportionment relative to a crime in which there were three major participants: Seabrook, Huberfeld, and Rechnitz.[11] In both the victim's judgment and the Government's judgment, this approach will help COBA recover the lost funds and be made whole.

The Government respectfully submits that such an order of restitution is appropriate under the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A, which requires a sentencing court to order "the defendant make restitution to the victim of the offense" for certain crimes, including where (a) the offense was "committed by fraud or deceit" and (b) "an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. §§ 3663A(a)(1), (c)(1)(A)(ii), (c)(1)(B). A "'victim' means a person directly and proximately harmed as a result of the commission of an offense . . . including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). *See generally Paroline v. United States*, 134 S. Ct. 1710, 1719 (2014) (describing "proximate cause" as a "flexible concept" that "generally refers to the basic requirement that there must be some direct relation between the injury asserted and the injurious conduct alleged" (quotation marks and ellipses omitted)). "Critically, '[a] district court's

---

[11] The Government is mindful that each of these men had different relationships to information regarding the potential risk of loss. In Seabrook's case, the evidence at trial demonstrated that although he did not have firsthand knowledge of Platinum's precise liquidity situation, he knew well the departure that COBA's investment in Platinum represented from investments typical for retirement benefit funds. He also hid information regarding specific, and relevant, risks—such as the risk of losing the entire investment—away from fellow Board members, each of whom testified that that knowledge would have been material to their decision to invest.

16

statutory authority to award restitution under the MVRA is limited to awards to victims of the offense of conviction.'" *United States v. Archer*, 671 F.3d 149, 170 (2d Cir. 2011) (quoting *In re Local # 46 Metallic Lathers Union*, 568 F.3d 81, 85 (2d Cir. 2009); *see also Archer*, 671 F.3d at 170 (the inquiry is "whether [the] losses were caused by [the] offense" of conviction").

Under the MVRA, COBA is entitled to restitution from Seabrook for the losses suffered as a result of COBA's investments in Platinum and attorneys' fees incurred by COBA in connection with the Government's investigation and prosecution of Seabrook. COBA was the victim of Seabrook's offenses of conviction, which were "committed by fraud or deceit." While, as the defense argues, Seabrook may not have known the full picture of Platinum's financial condition, Seabrook precipitated the investment that resulted in the loss and did so without regard to the best interests of COBA's members. This was more than simple disregard; Seabrook hid from his fellow Board members letters from COBA's own attorneys that outlined serious concerns about the investment *for COBA*. The lawyers specifically wrote about "the risk of large losses" and that "the structure of [Platinum] makes it difficult to recover in the event of fraud or other misconduct . . . . [W]e remain concerned that recovery in the event of fraud or misconduct may be challenging for this investment." While the lawyers noted some mitigating factors, they emphasized that this was a "serious matter for the trustees to consider." (GX 1072). But the trustees never had the opportunity to consider this "serious matter" because Seabrook hid this letter and the results of the due diligence, as well as the bribery scheme that precipitated COBA's investment in Platinum. (Tr. 109, 113-14, 180-81, 502, 533, 968, 978). Indeed, the Court dismissed the Government's right-to-control wire fraud count on the grounds that it was multiplicitous and part of the existing charged conduct. (July 17, 2018 Tr.). Seabrook's concealment of material information from the Board to further his bribery arrangement was

17

precisely what caused COBA to lose its money, in no small part because, as many Board members testified, they would not have approved the investment had they known about the diligence reports (or about Seabrook's kickback arrangement).  In other words, while internal problems at Platinum may have caused *Platinum* to collapse, it was, among other things, Seabrook's fraudulent concealment of the precise risks that materialized from the investment—*i.e.*, the risk of losing all of COBA's money with limited basis for recovery—that victimized *COBA* and its members.  For these reasons, Seabrook should be required to pay restitution under the MVRA.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that a sentence of 63 months, at the top of Seabrook's Guidelines range, is appropriate and would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

Dated: New York, New York
February 4, 2019

                                                Respectfully submitted,

                                                GEOFFREY S. BERMAN
                                                United States Attorney

By:   s/_____
       Martin S. Bell
       Russell Capone
       Lara Pomerantz
       Assistant United States Attorneys
       Southern District of New York
       (212) 637-2463/2247/2343

cc:     Paul Shechtman, Esq.
        Maggie E. Lynaugh, Esq.