UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X

UNITED STATES OF AMERICA,

                                      16 CR 467 (AKH)

      -v-

NORMAN SEABROOK,

               Defendant.
---------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF
## NORMAN SEABROOK'S MOTION FOR A NEW TRIAL

Richard w. Levitt
LEVITT & KAIZER
40 Fulton Street, 23rd Floor
New York, New York 10038
(212) 480-4000
rlevitt@landklaw.com
*Attorneys for Norman Seabrook*

## Table of Contents

Introduction ..................................................................................................1

Background ...................................................................................................3

Jona Rechnitz's continuing fraudulent activity. .................................................6

    *Jadelle Jewelry and Diamond LLC.*..............................................................7

    *Victor Franco Noval v. Rechnitz.* ...............................................................9

    *Gorodistian v. Jadelle Jewelry et al.*.........................................................11

    *Voutsas v Rechnitz.* ................................................................................12

Argument ...................................................................................................16

Conclusion..................................................................................................25

## Table of Authorities

**Cases**                                                     **Page(s)**

*United States v. Karlov*, 534 Fed.Appx. 38 (2d Cir. 2013).................................23

*United States v. Seijo,* 514 F.2d 1357 (2d Cir.1975)........................................20

*United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991) ......................... 17, 20-23

**Statutes and Other Authorities**

18 U.S.C. § 1343.............................................................................................3

18 U.S.C. § 1346.............................................................................................3

18 U.S.C. § 1349.............................................................................................3

Fed. R. Crim. P. 33....................................................................................1, 6, 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA,

                                          16 CR 467 (AKH)

      -v-

NORMAN SEABROOK,

                               Defendant.
--------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR A NEW TRIAL

      This memorandum is in support of Norman Seabrook's motion for a new trial pursuant to Fed. R. Crim. P. 33. It is based on the continuing criminality of lynchpin Government witness Jona Rechnitz and the lies he told at Mr. Seabrook's trial, falsely claiming he had turned over a new leaf and that his honesty was assured by the terms of his cooperation agreement – sentiments forcefully and persuasively repeated by the Government during summation.

      __Introduction__ -- Rechnitz's false claims of having turned over a new leaf and his cynical invocation of his cooperation agreement as a guarantor of his honesty are exposed as perjurious in at least three recently filed civil fraud complaints alleging a litany of continuing frauds by Rechnitz, his wife Rachel, and others. Additionally, he is presently under investigation by the FBI, and the corporate vehicle through which he perpetrated his most recent frauds, Jadelle Jewelry and Diamonds, LLC, is the subject of an involuntary bankruptcy petition in California.

Although the pending civil fraud complaints concern conduct that occurred after Rechnitz testified at Mr. Seabrook's trial, the nature and extent of the alleged conduct is such that he likely was committing crimes during the lead-up to Mr. Seabrook's trial, and during the trial itself, rendering his contrary sworn testimony false. This is apparent from the nature of the frauds themselves, which likely began long before the victims realized they were being defrauded; from Rechnitz's use of Jadelle LLC to commit his frauds, which he formed <u>prior</u> to his testimony against Seabrook, and from Rechnitz's statements to certain of his most recent fraud victims that he was untouchable by law enforcement because of his informant status.

We anticipate that the FBI will further develop the relevant facts during the course of its current investigation and also in the pending civil litigation and bankruptcy proceedings. We therefore respectfully ask the Court to take the following steps to bring the relevant facts to light:

1. Direct the Government to disclose relevant evidence, under seal if necessary, that has been developed by the FBI and other government agencies during its ongoing investigation into Mr. Rechnitz's wrongdoing subsequent to the Government and Rechnitz's entry into a cooperation agreement;

2. Direct the Government, pursuant to the cooperation agreement into which it entered with Mr. Rechnitz, to require Mr. Rechnitz to appear in this Court, produce relevant documents, and submit to sworn testimony;

3. Direct Pretrial Services, in the exercise of its supervisory role of Mr. Rechnitz, who is at liberty pending appeal from his judgment and conviction and sentence, to question Rechnitz and prepare a full report regarding Mr. Rechnitz's illicit activities while on bail; and

4. Authorize counsel for Mr. Seabrook to issue subpoenas to obtain relevant evidence.

**Background.** The Court is fully familiar with this case, the facts of which will therefore be provided in summary form. A two-count indictment was filed July 7, 2016, charging Norman Seabrook and Murray Huberfeld with Conspiracy to Commit Honest Services Wire Fraud in violation of 18 U.S.C. § 1349 (Count One), and Honest Services Wire Fraud in violation of 18 U.S.C. §§ 1343, 1346 and 2 (Count Two). The first trial ended in a hung jury on November 16, 2017. Huberfeld thereafter pleaded guilty and Seabrook was re-tried alone. As the Court knows, Seabrook was alleged to have accepted a cash payment from Jona Rechnitz in exchange for Seabrook's agreement to induce his union, the Correctional Officers Benevolent Association ("COBA"), to invest in his codefendant's hedge fund, Platinum Partners. Eventually, COBA invested a total of $20,000,000 in Platinum Partners, only $1,000,000 of which had been returned at the time of trial.

