UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
                                                               :
UNITED STATES OF AMERICA,                                      :    **ORDER DENYING MOTION**
                                                               :    **FOR A NEW TRIAL**
   -against-                                      :
                                                               :    16 Cr. 467 (AKH)
NORMAN SEABROOK,                                               :
                                                               :
                               Defendant. :
                                                               :
-------------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

        Defendant Norman Seabrook was convicted, following a jury trial, of one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, and one count of wire fraud in violation of 18 U.S.C. §§ 1343, 1346.  *See* Judgment, ECF No. 298.  Seabrook now moves for a new trial pursuant to Federal Rule of Criminal Procedure 33, contending that Jona Rechnitz, a government witness critical to securing Seabrook's conviction, perjured himself at the trial.  *See* New Trial Mtn., ECF No. 317.  Because there is no evidence that Rechnitz perjured himself at trial, Seabrook's motion is denied.  Seabrook's request for additional discovery is also denied.

## Factual Background

   A. <u>The Charges and Trials</u>

        On July 7, 2016, Seabrook and non-party co-defendant Murray Huberfeld were charged with conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 1349, and honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346.  *See* Indictment (July 7, 2016), ECF No. 10.  The Indictment alleged that Seabrook, the then-president of the Correction Officers Benevolent Association ("COBA"), directed COBA's funds into "Platinum Partners," a hedge-fund managed by Huberfeld, in exchange for a bribe from Platinum Partners.  *See id.* at ¶¶

12-20. The Indictment described Rechnitz—albeit without naming him—as orchestrating the kick-back scheme and facilitating one of the agreed-upon bribery payments. *See id.*

Seabrook and Huberfeld were tried jointly before Judge Andrew L. Carter from late October to early November 2017. *See* ECF Nos. 142-177. That trial ended in a hung jury. *See* Trial Tr. (Nov. 16, 2017), ECF No. 176, at 2142:8-12. I was assigned in December 2017 to conduct the re-trial. In May 2018, Huberfeld pled guilty to a superseding information that dropped the substantive wire fraud offense, *see* Huberfeld Plea Tr., ECF No. 203; Superseding Inf. (May 25, 2018), ECF No. 201, at 1-2.[1]

Seabrook was re-tried, alone, from August 1 to August 15, 2018. *See* ECF Nos. 236-253. The prosecution's case prominently featured testimony from Rechnitz, a cooperating witness. Rechnitz's testimony, which took place over the course of several days and occupies over four-hundred pages of the trial transcript, was the only direct evidence that Seabrook had accepted a $60,000 cash bribe. *See* Trial Tr. (Aug. 7-9, 2018), ECF Nos. 242, 244, 246. Given his centrality to the prosecution's case, Rechnitz's credibility became a key issue at trial.

Rechnitz has an extensive history of fraudulent conduct, a history highlighted at trial by both the prosecution and defense. On direct examination, for example, the government elicited testimony from Rechnitz describing instances in which he had lied to law enforcement officials, Trial Tr. (Aug. 7, 2018), ECF No. 242, at 555:4-5; failed to report certain income, *id.* at 555:11-14; fostered illegal relationships with members of the New York City Police Department, *id.* 555:25-556:1; bribed New York police officers in exchange for various illegal privileges, *id.* at 575:19-22, 579:1-12; bribed New York politicians in order to secure access and the promise of

---

[1] A superseding indictment was filed with respect to Seabrook as well, containing the same factual allegations but adding a new count for wire fraud ("Count Three"). *See* Superseding Ind., ECF No. 194 (May 17, 2018). Count Three was dismissed before Seabrook's second trial. *See* Order, ECF No. 219.

future benefits from said politicians and their staffs, Trial Tr. (Aug. 8, 2018), ECF No. 244, at 601:13-605:16; violated election laws by fundraising by way of "straw donors," *id*. 609:12-16; procured a police chaplaincy despite not having religious credentials, and solely for purposes of obtaining the prestige and privileges associated with that title, *id*. at 614:11-616:19; and lied about owning certain properties in order to impress others, *id*. at 626:10-12.