Mr. Rechnitz was the Government's principal witness, and he was the only witness who testified that Mr. Seabrook was paid to induce COBA's investment in Platinum Partners. Unquestionably, Rechnitz had considerable

baggage as he was exposed as a scam artist *ne plus ultra*. But the jury apparently accepted his testimony – and the Government's related arguments – that Rechnitz had turned a corner in his life and that, in any event, his honesty was assured by his cooperation agreement, since that agreement afforded him a benefit if, and only if, he testified honestly. In this regard Rechnitz testified;

At Tr. 562:

> Q. Under your written agreement with the government, what is it that you're expected to do? What's your understanding of that?
> A. I'm supposed to assist the government when called upon to testify, I'm supposed to commit no further crimes, and I'm supposed to tell the truth.

At Tr. 563:

> Q. What's your understanding, Mr. Rechnitz, of what will happen if you do not fulfill your obligations under the agreement?
> A. Then I will not receive the 5K, it will be figuratively ripped up, and I can face further charges if I lie, including obstruction of justice.
> Q. What would that mean, not having the 5K or having it ripped up, in the context of your sentencing?
> A. It would mean that I would not have any benefit of leniency, and I would be facing 20 years having already pled guilty.

At 564:

> Can you highlight that first sentence as I read: It's understood that should this office determine that either that Rechnitz has not provided substantial assistance in an investigation or prosecution, or that Mr. Rechnitz has violated any provision of this agreement, such a determination will release this office from any obligation to file a motion pursuant to Section 5K1.1 of the sentencing guidelines, but will not entitle Rechnitz to withdraw his guilty plea once it has been entered.

Fully understanding that the verdict likely would depend on whether the jury believed Rechnitz – his previous history as a malefactor notwithstanding –

was constrained by the truth-telling requirements of his cooperation agreement,

the Government argued on summation:

> So ladies and gentlemen, the testimony of Jona Rechnitz is clear, it's unambiguous, and it's incredibly damning. So why should you believe him?  Why should you believe Jona Rechnitz?  <u>You should believe Jona Rechnitz, first of all, because he has to tell the truth</u>.  The defense has gone through a lot of trouble over the course of this case of painting Mr. Rechnitz to be somebody who looked out for himself above all costs, that Jona Rechnitz was always in it for Jona recognize.  That Jona Rechnitz [ ] in other words, was a creature of incentive.  <u>Well, ladies and gentlemen, what are his incentives now</u>? Let's assume that's true.  What are Jona Rechnitz's incentives?

> <u>Well, you know what his incentives are because you know about the cooperation agreement he has with the government and Mr. Rechnitz's understanding of that cooperation.</u>  And Mr. Rechnitz told you if he doesn't fulfill his obligations, if he lies while testifying on the stand he will not receive the 5K, it will be figuratively ripped up, and I can face further charges if I lie, including obstruction of justice.  Ladies and gentlemen, if Jona Rechnitz is looking out for Jona Rechnitz, he tells the truth.

> The cooperation agreement itself is also in evidence, that's Government Exhibit 1601.  <u>You know that it requires that Rechnitz testify truthfully and that if Mr. Rechnitz violates the cooperation agreement, the U.S. Attorney's office doesn't have to write him that 5K letter</u>, that ticket to potential leniency in which the government will tell the judge about the substantial assistance that he's provided.  <u>Jona Rechnitz is a creature of incentive and he has the strongest of incentives to tell the truth.</u>

(1098-99, emphasis added).

Trial ended in conviction on August 15, 2018. Mr. Seabrook was

sentenced on February 8, 2019, to 58 months' imprisonment, three years'

supervised release, and $19,000,000 restitution. The Court permitted Mr.

Seabrook to remain at liberty pending appeal, decision upon which has not yet issued.[1]

Although the parties may differ regarding the nature and importance of alleged corroborating evidence, there can be no question that the jury's determination that Rechnitz was credible was key to its verdict, and that his credibility would have been destroyed had the jury known that Rechnitz was continuing to engage in fraud. Thus, should the Court find that Rechnitz in fact was either planning to engage in criminal conduct while he was cooperating against Seabrook, or that he in fact was engaging in such conduct while cooperating against Seabrook, it should also conclude that this newly discovered evidence would likely have resulted in acquittal, and grant Mr. Seabrook a new trial.