Likewise, on cross examination, the defense elicited testimony from Rechnitz detailing instances in which Rechnitz reported a $59,000 watch lost, received proceeds from his insurance to cover the loss, found the watch, and did not notify his insurance company, *id*. at 762:14-764:20; fraudulently obtained an insurance policy for his family, *id*. 765:7-767:19; submitted false documents in a firearm application, *id*. at 781:5-14; pretended to hold no interest in a real estate property (when in fact he did hold an interest) to deceive the property's tenant in a purchase negotiation, *id*. 783:12-784:15; gave Christmas presents and jewelry to the family of a police officer in exchange for a private police escort to the airport and a dedicated private lane in a crowded tunnel, *id*. at 788:17-791:1; and had even invoked the fact that his grandparents were Holocaust survivors to mislead FBI investigators in their investigation of his illegal relationships with police officers, *id*. at 791:17-792:16.

Ultimately, however, the government argued to the jury that once Rechnitz decided to cooperate with the investigation of Seabrook in the spring of 2016, Rechnitz was truthful from that time on. To this end, the government elicited testimony from Rechnitz as to his decision to cease further misconduct. *See, e.g.,* Trial Tr. (Aug. 7, 2018) at 559:9-10 ("I made a decision that I felt the only way to get out of this situation was to come clean"); Trial Tr. (Aug. 9, 2018) ("Once it was time to come clean, I did not lie."). And Rechnitz testified at length that

he had entered a written cooperation agreement with the government, promising not to lie or commit further crimes:

> Q: Now were you truthful with the United States government from [spring of 2016] on?
>
> A: Yes.
>
> Q: Have you been truthful with the government since that point?
>
> A: Yes.
>
> Q: Are you testifying today, Mr. Rechnitz, pursuant to an agreement with the government?
>
> A: Yes, I am.
>
> ….
>
> Q: Under your written agreement with the government, what is it that you're expected to do? What's your understanding of that?
>
> A: I'm supposed to assist the government when called upon to testify, I'm supposed to commit no further crimes,[2] and I'm supposed to tell the truth.
>
> ….
>
> Q: Mr. Rechnitz, … what is your understanding of what happens if you fulfill your obligations under the cooperation agreement that we have been referring to?
>
> A: That the government will submit a 5K letter to my sentencing judge.
>
> Q: What do you understand a 5K letter to be?
>
> A: A letter which will, in addition to describing all of my past conduct, discuss my level of cooperation with the government.
>
> ….
>
> Q: What's your understanding, Mr. Rechnitz, of what will happen if you do not fulfill your obligations under the agreement?

---

[2] The cooperation agreement explicitly provides that Rechnitz "shall commit no further crimes." Trial Tr. (Aug. 7, 2018) at 562:2-3.

>    A: That I will not receive the 5K, it will be figuratively ripped up, and I can face further charges if I lie, including obstruction of justice.

*Id*. at 560:8-563:21.

At summation, the government asked rhetorically, "Why should you believe Jona Rechnitz?", and offered the following answer:

>    So ladies and gentlemen, the testimony of Jona Rechnitz is clear, it's unambiguous, and it's incredibly damning. So why should you believe him? Why should you believe Jona Rechnitz? You should believe Jona Rechnitz, first of all, because he has to tell the truth. The defense has gone through a lot of trouble over the course of this case of painting Mr. Rechnitz to be somebody who looked out for himself above all costs, that Jona Rechnitz was always in it for Jona. That Jona Rechnitz[, in] other words, was a creature of incentive. Well, ladies and gentlemen, what are his incentives now? Let's assume that's true. What are Jona Rechnitz's incentives?
>
>    Well, you know what his incentives are because you know about the cooperation agreement he has with the government and Mr. Rechnitz's understanding of that cooperation. And Mr. Rechnitz told you if he doesn't fulfill his obligations, if he lies while testifying on the stand he will not receive the 5K, it will be figuratively ripped up, and I can face further charges if I lie, including obstruction of justice. Ladies and gentlemen, if Jona Rechnitz is looking out for Jona Rechnitz, he tells the truth.
>
>    ….
>
>    And think about this, ladies and gentlemen, Mr. Rechnitz told you why it was that he started to cooperate with the government. He started to cooperate with the government after going through several rounds of interviews in which he lied, because he could tell the questions were getting smarter, he didn't know what the government knew, but it seemed to be [a lot]. To lie, ladies and gentlemen, against the backdrop of a government investigation whose contours you don't know, but an investigation that seems to have figured out a lot, it wouldn't make sense. It would be a massive and scary and irrational risk. Jona Rechnitz, ladies and gentlemen, testified in a manner I submit that suggested that he wasn't willing to take that risk, that all of his incentives were lined up in favor of his telling the truth.