### Jona Rechnitz's continuing fraudulent activity.

We first became aware of Jona Rechnitz's continuing criminal conduct when news broke regarding the filing of a civil lawsuit alleging fraud by Rechnitz in *Noval v. Rechnitz*, 20SMCV00216 (Superior Ct. Los Angeles), on February 10, 2020 (Exhibit A). Two additional complaints followed, *Gorodistian v. Jadelle Jewelry et al,* 20STCV07425 (Superior Ct. Los Angeles), on February

---

[1]  Concomitant with the filling of this motion undersigned counsel is moving before the Second Circuit to hold Mr. Seabrook's appeal in abeyance pending the resolution of this motion. Should this Court determine it will grant Mr. Seabrook a new trial, we will ask that the Second Circuit relinquish jurisdiction and remand to this Court for entry of this Court's new trial order. See Fed.R.Crim.P. 33(b)(1).

20, 2020 (Exhibit B) and *Voutsas v Rechnitz* (Third Party Complaint), 20-cv-02580 (CDCA), on April 14, 2020 (Exhibit C). Meanwhile, on April 6, 2020, an involuntary bankruptcy petition was filed against Jadelle Jewelry and Diamonds, LLC, 20-bk-13530-BR (CDCA) (Exhibit D). The three civil complaints set forth allegations of stunning breadth, reflecting Jona Rechnitz's continuing course of fraudulent conduct, as well as boasts that he was untouchable because the Government was dependent on his continuing assistance. The nature of his crimes, the manner of their implementation, and his belief that he was untouchable require the conclusion that he believed, at the time he testified against Mr. Seabrook, that the truth-telling requirements of his cooperation agreement were meaningless, that he fully intended to commit – or was, indeed, then planning or committing – additional frauds, and that he believed himself insulated from further Government scrutiny.

*Jadelle Jewelry and Diamond LLC.* Jona Rechnitz incorporated Jadelle Jewelry and Diamond LLC – the corporate vehicle through which he would perpetrate his continuing frauds – in Delaware on October 18, 2017. Consistent with the characteristic care and cleverness that marked the scams that came to light at Mr. Seabrook's trial, Rechnitz immediately began an imaging campaign to position Jadelle as a jeweler to the stars, creating Instagram and Facebook pages studded with expensive jewelry and celebrities, highlighting the Kardashians, as well as several other A-listers from the entertainment and sports world, including Floyd Mayweather. As of the date of this memorandum,

Jadelle's Instagram site, https://www.instagram.com/jadellebh/?hl=en, displays photos from as early as May 17, 2018 – nearly three months before his testimony at Mr. Seabrook's trial – depicting expensive jewelry and well-known celebrities and influencers.[2] Jadelle's Facebook page, https://www.facebook.com/jadellebeverlyhills/, has similar postings, as early as July 27, 2018.

Rechnitz used his relationships with celebrities to imbue Jadelle and himself with an air of authenticity and credibility, characteristics he then used to lure his victims into his web of fraud. As described in the three pending fraud complaints, Rechnitz's new scams generally involved inducing jewelers to consign their – and others' – jewelry to Rechnitz for sale, but Rechnitz would instead pledge the jewelry for loans that were never repaid. On the other side of these same scams, Rechnitz would secure loans collateralized by this jewelry, but then would obtain the release of the jewelry in exchange for checks that would be rejected for insufficient funds.

Of course, none of this would have been possible had Rechnitz not first spent many months carefully and patiently building a persona of success and credibility for himself and Jadelle, a process in which he undoubtedly was engaging even while he and the Government were assuring the jury that his cooperation agreement guaranteed his honesty.

---

[2] A message commenting on a photo posted May 17, 2018 references Kim Kardashian, saying, "I saw that you guys gave Kim K some ice for her bday. Just letting you know that my bday is in 2 weeks, so I'm excited to see what you guys get me."

We now turn to the allegations in the three pending civil complaints.

*__Victor Franco Noval v. Rechnitz__*. In *Noval v. Rechnitz*, Jona Rechnitz, his wife, Rachel, Jadelle, Inc., Jadelle Jewelry and Diamonds (the "Jadelle Entities"), and other individuals are alleged to have defrauded the Plaintiff.

According to the Complaint (Exhibit A), on January 24, 2019, the Jadelle Entities, owned by Jona and Rachelle Rechnitz, borrowed $2,850,000 from Plaintiff pursuant to a written, signed loan agreement, which, together with additional transactions, eventually grew to $5,800,000 (principal plus interest). The loans were secured by jewelry valued at $7,000,000 and 2012 Bugatti automobile (Exhibit A, *Noval* Complaint, at Par. 16, 29).