Trial Tr. (Aug. 13, 2018), ECF No. 249, at 1098:12- 1100:5.

On August 15, 2018, the jury returned a unanimous verdict, finding Seabrook guilty on both charges. *See* Trial Tr. (Aug. 15, 2018), ECF No. 256, at 1323:5-10. On February

5

8, 2019, I sentenced Seabrook to 58 months' imprisonment, three years' supervised release, and $19,000,000 in restitution, owed jointly and severally with Huberfeld.[3] *See* Sentencing Tr. (Feb. 8, 2019), ECF No. 302; Judgment at 2-7.

 B. Post-Trial Developments

In the early months of 2020, a number of civil suits were filed in California state and federal court, accusing Rechnitz of engaging in fraudulent conduct. The complaints in these suits allege that Rechnitz borrowed $2,850,000 in January 2019, later fraudulently convinced the lender to release the loan collateral, and then liquidated the collateral without repaying the loan, *see generally Noval v. Rechnitz, et al.*, 20SMCV00216 (Superior Ct. Los Angeles) (filed Feb. 10, 2020); that Rechnitz fraudulently induced a victim into making a loan of around $1.6 million in June 2019, with no intent to repay the lender, *see generally Gorodistian v. Jadelle Jewelry et al.*, 20STCV07425 (Superior Ct. Los Angeles) (filed Feb. 20, 2020); and that Rechnitz tricked a victim into consigning him nearly $7 million of jewelry in October 2019 by falsely indicating that he had buyers lined up, when in fact he had liquidated the jewelry for his own purposes, *see generally Voutsas, et al. v. Rechnitz, et al.*, 20 Civ. 2580 (C.D.C.A.) (filed Apr. 14, 2020).[4] In a separate proceeding, Jadelle Jewelry and Diamonds, LLC, the corporate vehicle through which Rechnitz is alleged to have perpetrated his frauds, became the subject of involuntary bankruptcy proceedings in April 2020. *See generally Jadelle Jewelry & Diamonds, LLC*, 20 Bk. 13530 (C.D.C.A.) (filed Apr. 6, 2020).

---

[3] Seabrook timely appealed from his sentence and conviction on February 22, 2019. *See* Notice of Appeal (Feb. 22, 2019), ECF No. 299. The appeal has since been briefed and argued before the Second Circuit; however, in light of the instant motion, the Second Circuit has held the appeal in abeyance pending resolution of Seabrook's request for a new trial. *See* Gov't Opp. Mem. at 1 n.1.

[4] The complaints in *Noval*, *Gorodistian*, and *Voutsas*, are attached to the declaration of Richard Levitt, submitted in connection with this motion. *See* Levitt Decl., ECF Nos. 320-1 (the "*Noval*" Complaint"), 320-2 (the "*Gorodistian* Complaint"), 320-3 (the "*Voutsas* Complaint").

Meanwhile, as confirmed by the government's sealed representations, *see infra*, the FBI in Los Angeles in conjunction with the U.S. Attorney's Office for the Central District of California opened an investigation of Rechnitz pertaining to several possibly fraudulent business transactions undertaken by Rechnitz and his associates in the Log Angeles area.

## Procedural History

Seabrook filed the instant motion on April 28, 2020. *See* New Trial Mtn.; Def. Mem., ECF No. 319. The government filed its opposition papers on May 11, 2020. *See* Gov't Opp. Mem., ECF No. 322. On May 15, I issued an order, filed under seal and viewable only by the government to avoid interference with any ongoing investigation of Rechnitz, ordering the government to make an informed representation whether, through the investigation or otherwise, the government had learned of misconduct by Rechnitz in November 2018 or earlier (during the period of his testimony at Seabrook's trial and three months after). The government responded on May 20, representing that no criminal conduct by Rechnitz in or before November 2018 had been uncovered or was known. I ordered the government to provide a further update to the Court if it learned of additional relevant information. *See* Order Regulating Proceedings, ECF No. 324. Seabrook's motion for a new trial became fully briefed as of May 18, *see* Def. Reply Mem., ECF No. 323, and oral argument was heard on June 11, at which time the government represented that no new facts have emerged in the California investigation.