Of note, this initial loan, in January 2019, occurred less than six months after Rechnitz testified against Mr. Seabrook, and preceded by some 11 months the 10-month split sentence (i.e. five months imprisonment and five months house arrest) imposed on Rechnitz by this Court December 6, 2019. Later, in December 2019, (and, therefore, almost immediately after sentence was imposed) Rechnitz told Plaintiff he was securing a line of credit to repay the loan and asked that the collateral be returned to him (Par. 30). Rechnitz persuaded Plaintiff and Plaintiff's brother to deliver the collateral to Rechnitz in exchange for two checks dated January 14, 2020 and January 16, 2020 in the amounts of $2,500,000 and $1,300,000, respectively (Par. 31). Plaintiff then returned the collateral to Rechnitz and tendered the two checks, which bounced (Par. 32). According to the Complaint, "Jona has repeatedly lied, lulled, and attempted to

fabricate one excuse after another to delay paying Plaintiff." *Id.* The Complaint

continues:

34. Jona falsely enlisted attorneys to pretend payment on the loan was coming from family members to buy himself more time. A number of these family members had written letters to the Court for Jona's sentencing.

35. In reality, Jona liquidated Plaintiff's diamond collateral and spent Plaintiff's money, but refuses to tell Plaintiff how he liquidated the collateral or how he spent the loan proceeds.

36. It is apparent that Jona is continuing his criminal conduct in California after being convicted in New York.

37. Upon realizing he had been swindled and defrauded, Franco immediately filed a police report with the Beverly Hills Police.

38. Repeated demands have been made to Jona to return the diamond collateral. Jona, who wants to conceal his criminal conduct from the sentencing judge in New York and the federal prosecutors who vouched for him, as well as U.S. Probation, took numerous steps to lull the victim, Franco, to buy more time.

39. On January 16, 2020, with the assistance of a local Beverly Hills attorney, Jona drafted more documents and an additional check…to further stop Franco from disclosing and revealing that Jona's fraudulent conduct has only grown in scope and size and that he has learned nothing from his life of crime which spanned from 2011 to 2015, which then halted while he was cooperating from 2016 to 2018.

40. The fact that Jona only received 10 months custody time with 5 months house arrest has only emboldened him to commit more fraud, grand theft, and to issue worthless instruments.

41. The January 16, 2020 document requested that Franco keep Jona's fraud and breaches confidential until January 23, 2020. Jona, however, did not comply with the January 16, 2020 agreement and no payments have been received. Jona entered into the January 16, 2020 agreement without any intention of performing in order to delay Franco from seeking redress for the fraud and breaches.

Pars. 34-41. The Complaint hypothesizes, "On information and belief … Jona had pledged diamonds to [Plaintiff] that in fact were loaned to Jona and were not owned by Jona or Rachel." (Par. 45). The Complaint additionally alleges that Rechnitz engaged in numerous other swindles:

> 47. Jona, assisted by Rachel, have only become more emboldened in their frauds. On information and belief, they have taken goods on memo from various Southern California diamond merchants. Namely, Peter Marco, Moti Klein, and Julius Klein. The video Jona showed at his sentencing in federal court to the federal judge on December 19, 2019, with Kim Kardashian, was most likely depicted stolen and fraudulently obtained goods from Plaintiff and various diamond merchants. The amount of losses to these various parties is alleged to be over $15,000,000. They are number other victims as well involved in various scams perpetrated by Jona. On information and belief, they include Sotheby's, Leon Landver, Sam Gorodistian, Ben Adhoot, and Yehuda Gamzo. All the alleged victims have the same common pattern evidence used by Jona and Rachel which is to have attorneys contact them, telling them they are getting paid according to Jona.

Par. 47.

The Complaint also paraphrases Rechnitz's statements suggesting his immunity from Government scrutiny, alleging, "During the fraud, Jona has indicated that he was not concerned with any problems or things he has done because the FBI needs him as an informant so bad in the New York case where there are appeals they would never do anything to him no matter what he did." Par. 54.

***Gorodistian v. Jadelle Jewelry et al.*** In this action, Plaintiff Gorodistian transferred a total of $1,573,333, in several traunches, to Rechnitz, who claimed Jadelle Partners would use this (and other money) to extend loans to third

persons secured by jewelry and that Plaintiff would be entitled to monthly interest payments until the loans were repaid (Exhibit B, *Gorodistan* Complaint at Par. 12). Rechnitz took several steps to give Plaintiff a comfort level with him. For example, when pitching a prospective $1,200,000 loan, Rechnitz told Plaintiff the loan "would be funded 1/3 each by himself, Robert [Rechnitz's father], and Gorodistian." (Par. 18).[3]

None of the principal amounts Gorodistian lent to Rechnitz were repaid (Par. 20).

***Voutsas v Rechnitz***.   In this action, Peter Voutsas, aka Peter Marco (referred to herein as "Marco") and his LLC, were sued by David Rovinsky LLC for failing to return certain jewelry, and Voutsas then brought a third party claim against Jona Rechnitz, Rachel Rechnitz and others for fraud and related claims. Voutsas alleges that Jona Rechnitz made numerous false statements to this Court in support of his sentence on December 19, 2019 because, by that time his frauds, as described in the Third Party Complaint, "were well under way." (Exhibit C, *Voutsas* Complaint, at Par. 30).[4]

---

[3] The Court may recall that, at Mr. Seabrook's trial, Rechnitz acknowledged that he and his colleague Jason Nissen lulled his "close friend" Michael Weinberger into a Superbowl ticket scam by claiming both Rechnitz and Rechnitz's father-in-law were co-investors. (Tr. 857).