## Discussion

Federal Rule of Criminal Procedure 33 provides that a court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A motion for a new trial "based on newly discovered evidence is 'not favored,'" and accordingly a court "'must exercise great caution'" and may grant the motion "'only *in the most extraordinary*

7

*circumstances.*'" *United States v. Diaz*, 176 F.3d 52, 106 (2d Cir. 1999) (quoting *United States v. Spencer*, 4 F.3d 115, 118 (2d Cir. 1993)).

When "newly discovered evidence indicates that perjured testimony was given at trial, the effect of such evidence on the verdict depends on whether the prosecution was aware of that perjury." *Id.* If the prosecution "knew or should have known" of the perjury, the court must grant a new trial if it finds "that new evidence might alter the verdict of the jury." *Id.* (quotation marks omitted). On the other hand, if the prosecution was "unaware of the perjury, a new trial is warranted if the court is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Id.* (quotation marks omitted).

Any defendant "claiming that his conviction should be reversed based upon allegations of perjured testimony must show," first and foremost, that "'the witness actually committed perjury.'" *United States v. Walters*, 910 F.3d 11, 29 (2d Cir. 2018), *cert. denied*, 140 S. Ct. 117 (2019) (quoting *United States v. Zichittello*, 208 F.3d 72 (2d Cir. 2000)); *see United States v. Stewart*, 433 F.3d 273, 297 ("'[W]hen the newly discovered evidence focuses on the perjury of a witness, a threshold inquiry is whether the evidence demonstrates that the witness in fact committed perjury.'") (quoting *United States v. White*, 972 F.2d 16, 20 (2d Cir. 1992)).

Seabrook argues that Rechnitz perjured himself by testifying to his compliance with the cooperation agreement's bar against further criminality, while concurrently "intending, planning, and/or perpetrating new frauds," as evidenced by the California civil suits and ongoing government investigation. Def. Mem. at 17. In making this argument, Rechnitz relies heavily on *United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991). *See* Def. Mem. at 19-23.

In *Wallach*, the defendants, after being tried in June 1989 on racketeering charges and convicted, moved for a new trial on the grounds that one of the two primary government

8

witnesses perjured himself on the stand. *See* 935 F.2d at 455. The witness, Guariglia, testified pursuant to a cooperation agreement with the government and, along with the other cooperator, "offered the only testimony that directly linked the defendants with the admittedly illegal conduct." *Id*. And, at the least, "their testimony was … critical to the government." *Id*.

On direct examination, Guariglia testified that he had ceased his compulsive gambling habit, and that he had not gambled between the summer of 1988 and the time of the trial in June 1989. *See id*. After the trial, the government learned that Guariglia's testimony was untrue and that Guariglia had gambled in October 1988, and indicted Guariglia of perjury. *See id*. In or around December 1989, the government notified Wallach's counsel of Guariglia's perjury, and defendants moved for a new trial. *See id*. at 455-56.

The district court denied the motion, reasoning that Guariglia's

> testimony was not material: Guariglia's gambling and skimming did not bear on the defendants' guilt or innocence only on Guariglia's credibility. And here, these instances of falsehood would have been merely minor, cumulative additions to the massive mound of discredit heaped upon Guariglia over several days of both direct and cross-examination.

*Id*. at 457.

The Second Circuit disagreed. The Court held that the perjury required reversal under either formulation of the *Wallach* test, that is, whether or not the government was aware of the false testimony. In reaching this holding, the Court returned several times to the fact that the government held up Guariglia as (a) having left behind his gambling addiction, and (b) having a powerful incentive to testify truthfully pursuant to his cooperation agreement:

> Guariglia was the centerpiece of the government's case. Had it been brought to the attention of the jury that Guariglia was lying after he had purportedly undergone a moral transformation and decided to change his ways, his entire testimony may have been rejected by the jury. It was one thing for the jury to learn that Guariglia had a history of improprieties; it would have been an entirely

different matter for them to learn that after having taken an oath to speak the truth he made a conscious decision to lie. ….

Even assuming that the government had no knowledge of the perjury at the time of trial, we believe that reversal would still be warranted. The government acknowledges that it received additional information concerning the falsity of Guariglia's testimony in December 1989, months after the trial's conclusion. …. This additional information in itself provides a sufficient basis for granting the defendants a new trial.

….