[4] In preparation for his sentencing, and while he was engaging in this fraud, he wrote the Court, on October 16, 2019:

> Dear Judge Hellerstein: I am a felon. I am a criminal. I am the ONLY person to blame for that. I have caused tremendous pain and embarrassment to my family, my religion, and to myself. There is no way to undo what's been done. It's permanent, and for that I am truly sorry to everyone hurt by my crimes and actions. It eats me alive each and every

The Third Party Complaint alleges that Marco and Rechnitz enjoyed what appeared to be a trusting relationship between August 26, 2018 and December 23, 2019, buying and selling to and from one another nearly $40,000,000 in merchandise. (Par. 31). During this time "Jona introduced Marco to famous celebrities, including NBA stars Shaquille 'Shaq' O'Neal, Scottie Pippen, Sam Cassell, boxing champ Floyd Mayweather, pop stars Kim Kardishian [sic] & Kris Jenner, and artist Alec Monopoly, to name a few, who Marco parlayed Jona's introductions into clients and/or to advance his social

_____

day. When I wake up, when I go to sleep, it is always on my mind for the past 4 years. My actions harmed the people of New York, The people of Correction Officers Benevolent Association, my friends, my family and my community. I will forever carry this burden, as I deserve to. I have read of your Honor asking at various sentencings, why do good people do bad things? In my case, not assuming I'm a good person, I can answer this question. Arrogance, greed, and insecurity. Arrogance. I felt I was above the law. At this young age in my late 20's I was busy accepting honors at dinners and board positions at prestigious institutions. It got to my head. Greed. I wanted to gain contacts to grow my business, to make money and gain stature in the long run. Insecurity. I wanted to gain popularity by my peers and become a big shot in my community and business circles.

Shame on me. Finally, I couldn't wiggle my way out of this one. It changed my life as I knew it forever.  As a supposed religious man, I have been a disgrace to my religion. The only way to fix this is to make serving G-d my main focus for the rest of my life. I try to every day. I have changed as a person religiously, through prayer, my public and private behavior, and I always stop and think before I'm about to do something to see if it is something my parents, my family, and G-d would approve of.
                                             X X X
Your Honor, there are so many examples that I am omitting as I don't want to portray myself as the victim here. I caused a lot of pain and harm to others through my criminal activity and don't want to detract from that. JONA RECHNITZ.

Rechnitz reiterated much of the same nonsense at his sentencing.

media presence by being connected to them." During the overlapping period of between October 29, 2019 and January 17, 2020, Rechnitz acquired nearly $7,000,000 in jewelry from Marco on consignment, most of which was jewelry Marco had obtained from other vendors. (Par. 36). Marco continued to transfer merchandise to Rechnitz because the latter represented that he had buyers for them. (Par 37).

These representations, however, were false, and Marco was simply becoming yet another of Rechnitz's victims:

> 38.   Yet, no sooner than within weeks of being sentenced in the Southern District of New York, Jona, a convicted felon, was apparently so "distraught" and repentant about his criminal past, that instead of reselling Marco' Consigned Jewelry  (including Rovinsky's Ring & Necklace) and repaying Marco, Jona swindled Marco in a large scale fraud by absconding with the  pieces of Consigned Jewelry, and either pawned them off, or used them as collateral for loans to various questionable sources, and has not repaid Marco  the $6,950,444.40. In reality, Jona liquidated Marco' Consigned Jewelry (including Rovinsky's Ring & Necklace). Marco subsequently discovered from colleagues that Jona liquidated all pieces of Marco LLC's Consigned Jewelry (including Rovinsky's Ring & Necklace).

> 39. On information and belief, at this same time, Jona defrauded other diamond dealers and insurance companies in Southern California, including but not limited to: Sotheby's, Leon Landver, Ben Adhoot, and Yehuda Gamzo, Oved Anter, Moti Klein, and Julius Klein. The amount of losses to these various parties is alleged to be over $15,000,000.00.

(Pars. 38-39). As related in the Third Party Complaint, there then followed a litany of false statements, deceptions, bounced checks, and further frauds by Rechnitz as he sought to explain, obscure, and cover up his crimes. (Pars 40-47).

14

Rechnitz then importuned Marco to not expose his frauds, sending him the following text messages among others:

On January 22, 2020:

> "I'm at my cousin lawyer and cousin still getting everything sorted out so no noise and no issue I'll see you later still."

Par. 50.