In *Seijo*,[5] a cooperating witness, when asked on cross-examination whether he had ever been convicted of a drug offense, answered untruthfully that he had never been convicted of such an offense. Although the prosecution had no reason to know that the response was untruthful at the time it was given, we, nevertheless, reversed the defendant's conviction. In so doing, we emphasized that despite the presence of other impeaching material during the trial the disclosure of the witness' false statement would have had a tremendous impact on the jury's credibility assessment of the witness.

In the instant case, the district court found the evidence of Guariglia's perjury inconsequential because it was merely cumulative, providing one more basis for challenging Guariglia's credibility. In *Seijo*, we rejected this same reasoning. We noted that the witness had been subjected to direct and cross-examination and that he had admitted cooperating with the government, using opium, and being addicted to and selling heroin. Despite these admissions, we concluded that his denial of a prior marijuana conviction had 'a different and more serious bearing. In this aspect, *it cannot be said to constitute merely cumulative impeaching material*.' *Id*. at 1363 (emphasis added). As we emphasized: "The taint of [the] false testimony is not erased because his untruthfulness affects only his credibility as a witness. 'The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence.'" *Id*. at 1364 (quoting *Napue*, 360 U.S. at 269[6] …).

….

[H]ere, we conclude as a matter of law that had the jury been aware of Guariglia's perjury it probably would have acquitted the defendants. Guariglia's false testimony regarding his gambling directly calls into question the veracity of the rest of his statements. Guariglia's testimony was essential to the government's case; indeed, he tied all the pieces together. And, as we have emphasized, he was the only witness who the jury was led to believe had undergone a radical moral

---

[5] *See United States v. Seijo*, 514 F.2d 1357 (2d Cir. 1975).

[6] *See Napue v. Illinois*, 360 U.S. 264 (1959).

> transformation.  Moreover, the government through its redirect and in its closing argument made much of Guariglia's motive for telling the truth.  One of the prosecutors stated in closing:
>
>> The government submits to you that … Guariglia [is a] credible witness[] and you should credit [his] testimony for a number of reasons.  First of all, [he has] confessed to [his] crimes, and [he has] pleaded guilty to serious felony counts.  [He] entered into [a] cooperation agreement[] with the government and th[at] agreement[ is] in evidence….
>>
>> You heard the terms of the[] agreement[] when [he] testified.  If [he] perjured [himself], if [he] gave false testimony in this trial, then the deal is off.  [He] can be prosecuted for every crime [he] committed and everything [he has] said in interviews with the U.S Attorney's office and every trial [he has] testified in [his] testimony can be used against [him].  *That I submit gives them a powerful motive to tell the truth when they testified at this trial*.
>
> (emphasis added).  While vouching for a witness' credibility alone is not ordinarily a basis for reversal, these comments provide one more reason to set aside the jury's verdict.

*Id*. at 457-59 (all emphases in *Wallach*).

There are a number of similarities between *Wallach* and this case.  Both Rechnitz and Guariglia were important government witnesses that tied the prosecution together; both were held up by the government, including as a prominent feature of its summation, as being worthy of belief in part due to their cooperation agreements; both were subjected to questioning that exposed their extensive histories of illegal conduct; and the credibility of both was hotly debated by the prosecution and defense.

But there is a key distinguishing difference:  In *Wallach*, perjury was proven.[7] Here, even assuming *arguendo* the truth of the allegations in the California civil matters and that

---

[7] The presence or absence of perjury has proven decisive in other cases applying *Wallach*'s framework.  *See, e.g.*, *Zichettello*, 208 F.3d at 102 ("Appellants' claim fails because they have not established that Montoro committed perjury."); *Walters*, 910 F.3d at 29 (affirming the denial of a new trial in part because the alleged perjury was "likely the result of misremembering or confusing the circumstances rather than lying").  Indeed, in *Wallach*, the perjury

11

the investigation of Rechnitz will uncover other frauds, there is no evidence that any misconduct was contemplated or undertaken by Rechnitz at or around the time he testified in Seabrook's trial. Seabrook's argument that Rechnitz's alleged misdeeds in 2019 and 2020 were planned, or even contemplated, at the time he testified in August 2018, is speculative. Ordering a new trial based on speculation would be inconsistent with the "great caution" courts must exercise when deciding Rule 33 motions, *see Diaz*, 176 F.3d at 106 (quotation marks omitted). Because I am unpersuaded that Rechnitz perjured himself, and therefore unpersuaded that Seabrook was wrongly convicted on the basis of perjured testimony, the "interests of justice" do not call for a new trial, *see* Fed. R. Crim. P. 33(a).