On January 22, 2020:

> "Please confirm the following: They will wait until end of day tomorrow and keep it quiet. Need to know ASAP"

Par. 51.

On January 29, 2020:

> "All I can say is I'm handling things and don't discuss anything with anyone. No updates to people who call you unless it's oved or lazar."

Par. 52.

Rechnitz thereafter continued his coverup, and eventually threatened Marco's lawyer after learning the lawyer was investigating the involvement of Marco's father, Robert, in Marco's fraud scheme. To this end, Rechnitz called Marco at 10:00 pm on March 10, 2020,

> livid that Cohen is "going after his family and his father" threatening him and Anter that unless he receives a letter from Marco and Anter that they will be firing Cohen as their attorney, that Jona will engage in an all out war, "destroy" "rip apart" and "mess and fuck Cohen good" with the State Bar (claiming to have texts that Cohen was his lawyer creating a conflict of interest)…

Par. 79.

Rechnitz then claimed to Marco to be immune from further prosecution because of his informant status:

> Jona brazenly assured Marco that his role as one of the single most important and prolific white collar cooperating witnesses in the recent history of the Southern District of New York, with his working closely with the FBI as an informant, along with the fact that he only received 10 months custody time with 5 months house arrest, that since the FBI needs him as an informant so badly in the New York case that they would never do anything to him no matter what he did, making him immune from any further prosecution….

Par. 79.

## Argument

District courts may grant a new trial pursuant to Fed.R.Crim.P. 33 if "the interests of justice so require." Fed.R.Crim.P. 33(a). The test for whether to grant a new trial based on newly discovered evidence that a witness committed perjury is well-settled:

> Whether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury. With respect to this latter inquiry, there are two discrete standards of review that are utilized. Where the prosecution knew or should have known of the perjury, the conviction must be set aside " 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *Perkins v. LeFevre,* 691 F.2d 616, 619 (2d Cir.1982) (quoting *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976)); *see also Sanders v. Sullivan,* 863 F.2d 218, 225 (2d Cir.1988) (question is whether the jury's verdict "might" be altered); *Annunziato v. Manson,* 566 F.2d 410, 414 (2d Cir.1977). Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is "virtually automatic." *United States v. Stofsky,* 527 F.2d 237, 243 (2d Cir.1975) (citing *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959)), *cert. denied,* 429 U.S. 819, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976). Where the government was unaware of a witness' perjury, however,

> a new trial is warranted only if the testimony was material and "the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Sanders*, 863 F.2d at 226; *see also United States v. Seijo*, 514 F.2d 1357, 1364 (2d Cir.1975) (The test " 'is whether there was a significant chance that this added item, developed by skilled counsel ... could have induced a reasonable doubt in the minds of enough of the jurors to avoid a conviction.' ") (citations omitted).

*United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991). Therefore, if the witness testified perjuriously about a material matter, and the Government knew or should have known of the perjury, reversal is "virtually automatic." *Id.* On the other hand, if the Government is not charged with knowledge of the perjury, a new trial is appropriate only if the perjurious testimony was material and "the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Id.* Under either test, Mr. Seabrook is entitled to relief.

The evidence that Jona Rechnitz was intending, planning, and/or perpetrating new frauds at the very moment he was assuring the jury he had turned over a new leaf and that his cooperation agreement assured his credibility, was not then known to the defense and could not have previously been discovered through the exercise of due diligence. And surely his testimony regarding these matters was material, because they concerned the most significant issue the jury faced: whether to believe Rechnitz – the only witness to claim Mr. Seabrook accepted payment in exchange for encouraging COBA's investment in Platinum Partners – his previous transgressions notwithstanding. And, although the Government asserted that Rechnitz's

testimony in this regard was corroborated by other evidence, all such evidence could reasonably be interpreted as, at the least, not incompatible with innocence; this is clear, among other reasons, from the first trial jury's failure to reach a verdict.

Nor can it reasonably be said that the new evidence is "merely" cumulative of previous evidence casting doubt on Rechnitz's credibility. Surely, Rechnitz came to court with heavy baggage, including his breathtaking history of lies and scams, some of which were eerily similar to what he claimed happened in this case.[5] But the newly discovered evidence does not merely pack additional dirty laundry into that same suitcase; rather, it directly and powerfully undermines Rechnitz's and the Government's claim that his old dirty laundry had been disinfected by the cleansing power of Rechnitz's cooperation agreement.