Seabrook concedes that the "pending civil fraud complaints concern conduct that occurred after Rechnitz testified at Mr. Seabrook's trial," but argues that "the nature and extent of the alleged conduct is such that he likely was committing crimes during the lead-up to … trial, and the trial itself." Def. Mem., ECF No. 319, at 2. Seabrook argues that "the revelations that have thus far come to light of Rechnitz's continuing criminality expose merely the tip of the proverbial iceberg and that the FBI's investigation, along with discovery in the pending civil fraud cases, and in anticipated additional cases, will shed further light on the [Rechnitz]'s one-man crime wave." *Id*. However, Seabrook admits that he does "not yet know with absolute certainty" whether or not Rechnitz was "contemplating, planning, and/or perpetrating" the conduct alleged in the civil suits before or during the August 2018 trial. *See* Def. Reply Mem. at 3. Acknowledging that the allegations of frauds by Rechnitz after he testified are not evidence of frauds or criminality by Rechnitz at the time he testified in August 2018, Seabrook points to two acts taken by Rechnitz prior to the trial, incorporating his jewelry company, Jadelle, and

---

was conceded by the government. *See* 445 F.2d at 455 ("The government concedes that Guariglia committed perjury.").

12

promoting Jadelle on social media, *see* Def. Mem. at 23.  These acts of normal commerce tell us nothing.[8]  Seabrook's arguments are speculative.  His Rule 33 motion presents no evidence of perjury by Rechnitz.

Seabrook, acknowledging the absence of evidence, requests "additional discovery" or an "appropriate hearing" to further investigate the specifics of Rechnitz's conduct.  *See* Def. Mem. at 25; Def. Reply Mem. at 19.  Seabrook stated at oral argument that the *Jadelle* bankruptcy action has ordered depositions, and asks that I wait to see if the depositions disclose relevant information.  *See* Oral Arg. Tr. (June 11, 2020).

Neither discovery nor a hearing is appropriate.  Seabrook's claims of Rechnitz's misconduct are either insufficiently specific, or insufficiently substantiated, or insufficiently tied to the relevant time period to convince me that suspending this matter for an indefinite period for "further investigation" will "very likely lead to the discovery" of Rechnitz having perjured himself, *United States v. Velarde*, 485 F.3d 553, 560 (10th Cir. 2007); *see, e.g., United States v. Williams*, No. 02 Cr. 1372, 2017 WL 3613661, at *2 (S.D.N.Y. Aug. 21, 2017) ("Discovery is available … only upon a showing of *good cause* which requires the petitioner to present *specific allegations* that give the Court reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief.") (emphases added) (quotation marks and alterations omitted).

In effect, what Seabrook seeks is more time, hoping that depositions, or investigations, or other proceedings will turn up evidence of earlier wrongdoing by Rechnitz.

---

[8] Seabrook's claim that a theft of jewelry from his car shows his complicity is no better evidence.  The argument makes its debut appearance in his reply brief, and is therefore, at the least arguably, forfeited, *Fisher v. Kanas*, 487 F.Supp.2d 270, 278 (E.D.N.Y. 2007), *aff'd* 288 F. App'x 721 (2d Cir. 2008) Def. Reply Mem. at 6.  Seabrook hypothesizes that Rechnitz staged the theft of jewelry from his car to make an insurance claim but admitted in oral argument that he has no evidence of an insurance claim, or an investigation by an insurance company, or a recovery of insurance by Rechnitz.

Meanwhile, Seabrook's appeal will remain on hold and uncertainty will be cast on the pending appeals of Seabrook's co-conspirators, Huberfeld and Rechnitz.  Meanwhile, the New York City corrections officers, the victims of the conspiracy orchestrated by Seabrook, Huberfeld, and Rechnitz, will have to continue to await full restitution.

Rule 33 favors finality of criminal judgments, and the absence of any concrete evidence here excludes Seabrook's motion from the "rare class of cases" in which discovery in furtherance of a Rule 33 motion is called for, *see Velarde*, 485 F.3d at 553.

## Conclusion

Seabrook's motion is denied.  The Clerk instructed to terminate the open motion (ECF No. 317).

SO ORDERED.

Dated:	June 15, 2020	_____/s/_____
	New York, New York	ALVIN K. HELLERSTEIN
	United States District Judge