---

[5] For example, the Court may recall the uncanny resemblance between Rechnitz's claim to have given Mr. Seabrook a $60,000 bribe, which he then "recovered" from Murray Huberfeld, and the ticket scam he concocted and perpetrated against his "good friend" Michael Weinberger. In that flimflam, ticket broker Jason Nissen purchased in bulk Super Bowl tickets for $1.25 million in January 2015, but at Rechnitz's request Nissen agreed to send Weinberger an email falsely stating Nissen paid $3.9 million for the tickets, so Rechnitz could tell Weinberger the deal was for the inflated price. (855-56). They agreed Rechnitz would then falsely tell Weinberger that Rechnitz's father-in-law was investing $100,000 (presumably to give Weinberger a comfort level) and that Rechnitz was himself investing $1.9 million. Rechnitz then parlayed these lies into obtaining a $1.9 million investment from Weinberger, an excess of $650,000 over the actual $1.25 million purchase price for the tickets. Of the illicit profit, $300,000 went to Rechnitz to cover Nissen's prior debt to him and an additional $95,000 also went to Rechnitz as a commission. (857). The balance of $250,000 went to Nissen. *Id.*

The only issue in dispute, therefore, is the effect the new evidence may have had on the jury's deliberations. Undoubtedly, the Government will argue that this new evidence of Rechnitz's trial perjury and continuing criminality would not have altered the verdict because Rechnitz was impeached with a dizzying array of crime and fraud, as indeed he was. The newly discovered evidence, however, struck at the heart of the Government's powerful argument that Rechnitz's previous transgressions did not impair his testimonial veracity because Rechnitz was a man motivated by self-interest and his self-interest now counseled complete honesty and lawfulness, lest he lose the considerable benefits vouchsafed by his cooperation agreement. No other evidence provided the Government this argument.

In *United States v. Wallach*, *supra*, defendant, charged and convicted of fraud in the so-called "Wedtech" case, moved for a new trial after the Government conceded that one of the two principal prosecution witnesses, Guariglia, committed perjury at trial when he testified, pursuant to a cooperation agreement, that he had stopped his compulsive gambling in the summer of 1988 when in fact he was still gambling in 1989. The district court found Guariglia's perjury was not material and did not require the grant of a new trial, regardless of whether the Government knew or should have known of the perjury:

> The testimony was not material: Guariglia's gambling and skimming did not bear on the defendants' guilt or innocence only on Guariglia's credibility. And here, these instances of falsehood would have been merely minor, cumulative additions to the massive

19

mound of discredit heaped upon Guariglia over several days of both direct and cross-examination.

*United States v. Wallach*, 935 F.2d 445, 457 (2d Cir. 1991).

The Second Circuit disagreed, finding that, regardless whether the Government knew of the perjury, a new trial was required. In so holding the Court drew upon its previous holding, in *United States v. Seijo*, 514 F.2d 1357 (2d Cir. 1975), explaining:

> In *Seijo,* a cooperating witness, when asked on cross-examination whether he had ever been convicted of a drug offense, answered untruthfully that he had never been convicted of such an offense. Although the prosecution had no reason to know that the response was untruthful at the time it was given, we, nevertheless, reversed the defendant's conviction. In so doing, we emphasized that despite the presence of other impeaching material during the trial the disclosure of the witness' false statement would have had a tremendous impact on the jury's credibility assessment of the witness. *Id.*

*United States v. Wallach*, 935 F.2d at 458 (footnote omitted). The facts before the court in *Wallach*, the Second Circuit held, required a similar conclusion to that reached in *Seijo*:

> In the instant case, the district court found the evidence of Guariglia's perjury inconsequential because it was merely cumulative, providing one more basis for challenging Guariglia's credibility. In Seijo, we rejected this same reasoning. We noted that the witness had been subjected to direct and cross-examination and that he had admitted cooperating with the government, using opium, and being addicted to and selling heroin. Despite these admissions, we concluded that his denial of a prior marijuana conviction had 'a different and more serious bearing. In this aspect, it cannot be said to constitute merely cumulative impeaching material." Id. at 1363 (emphasis added). As we emphasized: 'The taint of [the]false testimony is not erased because his untruthfulness affects only his credibility as a witness. 'The jury's estimate of the truthfulness and reliability of a given witness may well be

determinative of guilt or innocence.' "Id. at 1364 (quoting Napue, 360 U.S. at 269 , 79 S.Ct. at 1177).

*Id.*

In language that can be applied, nearly word-for-word, to the instant case,

the *Wallach* court concluded:

> Applying that analysis here, we conclude as a matter of law that had the jury been aware of Guariglia's perjury it probably would have acquitted the defendants. Guariglia's false testimony regarding his gambling directly calls into question the veracity of the rest of his statements. Guariglia's testimony was essential to the government's case; indeed, he tied all the pieces together. And, as we have emphasized, he was the only witness who the jury was led to believe had undergone a radical moral transformation. Moreover, the government through its redirect and in its closing argument made much of Guariglia's motive for telling the truth. One of the prosecutors stated in closing:
>
> > The government submits to you that Mr. Moreno and Mr. Guariglia are credible witnesses and you should credit their testimony for a number of reasons. First of all, they have confessed to their crimes, they have admitted their crimes, and they have pleaded guilty to serious felony counts. They entered into cooperation agreements with the government and those agreements are in evidence....
> >
> > You heard the terms of those agreements when they testified. If they perjured themselves, if they give false testimony in this trial, then the deal is off. They can be prosecuted for every crime they committed and everything they have said in interviews with the U.S. Attorney's office and every trial they have testified in their testimony can be used against them. *That I submit gives them a powerful motive to tell the truth when they testified at this trial.*

*Id.* 935 F.2d at 458–59 (2d Cir. 1991) (emphasis in original).

The reasoning behind the court's conclusion in *Wallach* – that the jury would probably have acquitted Wallach had it known of Guariglia's lies – applies

equally, if not more forcefully, to Jona Rechnitz's false testimony that his cooperation agreement was keeping him honest when the evidence strongly suggests he was, at that very moment, planning additional frauds through his newly incorporated company, Janelle: Rechnitz's testimony, like Guariglia's was "essential to the government's case; he "tied all the pieces together"; he was "the only witness who the jury was led to believe had undergone a radical moral transformation"; and "the government through its redirect and in its closing argument made much of Guariglia's motive for telling the truth." In fact, the instant facts are even more compelling than those in *Wallach*. For one thing, in *Wallach*, Guariglia was only one of *two* essential witnesses, the other being Mario Moreno, whereas here, Rechnitz was unquestionably the principal witness against Mr. Seabrook. The Government underscored this point in its brief on appeal before the Second Circuit, arguing that any error in admitting the evidence of COBA's bankruptcy and loss was harmless because the jury "necessarily" relied on Rechnitz's testimony to convict Mr. Seabrook:

> Even if the evidence of loss should not have been admitted, any such error was harmless. … By contrast, the most significant evidence—on which the jury *necessarily* relied in reaching a verdict of guilt —was the firsthand account of Seabrook's accomplice, Rechnitz, who brokered and facilitated the bribe. As an eyewitness, co-conspirator, and firsthand facilitator of the bribe payment, Rechnitz was the key to the case by virtue of his role in the fraud and the directly probative nature of his extensive testimony concerning the conspiracy.

Gov't Brief at 43 (emphasis in original).

And whereas in *Wallach*, Guariglia's lies concerned a single issue – his continued gambling – here, Rechnitz hid the fact that he was embarking on the

next phase of his massively crime-infested life even as he was assuring the jury – with the Government's cheerleading – that his cooperation agreement all but guaranteed his honesty. *Cf. United States v. Karlov*, 534 Fed.Appx. 38, 40 (2d Cir. 2013) (court affirms denial of defendant's new trial motion based on witness's perjury, noting "[i]n contrast to [*Wallach*], Shapovalov did not claim to have 'undergone a moral transformation,' nor did the government so suggest.").

Moreover, we believe the revelations that have thus far come to light of Rechnitz's continuing criminality expose merely the tip of the proverbial iceberg and that the FBI's investigation, along with discovery in the pending civil fraud cases, and in anticipated additional cases, will shed further light on the Government's one-man crime wave. And although not necessary to deciding this case – as a new trial should be ordered regardless of which *Wallach* standard is applied – it appears quite likely that the Government failed sufficiently to monitor Rechnitz's conduct during his period of cooperation. After all, his lengthy history of massive fraud, combined with his cleverness and lack of moral compass counseled extreme caution and thorough monitoring; what was Janelle and why did he incorporate it? What were his motives in courting the rich and famous on Facebook, Instagram and elsewhere? What deals was he engaging in and what controls did the Government put in place to monitor his activities as he used other people's money and jewelry to enrich himself? Rechnitz had shown himself to be an uncommon criminal who needed to be watched like a hawk; instead, the Government, so obviously enamored with him, and perhaps

consciously avoiding learning the truth, instead watched him with Mr. Magoo eyes.

And, if the Government now argues that it did not – and could not – have known that its star witness was planning to continue his life of crime even as he was testifying his criminal life was behind him, how could the jury not have been similarly taken in by him? Indeed, in its presentencing memorandum, the Government waxed rhapsodic about its hero, moving under Section 5K1.1 "with particular enthusiasm," because Rechnitz "has adhered to his end of an agreement with the Government that requires him to be truthful and law abiding at all times," and comparing him favorably with other cooperators who received sentences of time served. *See United States v. Jona Rechnitz,* 16-cr-389 (Doc 70).

## Conclusion

For all these reasons, the Court should order (1) the Government to provide the Court and defense counsel a thorough update of its investigation; and (2) order or authorize the additional discovery requested herein. It should then grant Mr. Seabrook's motion for a new trial.

Dated: April 28, 2020

Respectfully submitted,

_____

Richard Levitt
LEVITT & KAIZER
40 Fulton Street, 23rd Floor
New York, New York 10038
(212) 480-4000
rlevitt@landklaw.com
*Attorneys for Norman Seabrook*